# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| FREEDOM PATH, INC. ~~Cogency Global~~ ~~1601 Elm St., Ste. 4360~~ ~~Dallas, TX 75201~~ _.._ | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) )- |
|  | ) |
| INTERNAL REVENUE SERVICE ~~1111 Constitution Ave., N.W.~~ ~~Washington, D.C. 20004~~ | ) ) ) ) |
| ~~CHARLES P. RETTIG,~~ ~~COMMISSIONER OF THE~~ ~~INTERNAL REVENUE SERVICE~~ ~~1111 Constitution Ave., N.W.~~ ~~Washington, D.C. 20004~~ | ) ) ) ) ) ) |
| ~~DEPARTMENT OF THE TREASURY~~ ~~United States Department of the~~ ~~Treasury,~~ ~~1500 Pennsylvania Ave., N.W.~~ ~~Washington, D.C. 20220~~ | ) ) ) ) ) ) |
| ~~STEVEN MNUCHIN,~~ ~~SECRETARY OF THE TREASURY~~ ~~United States Department of the~~ ~~Treasury,~~ ~~1500 Pennsylvania Ave., N.W.~~ ~~Washington, D.C. 20220~~ | ) ) ) ) ) ) ) |
| ~~and~~ | ) ) |
| ~~UNITED STATES OF AMERICA~~ ~~Serve:~~ ~~The Honorable William Barr~~ ~~Attorney General of the United States~~ ~~of America~~ | ) ) ) ) ) |

Civil Case No. 20-1349 (KBJ)

~~950 Pennsylvania Ave., NW~~ )
~~Washington, D.C. 20530~~, et al., )
)
          Defendants. )
_____ )

### FREEDOM PATH, INC.'S FIRST AMENDED COMPLAINT
### FOR DECLARATORY ~~AND INJUNCTIVE~~ RELIEF

Plaintiff Freedom Path, Inc. ("Freedom Path") brings this action and complains as follows:

### NATURE OF THE ACTION

1.    ~~This lawsuit raises, among other things, both a facial challenge and an as-applied challenge to the constitutionality of the "facts and circumstances" test adopted by the Internal Revenue Service ("IRS") in its Revenue Ruling 2004-6 (the "Facts and Circumstances Test"). The 11-factor Facts and Circumstances Test was expressly used by the IRS to evaluate Freedom Path's speech—as well as many others'—and it was used to justify the denial of~~ Freedom Path seeks a declaration under 26 U.S.C. § 7428 that the Internal Revenue Service ("IRS") improperly denied Freedom Path's IRS Form 1024 Application for Recognition of Exemption under § 501(a) ("Application for Exemption") as a ~~26 U.S.C. § 501(c)(4) organization.~~ § 501(c)(4) organization. In denying Freedom Path's application for § 501(c)(4) status, the IRS expressly applied the "facts and circumstances" test previously adopted by the IRS in its Revenue Ruling 2004-6 (the "Facts and Circumstances Test"). This 11-factor Facts and Circumstances Test is how the IRS evaluates whether advocacy communication constitutes issue advocacy or political campaign intervention. As confirmed by this Test's application to Freedom Path's speech, the Facts and Circumstances Test is unconstitutionally vague and violates the First Amendment.

2.     There is no constitutional or objective way to administer a test as vague and subjective as the Facts and Circumstances Test. Because of its constitutional failings, ~~it~~the Facts and Circumstances Test causes nonprofit organizations such as Freedom Path to limit their associations and self-censor their public communications—constitutional harms that cannot and should not be allowed. The Facts and Circumstances ~~Test, and its~~Test's application in this case~~,~~ is a textbook example of an unconstitutionally vague law. *See Thomas v. Collins*, 323 U.S. 516, 535 (1945) (vague tests place the speaker wholly at the mercy of the varied understandings of hearers). ~~The~~Moreover, the Facts and Circumstances ~~Test, and its~~Test's application ~~in this case,~~here also violates the First Amendment's guarantees of free speech and association—especially because it is substantially overbroad. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

3.     These constitutional deficiencies, which result in the self-censorship of nonprofit organizations, ~~necessitate findings~~compel the conclusion that the IRS's Facts and Circumstances Test is: (~~1~~i) an intolerably vague test for administering the Internal Revenue Code in violation of the Fifth Amendment's Due Process Clause and the First Amendment's Free Speech Clause; (~~2~~ii) an unconstitutional burden on the right to free speech under the First Amendment; and (~~3~~iii) a substantially overbroad regulation of speech in violation of the First Amendment.

4.     ~~In addition to the constitutional deficiencies, the IRS's application of the Facts and Circumstances Test here to deny Freedom Path's application for 26 U.S.C. § 501(c)(4) status thereby effectively rendering it a 26 U.S.C. § 527 "political organization" violates the Administrative Procedure Act in many ways. For example, the IRS's decision was contrary to law and was arbitrary and~~

~~capricious.~~Accordingly, Freedom Path is entitled to a declaration under 26 U.S.C. § 7428 that the IRS improperly denied Freedom Path's application for § 501(c)(4) status.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this case under 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 2201 (Declaratory Judgment Act), and 26 U.S.C. § 7428 (Declaratory Judgments Relating to Status and Classification of Certain Organizations).

6. The federal government defendants have waived their sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 2201.

7. Venue is proper in this Court under 26 U.S.C. § 7428 and 28 U.S.C. § 1391(e)(1)(A)-(C).

8. This action is properly brought under 26 U.S.C. § 7428(a) because Freedom Path received a letter from Defendant IRS on February 20, 2020 issuing a final adverse determination that Freedom Path did not qualify for exemption from federal income tax under 26 U.S.C. § 501(a) as an organization described in § 501(c)(4) ("Determination Letter").

9. This action is also properly brought under 26 U.S.C. § 7428(b) because Freedom Path has exhausted the administrative remedies available to it within the IRS by timely taking all ~~reasonably~~reasonable steps to secure a final determination.

10. This Court has personal jurisdiction over Defendants.

## PARTIES

11. Plaintiff Freedom Path is a nonprofit corporation organized under the Texas Business Organizations Code. Freedom Path was formed and operates as a social welfare organization pursuant to 26 U.S.C. § 501(c)(4).

12.     Defendant Internal Revenue Service is an agency of the United States that is responsible for administration and enforcement of provisions of the Internal Revenue Code, as well as other IRS rules, regulations, policies, procedures, and practices.

13.     Defendant Charles P. Rettig is being sued in his official capacity as the Commissioner of Internal Revenue. He serves as the head of the Internal Revenue Service.

14.     Defendant Department of the Treasury is an agency in the Executive Branch of the Federal Government responsible for, among other things, the Internal Revenue Service.

15.     Defendant Steven T. Mnuchin is being sued in his official capacity as the Secretary of the Treasury. He serves as the head of the Department of the Treasury.

16.     The United States of America is a proper defendant pursuant to 5 U.S.C. § 702, 26 U.S.C. § 7431(a), and 28 U.S.C. § 1346(e).

## STATEMENT OF FACTS AND LEGAL BACKGROUND

17.     Freedom Path is a Texas nonprofit corporation formed to promote the social welfare within the meaning of 26 U.S.C. § 501(c)(4). The mission of the organization is to promote and defend the causes that recognize the individual rights and liberties guaranteed to all Americans in the greatest governing document ever conceived: the United States Constitution. Nothing in Freedom Path's organizational documents or in its public statements indicates that Freedom Path has the primary purpose of influencing the results of an election.

**A.     The IRS's Facts and Circumstances Test To Determine Whether Advocacy Communications Constitute Issue Advocacy or Political Campaign Intervention is Vague, Ambiguous, Arbitrary, and Unlawfully Burdens Free Speech.**

20.     The IRS's subjective Facts and Circumstances Test is unlawfully vague, ambiguous, arbitrary, and unconstitutional ~~both facially and as applied to Freedom Path's speech at issue here.~~.

21.     The IRS has even acknowledged the need for "sharper" rules that would afford "greater certainty" to the public and the government. *See* Notice of Proposed Rulemaking: Guidance for Tax-Exempt Social Welfare Organizations on Candidate Related Political Activities, 78 Fed. Reg. 71535, 71536-37 (Nov. 29, 2013).

22.     The IRS has publicly acknowledged that the Facts and Circumstances Test has "created considerable confusion for both the public and the IRS." *Id.* at 72536 ("In addition, '[t]he distinction between campaign intervention and social welfare activity, and the measurement of the organization's social welfare activities relative to its total activities, have created considerable confusion for both the public and the IRS in making appropriate § 501(c)(4) determinations.' The Treasury Department and the IRS recognize that both the public and the IRS would benefit from clearer definitions of these concepts.") (quoting Daniel Werfel, *Charting a Path Forward at the IRS: Initial Assessment and Plan of Action* 28 (June 24, 2013)).

23.     26 U.S.C. § 501(a) states that "An organization described in subsection (c) or (d) . . . shall be exempt from taxation under this subtitle unless such exemption is denied by section 502 or 503." 26 U.S.C. § 501(a).

24.     Section 501(c)(4) provides that an organization may qualify for exemption if it is "not organized for profit but operated exclusively for the promotion of social welfare." ~~26 U.S.C.~~ *Id.* § 501(c)(4). ~~The~~Under longstanding precedent, the IRS has stated that an organization satisfies this standard and is operated exclusively for the promotion of social welfare under § 501(c)(4) if it is "primarily engaged in promoting in some way the common good and general welfare of the people of the community." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i). *See also* Rev. Rul. 81-95, 1981-1 C.B. 332 (stating that an organization must be primarily engaged in activities that promote social welfare).

25.      Section 501(c)(4) organizations include "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes." 26 U.S.C. § 501(c)(4)(A).

26.      As the IRS has previously explained:

> Although the promotion of social welfare within the meaning of section 1.501(c)(4)-1 of the regulations does not include political campaign activities, the regulations do not impose a complete ban on such activities for section 501(c)(4) organizations. Thus, an organization may carry on lawful political activities and remain exempt under section 501(c)(4) as long as it is primarily engaged in activities that promote social welfare.

Rev. Rul. 1981-95, 1981-1 C.B. 332.

27.      In contrast to § 501(c)(4), § 527 of the Internal Revenue Code regulates and covers, as "political organizations," those organizations whose primary purpose is influencing or attempting to influence elections. *See* 26 U.S.C. § 527(e)(1)-(2) ("political organization" means an organization "operated primarily for the purpose" of accepting contributions and making expenditures "for an exempt function"—that is, "influencing or attempting to influence" elections).

28.      Section 527 imposes a tax for each year on the taxable income of every "political organization." *Id.* § 527(b). "Political organization" means "a party, committee, association, fund, or other organization (whether or not incorporated) organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both, for an exempt function." *Id.* § 527(e)(1). An "exempt function" means "the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office or office in a political organization, or the election of

Presidential or Vice-Presidential electors, whether or not such individual or electors are selected, nominated, elected, or appointed." *Id.* § 527(e)(2). "'[C]ontributions' includes a gift, subscription, loan, advance, or deposit, of money, or anything of value, and includes a contract, promise, or agreement to make a contribution, whether or not legally enforceable." *Id.* § 271(b)(2); *see id.* § 527(e)(3). "'[E]xpenditures' includes a payment, distribution, loan, advance, deposit, or gift, of money, or anything of value, and includes a contract, promise, or agreement to make an expenditure, whether or not legally enforceable." *Id.* § 271(b)(3); *see id.* § 527(e)(4).

29.     With respect to the IRS's review process as it relates to the evaluation of an organization's expenses for public communications, the IRS examines the communications to determine whether a given communication constitutes "issue advocacy" (or other social-welfare-related activity) or an expenditure for political campaign intervention that constitutes an "exempt function" under § 527(e)(2).

30.     Crucially, a number of significant practical consequences ~~flow~~result from being ~~deemed~~denied status as a § ~~527 political organization in addition to clear tax consequences.~~ 501(c)(4).

31.     For example, organizations denied § 501(c)(4) status cannot avail themselves of the exemption from the federal income tax unless they secure tax-exempt status under another provision. *See* 26 U.S.C. § 501(a) ("An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle[.]").

32.     Moreover, some States require disclosure of contributions and donors to organizations that do not have § 501(c)(4) status. *See, e.g.*, R.I. Gen. Laws § 17-25.3-1.

33.     Likewise, when the IRS denies an organization § 501(c)(4) status by applying the 11-factor Facts and Circumstances Test, that determination essentially requires that organization to instead operate either as a § 527 political organization or as a for-profit organization.

34.     And a number of significant practical consequences result from being deemed a § 527 political organization.

~~31.~~35.   For example, a § 501(c)(4) organization that is not a "political organization" under § 527 generally benefits from additional tax exemptions compared to a § 527 organization.

~~32.~~36.   Plus, § 501(c)(6) trade associations, § 501(c)(5) labor unions, and other § 501(c)(4) organizations choose whether to associate with, and help fund the speech of, a § 501(c)(4) organization based on whether the potential recipient's tax-exempt status is in good standing. Otherwise, the other organizations, in turn, risk their respective tax-exempt statutes simply by making donations to a group the IRS may soon determine is primarily engaged in "political activity" rather than genuine issue advocacy.

37.     ~~Additionally~~Section "501(c) organizations . . . are not required to publicly disclose their donors." *McCutcheon v. FEC*, 572 U.S. 185, 224 (2014) (citing 26 U.S.C. § 6104(d)(3)).

~~33.~~38.   By contrast, a § 527 political organization is forced to disclose its donors by filing with the Secretary of the Treasury either a series of reports (including pre- and post-election reports) or monthly reports. ~~26 U.S.C~~*Id.* § 527(j)(2)(A)-(B). The contents of these reports must include "[t]he amount, date, *and purpose of each expenditure* made to a person if the aggregate amount of expenditures to such person during the calendar year equals or exceeds $500 and the name and address of the person (in the case of an individual, including the occupation and name of employer of such individual)." *Id.* § 527(j)(2)(3)(A) (emphasis added). In addition, the

organization must disclose "[t]he *name and address* (in the case of an individual, *including the occupation* and name of employer of such individual) of all contributors which contributed an aggregate amount of $200 or more to the organization during the calendar year and the amount and date of the contribution." *Id.* § 527(j)(2)(3)(B) (emphases added).

~~34.~~39.  The Secretary of the Treasury is generally required to disclose— *to the public*— the name and address of any contributor to a § 527 political organization. *See* ~~26 U.S.C~~*Id.* § 6104(b), (d)(3)(A).

~~35.    But "501(e) organizations . . . are not required to publicly disclose their donors." *McCutcheon v. FEC*, 572 U.S. 185, 224 (2014) (citing 26 U.S.C. § 6104(d)(3)).~~

~~36.~~40.  ~~Firms~~Further, firms in the finance industry and many of the employees who work for them are strictly prohibited or severely limited in their ability to make political contributions, including to a group the IRS may soon determine has a "primary purpose" of political activity. *See* 17 C.F.R. § 275 (Securities and Exchange Commission Rules against political contributions by investment advisors); Municipal Securities Rulemaking Board Rule G-37(b).

~~37.~~41.  These significant consequences, among others, of being denied status as a § 501(c)(4) organization and effectively being deemed a § 527 political organization ~~versus a § 501(e)(4) organization~~ and the significant consequences of the IRS's primary purpose analysis ~~to determine both~~ highlight the need for a clear test for determining organizations' primary purposes.

~~38.~~42.  Pursuant to Revenue Ruling 2004-6, however, whether an organization's communication constitutes "issue advocacy" (permissible as a § 501(c)(4)'s primary purpose) or an "exempt function" for influencing elections (triggering § 527 political organization status) is not made with reference to any clearly defined bright-line rules.

39.43.  Instead, this analysis is based on a highly subjective evaluation of all the facts and circumstances of each case. *See* Rev. Rul. 2004-6, 2004-1 C.B. 328, 330 ("All the facts and circumstances must be considered to determine whether an expenditure for an advocacy communication relating to a public policy issue is for an exempt function under § 527(e)(2)."). Revenue Ruling 2004-6 applies to evaluate the political activities of § 501(c)(4), § 501(c)(5), and § 501(c)(6) organizations.

40.44.  Revenue Ruling 2004-6 lists 11 factors to be considered, but very clearly indicates that the list is non-exhaustive:

> In facts and circumstances such as those described in the six situations, factors that tend to show that an advocacy communication on a public policy issue is for an exempt function under § 527(e)(2) *include, but are not limited to, the following*:

a)  The communication identifies a candidate for public office;

b)  The timing of the communication coincides with an electoral campaign;

c)  The communication targets voters in a particular election;

d)  The communication identifies that candidate's position on the public policy issue that is the subject of the communication;

e)  The position of the candidate on the public policy issue has been raised as distinguishing the candidate from others in the campaign, either in the communication itself or in other public communications; and

f)  The communication is not part of an ongoing series of substantially similar advocacy communications by the organization on the same issue.

Rev. Rul. 2004-6, 2004-1 C.B. 328at 330 (emphasis added).

41.45.  On the other hand,

> In facts and circumstances such as those described in the six situations, factors that tend to show that an advocacy communication on a public policy issue is not for an exempt function under § 527(e)(2) include, *but are not limited to*, the following:

a)  The absence of any one or more of the factors listed in a) through f) above;

b) The communication identifies specific legislation, or a specific event outside the control of the organization, that the organization hopes to influence;

c) The timing of the communication coincides with a specific event outside the control of the organization that the organization hopes to influence, such as a legislative vote or other major legislative action (for example, a hearing before a legislative committee on the issue that is the subject of the communication);

d) The communication identifies the candidate solely as a government official who is in a position to act on the public policy issue in connection with a specific event (such as a legislator who is eligible to vote on the legislation); and

e) The communication identifies the candidate solely in the list of key or principal sponsors of the legislation that is the subject of the communication.

*Id.* (emphasis added).

42.46.  In sum, Revenue Ruling 2004-6 presents a lengthy, yet non-exhaustive, series of factors that may or may not ("tend to") indicate that a communication is for an exempt function under § 527(e)(2), and the IRS reserves the right to apply factors not listed. No single factor is determinative or predominates. The 11 factors are not weighted against each other, and the ruling acknowledges that other unspecified facts and circumstances may be equally relevant, varying on a case-by-case basis.

43.47.  In addition, Revenue Ruling 2004-6 presents six hypothetical "situations." Each situation, however, simply lays out an isolated set of facts and states a result in those circumstances. There is little reasoning provided for in the result beyond a simple restatement of the applicable factors.

44.48.  For example, language in Scenario 1 of Revenue Ruling 2004-6 suggests that one object of the "facts and circumstances" evaluation *may be* to determine if the expenditure supports or opposes a candidacy based on an issue. *See* Rev. Rul. 2004-6, Situation 1 ("Therefore, there is nothing to indicate that Senator A's candidacy should be supported or opposed based on this issue."). The other five scenarios, however, do not include such language.

45.49.  Revenue 2004-6 states that each situation involves a communication that identified a candidate before an election, appeared shortly before an election, and targeted voters in an election. While it states that no factor weighs more than another, it does not offer clear guidance explaining how the IRS could consider these three factors alone and when a factor may not be material at all to an analysis.

46.50.  At best, Revenue Ruling 2004-6 indicates what might be considered relevant in some circumstances, leaving a reader to guess at the ruling's meaning more generally. The ruling fails to provide the real-world, objective guidance needed by both those who form and operate social welfare organizations and by IRS employees who are charged with enforcing the law.

47.51.  Recent decisions of the U.S. Supreme Court indicate that the use of the multi-factor test employed in Revenue Ruling 2004-6 is constitutionally infirm and that specific factors identified in the two Revenue Rulings may not be valid gauges of the presence or absence of "political" or "campaign" activity.

48.52.  The Supreme Court has cast doubt on similarly formless multifactor tests. As the Court explained in *Citizens United v. Federal Election Commission*:

> In fact, after this Court in [*FEC v. Wisconsin Right to* Life] adopted an objective "appeal to vote" test for determining whether a communication was the functional equivalent of express advocacy, . . . the FEC adopted a two-part, 11-factor balancing test to implement *WRTL*'s ruling. . . .

> This is precisely what *WRTL* sought to avoid. *WRTL* said that First Amendment standards "must eschew the 'open-ended rough-and-tumble of factors,' which 'invit[es] complex argument in a trial court and a virtually inevitable appeal.'" . . . Government officials pore over each word of a text to see if, in their judgment, it accords with the 11-factor test they have promulgated. This is an unprecedented governmental intervention into the realm of speech.

558 U.S. 310, 334-36 (2010) (citations omitted).

49.53.  Specific factors identified in the Facts and Circumstances ~~Tests~~Test are also of questionable validity.

50.54. *First*, the U.S. Supreme Court has specifically held that the fact that a communication "*coincides with an electoral campaign*" or is "delivered close in time to the election" is irrelevant to determining whether the communication is or is not genuine issue advocacy. *Cf.* Rev. Rul. 2004-6, 2004-1 C.B. ~~328~~at 330 ("The timing of the communication coincides with an electoral campaign.").

51.55.  In *FEC v. Wisconsin Right to Life* ("*WRTL*"), the Court considered the Bipartisan Campaign Reform Act's restrictions on "electioneering communications," which "by definition air just before a primary or general election." 551 U.S. 449, 471 (2007) (controlling op. of Roberts, C.J.). The Court found the timing of advertisements to be "unpersuasive" with respect to determining whether a communication should be deemed the functional equivalent of express advocacy. The Court emphasized that "a group can certainly choose to run an issue ad to coincide with public interest rather than a floor vote." *Id*. at 472. The unmistakable message, which fully comports with common sense, is that both officeholders and citizens are most engaged in issue debates, and paying the most attention to substantive policy matters, during periods of time close to elections. As a result, it makes perfect sense that issue advocacy messages would be delivered during these time periods, when the relevant actors are most engaged and most receptive to issue advocacy. Finally, the Court made clear that a group's decision not to continue running advertisements on an issue after an election "does not support an inference that the ads were the functional equivalent of electioneering," because in that case, "the debate had changed." *Id.* at 473. It is often the case that elections change the terms of a debate; this is one of ~~their~~the *purposes*~~.~~ of elections.

52.56.  *Second*, whether a communication is "*part of an ongoing series of substantially similar advocacy communications*," Rev. Rul. 2004-6, 2004-1 C.B. 328at 330 (emphasis added), appears to favor established, single-issue interest groups, and accordingly "identifies certain preferred speakers." *Citizens United*, 558 U.S. at 340. This factor suggests that a communication made by an established, single-issue interest group may be presumed to be "issue advocacy," while the exact same communication made by either a new organization or a broad multi-issue advocacy organization is more likely to be treated as "political campaign intervention." But neither the identity of a speaker, nor that speaker's past communications, has any bearing on whether a given communication is issue advocacy or political/campaign advocacy. Instead, prioritizing certain speakers over others is "a constitutional wrong" the Supreme Court has repeatedly warned against. *Id.* This Revenue Ruling factor appears to do precisely that.

53.57.  *Third*, the IRS's treatment of discussion of issues on which candidates differ ("*whether the issue addressed in the communication has been raised as an issue distinguishing candidates for a given office*") appears to serve no purpose other than to discourage non-profit organizations from discussing *the most important issues*. And, of course, "[d]iscussion of issues cannot be suppressed simply because the issues may also be pertinent in an election"—as important and potentially divisive issues are. *WRTL*, 551 U.S. at 474. There is little purpose in communicating about issues on which everyone already agrees. The most important and consequential policy and legislative issues almost always involve matters on which officeholders and candidates disagree, sometimes strongly, and the fact that they may disagree on an issue raised in an advocacy communication has no bearing on whether that communication is genuine issue advocacy.—or, is *not* issue advocacy, as the Revenue Ruling suggests.

54.58.  *Fourth*, to the extent that most of the factors used by the IRS focus on contextual or external considerations, as compared to objectively examining the communication within its own "four corners," those factors are constitutionally suspect. The U.S. Supreme Court has stated very clearly that "contextual factors . . . should seldom play a significant role in the inquiry. Courts need not ignore basic background information that may be necessary to put an ad in context . . . but the need to consider such background should not become an excuse for discovery or broader inquiry of the sort we have just noted raises First Amendment concerns." *Id.* at 473.

55.59.  Furthermore, "regulations authorizing tax exemptions may not be so unclear as to afford latitude for subjective application by IRS officials." *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1034 (D.C. Cir. 1980). "Vague laws are not tolerated for a number of reasons": (a) the law must "inform[] those subject to the law of its meaning"; and (b) the law must "provid[e] officials with explicit guidelines in order to avoid arbitrary and discriminatory enforcement." *Id.* at 1035. "These standards are especially stringent, and an even greater degree of specificity is required, where, as here, the exercise of First Amendment rights may be chilled by a law of uncertain meaning." *Id.* (collecting cases). Yet the Facts and Circumstances Test is replete with factors whose inclusion provides no notice and can only increase arbitrary enforcement—chilling speech as a result.

56.60.  Under the Facts and Circumstances Test, the IRS's approach to determining whether speech is political campaign intervention is "we know it when we see it." *Id.* at 1040 (citing *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring)). Social welfare organizations must guess how much of each kind of activity is allowed and whether they should track their activities based on the amount of dollars spent, the amount of time spent, or any of a

number of other measures. *See, e.g.*, Judith E. Kindell & John Francis Reilly, *Election Year Issues* 350-52 (2002), https://~~www.irs.gov/pub/irs-tege/eotopici02.pdf.~~bit.ly/2Tojoss.

~~57.~~61.  For instance, Revenue Ruling 2004-6 asks whether a "communication is targeted at voters in a particular election"—but it is very difficult to draw any conclusions about how this factor is relevant, either as a matter of law or common sense. In *all six* hypothetical scenarios addressed in the Revenue Ruling, the expenditures described are "targeted to voters," but in Scenarios 1, 2, and 5 the expenditure *is not* deemed to be for an exempt function, while in Scenarios 3, 4, and 6 the expenditure *is* deemed to be for an exempt function. These examples fail to indicate (i) *how* the "targeted to voters" factor matters one way or another in the analysis~~.~~; and (ii) what *weight* it has. For its part, the IRS seems to agree, at least as to § 501(c)(3) organizations: "targeted to voters" is *not* one of the factors listed in Revenue Ruling 2007-41 applicable to § 501(c)(3) organizations. *See* Rev. Rul. 2007-41, 2007-1 C.B. 1421 ("Whether an organization is participating or intervening directly or indirectly, in any political campaign on behalf of or in opposition to any candidate for public office depends on all the facts and circumstances of each case.").

~~58.~~62.  This makes sense: Genuine issue advocates are silenced if they are not permitted to encourage an elected official's own constituents to urge that official to change his or her position on a matter of public importance. Elected officials are only accountable to their own constituents, largely consisting of voters, and it is those voters who must be reached if an organization hopes to change the official's position. In short, because this factor could apply to almost all issue advocacy the law is meant to protect, it can only be wielded to punish certain issue advocacy.

~~59.~~63.  Acknowledging that no "well established interpretation or principal of tax law" exists, the IRS has declined to issue guidance on the distinctions between Revenue Ruling 2004-6

and Revenue Ruling 2007-41 addressing political campaign intervention.[1] In response to an information request, the IRS specifically declined to answer (~~1~~i) whether the application of the two sets of factors would result in different rulings, and (~~2~~ii) which revenue ruling applies to the primary purpose test for qualification as a § 501(c)(4) organization. *See* IRS Information Letter 501.3800, 527.03-00 (Issued Jan. 14, 2013).

~~60.~~64.  No court has ever had the opportunity to definitively review on the merits the IRS's Facts and Circumstances Test set forth in this Revenue Ruling.

~~61.~~65.  Recently, the courts have recognized the IRS's evasive efforts to preclude this review.

~~62.~~66.  The Ninth Circuit, in concluding that case was moot because IRS had abated the tax, nevertheless observed that IRS could have abated the tax to avoid judicial scrutiny:

> This set of facts may be capable of repetition, given Catholic Answers' assertion that it will engage in similar political speech in the future . . . However, should this set of facts recur, the case will not evade review because it will be clear then, while it is not now, that the IRS has intentionally maneuvered to avoid judicial scrutiny and will not be permitted to engage in evasion of this kind.

*Catholic Answers, Inc. v. United States*, 438 F. App'x 640, 641 (9th Cir. 2011) (unpublished).

~~63.~~67.  Likewise, in *Christian Coalition of Florida, Inc. v. United States*, the Eleventh Circuit found that a similar challenge to the Facts and Circumstances Test was moot because IRS had refunded the organization's disputed taxes in full and cautioned:

> This point also highlights the possibility that, should a similar dispute over CC-FL's tax exempt status arise in a future tax refund suit, the "voluntary cessation" exception to mootness may have a role to play if the IRS fails to refund the disputed taxes within the six month statutory period, and then later refunds the taxes after litigation begins, solely to deprive the court of jurisdiction and without any independent basis for granting the refund. We offer no opinion on the merits of a

---

[1] Revenue Ruling 2007-41 discusses political campaign intervention in the context of § 501(c)(3) organizations.

voluntary cessation claim presented under such circumstances, as those circumstances do not describe the case currently before us.

662 F.3d 1182, 1196 n.13 (11th Cir. 2011).

64.68.  The Constitution does not allow this degree of vagueness, particularly when First Amendment rights are involved.

65.69.  The void-for-vagueness doctrine requires the law to be so clear that "men of common intelligence" need not "guess as to its meaning." *See Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976).

66.70.  The Facts and Circumstances Test does not meet that standard, and it was arbitrarily used and unevenly applied by the IRS to analyze Freedom Path's speech and deny Freedom Path's tax exemption. It has also chilled the speech of Freedom Path and other organizations.

**B.     The IRS Subjected Freedom Path To A Lengthy Application Process.**

Pre-2020 Process.

67.71.  On March 7, 2011, Freedom Path submitted to the IRS a complete Application for Exemption as a § 501(c)(4) organization.

68.72.  On or about June 15, 2011, Freedom Path's counsel spoke with Ronald Bell, an IRS employee.

69.73.  Ronald Bell confirmed that Freedom Path's Application for Exemption had been assigned to him for processing on March 30, 2011.

70.74.  Nearly one year later, on February 13, 2012, the IRS sent Freedom Path a set of voluminous and probing requests for additional information.

71.75.  Among other requests, this letter attempted to force Freedom Path to disclose the names of its donors.

72.76.  The Treasury Inspector General for Tax Administration ("TIGTA") Report would later determine that similar requests were unnecessary to determining Freedom Path's tax-exempt status. *See generally* TIGTA, *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review* 3 (May 14, 2013), https://~~www.treasury.gov/tigta/auditreports/2013reports/201310053fr.pdf~~bit.ly/31AX M0M ("TIGTA Report").

73.77.  Despite the unprecedented nature of the requests, Freedom Path complied with most, providing comprehensive responses to the IRS on June 3, 2012. Freedom Path did not, however, provide a list of its donors, as requested, since such information is not relevant to an organization's qualification for tax exemption under 26 U.S.C. § 501(c)(4).

74.78.  The IRS then sat on Freedom Path's Application for Exemption for another eight months, neither responding nor seeking additional information from Freedom Path until February 20, 2013.

75.79.  Freedom Path felt the negative effects of the application process long before then, however. By May 2012, Freedom Path had grown increasingly concerned about the potential of paying taxes on donations it received, both in the past and in the future, if a determination of tax-exempt status was not issued. Dkt. No. 1-8, Declaration of Scott Bensing ¶ 12 ("Bensing Decl."). It similarly was concerned about disclosing its donors, who made contributions under the expectation of privacy. *See id.* So Freedom Path self-censored its advocacy, stopped its active fundraising activities, and ran out of money to pay its legal fees. *See id.* ¶¶ 12, 14, 15.

76.80.  In a letter dated February 20, 2013, IRS agent Joseph Herr sent Freedom Path additional requests for information regarding its communications and activities. *See* Dkt. No. 1-1, IRS Feb. 20, 2013 Information Request~~, attached as Exhibit 1~~.

77.81.  Freedom Path provided some responses to Mr. Herr's requests, but it largely declined to provide more detailed information because the IRS had just illegally disclosed Freedom Path's confidential tax information to the news organization *ProPublica*. *See* Dkt. No. 1-2, Freedom Path Response to IRS 3, attached as Exhibit 2.

78.82.  Freedom Path's apprehension was justified: The illegal release of other organizations' tax information had resulted in administrative complaints being filed against the organizations, which further chilled exercise of their First Amendment rights.

79.83.  Around the same time, Freedom Path's counsel co-signed a letter to the IRS expressing grave concern about the unlawful disclosures of tax returns.

80.84.  On April 24, 2013, the IRS sent Freedom Path a follow-up letter, with Mr. Herr's February 2013 letter attached, stating that Freedom Path was required to provide the additional information requested in the Herr letter or "we will close your case" and "you may lose your right to ask a court for a declaratory judgment on your exempt status." Dkt. No. 1-3, IRS Request for Additional Information at 1 (Apr. 24, 2013), attached as Exhibit 3.).

81.85.  Just sixteen days later, on May 10, 2013, Lois Lerner, then-Director of Exempt Organizations, apologized publicly on behalf of the IRS for a pattern of intentionally and systematically targeting conservative organizations that applied for tax exemptions for additional and unconstitutional scrutiny. *See* Zachary A. Goldfarb & Karen Tumulty, *IRS admits targeting conservatives for tax scrutiny in 2012 election,* Wash. Post (May 10, 2013), https://www.washingtonpost.com/business/economy/irs-admits-targeting-conservatives-for-tax-scrutiny-in-2012-election/2013/05/10/3b6a0ada-b987-11e2-92f3-f291801936b8_story.htmlwapo.st/3jpqV4X.

82.86.  The TIGTA Report concluded that the IRS, both before and during the 2012 election cycle, had engaged in the following: (a) targeting of tax-exempt applications from perceived conservative organizations for additional scrutiny and inquiry based on "inappropriate criteria"—including organizational names and policy positions; (b) significantly delaying the processing of these applications, keeping them open over twice the length of time typically required to process tax-exempt applications; and (c) requesting additional information from these applicants that was entirely unnecessary and irrelevant to the IRS's determination regarding the organization's tax-exempt status. *See* TIGTA Report at 5-20.

83.87.  On June 26, 2013, the IRS sent Freedom Path another letter—with no reference to and without withdrawing the previous letters dated February 20 and April 24—stating that the IRS was instituting a new optional expedited process, *i.e.*, the "Optional Expedited Process for Certain Applications Under Section 501(c)(4)," for certain organizations applying for exemption under § 501(c)(4). *See* Dkt. No. 1-4, IRS Letter 5228 (Rev. 9-2013), attached as Exhibit 4.).

84.88.  Through this process, Freedom Path could receive approval of its pending application *if* it made (i) certain characterizations of its past and current political activities and (ii) promises of forbearance regarding its future spending on political activities. *Id*.

85.89.  Notably, the latter representations required Freedom Path to certify under penalty of perjury that it would limit certain issue advocacy expenditures that are nonetheless non-political in nature and constitutionally protected. *See id.*

86.90.  Freedom Path declined to participate in the optional expedited process.

87.91.  Seemingly in response, the IRS sent Freedom Path a "proposed denial" of its Application for Exemption. *See* Dkt. No. 1-5, IRS Proposed Denial, attached as Exhibit 5 (without enclosures)..

88.92.  Using the 11-factor Facts and Circumstances Test to analyze Freedom Path's television advertisements and mailers, the IRS's "proposed denial" letter concluded that Freedom Path engaged in too much political campaign intervention to attain tax-exempt status as a 26 U.S.C. § 501(c)(4) organization. *See id.* at 5-9.

89.93.  Specifically, the IRS's "proposed denial" letter included a summary of the Facts and Circumstances Test in the "LAW" section of its letter; this was followed by an "ANALYSIS" section that applied the Facts and Circumstances Test to two television advertisements, "Repeal It" and "Three Men," that Freedom Path had directed to the general public. *See id.* The "proposed denial" letter stated that the two advertisements are not issue advocacy for purposes of analyzing 26 U.S.C. § 501(c)(4) status but are, instead, political campaign intervention. *Id.* at 8 ("Accordingly, based on all of the facts and circumstances, we conclude that the two television advertisements and three mailers that express approval for <u>Candidate2</u> also constituted campaign intervention.").

90.94.  Freedom Path filed detailed responses to the September 2013 Letter disputing the constitutionality of the Facts and Circumstances Test and the manner in which the IRS was seeking to apply it to Freedom Path's speech.

91.95.  The time and resources necessary to research, draft, and file such responses cost Freedom Path not less than $10,160.50 in legal fees that it would not have incurred but for the IRS's unlawful application of an unconstitutional Facts and Circumstance Test to its speech.

92.96.  This forced Freedom Path to divert funds, which would otherwise have been spent on advocacy and other forms of communication and speech in the future. Bensing Decl. ¶¶ 14-15.

2020 Final Determination.

93.97.  Freedom Path would ultimately not obtain a final determination from the IRS about its 26 U.S.C. §_501(c)(4) status until years later—in February 2020.

94.98.  As the TIGTA Report recognized, delays in IRS processing of tax-exempt status applications are costly: "[T]his means that potential donors and grantors could be reluctant to provide donations or grants. . . . The delays may have also prevented some organizations from receiving certain benefits of the tax-exempt status. For example, if organizations are approved for tax-exempt status, they may receive exemption from certain State taxes and reduced postal rates. For organizations that may eventually be denied tax-exempt status but have been operating while their applications are pending, the organizations will be required to retroactively file income tax returns and may be liable to pay income taxes for, in some cases, more than two years." TIGTA Report at 12.

95.99.  In its February 20, 2020 final adverse determination letter, the IRS determined that Freedom Path did not qualify for exemption from federal income tax under 26 U.S.C. § 501(a) as a § 501(c)(4) organization. The IRS stated that it made this adverse determination on the basis that Freedom Path's "primary activity is making political expenditures in support or in opposition of candidates running for elected office." Dkt. No. 1-6, Final Determination Letter at 1, attached as Exhibit 6.

96.100.        This analysis was based on a total of 26 television advertisements and direct mailings issued by Freedom Path. *Id.* at 12.

97.101.        The IRS arrived at this conclusion because it "estimated" that Freedom Path spent 60% of its direct expenditures in 2012 on political campaign intervention, but spent only 30% on issue advocacy. *Id.* at 18.

98.102.      But these funding determinations—by which the IRS determined that Freedom Path's "primary activity" was influencing elections—were based on the IRS's incorrect classification of certain textbook examples of issue advocacy as "political campaign intervention."

99.103.      Most importantly, the IRS determined that two television advertisements (the "Repeal It" and "Three Men" advertisements discussed in more detail below at Paragraphs 136-194),152-199), were "political campaign intervention." The IRS made clear that determining what constitutes political campaign intervention is a facts-and-circumstances inquiry. *See, e.g.*, *id.* at 16-17 & 17 n.7.

100.104.      But for the IRS determining that the "Repeal It" television advertisementsadvertisement was a political campaign intervention, Freedom Path would not have been denied 26 U.S.C. § 501(c)(4) status.

101.105.      But for the IRS determining that the "Three Men" television advertisement was a political campaign intervention, Freedom Path would not have been denied 26 U.S.C. § 501(c)(4) status.

102.106.      The Final Determination Letter discusses a total of 26 advertisements and direct mail communications. According to the IRS, these 26 advertisements and direct mailings comprised "substantially all" (more than 90%) of Freedom Path's direct expenditures in 2012. *Id.* at 12.

103.107.      The IRS noted other miscellaneous expenditures. *Id.* at 14.

104.108.      These other expenditures had no effect on the IRS's ultimate determination of Freedom Path's 26 U.S.C. § 501(c)(4) status.

105.109.      The parties agreed on how to classify most of the 26 advertisements and mailings at issue.

106.110.      Regarding the television advertisements, 3 of the 6 were reported by Freedom Path to the Federal Election Commission ("FEC") as independent expenditures "*expressly advocating* the election or defeat of a clearly identified candidate that is not made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party or its agents" under 11 C.F.R. § 100.16(a). *Id.* at 12 (emphasis added).

107.111.      Similarly, 3 of the 20 direct mailings were reported by Freedom Path to the FEC as independent expenditures that were express advocacy. *Id.* at 13.

108.112.      The IRS acknowledged that 1 of the 6 television advertisements was not political campaign intervention. *Id.* at 18.

109.113.      And the IRS acknowledged that 12 of the 20 direct mailings were not political campaign intervention. *Id.*

110.114.      The dispute thus centered primarily on how to classify 2 other television advertisements ("Repeal It" and "Three Men").

111.115.      The dispute also involved the remaining 5 direct mailings.

112.116.      The IRS determined that these remaining 2 television advertisements (which mentioned Orrin Hatch) and the remaining 5 direct mailings (2 of which mentioned Dan Liljenquist and 3 of which mentioned Orrin Hatch) constituted political campaign intervention. *Id.* at 17.

113.117.      These 2 television advertisements ("Repeal It" and "Three Men") were not political campaign intervention.

114.118.      These 2 television advertisements ("Repeal It" and "Three Men") were issue advocacy.

~~115.~~119.        These remaining 5 direct mailings were not political campaign intervention.

~~116.~~120.        These remaining 5 direct mailings were issue advocacy.

~~117.~~121.        The IRS noted that Freedom Path reported the "Three Men" television advertisement to the FEC as an "electioneering communication" because the advertisement aired within 30 days of the Utah Party convention, where candidates could "win the [Republican] Party nomination for U.S. Senate outright with a sufficient percentage of the delegate vote." *Id.* at 12.

~~118.~~122.        "Electioneering communication" is a phrase that does not appear in 26 U.S.C. § 501 or § 527.

~~119.~~123.        "Electioneering communication" is a standard established for FEC regulation in 52 U.S.C. § 30104(f)(3).

~~120.~~124.        "Electioneering communication" covers communications that merely (~~1~~i) mention a candidate (~~2~~ii) within a certain time period before elections or primary conventions. *Id.* § 30104(f)(3)(A).

~~121.~~125.        "Electioneering communication" includes some communication that is mere issue advocacy.

~~122.~~126.        The concept of "electioneering communication" is not trying to measure whether that communication is influencing or attempting to influence an election.

~~123.~~127.        To assess Freedom Path's 26 U.S.C. § 501(c)(4) status, the IRS examined whether Freedom Path is "*primarily* engaged in promoting in some way the common good and general welfare of the people of the community." Final Determination Letter at 14.

~~124.~~128.        In making this determination, the IRS relied heavily on Revenue Ruling 2004-6's 11-factor Facts and Circumstances Test.

125.129.    The IRS did not discuss the validity or constitutionality of Revenue Ruling 2004-6's 11-factor Facts and Circumstances Test.

126.130.    Instead, the IRS simply recited the Facts and Circumstances Test at length and then applied it:

Rev. Rul. 2004-6, 2004-1 C.B. 328, analyzes six situations to determine whether the organization described in each has expended funds for a § 527(e)(2) exempt function as a result of an advocacy communication on a public policy issue. A § 527(e)(2) exempt function means "the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any federal, state or local public office or office in a political organization, or the election of Presidential or Vice-Presidential electors, whether or not such individual or electors are selected, nominated, elected, or appointed." All the facts and circumstances must be considered when making this determination. Factors that tend to show that an advocacy communication on a public policy issue is for a § 527(e)(2) exempt function include, but are not limited to, the following:

- The communication identifies a candidate for public office;
- The timing of the communication coincides with an electoral campaign;
- The communication targets voters in a particular election;
- The communication identifies that candidate's position on the public policy issue that is the subject of the communication;
- The position of the candidate on the public policy issue has been raised as distinguishing the candidate from others in the campaign, either in the communication itself or in other public communications; and
- The communication is not part of an ongoing series of substantially similar advocacy communications by the organization on the same issue.

In facts and circumstances, such as those described in the six situations, factors that tend to show that an advocacy communication on a public policy issue is not for a § 527(e)(2) exempt function include, but are not limited to, the following:

- The absence of any one or more of the factors listed above;
- The communication identifies specific legislation, or a specific event outside the control of the organization, that the organization hopes to influence;
- The timing of the communication coincides with a specific event outside the control of the organization that the organization hopes to influence, such as a legislative vote or other major legislative action (for example, a hearing before a legislative committee on the issue that is the subject of the communication);
- The communication identifies the candidate solely as .a government official who is in a position to act on the public policy issue in connection with the

specific event (such as a legislator who is eligible to vote on the legislation); and

- The communication identifies the candidate solely in the list of key or principal sponsors of the legislation that is the subject of the communication.

*Id.* at 15-16.

~~127.~~131.      The IRS's legal analysis was cursory and flawed, and it relied heavily on the Facts and Circumstances Test.

~~128.~~132.      The IRS noted that 5 of the 6 television advertisements in 2012 and 8 of the 20 direct mailings in 2012 were distributed in the "months" leading up to the nominating convention and primary election in which these candidates were competing. *Id.* at 17.

~~129.~~133.      "Months" does not provide a meaningful timeframe for determining whether speech is influencing or attempting to influence elections.

~~130.~~134.      The IRS also erroneously suggested that merely mentioning a candidate while expressing disapproval of a public policy (in 2 of the direct mailings) is an independent expenditure that expressly advocates. *See id.*

~~131.~~135.      The IRS used these incorrect determinations as to 2 of the television advertisements and 5 of the direct mailings to arrive at an erroneous calculation of the relative percentages of Freedom Path's political versus issue advocacy expenditures.

~~132.~~136.      The IRS's analysis ultimately rested on "estimated" percentages of Freedom Path's direct expenditures: The IRS concluded that the advertisements and direct mailings that constituted political campaign intervention amounted to 60% of Freedom Path's direct expenditures—whereas only an estimated 30% of Freedom Path's direct expenditures did not constitute political campaign intervention. *Id.* at 18.

133.137.　　　If the "Repeal It" television advertisement waswere treated as issue advocacy and not political campaign intervention, that alone would drop this percentage from about 60% to about 46%.

134.138.　　　If the "Three Men" advertisement waswere treated as issue advocacy and not political campaign intervention, that alone would drop the percentage from about 60% to about 47%.

135.139.　　　If both the "Repeal It" and "Three Men" advertisements were treated as issue advocacy and not political campaign intervention, these conclusions would drop the percentage from about 60% to about 33%.

Disputed Television Advertisements.

136.140.　　　Freedom Path and its agents developed policy objectives and messaging consistent with its mission and in furtherance of its exempt purpose, including the ultimate creation of six television advertisements that Freedom Path distributed in Utah.

137.141.　　　In or about December 2011, Freedom Path sought to air a television advertisement entitled "Leader." *See* Dkt. No. 1-7, Autumn Productions Script (Dec. 27, 2011)̶,̶ attached as Exhibit 7.).

138.142.　　　That "Leader" advertisement never aired because Freedom Path was correctly worried that the IRS would erroneously deem it to be political campaign intervention and thus affect Freedom Path's 26 U.S.C. § 501(c)(4) status.

139.143.　　　The proposed "Leader" advertisement included a call to action urging Senator Orrin Hatch to "keep fighting ObamaCare." But Freedom Path feared that references to Senator Hatch's "values" and "courage to lead" would be construed by the IRS as political campaign intervention that constitutes an "exempt function" under 26 U.S.C. § 527(e)(2).

140.144.     Notably, under the IRS's unlawful Facts and Circumstances Test, four of the six factors *could* apply:

   a)  The communication identifies a candidate for public office;

   b)  The timing of the communication coincides with an electoral campaign;

   c)  The communication targets voters in a particular election;

   d)  The communication identifies that candidate's position on the public policy issue that is the subject of the communication.

Rev. Rul. 2004-6, 2004-1 C.B. 328at 330.

141.145.     Freedom Path had no way of knowing whether the airing of the proposed "Leader" advertisement in January 2012 or February 2012 would be deemed by the IRS to "coincide[] with an electoral campaign." Not only has the IRS failed to issue guidance explaining how long before an election an advertisement must be aired so as to not "coincide[] with an electoral campaign," the IRS has also failed to issue guidance as to whether a state party convention might constitute "an electoral campaign."

142.146.     Freedom Path also sought to air the advertisement to bring the public's attention to the fact that Senator Hatch had been engaged in specific legislative efforts to overturn the Affordable Care Act, and to encourage the general public to voice their ongoing support for those efforts during a time while other Members of the U.S. House of Representatives and U.S. Senate were focusing less on the issue once the Affordable Care Act was signed into law.

143.147.     Notwithstanding Freedom Path's efforts to maintain the public's focus on repealing the Affordable Care Act, as to continue urging Senator Hatch to "keep fighting ObamaCare," Freedom Path feared that references to Senator Hatch's previous actions would be construed by the IRS as political campaign intervention that constitutes an "exempt function"

under 26 U.S.C. § 527(e)(2) because the advertisement identifies his position on the public policy that is the subject of the communication.

~~144.~~148.	As a direct consequence of the IRS's amorphous Facts and Circumstances Test and the uncertainty as to how Revenue Ruling 2004-6's multifactor test would be applied to the proposed "Leader" advertisement, Freedom Path was forced to mute itself by not distributing the proposed "Leader" advertisement as planned.

~~145.~~149.	Freedom Path has been and will be forced to continue curtailing similar speech in the future without the judicial relief sought in this action.

~~146.~~150.	Freedom Path's concerns about airing the "Leader" advertisement proved to be correct.

~~147.~~151.	In the Final Determination Letter, the IRS adopted and applied its vague Facts and Circumstances Test to the speech that Freedom Path actually did engage in.

~~148.~~152.	Freedom Path aired its first television advertisement in July 2011 on the subject of the Balanced Budget Amendment. This advertisement encouraged passage of a Balanced Budget Amendment and called for an end to "runaway spending." Freedom Path later aired this same advertisement from May 21 to May 25, 2012.

~~149.~~153.	The IRS eventually concluded this advertisement constituted issue advocacy and not political campaign intervention.

~~150.~~154.	Freedom Path aired its second television advertisement, "Repeal It," statewide in Utah in late January and early February 2012.

~~151.~~155.	The on-screen visuals/text and audio for Freedom Path's "Repeal It" advertisement stated:

| Audio | On-Screen Visuals and Text |
|---|---|
| ObamaCare.<br>A trillion dollars in new government spending. | Visual: Photo of President Obama next to a massive stack of paperwork and stethoscope.<br><br>Text: ObamaCare<br>$1.5 TRILLION<br>New Government Spending<br>Press Release, National Federation of Independent Business<br>Nov. 9, 2011 |
| And devastating to small business. | Visual: Sign that says "CLOSED"<br><br>Text: ObamaCare<br>Devastating to Small Business |
| But ObamaCare can still be stopped. | Visual: Photo of President Obama next to a massive stack of paperwork and stethoscope.<br><br>Text: ObamaCare<br>CAN STILL BE STOPPED |
| Utah's Orrin Hatch has sponsored a bill to repeal it. The first to call it unconstitutional, Hatch has even personally signed a brief to have the courts nullify it. | Visual: Photo of Senator Orrin Hatch and photo of U.S. Capitol.<br><br>Text: U.S. Senator Orrin Hatch:<br>ObamaCare<br>REPEAL IT<br>S. 192 Repeal the Job-Killing Health Care Act |
| Declaring ObamaCare unconstitutional. | Visual: Photo of Senator Orrin Hatch and photo of U.S. Constitution.<br><br>Text: U.S. Senator Orrin Hatch:<br>ObamaCare<br>UNCONSTITUTIONAL<br>"Democrats Shred Constitution," Investor's Business Daily, Oct. 2009 |
| Senator Hatch has personally signed a brief to have the courts nullify it. | Visual: Photo of Senator Orrin Hatch and photo of hand signing document.<br><br>Text: U.S. Senator Orrin Hatch:<br>ObamaCare<br>NULLIFY IT<br>"Democrats Shred Constitution," Investor's Business Daily, Oct. 2009 |

| Orrin Hatch, leading the conservative charge to repeal ObamaCare. | Visual: Photo of Senator Orrin Hatch<br><br>Text: Tell Senator Hatch:<br>Keep leading the fight!<br>Call (202) 224-3121<br>LEADING THE FIGHT AGAINST ObamaCare<br>Paid for by Freedom Path |

152.156.    In the Final Determination Letter, the IRS deemed this "Repeal It" advertisement to be political campaign activity in support of Senator Hatch's candidacy under the Facts and Circumstances Test.

153.157.    Notably, at the time of the advertisement, Senator Hatch served as a member of two committees with important oversight responsibilities involving the Affordable Care Act.[2] He was the ranking member of the Senate Finance Committee, which has oversight over the IRS— a federal agency tasked with implementation of many aspects of the Affordable Care Act. He was also a member of the Senate Health, Education, Labor and Pensions Committee, which has oversight over the Department of Health and Human Services.

154.158.    The "Repeal It" advertisement finished airing more than sixty days before the Utah Republican State Convention[3] and more than four months before the Republican primary election.[4]

155.159.    The "Repeal It" advertisement did not qualify as "electioneering communication" for purposes of FEC regulation. *See* 52 U.S.C. § 30104(f)(3) (requiring communication to be made within "30 days before a primary" election or convention).

---

[2] Senator Hatch retired as a U.S. Senator on January 3, 2019.
[3] The 2012 Utah Republican State Convention was held on April 21, 2012. It was attended by approximately 4,000 delegates selected by local party committees in the State of Utah.
[4] The State of Utah's 2012 primary election was held on June 26, 2012.

156.160.        The IRS nevertheless concluded the "Repeal It" advertisement was political campaign intervention.

157.161.        The "Repeal It" advertisement aired immediately before several important legislative developments related to the Affordable Care Act, and these involved either votes or possible legislative actions on the part of the U.S. Senate and Senator Hatch.

158.162.        For example: (i) on February 1, 2012, Senator Hatch signed on as a co-sponsor of legislation repealing certain aspects of the Affordable Care Act; (ii) on February 9, 2012, Senator Hatch was an original co-sponsor of an amendment to amend the Affordable Care Act to protect rights of conscience with regard to requirements for coverage of specific items and services; (iii) on February 17, 2012, the Senate voted on a budget compromise bill that would have offset new spending by reducing funds for certain programs tied to the 2010 healthcare overhaul; (iv) on March 1, 2012, the Senate voted on an amendment that would allow health insurance plans to deny coverage to provisions for medical services that run counter to the plan sponsor's or employer's religious beliefs and would also establish a private right of legal action for enforcement of the coverage exemptions; (v) on May 16, 2012, the Senate voted to consider a plan to repeal the Affordable Care Act and overhaul of the Medicare and Medicaid programs; and (vi) on May 24, 2012, the Senate voted on an amendment that would repeal certain aspects of the Affordable Care Act.

159.163.        During the remainder of the decade, Members of the U.S. Senate and U.S. House of Representatives proposed multiple bills to repeal the Affordable Care Act.

160.164.        During the remainder of the decade, the U.S. House of Representatives voted dozens of times to repeal the Affordable Care Act.

161.165.        Beginning on March 21, 2012, Freedom Path distributed another television advertisement, "Three Men," that also aired statewide in Utah. The on-screen visuals/text and audio for Freedom Path's "Three Men" advertisement stated:

| Audio | On-Screen Visuals and Text |
|---|---|
| Debt. More than 15 trillion dollars that will cripple our next generation. | Visual: Image of a running National Debt Clock with debt increasing by the second; overlaying a background photo of the White House |
| But conservative Utah Senators Orrin Hatch and Mike Lee have authored the Balanced Budget Amendment to stop Washington's runaway spending. | Visual: Photos of Senators Orrin Hatch and Mike Lee; photo of the U.S. Constitution; photo of stop sign with the text "STOP RUNAWAY SPENDING"<br><br>Text: SENATOR ORRIN HATCH<br>SENATOR MIKE LEE<br>SENATOR MIKE LEE<br>Authors of the BALANCED BUDGET AMENDMENT<br><br>STOP RUNAWAY SPENDING |
| It's the bold conservative plan supported by Mitt Romney to get spending under control. | Visual: Photo of Mitt Romney; photo of the American flag<br><br>Text: BALANCED BUDGET AMENDMENT<br>BOLD CONSERVATIVE PLAN |
| Call Senators Hatch and Lee. | Visual: Photos of Senator Orrin Hatch, Senator Mike Lee, Mitt Romney<br><br>Text: Tell SENATORS HATCH and LEE: KEEP LEADING THE FIGHT!<br>Call (202) 224-3121 |
| Tell them to keep fighting for the Balanced Budget Amendment. | Visual: Photos of Senator Orrin Hatch, Senator Mike Lee, Mitt Romney<br><br>Text: Tell SENATORS HATCH and LEE: KEEP LEADING THE FIGHT!<br>FOR THE BALANCED BUDGET AMENDMENT |

| And for the future of America. | Visual: Photos of Senator Orrin Hatch, Senator Mike Lee, Mitt Romney<br><br>Text: Tell SENATORS HATCH and LEE: KEEP LEADING THE FIGHT! FOR THE FUTURE OF AMERICA |
| Freedom Path is responsible for the content of this advertising. | Text: PAID FOR BY FREEDOM PATH. FREEDOM PATH IS RESPONSIBLE FOR THE CONTENT OF THIS ADVERTISING. NOT AUTHORIZED BY ANY CANDIDATE OR CANDIDATE'S COMMITTEE. WWW.FREEDOM-PATH.ORG |

162.166.    In the Final Determination Letter, the IRS deemed this "Three Men" advertisement to be political campaign intervention activity in support of Senator Hatch's candidacy under the Facts and Circumstances Test.

163.167.    Freedom Path aired its first advertisement encouraging the passage of a Balanced Budget Amendment in 2011, shortly after it was introduced.

164.168.    The Final Determination Letter suggests that "Repeal It" and "Three Men" failed to discussdiscussed legislation that was not scheduled for a vote and did not involve additional action since introduction in the year prior to the date on which the advertisements aired.

165.   Issue advocacy is not limited to legislation that is currently scheduled for a vote.

169.   IssueContrary to the Facts and Circumstances Test and the IRS's application of it here, issue advocacy is not limited to legislation that is currently scheduled for a vote. *Cf.* Rev. Rul. 2004-6, 2004-1 C.B. at 330 (identifying the following factors as supporting a finding of campaign intervention: "[i] The communication identifies specific legislation, or a specific event outside the control of the organization, that the organization hopes to influence. . . . [ii] The timing

of the communication coincides with a specific event outside the control of the organization that the organization hopes to influence, such as a legislative vote or other major legislative action[.]").

~~166.~~170.      Likewise, issue advocacy is not limited to legislation that has had active consideration in a particular legislative chamber since it was introduced.

~~167.~~171.      ~~While the IRS suggests~~Regardless, the facts belie the IRS's suggestion in the Final Determination Letter that the Balanced Budget Amendment was no longer a relevant issue in Congress in 2012~~, the facts suggest otherwise.~~.

~~168.~~172.      On March 29, 2012, for example, while the "Three Men" advertisement was still on the air, Senator Rand Paul introduced a budget resolution co-sponsored by Utah Senator Mike Lee that would have made "it out of order to consider in the Senate any budget resolution after the enactment of this resolution until a balanced budget amendment to the U.S. Constitution has been adopted, except by a supermajority waiver." S. Con. Res. 39, 112th Cong. (2012).

~~169.~~173.      The legislation discussed in these advertisements was introduced and remained on the calendar during the 112th Congress.

~~170.~~174.      The introduction of legislation alone is "major legislative activity," as introduction is the first formal step to the consideration of legislation by the U.S. Senate as a whole and is an activity outside the control of Freedom Path. *See* U.S. Senate R. of Procedure § 288j (112th Cong.).

~~171.~~175.      Neither the "Repeal It" nor the "Three Men" advertisement references an election or contains a statement of support for Senator Hatch's candidacy.

~~172.~~176.      Neither the "Repeal It" nor the "Three Men" advertisement takes a position on Senator Hatch's character, qualifications, or fitness for office.

173.177.       Without having independent and additional knowledge, a viewer of "Repeal It" or "Three Men" would not even know from these communications that Senator Hatch was a candidate for public office.

174.178.       Both the "Repeal It" and "Three Men" advertisements urge the public to take action regarding specific legislation or major legislation.

175.179.       Specifically, they encourage viewers to contact their Senator(s), provide the viewers the official Senate phone number, and then ask viewers to make their opinion about the legislation and policies at issue in the advertisements known to their Senator(s).

176.180.       The Final Determination Letter states that Freedom Path "did not provide . . . any communications . . . produced or distributed after the . . . primary election" regarding the national debt or legislative repeal of the Affordable Care Act. Final Determination Letter at 17.

177.181.       Issue Contrary to the Facts and Circumstances Test and IRS's application of it here, issue advocacy is not limited to communications that are made repeatedly or made immediately after elections. *Cf.* Rev. Rul. 2004-6, 2004-1 C.B. at 330 ("The communication is not part of an ongoing series of substantially similar advocacy communications by the organization on the same issue.").

178.182.       The Supreme Court in *WRTL* held that this timing should not support an inference that Freedom Path sought to influence an election or conduct political campaign intervention.

179.183.       In the Final Determination Letter, the IRS makes clear that the Facts and Circumstances Test puts significant weight on the timing of communications in assessing whether a communication is influencing or attempting to influence elections.

180.184.　　　This contradicts the U.S. Supreme Court's warning that "contextual factors . . . should seldom play a significant role in the inquiry" whether communication is influencing or attempting to influence elections. *WRTL*, 551 U.S. at 473.

181.185.　　　Furthermore, the Facts and Circumstances Test apparently penalizes Freedom Path for airing communications during an election year.

182.186.　　　An election year is the specific period of time in which public officials and the public are more likely to be affected by the communications of issue advocacy. *See*, *e.g*., Saul Zipkin, *The Election Period and Regulation of the Democratic Process*, 18 Wm. & Mary Bill Rts. J. 533, 544 (2010) ("The pre-election period is a time of heightened engagement with the democratic process: a time when both voters and political actors are more attentive to one another.").

183.187.　　　The "Repeal It" and "Three Men" advertisements do not contain many of the factors that are indicia of political campaign intervention activity under Revenue Ruling 2004-6, which are listed in Paragraph 4044 above.

184.188.　　　The "Repeal It" and "Three Men" advertisements aired more than sixty days before the primary election. *Cf*. Rev. Rul. 2004-6, 2004-1 C.B. at 330 ("The timing of the communication coincides with an electoral campaign[.]").

185.189.　　　The "Repeal It" and "Three Men" advertisements aired in Utah statewide.

186.190.　　　The "Repeal It" and "Three Men" advertisements were not efficiently targeted to the approximately 4,000 delegates attending the state convention. *Cf*. Rev. Rul. 2004-6, 2004-1 C.B. at 330 ("The communication targets voters in a particular election[.]")

187.191.　　　The "Repeal It" and "Three Men" advertisements did not raise an issue that distinguished Senator Hatch from his opponent. *Cf*. *id*. ("The position of the candidate on the

public policy issue has been raised as distinguishing the candidate from others in the campaign, either in the communication itself or in other public communications[.]").

188.192.    TheFurthermore, the "Repeal It" and "Three Men" advertisements contain many of the characteristics of communications that do not constitute political campaign intervention activity, which are listed in Paragraph 4145 above.

189.193.    The "Repeal It" and "Three Men" advertisements identify specific legislation, legislative public policy issues, and major legislative action that they hope to influence and that are outside the control of Freedom Path. *See id.* ("The timing of the communication coincides with a specific event outside the control of the organization that the organization hopes to influence, such as a legislative vote or other major legislative action[.]").

190.194.    The "Repeal It" and "Three Men" advertisements correspond to legislative events, such as the introduction of legislation and addition of co-sponsors to legislation. *See id.* ("The timing of the communication coincides with a specific event outside the control of the organization that the organization hopes to influence, such as a legislative vote or other major legislative action[.]").

191.195.    The "Repeal It" and "Three Men" advertisements identify Senator Hatch only in his capacity as a legislator. *See id.* ("The communication identifies the candidate solely as a government official who is in a position to act on the public policy issue in connection with the specific event (such as a legislator who is eligible to vote on the legislation)[.]").

192.196.    As discussed above, the IRS incorrectly determined that the "Repeal It" and "Three Men" television advertisements, as well as 5 direct mailings, constituted political campaign intervention.

193.197.　　　Because of these erroneous findings, the IRS estimated that 60% of Freedom Path's direct expenditures constituted political campaign intervention—thus precluding Freedom Path from being exempt as a § 501(c)(4) organization.

194.198.　　　But if the IRS had made a correct determination with regard to either of the 2 television advertisements, it could not have ~~rationally~~ concluded that Freedom Path's "primary activity" was making political expenditures to influence or attempt to influence elections—because that direct-expenditure percentage would have been reduced from 60% to at least less than 50%.

195.199.　　　Further, if the IRS had made a correct determination with regard to both television advertisements, it could not have ~~rationally~~ concluded that Freedom Path's "primary activity" was making political expenditures to influence or attempt to influence elections—because that direct-expenditure percentage would have been reduced from 60% to approximately 33%.

**~~CAUSES~~CAUSE OF ACTION**
**~~COUNT I~~**
**Declaratory Judgment Pursuant to 26 U.S.C. §~~ ~~ 7428**

~~196.　Freedom Path realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.~~

~~197.　The IRS erred by concluding that Freedom Path is not exempt under 26 U.S.C. § 501(c) because Freedom Path meets both the statutory and regulatory requirements that it be "operated exclusively for the promotion of social welfare," 26 U.S.C. 501(c)(4)(A)—defined as being "primarily engaged in promoting in some way the common good and general welfare of the people of the community." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i).~~

~~198.　Freedom Path is entitled to a declaratory judgment that it has 26 U.S.C. § 501(c)(4) tax-exempt status.~~

199.   Freedom Path is entitled to a declaratory judgment that the IRS's amorphous Facts and Circumstances Test, identified in Paragraphs 40-41, is invalid.

200.   This Court may grant declaratory relief to an organization challenging the IRS's final determination that the organization is not exempt under 26 U.S.C. § 501(c). *See* 26 U.S.C. § 7428(a)(1)(E).

201.   Because Freedom Path is an exempt organization and exhausted administrative remedies, it seeks a declaratory ruling that Freedom Path qualifies for tax exemption under 26 U.S.C. § 501(c)(4).

### COUNT II
### Vagueness
### Violations of the First and Fifth Amendments
### Declaratory Judgment and Injunctive Relief

202.200.   Freedom Path realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

201.   The IRS erred by concluding that Freedom Path is not exempt from taxation under 26 U.S.C. § 501(c)(4).

202.   Freedom Path is "primarily engaged in promoting in some way the common good and general welfare of the people of the community." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i).

203.   The IRS erred by applying the IRS's Facts and Circumstances Test to determine Freedom Path's § 501(c)(4) status, because the Test is unconstitutionally vague—both facially and as applied. It violates the First Amendment.

203.204.   *Vagueness.* The Test provided and still provides inadequate notice to Freedom Path—and similar issue advocacy groups—about what is permissible and versus impermissible speech for purposes of attaining § 501(c)(4) status. And it fails to provide IRS

officials with "explicit guidelines in order to avoid arbitrary and discriminatory enforcement." *Big Mama Rag*, 631 F.2d at 1035; *see also Hynes*, 425 U.S. at 622 (a law must "provide explicit standards for those who apply" it) (citation omitted). The IRS itself has admitted as much. *See* 78 Fed. Reg. at 71536-37 (acknowledging the need for "sharper" rules that would afford "greater certainty" to the public and the government). This vague test encourages and allows arbitrary enforcement. As a result, Freedom Path was required to "steer far wider of the unlawful zone, than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (citation and quotation marks omitted).

~~204.~~205.        In stark contrast to the objective standards adopted by the U.S. Supreme Court for measuring whether an organization's primary purpose is influencing elections, the IRS has ~~blatantly~~ ignored the Court's applicable precedent and continued to apply the amorphous Facts and Circumstances Test to Freedom Path's speech. The 11 factors that the IRS considers when attempting to apply its Facts and Circumstances Test contained in Revenue Ruling 2004-6 are so ~~grossly~~ indeterminate, and their application so ~~grossly~~ imprecise, that Freedom Path lacked and ~~others like it lack~~still lacks adequate notice of the meaning and requirements of the law. And IRS officials lack "explicit guidelines in order to avoid arbitrary and discriminatory enforcement." *Big Mama Rag*, 631 F.2d at 1035 (collecting cases); *see Hynes*, 425 U.S. at 622.

~~205.~~206.        Vagueness concerns are heightened here where IRS's enforcement of the Facts and Circumstances Test implicates Freedom Path's First Amendment rights: "These standards are especially stringent, and an even greater degree of specificity is required, where, as here, the exercise of First Amendment rights may be chilled by a law of uncertain meaning." *Big Mama Rag*, 631 F.2d at 1035 (collecting cases); *see Hynes*, 425 U.S. at 620 ("The general test of vagueness applies with particular force in review of laws dealing with speech.").

206.   The standard for determining whether a group gets § 501(c)(4) tax-exempt status must be given a construction allowing those groups to do issue advocacy or else it is vague, overbroad, and a violation of the *First Amendment*.

207.   The standard for determining whether a group's primary purpose is influencing or attempting to influence elections, under § 527, must be given a construction that does not cover issue advocacy or else it is vague, overbroad, and a violation of the First Amendment.

208.   Therefore, The IRS's determination here about Freedom Path seeks a declaration that the IRS's Facts and Circumstances Test contained in Revenue Ruling 2004-6 is facially void for vagueness in violation of the Due Process Clause of the Fifth Amendment or the First Amendment and a permanent injunction against its enforcement.

209.207.    Path's speech also unconstitutionally burdened and continues to chill Freedom Path also seeks a declaration that the IRS's Facts and Circumstances Test contained in Revenue Ruling 2004-6, as applied in this case, is void for vagueness in violation of the Due Process Clause of the Fifth Amendment or the First Amendment and a permanent injunction against its enforcement.Path's speech.

**Count III**
**Free Speech**
**Violations of the First Amendment**
**Declaratory and Injunctive Relief**

210.   Freedom Path realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

211.208.        The Facts and Circumstances Test used by ~~Defendant~~the IRS to analyze

and guide Freedom Path's speech is in direct conflict with the U.S. Supreme Court's clear

guidelines relating to issue advocacy and campaign speech. *See, e.g.*, *WRTL*, 551 U.S. 449.

212.   ~~The   IRS's   determination   here   about   Freedom   Path's   speech~~

~~unconstitutionally burdened and chills Freedom Path's speech.~~

213.209.        ~~Additionally, the~~Facts and Circumstances Test is also unconstitutionally

overbroad because a "substantial number of [the Test's] applications are unconstitutional, judged

in relation to" whatever legitimate sweep the Test may have. *United States v. Stevens*, 559 U.S.

460, 473 (2010) (citation omitted).

214.210.        The Supreme Court has disapproved of similarly amorphous multifactor

tests designed to judge permissible from impermissible speech. *See Citizens United*, 558 U.S. at

336 ("First Amendment standards must eschew the open-ended rough-and-tumble of factors,

which invit[es] complex argument in a trial court and a virtually inevitable appeal.") (quoting

*WRTL*, 551 U.S. at 469 (controlling op. of~~ ~~Roberts, C.J.)).

215.211.        Likewise, the Supreme Court has disapproved of many of the individual

factors the IRS relies on in its Facts and Circumstances ~~test. As an initial matter, many~~Test.

Many of the factors ~~rely on~~in the Facts and Circumstances Test are "contextual factors"

~~which~~that "should seldom play a significant role in the inquiry" into the objective content of the

speech. *WRTL*, 551 U.S. at 473. And more specifically, the Court has identified certain factors as

either irrelevant or inappropriate to the inquiry. *~~See Paragraphs 49-54~~See* Paragraphs 53-62.

216.212.        As a result, the Facts and Circumstances Test stands in stark contrast to the

standard adopted by the U.S. Supreme Court in *WRTL* in 2007. The IRS has~~ blatantly~~ ignored

the Court's applicable precedent and continued to apply the amorphous, vague, and overly broad Facts and Circumstances Test to Freedom Path's speech.

217.213.      This "testTest" is grosslyso indeterminate, and its guidance to would-be speakers and social welfare organizations grosslyso imprecise, that the speaker cannot be sure what speech is protected and what is prohibited,. *Thomas*, 323 U.S. at 534-36, resulting. This results in processes for determining exempt function activity or the Exempt Application process that are inherently unfair and unconstitutional, see. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 432-33 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.").

214.    The IRS's use of the subjective Facts and Circumstances Test contained in Revenue Ruling 2004-6 to determine Freedom Path's tax-exempt status or "exempt function activity" is evidenced inconfirmed by the Final Determination letter, and.

218.215.      This Test also caused Freedom Path not to run certain genuine issue advertisements protected under *WRTL*, and will continueit continues to cause Freedom Path not to run such advertisements in the future. *See Keyishian v. Board of Regents*, 385 U.S. 589, 604 (1967) ("When one must guess what . . . utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone.'") (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

216.    The standard for determining whether an organization gets § 501(c)(4) tax-exempt status must be given a construction allowing those groups to do issue advocacy or else it is vague, overbroad, and a violation of the First Amendment.

219.217.      Freedom Path seeks a declaration thatis entitled to a declaratory judgment that it has 26 U.S.C. § 501(c)(4) tax-exempt status and that the application of the IRS's Facts and Circumstances Test contained in Revenue Ruling 2004-6 is unlawful as applied,

~~overbroad, and facially~~ (i) void for vagueness in violation of the Due Process Clause of the Fifth Amendment or the First Amendment: and (ii) is unlawful and a ~~permanent injunction against its enforcement~~ violation of the First Amendment.

~~COUNT IV~~
~~Violations of the Administrative Procedure Act~~
~~Contrary to Law~~
~~Declaratory Judgment and Injunctive Relief~~

218.    This Court may grant declaratory relief to an organization challenging the IRS's final determination that the organization is not exempt under 26 U.S.C. § 501(c). *See* 26 U.S.C. § 7428(a)(1)(E).

~~220.~~ Because Freedom Path ~~realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.~~

~~221.   The IRS violated the Administrative Procedure Act (APA) by acting contrary to law in denying Freedom Path's application for 26 U.S.C. § 501(c)(4) status. *See* 5 U.S.C. § 706.~~

~~222.   The IRS unlawfully withheld~~ is an exempt organization and ~~unreasonably delayed Freedom Path's § 501(c)(4) tax-exempt status. *See id*.~~

~~223.   The IRS abused its discretion and acted not in accordance with law in violating the Constitution, as explained above. *See id*.~~

~~224.~~219.     ~~The IRS abused its discretion and acted not in accordance with law in rejecting Freedom Path's application for~~ has exhausted its administrative remedies, it seeks a declaratory ruling under 26 U.S.C. § 7428 that Freedom Path qualifies for tax exemption under 26 U.S.C. § 501(c)(4)~~ status. *See id*.~~).

225. The IRS acted contrary to law in using its vague Facts and Circumstances Test to essentially determine that Freedom Path was a political organization under 26 U.S.C. § 527.

226. Freedom Path seeks a declaration that the IRS unlawfully withheld, unreasonably delayed, abused its discretion, and acted not in accordance with law—thus violating the Administrative Procedure Act in many ways—in denying Freedom Path's application for 26 U.S.C. § 501(c)(4) status.

**COUNT V**
**Violations of the Administrative Procedure Act**
**Arbitrary and Capricious**
**Declaratory Judgment and Injunctive Relief**

227. Freedom Path realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

228. The IRS violated the Administrative Procedure Act (APA) by acting arbitrarily and capriciously in denying Freedom Path's application for 26 U.S.C. § 501(c)(4) status. *See* 5 U.S.C. § 706.

229. The IRS's Revenue Ruling 2004-6 is arbitrary and capricious.

230. The IRS applied and heavily relied on Revenue Ruling 2004-6 in denying Freedom Path's application for 26 U.S.C. § 501(c)(4) status.

231. The IRS itself has effectively conceded that it cannot apply its own non-exhaustive, 11-factor test with any predictability. *See* 78 Fed. Reg. at 71536-37 (acknowledging the need for "sharper" rules that would afford "greater certainty" to the public and the government).

232.   Furthermore, the IRS failed to explain why its 11-factor Facts and Circumstances Test in Revenue Ruling 2004-6 is not unconstitutionally vague or a free speech violation—even though Freedom Path expressly challenged the 11-factor test on those bases.

233.   Freedom Path seeks a declaration that the IRS acted arbitrarily and capriciously, and thus violated the Administrative Procedure Act, in denying its application for 26 U.S.C. § 501(c)(4) status.

## PRAYER FOR RELIEF

WHEREFORE Freedom Path demands judgment against Defendants and in favor of Freedom Path as follows:

a.      declare Freedom Path is qualified for tax exemption to operate as ana 26 U.S.C. § 501(c)(4) organization;

b.      declare that the Facts and Circumstances Test contained in IRS Revenue Ruling 2004-6, and any applicable rules and regulations implementing this Revenue Ruling, are unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment and the First Amendment as applied to Freedom Path's § 501(c)(4) application;

c.      declare that the Facts and Circumstances Test contained in IRS Revenue Ruling 2004-6, and any applicable rules and regulations implementing this Revenue Ruling, are unconstitutional restrictions on free speech—as applied, and overbroad, and facially—in violation of the First Amendment; as applied to Freedom Path's § 501(c)(4) application; and

d. ~~declare that the IRS's ruling here about Freedom Path's speech unlawfully chilled and chills Freedom Path's speech and the speech of other organizations;~~

e. ~~enjoin Defendants from using the Facts and Circumstances Test contained in IRS Revenue Ruling 2004-6, and any applicable rules and regulations implementing this Revenue Ruling;~~

f. ~~enjoin Defendants from enforcing the IRS ruling here against Freedom Path;~~

g. ~~award Freedom Path its reasonable attorney's fees, costs, and expenses associated with this action pursuant to the Equal Access of Justice Act, 28 U.S.C. § 2412(d)(1)(A); and~~

~~h.~~d. award Freedom Path such other and further relief as this Court deems necessary and proper.

Dated: ~~May 20~~October 23, 2020

Respectfully submitted,

/s/ Scott A. Keller
Scott A. Keller
D.C. Bar No. 1632053
BAKER BOTTS LLP
700 K St. NW
Washington, D.C. 20001
(202) 639-7837
scott.keller@bakerbotts.com

Chris K. Gober*
D.C. Bar No. 975981
The Gober Group PLLC
7500 Rialto Blvd., Bldg. 1, Suite 250
Austin, TX 78735
(512) 354-1787
cg@gobergroup.com

*Admitted *pro hac vice*