**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FREEDOM PATH, INC.,      )
             )
   Plaintiff,      )
             )
   v.         )   No. 1:20-cv-01349 (KBJ)
             )
INTERNAL REVENUE SERVICE, et al.,  )
             )
   Defendants.     )
_____ )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>FREEDOM PATH'S MOTION FOR SUMMARY JUDGMENT</u>**

Chris K. Gober
D.C. Bar No. 975981
The Gober Group PLLC
14425 Falcon Head Blvd, Bldg E
Austin, TX 78738
(512) 354-1787
cg@gobergroup.com

Scott A. Keller
D.C. Bar No. 1632053
Baker Botts LLP
700 K St. NW
Washington, D.C. 20001
(202) 639-7837
scott.keller@bakerbotts.com

*Counsel for Plaintiff Freedom Path, Inc.*

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Introduction and Summary of Argument .................................................................. 1

Background .............................................................................................................. 6

    A. Regulatory Background ...................................................................... 6

    B. Factual Background ......................................................................... 10

Standard of Review ............................................................................................... 19

Argument .............................................................................................................. 20

I.    The IRS's 11-Part "Facts And Circumstances Test" For Evaluating Whether Speech Is Political Campaign Intervention Is Unconstitutionally Vague. ........................................... 20

    A.    The Supreme Court Already Has Rejected As "Ambiguous" A Nearly Identical 11-Factor Test For Regulating Political Speech. ...................................................... 23

    B.    The Facts And Circumstances Test Does Not Provide The "Objective And Workable Standards" Necessary To Provide Fair Notice To Regulated Parties Or To Limit Arbitrary Enforcement By The IRS. .......................................... 25

        1.    The Test's 11 Factors Can Include Issue Advocacy Communications, And They Are Individually Vague And Often Contradictory. ...................................... 25

        2.    Revenue Ruling 2004-06's Six Hypothetical Applications Of The 11-Factor Test Provide Little Further Guidance And Only Confirm The Test's Vagueness. ...................................... 32

II.    To Cure The Vagueness Problems, The IRS's Standard For "Political Campaign Intervention" Should Be Limited To Express Advocacy. ...................................... 34

III.    Freedom Path Qualifies As A § 501(c)(4) Organization Because Its Primary Activity Is Issue Advocacy Seeking Legislation, Which Is Precisely What Freedom Path's "Repeal It" And "Three Men" Advertisements Were Here. ...................................... 37

Conclusion ............................................................................................................ 41

i

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*Airlie Found. v. IRS*,
283 F. Supp. 2d 58 (D.D.C. 2003) ........................................................................20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..............................................................................................20

*\*Big Mama Rag, Inc. v. United States*,
631 F.2d 1030 (D.C. Cir. 1980) ..........................................................5, 21, 22, 27

*\*Buckley v. Valeo*,
424 U.S. 1 (1976) (per curiam) ..................................................................... *passim*

*\*Citizens United v. FEC*,
558 U.S. 310 (2010) ....................................................................................... *passim*

*Comm. for Creative Non-Violence v. Turner*,
893 F.2d 1387 (D.C. Cir. 1990) ...........................................................................22

*Connick v. Myers*,
461 U.S. 138 (1983) ................................................................................................5

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ..............................................................................................21

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ....................................................................................4, 21, 22

*FEC v. Mass. Citizens for Life, Inc. (MCFL)*,
479 U.S. 238 (1986) ...................................................................................2, 39, 40

*\*FEC v. Wis. Right To Life, Inc. (WRTL)*,
551 U.S. 449 (2007) ....................................................................................... *passim*

*Feld v. Fireman's Fund Ins. Co.*,
909 F.3d 1186 (D.C. Cir. 2018) ...........................................................................20

*Freedom Path, Inc. v. IRS*,
913 F.3d 503 (5th Cir. 2019) ................................................................................22

*Freedom Path, Inc. v. IRS*,
No. 3:14-CV-1537-D (N.D. Tex.) ..................................................................10, 22

*Fund for the Study of Economic Growth and Tax Reform v. IRS*,
  997 F. Supp. 15 (D.D.C. 1998) ........................................................................20

*Garrison v. Louisiana*,
  379 U.S. 64 (1964) .............................................................................................5

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) .........................................................................................21

*Hynes v. Mayor of Oradell*,
  425 U.S. 610 (1976) .........................................................................................22

*Jacobellis v. Ohio*,
  378 U.S. 184 (1964) .........................................................................................27

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
  513 U.S. 527 (1995) ....................................................................................23, 27

*Keyishian v. Bd. of Regents of Univ. of State of New York*,
  385 U.S. 589 (1967) .........................................................................................32

*Kolender v. Lawson*,
  461 U.S. 352 (1983) .........................................................................................28

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .........................................................................................27

*Libertarian Party of Ohio v. Blackwell*,
  462 F.3d 579 (6th Cir. 2006) ...........................................................................30

*McConnell v. FEC*,
  540 U.S. 93 (2003) ......................................................................................35, 39

*McCutcheon v. FEC*,
  572 U.S. 185 (2014) ...........................................................................................7

*Minn. Citizens Concerned for Life, Inc. v. Kelley*,
  427 F.3d 1106 (8th Cir. 2005) .........................................................................30

*Minn. Voters Alliance v. Mansky*,
  138 S. Ct. 1876 (2018) .........................................................................4, 20, 21, 27

*NAACP v. Hampton Cty. Election Comm'n*,
  470 U.S. 166 (1985) ...........................................................................................2

*New Dynamics Found. v. United States*,
  70 Fed. Cl. 782 (2006) .....................................................................................20

*Norcal v. IRS*,
No 1:13-cv-00341 (S.D. Ohio) ............................................................................10

*Sessions v. Dimaya*,
138 S. Ct. 1204 (2018)........................................................................................22

*Van Hollen v. FEC*,
811 F.3d 486 (D.C. Cir. 2016)............................................................................39

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982)............................................................................................22

## STATUTES AND RULES

26 U.S.C. § 501(a) ....................................................................................................7

26 U.S.C. § 527.................................................................................................7, 9, 36

26 U.S.C. § 6104 .......................................................................................................7

26 U.S.C. § 7428 .......................................................................................................6

52 U.S.C. § 30104.........................................................................................12, 36, 38

Fed. R. Civ. P. 56(a) ...............................................................................................19

## REGULATORY AUTHORITIES

11 C.F.R. § 114.15............................................................................................24, 25

17 C.F.R. § 275 .........................................................................................................7

*26 C.F.R. § 1.501 ........................................................................................... *passim*

Guidance for Tax-Exempt Social Welfare Organizations on Candidate-Related
Political Activities, 78 Fed. Reg. 71535 (Nov. 9, 2013)................................3, 26, 36

Guidance Under Section 6033 Regarding the Reporting Requirements of Exempt
Organizations, 85 Fed. Reg. 31959 (May 28, 2020)...............................................7

*Rev. Rul. 68-656, 1968 WL 15166 ......................................................... *passim*

Rev. Rul. 1981-95, 1981 WL 166125.........................................................................8

*Rev. Rul. 2004-06, 2003 WL 23009324 ................................................... *passim*

Rev. Rul. 2007-41, 2007 WL 1576989......................................................................13

iv

## OTHER AUTHORITIES

Barton Beebe, *An Empirical Study of the Multifactor Tests for Trademark Infringement*, 94 Cal. L. Rev. 1581 (2006)..............................................................27

Daniel Werfel, *Charting a Path Forward at the IRS: Initial Assessment and Plan of Action* (June 24, 2013)...........................................................................26

Dep't of Justice, *Attorney General Jeff Sessions Announces Department of Justice has Settled with Plaintiff Groups Improperly Targeted by IRS* (Oct. 26, 2017)....................10

Edward A. Zelinsky, *Applying the First Amendment to the Internal Revenue Code:* Minnesota Voters Alliance *and the Tax Law's Regulation of Nonprofit Organizations' Political Speech*, 83 Alb. L. Rev. 1 (2020)....................................................29

IRS, *Social Welfare Organizations*, https://bit.ly/34US4IM ..........................................8

Laura W. Murphy & Marvin J. Johnson, *ACLU Letter to the IRS Expressing Concerns About Revenue Ruling 2004-06 with Regard to Political Speech and the Definition of What is or is not an "Exempt Function"* (Jan. 26, 2004) ..............................3

Mark Memmott, *IRS Apologizes For Singling Out Conservative Groups*, NPR (May 10, 2013)...................................................................................................11

Paul C. Barton, *Koskinen's Comments on Political Spending of Nonprofits Disputed*, Tax Notes and Tax Analysis (March 31, 2015) ......................................8

Richard Cowan & Susan Cornwell, *House Votes to Begin Repealing Obamacare*, Reuters (Jan. 13, 2017) ...............................................................................39

S. Con. Res. 39, 112th Cong. (2012) ..........................................................................16

Treasury Inspector General for Tax Administration, *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review* (May 14, 2013) ...........................11, 12

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(a), Plaintiff Freedom Path, Inc. ("Freedom Path") respectfully submits the following Memorandum of Points and Authorities in Support of its Motion for Summary Judgment.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This lawsuit is the culmination of the Internal Revenue Service's ("IRS") years-long consideration of Plaintiff Freedom Path's application for 26 U.S.C. § 501(c)(4) "public welfare organization" tax-exempt status, which was filed in 2011. Since then, the IRS engaged in invasive requests for Freedom Path's information, illegally publicly disclosed Freedom Path's information, and eventually settled a separate lawsuit for targeting Freedom Path for its conservative views.

The IRS erroneously denied Freedom Path's application for § 501(c)(4) status, concluding that Freedom Path is not "primarily engaged in promoting in some way the common good and general welfare of the people of the community." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i). The IRS's denial order applied an unlawfully vague, 11-part standard to determine that two of Freedom Path's television advertisements were "intervention in political campaigns," which the IRS does not consider as a valid social-welfare purpose for § 501(c)(4) status. *Id.* § 1.501(c)(4)-1(a)(2)(ii). But these two advertisements were actually issue advocacy "seeking legislation," which the IRS has recognized for decades as a valid social-welfare purpose warranting § 501(c)(4) status. If these two advertisements are properly treated as issue advocacy rather than political campaign intervention, then Freedom Path's primary activity is not political campaign intervention—so Freedom Path should be granted § 501(c)(4) status. The material facts are undisputed, so summary judgment should be granted for Freedom Path on these dispositive legal questions.

I.     The IRS denied Freedom Path § 501(c)(4) status by applying an unlawfully vague, 11-part "Facts and Circumstances Test" to evaluate whether Freedom Path's political speech con-

stituted "political campaign intervention." AR.236-39; [1] *see* Rev. Rul. 2004-06, 2003 WL 23009324, at *1 (IRS's initial creation of this 11-part test for evaluating political speech).

For decades, the IRS has stated that "political campaign intervention" is not a social-welfare purpose warranting § 501(c)(4) status, 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii)—but "inform[ing] the public . . . on a subject of public interest and concern" and the "seeking of legislation" each is "a permissible means of attaining social welfare purposes" that does warrant § 501(c)(4) tax-exempt status, Rev. Rul. 68-656, 1968 WL 15166, at *1.

The Supreme Court has recognized issue advocacy and speech seeking legislation will often mention political candidates. *See, e.g.*, *FEC v. Wis. Right To Life, Inc. (WRTL)*, 551 U.S. 449, 456-57 (2007) ("[c]andidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions") (quoting *Buckley v. Valeo*, 424 U.S. 1, 42 (1976) (per curiam));[2] *FEC v. Mass. Citizens for Life, Inc. (MCFL)*, 479 U.S. 238, 249 (1986) (recognizing that there are situations for which "mere discussion of public issues [] by their nature raise the names of certain politicians"); *Buckley*, 424 U.S. at 42 ("Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest."). Likewise, such speech may often come shortly before elections. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 334 (2010) ("There are short timeframes in which speech can have influence."); *WRTL*, 551 U.S. at 473 ("a group can certainly choose to run an issue ad to coincide with public interest"); *id.* at 472 (holding that speech's proximity to an election does not convert speech from issue advocacy into express advocacy or its functional equivalent); *NAACP v. Hampton Cty. Election Comm'n*, 470 U.S. 166, 177 (1985) ("issues that provoke responses from the electorate . . . are most likely to arise shortly before election time").

---

[1] Citations to the Administrative Record take the following form: AR.[Bates Number].
[2] All citations to *WRTL* are to the Chief Justice's controlling plurality opinion.

Yet the IRS has refused to provide clear, fair notice—or notice that accords with the Supreme Court's understanding of issue advocacy—of what speech constitutes "political campaign intervention" versus speech "seeking legislation."

Instead, the IRS applies its 11-part Facts and Circumstances Test. The vagueness of this non-exhaustive multifactor test is only exacerbated by its individual factors—which are often themselves vague in isolation, contradictory in conjunction, and not weighted or otherwise prioritized. This formless standard leaves organizations like Freedom Path in the dark about what significant consequences will occur if they engage in protected speech. And this vague test can easily encompass issue advocacy seeking legislation simply because that speech mentions candidates or comes before an election. That is precisely what occurred here to Freedom Path, as the two dispositive advertisements at issue both sought legislation: Freedom Path's "Repeal It" advertisement sought the repeal of the Affordable Care Act, AR.884, and the "Three Men" advertisement sought the enactment of a Balanced Budget Amendment, AR.885.

The IRS itself has conceded that its 11-part Facts and Circumstances Test has caused "considerable confusion"—both externally for organizations and internally for the IRS—about which organizations qualify for § 501(c)(4) status. *See* Guidance for Tax-Exempt Social Welfare Organizations on Candidate-Related Political Activities, 78 Fed. Reg. 71535, 71536 (Nov. 9, 2013).

Indeed, the American Civil Liberties Union asserted that this 11-part test is "inherently vague," "offends basic notions of due process," and "enhances the risk of arbitrary and discriminatory enforcement." Laura W. Murphy & Marvin J. Johnson, *ACLU Letter to the IRS Expressing Concerns About Revenue Ruling 2004-06 with Regard to Political Speech and the Definition of What is or is not an "Exempt Function"* (Jan. 26, 2004), https://bit.ly/3mqRJUb ("ACLU Letter").

As the Supreme Court recently reaffirmed in *Minnesota Voters Alliance v. Mansky*, regulation of speech requires law "capable of reasoned application." 138 S. Ct. 1876, 1892 (2018). Even if the government has a legitimate regulatory purpose, the government cannot lawfully use an "unmoored" test with an "indeterminate scope" and "the potential for erratic application." *Id.* at 1888, 1889, 1890.

In fact, the Supreme Court has already invalidated a virtually identical "two-part, 11-factor balancing test" for assessing whether political speech is issue advocacy, characterizing such an 11-factor test as "ambiguous" and "an unprecedented governmental intervention into the realm of speech." *Citizens United*, 558 U.S. at 335, 336. Government agencies cannot create "ambiguous tests" for assessing political speech that require "[g]overnment officials [to] pore over each word of a text to see if, in their judgment, it accords with the 11-factor test they have promulgated." *Id.* at 336. The IRS's Facts and Circumstances Test replicates these same problems and subjects the protected political speech of organizations like Freedom Path to an "'open-ended rough-and-tumble of factors'" in violation of Supreme Court precedent. *WRTL*, 551 U.S. at 469 (citation omitted).

Accordingly, the IRS's 11-part Facts and Circumstances Test is unlawfully vague under the Due Process Clause, as well as the First Amendment. "Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way. When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted).

IRS "regulations authorizing tax exemptions may not be so unclear as to afford latitude for subjective application by IRS officials," and the vagueness doctrine ensures that government officials have "explicit guidelines in order to avoid arbitrary and discriminatory enforcement." *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1034, 1035 (D.C. Cir. 1980). Nowhere is the need for clear rules more important than in the government's regulation of political speech, *id.* at 1035—"the most fundamental First Amendment activities," *Buckley*, 424 U.S. at 14; *see, e.g.*, *Connick v. Myers*, 461 U.S. 138, 145 (1983) ("Speech concerning public affairs is more than self-expression; it is the essence of self-government.") (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)).

II.     To cure the vagueness problems, this Court should limit the IRS's "political campaign intervention" standard to express advocacy. This is the same way the Supreme Court saved similarly vague standards that turn on an organization's political campaign intervention or speech to "influence" an election. Namely, *Buckley v. Valeo* held that a nearly identical standard ("influencing" political campaigns) "must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office"—"in order to preserve the provision against invalidation on vagueness grounds," 424 U.S. at 44; *see id.* at 79-80 ("vagueness problems" cured by limiting the standard of "influencing" political campaigns to "communications that expressly advocate").

III.    When "political campaign intervention" is correctly limited to only express advocacy, Freedom Path's political campaign intervention amounted to no more than about 40% of Freedom Path's total expenditures in 2012—far short of being Freedom Path's "primary purpose." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i). In the two dispositive advertisements here, Freedom Path's speech came nowhere close to express advocacy—or even the broader "functional equivalent of

express advocacy." *WRTL*, 551 U.S. at 470. The material facts of this speech are undisputed. Neither advertisement uses any language expressly urging votes for a particular candidate or even mentions any election. Instead, both advertisements contain the hallmarks of issue advocacy: They "focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter." *Id.* These two advertisements therefore were not "political campaign intervention." Instead, they were issue advocacy seeking legislation, which is a valid social-welfare purpose warranting § 501(c)(4) status.

Accordingly, this Court should declare that the IRS's 11-part Facts and Circumstances Test is unconstitutionally vague as applied to Freedom Path's speech and application for § 501(c)(4) tax-exempt status, and the Court should declare that Freedom Path is entitled to § 501(c)(4) tax-exempt status. *See* 26 U.S.C. § 7428(a).

## BACKGROUND

### A.      Regulatory Background

1.      The IRS regulates political speech by granting or denying tax-exempt status to organizations based on their political speech. Through different tax-exempt statuses, the IRS can impose varying tax burdens and significant regulatory consequences.

At issue here, an organization qualifies for 26 U.S.C. § 501(c)(4) tax-exempt status—as a "social welfare organization"—"if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community" or otherwise "operated primarily for the purpose of bringing about civic betterments and social improvements." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i).

Section 501(c)(4) status entails significant consequences. Organizations with § 501(c)(4) status are exempt from federal income tax. 26 U.S.C. § 501(a). Section 501(c)(4) organizations

also are "not required to publicly disclose their donors."[3] *McCutcheon v. FEC*, 572 U.S. 185, 224 (2014) (citing 26 U.S.C. § 6104(d)(3)). And after a recent regulatory amendment, § 501(c)(4) organizations also do not have to disclose their donors to the IRS. *See* Guidance Under Section 6033 Regarding the Reporting Requirements of Exempt Organizations, 85 Fed. Reg. 31959, 31968 (May 28, 2020) (amending 26 C.F.R. § 1.6033-2(g)). The IRS's designation of § 501(c)(4) status has additional ramifications beyond the IRS's direct regulation. For instance, firms regulated by the Securities and Exchange Commission are severely limited in their ability to contribute to political campaigns, which may include a group the IRS determines has a "primary purpose" of political activity. *See* 17 C.F.R. § 275 (Securities and Exchange Commission "pay-to-play" rule against contributions by investment advisors); *see also* Municipal Securities Rulemaking Board Rule G-37(b) (prohibiting firms from engaging in specific business practices with an issuer within two years of the issuer contributing to public officials).

The IRS will deny an application for § 501(c)(4) status if the IRS concludes that the organization primarily engages in political speech that constitutes *political campaign intervention*—that is, "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii).

In contrast, under the IRS's longstanding position, it will grant an application for § 501(c)(4) status if the organization primarily engages in *issue advocacy* or *seeks legislation*. In 1968, the IRS recognized that the "seeking of legislation germane to [an] organization's programs" is "a permissible means of attaining social welfare purposes" warranting § 501(c)(4) status. Rev.

---

[3] Some other organizations regulated by the IRS do have to disclose their donors, namely "political organizations" under 26 U.S.C. § 527. The IRS also uses its vague 11-part Facts and Circumstances Test to evaluate § 527 status. *See* Rev. Rul. 2004-06, 2003 WL 23009324, at *1. Section 527 "political organizations" are "organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both, for an exempt function," which is defined as "influencing or attempting to influence" elections. 26 U.S.C. § 527(e)(1)-(2). Section 527 political organizations must disclose their donors to the IRS, *id.* § 527(j)(3)(A)-(B); the IRS, in turn, must make these disclosures publicly available, *id.* § 527(k), § 6104(d)(7).

Rul. 68-656, 1968 WL 15166, at *1. The IRS today continues to acknowledge that "[s]eeking legislation germane to the organization's programs is a permissible means of attaining social welfare purposes" to become "a section 501(c)(4) social welfare organization." IRS, *Social Welfare Organizations*, https://bit.ly/34US4IM. More broadly, "[a]n organization that is organized and operated to inform the public by educational methods on a subject of public interest and concern may be exempt under section 501(c)(4) of the Code even though the subject evokes controversy and even though the organization advocates a particular viewpoint and seeks changes in law to reflect such viewpoint." Rev. Rul. 68-656, 1968 WL 15166, at *1.

Under the IRS's "primary activity" test for § 501(c)(4) status, "an organization may carry on lawful political activities and remain exempt under section 501(c)(4) as long as it is primarily engaged in activities that promote social welfare." Rev. Rul. 1981-95, 1981 WL 166125, at *2; *id.* ("[T]he regulations do not impose a complete ban on ['political campaign activities'] for section 501(c)(4) organizations."). Although IRS guidance permits an organization to engage in a mix of social welfare activity and political campaign intervention, the IRS has not promulgated definitive guidance on how to calculate which activity constitutes the organization's primary activity. Then-IRS Commissioner John Koskinen quantified "primary activity" by saying, "If you spend at this point less than *49 percent of your money on politics*, you can be a (c)(4)." Paul C. Barton, *Koskinen's Comments on Political Spending of Nonprofits Disputed*, Tax Notes and Tax Analysis (March 31, 2015) (emphasis added).

2.      As the IRS did to Freedom Path's protected political speech and application here, AR.236-39, the IRS applies an open-ended, 11-part "Facts and Circumstances Test" to evaluate whether an organization's advocacy communications constitute "political campaign intervention"

for purposes of assessing § 501(c)(4) status.[4] Instead of drawing a clear line, the Facts and Circumstances Test directs the IRS to consider "[a]ll the facts and circumstances" to determine whether a given communication is political campaign intervention. Rev. Rul. 2004-06, 2003 WL 23009324, at *1.

This Test contains a non-exhaustive list of 11 factors organized into two groups:

| Indicia That Speech Is Political Campaign Intervention | Indicia That Speech Is Not Political Campaign Intervention |
|---|---|
| "**a)** The communication identifies a candidate for public office; **b)** The timing of the communication coincides with an electoral campaign; **c)** The communication targets voters in a particular election; **d)** The communication identifies that candidate's position on the public policy issue that is the subject of the communication; **e)** The position of the candidate on the public policy issue has been raised as distinguishing the candidate from others in the campaign, either in the communication itself or in other public communications; and **f)** The communication is not part of an ongoing series of substantially similar advocacy communications by the organization on the same issue." | "**a)** The absence of any one or more of the factors listed in a) through f) above; **b)** The communication identifies specific legislation, or a specific event outside the control of the organization, that the organization hopes to influence; **c)** The timing of the communication coincides with a specific event outside the control of the organization that the organization hopes to influence, such as a legislative vote or other major legislative action (for example, a hearing before a legislative committee on the issue that is the subject of the communication); **d)** The communication identifies the candidate solely as a government official who is in a position to act on the public policy issue in connection with the specific event (such as a legislator who is eligible to vote on the legislation); and **e)** The communication identifies the candidate solely in the list of key or principal sponsors of the legislation that is the subject of the communication." |

*Id.*

---

[4] The IRS originally created the Facts and Circumstances Test to determine when an organization "that engages in public policy advocacy" actually engages in communications that have the "function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any . . . public office or office." 26 U.S.C. § 527(e)(2) (emphasis added); *see* Rev. Rul. 2004-06, 2003 WL 23009324, at *1.

The IRS's Revenue Ruling 2004-06, which initially created this 11-part Facts and Circumstances Test, also outlines six hypothetical "situations" evaluating whether hypothetical advocacy communications qualify as political campaign intervention under this Test. *Id.*

## B. Factual Background

After a years-long application process, the IRS denied Freedom Path's application for § 501(c)(4) status after applying the Facts and Circumstances Test to Freedom Path's political speech multiple times. This denial came after the IRS engaged in broad and invasive requests for information from Freedom Path, illegally publicly disclosed Freedom Path's confidential tax information, and eventually settled a separate lawsuit regarding the IRS's targeting of Freedom Path based on Freedom Path's conservative views.[5]

1.     Freedom Path is a nonprofit corporation formed "to promote and defend the causes that recognize the individual rights and liberties guaranteed to all Americans[.]" AR.15. Freedom Path "has advocated against excessive government spending, in favor of a Balanced Budget Amendment" and "against the Patient Protection and Affordable Care Act and various healthcare policies of the federal government." AR.47.

Freedom Path completed its Application for Exemption as a § 501(c)(4) organization on March 7, 2011. AR.20-24. About eleven months later, the IRS sent Freedom Path requests for additional information, including the identities of Freedom Path's donors. AR.25-33. Freedom

---

[5] Freedom Path sued the IRS in April 2014 for the IRS's "illegal targeting of Plaintiff and the additional and unconstitutional scrutiny of Plaintiff's pending [application] based solely on its conservative policy positions[.]" Dkt. No. 1, *Freedom Path, Inc. v. IRS*, No. 3:14-CV-1537-D (N.D. Tex. Apr. 28, 2014). The IRS settled this claim on November 28, 2017. Dkt. No. 106, *Freedom Path*, No. 3:14-CV-1537-D (Nov. 28, 2017).

The IRS also settled similar claims in other cases, including a class-action that included Freedom Path. Dkt. No. 431, *Norcal v. IRS*, No, 1:13-cv-00341 (Aug. 8, 2018 S.D. Ohio). The Attorney General publicly apologized for the IRS's misconduct in targeting conservative organizations: "There is no excuse for this conduct. Hundreds of organizations were affected by these actions, and they deserve an apology from the IRS. We hope that today's settlement makes clear that this abuse of power will not be tolerated." Dep't of Justice, *Attorney General Jeff Sessions Announces Department of Justice has Settled with Plaintiff Groups Improperly Targeted by IRS* (Oct. 26, 2017), https://bit.ly/38doIY7.

Path complied with most of these requests, but it did not provide a list of its donors. AR.46. The Treasury Inspector General for Tax Administration ("TIGTA") later confirmed that the IRS requesting such donor information was "unnecessary" and irrelevant to an organization's tax-exempt status. TIGTA, *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review* 20 (May 14, 2013), https://bit.ly/3noxdV8 ("TIGTA Report").

When the IRS requested this information, however, Freedom Path had already spent most of its funds and decided that "it would not accept additional contributions until the IRS provided additional clarity regarding the application process or issued a favorable determination regarding its tax-exempt status." AR.287. After May 15, 2012, Freedom Path stopped accepting contributions and spent its remaining funds "on the legal and accounting fees necessary to respond to the IRS's ongoing inquiries." *Id.* So Freedom Path's advocacy was chilled by the IRS's delay and requests. *Id.*

More than eight months after Freedom Path responded to the IRS's first set of requests, the IRS requested yet more information from Freedom Path on February 20, 2013. AR.174-77. Again, Freedom Path provided some responses, but it largely declined to provide more detailed information because the IRS had already illegally publicly disclosed Freedom Path's confidential tax information. *See* AR.182-94. On April 24, 2013, the IRS sent Freedom Path a follow-up letter, demanding Freedom Path provide the additional information the IRS requested or "we [IRS] will close your case" and "you [Freedom Path] may lose your right to ask a court for declaratory judgment on your exempt status." AR.195.

Shortly after the IRS demanded Freedom Path comply with its second round of requests, the IRS publicly apologized for a pattern of intentionally targeting conservative organizations like Freedom Path. *See, e.g.*, Mark Memmott, *IRS Apologizes For Singling Out Conservative Groups*,

NPR (May 10, 2013), https://n.pr/37qaRgw. Specifically, the TIGTA report concluded that, during the 2012 election, the IRS: (1) targeted tax-exempt applications from perceived conservative organizations for additional scrutiny and inquiry based on "inappropriate criteria" like organizational names and policy positions; (2) delayed those applications' processing time; and (3) requested unnecessary information from applicants. *See* TIGTA Report at 5-20.

Then, on June 26, 2013, the IRS sent Freedom Path another letter about the IRS's new "Optional Expedited Process." AR.210. But this "Optional Expedited Process" included notably different standards for evaluating § 501(c)(4) status. For example, in determining an organization's "primary activity," the IRS under this optional process would (1) evaluate not only total expenditures, as former IRS Commissioner Koskinen stated, but also total *time* spent on political campaign intervention, and (2) ask whether political campaign intervention exceeded just *40%* of the organization's activities, rather than 50%. AR.210. Furthermore, the IRS's definition of "political campaign intervention" under this optional process entailed an even broader test with no basis in the Internal Revenue Code or IRS regulations: "Any public communication within 60 days prior to a general election or 30 days prior to a primary election that *identifies* a candidate in the election." AR.211 (emphasis added).[6] Freedom Path accordingly declined to participate in this "Optional Expedited Process." AR.223.

2.     After Freedom Path declined to participate in this new optional process—and over two years after Freedom Path initially completed its application—the IRS sent Freedom Path a "proposed denial" of Freedom Path's application on September 30, 2013. *See* AR.231-83 (pro-

---

[6] This test matches the Bipartisan Campaign Reform Act's ("BCRA") separate definition of an "electioneering communication": "any broadcast, cable, or satellite communication which—(I) refers to a clearly identified candidate for Federal office; (II) is made within (aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or (bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and other than President or Vice President, is targeted to the relevant electorate." 52 U.S.C. § 30104(f)(3)(A)(i).

posed denial and attachments). This letter block-quoted the IRS's 11-part Facts and Circumstances Test, and the letter's substantive analysis applied the 11-part Facts and Circumstances Test to Freedom Path's speech; the letter concluded that Freedom Path engaged in too much "political campaign intervention" in 2012 to qualify as a § 501(c)(4) organization. *See* AR.236-39.[7] The IRS did not consider Freedom Path's 2011 activities, when Freedom Path spent hundreds of thousands of dollars on issue advocacy and did not report any expenditures to the Federal Election Commission ("FEC") as express advocacy independent expenditures. AR.48-49.

Instead, the IRS analyzed Freedom Path's 6 television advertisements[8] and 20 direct mailings in 2012, and the IRS found that these 26 instances of political speech comprised "substantially all" (more than 90%) of Freedom Path's "direct expenditures" that year.[9] AR.233.

The IRS's dispositive analysis turned on two of Freedom Path's television advertisements: (1) "Repeal It," discussing the Affordable Care Act (AR.884); and (2) "Three Men," discussing

---

[7] The IRS cited myriad Revenue Rulings, many of which simply repeat the "political campaign intervention" standard, with one notable exception. Revenue Ruling 2007-41 "provides 21 examples illustrating the application of the facts and circumstances to be considered to determine whether . . . [a] *section 501(c)(3)* [organization] has participated in, or intervened in . . . political campaign on behalf of (or in opposition to) any candidate for public office." Rev. Rul. 2007-41, 2007 WL 1576989, at *1 (emphasis added). From this Revenue Ruling 2007-41, the IRS divined factors that overlap almost entirely with the 11-part Facts and Circumstances Test. AR.237. Unlike the 11-part Facts and Circumstances Test, however, the IRS Appeals Officer later in 2019 did not rely on Revenue Ruling 2007-41. *See infra* pp.18-19.

[8] One of the 6 advertisements that the IRS considered a "television" advertisement was actually a digital video advertisement called "Obamacare," but this factual dispute is immaterial. The IRS did not formally conclude whether this digital advertisement was political campaign intervention in its 2013 proposed denial letter. AR.234. The IRS's Appeals Officer in 2019 would later classify it as issue advocacy. AR.848.

[9] The IRS identified an additional Freedom Path television advertisement, but it did not include this in its analysis because the IRS found that this advertisement did not occur in 2012. AR.238 n.7. This advertisement was similar to the "Three Men" advertisement and the IRS's 2013 letter concluded "if it aired in [2012] . . . the advertisement would constitute political campaign intervention." AR.238 n.7. In 2019, the IRS Appeals Officer came to the opposite conclusion on both points: The Appeals Officer found that this advertisement did occur in 2012, but that it "is a *non-political advertisement* because it does not identify any candidates running for office." AR.848 (emphasis added).

the Balanced Budget Amendment (AR.885).[10] The IRS concluded that both these advertisements were "political campaign intervention" on behalf of then-U.S. Senator Orrin Hatch.

There are some differences between the IRS's calculations of Freedom Path's expenditures compared to what Freedom Path reported to the IRS. But these differences are immaterial to this summary-judgment motion, because if both the "Repeal It" and "Three Men" advertisements are treated as issue advocacy rather than political campaign intervention, then Freedom Path is entitled to § 501(c)(4) status even under the IRS's calculations.

The IRS calculated Freedom Path's total "direct" 2012 expenditures as $917,435. AR.233.[11] (But Freedom Path reported to the IRS approximately $1,178,927 in total 2012 expenditures—and even the IRS's own Appeals Officer would later calculate Freedom Path's 2012 expenditures as $1,068,966.70. AR.860; AR.846.)

The IRS further found that Freedom Path spent 60% of its 2012 "direct expenditures" on "political campaign intervention" and 30% on other mailings and television advertisements that did not constitute "political campaign intervention." AR.239. Applying the IRS's finding that Freedom Path spent 60% of its 2012 "direct expenditures" on political campaign intervention, the IRS determined that Freedom Path spent about $550,000 (that is, 60% of $917,435) on political campaign intervention in 2012.

---

[10] The proper classification of Freedom Path's other 4 television advertisements and all 20 of its direct mailings are either not disputed or were negligible—and thus immaterial—to the IRS's conclusion that Freedom Path engaged primarily in political campaign intervention. Freedom Path acknowledged that 3 of these other television advertisements were express advocacy counting as political campaign intervention (and Freedom Path reported these 3 advertisements to the FEC as express advocacy), and the IRS correctly concluded that the "Obamacare" advertisement was not "political campaign intervention." AR.238. For the 20 direct mailings, the IRS found that 8 were political campaign intervention while 12 were not. *Id.* Freedom Path disputes the IRS's conclusion that 5 of the 8 direct mailings were political campaign intervention, but these 5 mailings constituted a relatively smaller portion of Freedom Path's expenditures that would not materially alter the primary-activity analysis.

[11] The IRS calculated $917,435 in "direct expenditures" by excluding amounts paid to vendors for fundraising, legal services, and administrative support from Freedom Path's reported amount. AR.233.

Together, expenditures on the dispositive "Repeal It" and "Three Men" advertisements accounted for about $319,400—which is approximately 35%—of Freedom Path's total direct expenditures in 2012 as calculated by the IRS ($917,435). The IRS's 2013 denial letter did not individually calculate the expenditures on these advertisements. But Freedom Path represented to the IRS in a sworn statement that it made expenditures "[e]xceeding $150,000" on the "Repeal It" advertisement—which, to be safe, accounted for no more than $160,000. AR.295. And Freedom Path reported to the FEC $159,400 in expenditures on the "Three Men" advertisement. AR.912, 916. If both these advertisements were not counted as political campaign intervention, then Freedom Path's political campaign intervention expenditures in 2012 would have been only $230,600 (that is, $550,000 - $319,400). And $230,600 in political campaign intervention expenditures is just 25% of Freedom Path's total direct expenditures (as those expenditures were calculated by the IRS) in 2012.[12]

"Repeal It" aired statewide in Utah in late January and early February 2012. AR.295. Freedom Path reported to the IRS that it spent something "[e]xceeding $150,000" on this advertisement, and it issued other advertisements on the Affordable Care Act. AR.295; AR.848; AR.887. The audio and on-screen visuals and text for Freedom Path's "Repeal It" advertisement stated (AR.884):

| Audio | On-Screen Visuals | On-Screen Text |
|---|---|---|
| ObamaCare.<br>A trillion dollars in new government spending. | Photo of President Obama next to a massive stack of paperwork and stethoscope. | ObamaCare<br>$1.5 TRILLION<br>New Government Spending<br>Press Release, National Federation of Independent Business<br>Nov. 9, 2011 |

---

[12] By contrast to this calculation—which only works backwards from the IRS's findings—Freedom Path reported $360,748.91 in express advocacy independent expenditures to the FEC in 2012. AR.889-921. Thus, limiting Freedom Path's political campaign intervention to its express advocacy, political campaign intervention accounted for 40% of Freedom Path's total direct expenditures as calculated by the IRS ($917,435). And the $360,748.91 in express advocacy accounted for 30% of Freedom Path's total 2012 expenditures as reported to the IRS ($1,178,927).

| And devastating to small business. | Sign that says, "CLOSED" | ObamaCare Devastating to Small Business |
| But ObamaCare can still be stopped. | Photo of President Obama next to a massive stack of paperwork and stethoscope. | ObamaCare CAN STILL BE STOPPED |
| Utah's Orrin Hatch has sponsored a bill to repeal it. The first to call it unconstitutional, Hatch has even personally signed a brief to have the courts nullify it. | Photo of Senator Orrin Hatch and photo of U.S. Capitol. | U.S. Senator Orrin Hatch: ObamaCare REPEAL IT S. 192 Repeal the Job-Killing Health Care Act |
| Declaring ObamaCare unconstitutional. | Visual: Photo of Senator Orrin Hatch and photo of U.S. Constitution. | U.S. Senator Orrin Hatch: ObamaCare UNCONSTITUTIONAL "Democrats Shred Constitution," Investor's Business Daily, Oct. 2009 |
| Senator Hatch has personally signed a brief to have the courts nullify it. | Photo of Senator Orrin Hatch and photo of hand signing document | U.S. Senator Orrin Hatch: ObamaCare NULLIFY IT "Democrats Shred Constitution," Investor's Business Daily, Oct. 2009 |
| Orrin Hatch, leading the conservative charge to repeal ObamaCare. | Photo of Senator Orrin Hatch | Tell Senator Hatch: Keep leading the fight! Call (202) 224-3121 LEADING THE FIGHT AGAINST ObamaCare Paid for by Freedom Path |

The second advertisement, "Three Men," aired statewide in Utah starting on March 21, 2012, to encourage the passage of a Balanced Budget Amendment. AR.293.[13] Freedom Path reported to the FEC that it spent approximately $159,400 on this advertisement, and it issued other advertisements on the Balanced Budget Amendment. AR.912-13, 916-17; AR.883. The audio and on-screen visuals and text for "Three Men" stated (AR.885):

---

[13] On March 29, 2012, while "Three Men" was still on the air, Senator Rand Paul and Senator Mike Lee introduced a budget resolution that would have made "it out of order to consider in the Senate any budget resolution after the enactment of this resolution until a balanced budget amendment to the U.S. Constitution has been adopted, except by a supermajority waiver." S. Con. Res. 39, 112th Cong. (2012).

| Audio | On-Screen Visuals | On-Screen Text |
|---|---|---|
| Debt. More than 15 trillion dollars that will cripple our next generation. | Image of a running National Debt Clock with debt increasing by the second; overlaying a background photo of the White House. | |
| But conservative Utah Senators Orrin Hatch and Mike Lee have authored the Balanced Budget Amendment to stop Washington's runaway spending. | Photos of Senators Orrin Hatch and Mike Lee; photo of the U.S. Constitution; photo of a stop sign with the text "STOP RUNAWAY SPENDING" | SENATOR ORRIN HATCH SENATOR MIKE LEE Authors of the BALANCED BUDGET AMENDMENT STOP RUNAWAY SPENDING |
| It's the bold conservative plan supported by Mitt Romney to get spending under control. | Photo of Mitt Romney; photo of the American flag | BALANCED BUDGET AMENDMENT BOLD CONSERVATIVE PLAN |
| Call Senators Hatch and Lee. | Photos of Senator Orrin Hatch, Senator Mike Lee, Mitt Romney | Tell SENATORS HATCH and LEE: KEEP LEADING THE FIGHT! Call (202) 224-3121 |
| Tell them to keep fighting for the Balanced Budget Amendment. | Photos of Senator Orrin Hatch, Senator Mike Lee, Mitt Romney | Tell SENATORS HATCH and LEE: KEEP LEADING THE FIGHT! FOR THE BALANCED BUDGED AMENDMENT |
| And for the future of America. | Photos of Senator Orrin Hatch, Senator Mike Lee, Mitt Romney | Tell SENATORS HATCH and LEE: KEEP LEADING THE FIGHT! FOR THE FUTURE OF AMERICA |
| Freedom Path is responsible for the content of this advertising. | | PAID FOR BY FREEDOM PATH. FREEDOM PATH IS RESPONSIBLE FOR THE CONTENT OF THIS ADVERTISING. NOT AUTHORIZED BY ANY CANDIDATE OR CANDIDATE'S COMMITTEE. WWW.FREEDOM-PATH.ORG |

In evaluating these two advertisements, the IRS's proposed denial letter applied the 11-part Facts and Circumstances Test. The IRS block-quoted Revenue Ruling 2004-06's Facts and Circumstances Test and then applied various factors to Freedom Path's advertisements. AR.236-39. For instance, the IRS noted that five of the six television advertisements (including the two at issue) were distributed in the "months" leading up to the Utah nominating convention and primary elections, reflecting the Facts and Circumstances Test's negative timing factor. AR.234; *cf.* Rev. Rul. 2004-06, 2003 WL 23009324, at *1 (Negative Factor: "The timing of the communication coincides with an electoral campaign"). The IRS further suggested that "Repeal It" and "Three Men" discussed legislation that was not scheduled for a vote, seemingly reflecting the absence of one of the Test's positive timing factors. AR.234; *cf.* Rev. Rul. 2004-06, 2003 WL 23009324, at *1 (Positive Factor: "The timing of the communication coincides with a specific event outside the control of the organization that the organization hopes to influence, such as a legislative vote or other major legislative action."). The "proposed denial" concluded "based on all of the facts and circumstances, we conclude that the two television advertisements . . . also constituted political campaign intervention." AR.234.

3.       In a letter responding to the IRS's proposed denial, Freedom Path disputed both the constitutionality of the Facts and Circumstances Test and its application to Freedom Path's speech, triggering an internal administrative appeal of the IRS's proposed denial. AR.288-89.

After considering Freedom Path's response, an IRS Appeals Officer in 2019 again expressly applied the 11-part Facts and Circumstances Test to Freedom Path's § 501(c)(4) application and agreed that the IRS should deny Freedom Path's application. *See* AR.846 ("I will briefly discuss each advertisement and apply Revenue Ruling 2004-06 (for 501 (c)(4) organizations)"); *see also* AR.753. The IRS Appeals Officer stated that Freedom Path spent "$553,751" on political

campaign intervention expenditures of its "total expenditures of $1,068,966.70" in 2012, which aligns with the 2013 proposed denial letter's calculations as discussed above. AR.846.

But the Appeals Officer seemed to contradict one of the IRS's most important conclusions in its 2013 proposed denial letter. It appears that the Appeals Officer determined that the "Repeal It" television advertisement discussing the Affordable Care Act was *not* political campaign intervention. Though the Appeals Officer did not mention this advertisement by name, he concluded that Freedom Path's two advertisements referencing the Affordable Care Act were issue advocacy rather than political campaign intervention:

> There were two advertisements that featured President Obama discussing the Affordable Care Act. The ads asked the public not to support Obamacare and call their representatives. The government and the authorized representative and this Appeals Officer agree that these two ads *support Advocacy activities and not political activities*.

AR.848 (emphasis added). The record only includes two advertisements regarding the Affordable Care Act, and one is the "Repeal It" advertisement. *See* AR.884, 887.

4.     Finally, on February 20, 2020, the IRS sent its final adverse determination letter, simply affirming the conclusions from the IRS's 2013 proposed denial letter without further analysis or reference to the Appeals Officer's 2019 analysis. AR.855-59.

On the same day, the IRS sent Freedom Path a "Notice of Intent to Disclose" a redacted version of the IRS's "ruling" on Freedom Path's application: The IRS's September 30, 2013 "proposed denial" letter stripped of any identifying information and dated February 20, 2020. AR.922-23.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is proper only if, viewing the evidence in the light most favor-

able to the non-movant and drawing all justifiable inferences in its favor, there are no genuine disputes of material fact for a jury to resolve." *Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1190 (D.C. Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "The standard of review in" cases challenging denials of tax-exempt status under 26 U.S.C. § 7428 "is *de novo* and the scope of review is limited to the administrative record in the absence of a showing of good cause." *Airlie Found. v. IRS*, 283 F. Supp. 2d 58, 61 (D.D.C. 2003) (citation omitted). The review is "de novo" in the sense that "it is for the court, *ab initio*, to determine whether the organization in question is entitled to exemption." *New Dynamics Found. v. United States*, 70 Fed. Cl. 782, 794 (2006), *cited favorably by Family Trust of Massachusetts, Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012). Consequently, this Court does not defer to the IRS's adverse determination and, to the extent necessary, could "make findings of fact which differ from the administrative record." *Airlie*, 283 F. Supp. 2d at 62 (quoting *Fund for the Study of Economic Growth and Tax Reform v. IRS*, 997 F. Supp. 15, 18 (D.D.C. 1998)).

## ARGUMENT

### I.    The IRS's 11-Part "Facts And Circumstances Test" For Evaluating Whether Speech Is Political Campaign Intervention Is Unconstitutionally Vague.

The IRS's 11-part Facts and Circumstances Test is unconstitutionally vague under the Due Process Clause, as confirmed by its application here to Freedom Path's protected political speech. First Amendment free speech concerns further bolster the vagueness of the IRS's test for evaluating political speech.

As the Supreme Court has consistently held and recently reaffirmed, even if the government has the authority to regulate speech, its regulation must "be guided by objective, workable standards" in "a law capable of reasoned application." *Minn. Voters All.*, 138 S. Ct. at 1891, 1892. As the D.C. Circuit recognized decades ago, IRS "regulations authorizing tax exemptions may not

be so unclear as to afford latitude for subjective application by IRS officials." *Big Mama Rag*, 631 F.2d at 1034-35. So even if the IRS has authority to assign tax-exempt status to organizations based on their political speech, it must do so with enough clarity to avoid vagueness concerns. *See Minn. Voters All.*, 138 S. Ct. at 1891, 1892.

The IRS's 11-part Facts and Circumstances Test triggers all of the concerns underlying the vagueness doctrine. *See FCC v. Fox*, 567 U.S. at 253. First, those subject to the law must have fair notice of the law's requirements, and due process requires that the law must "provide a person of ordinary intelligence fair notice of what is prohibited." *Id.* at 254. The open-ended, 11-part Facts and Circumstances Test for determining political campaign intervention does not provide fair notice of what political speech will render an organization ineligible for § 501(c)(4) status. Compounding the vagueness problem, the IRS acknowledges that issue advocacy and "seeking legislation" is a social-welfare purpose warranting § 501(c)(4) status. Rev. Rul. 68-656, 1968 WL 15166, at *1. The IRS's Facts and Circumstances test wholly fails to "articulate some sensible basis for distinguishing" between political campaign intervention and issue advocacy seeking legislation. *Minn. Voters All.*, 138 S. Ct. at 1888 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 808-09 (1985)).

Second, laws "must provide explicit standards for those who apply them" to "prevent[]" "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). But there is no way to avoid arbitrary enforcement of the 11-part Facts and Circumstances Test. It took years for the IRS to issue a ruling on Freedom Path's application for § 501(c)(4) status, and the IRS had to settle a separate lawsuit alleging that the IRS discriminatorily enforced these laws by targeting Freedom Path for its conservative views. And it remains a mystery why the "Repeal It" and "Three Men" advertisements were treated as political campaign intervention

rather than speech seeking legislation to repeal the Affordable Care Act and enact a Balanced Budget Amendment, respectively.

Finally, vagueness concerns are especially heightened with laws dealing with speech: "The Supreme Court has indicated that '[t]he general test of vagueness applies with particular force in review of laws dealing with speech.'" *Comm. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394-95 (D.C. Cir. 1990) (alteration in original; quoting *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976)). Consequently, vagueness "standards are especially stringent, and an even greater degree of specificity is required, where, as here, the exercise of First Amendment rights may be chilled by a law of uncertain meaning."[14] *Big Mama Rag*, 631 F.2d at 1035 (collecting cases); *see, e.g.*, *FCC v. Fox*, 567 U.S. at 253-54 ("When speech is involved, rigorous adherence to [vagueness] requirements is necessary to ensure that ambiguity does not chill protected speech.").

---

[14] The Fifth Circuit vacated the Northern District of Texas's determination that the IRS's Fact and Circumstances Test is facially valid. *Freedom Path, Inc. v. IRS*, 913 F.3d 503, 508 (5th Cir. 2019). And the instant lawsuit concerns an as applied challenge.

In all events, the Northern District of Texas incorrectly reasoned that a less stringent vagueness analysis applied because the Facts and Circumstances Test carries only civil consequences. *Freedom Path, Inc. v. IRS*, No. 3:14-CV-1537-D, 2017 WL 2902626, at *5 (N.D. Tex. July 7, 2017) (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982)). The D.C. Circuit's binding precedent in *Big Mama Rag* makes clear that laws governing civil determinations of tax status "may not be so unclear as to afford latitude for subjective application by IRS officials." 631 F.2d at 1034-35; *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (finding vagueness in civil case); *id.* at 1228-29 (Gorsuch, J., concurring in part and concurring in the judgment) ("This Court has already expressly held that a 'stringent vagueness test' should apply to at least some civil laws—those abridging basic First Amendment freedoms."). Moreover, the Northern District of Texas's decision came before the Supreme Court's decision in *Minnesota Voters Alliance*, which made clear that, regardless of the government's underlying authority, its regulation of political speech must "be guided by objective, workable standards" embodied in "a law capable of reasoned application." 138 S. Ct. at 1891, 1892.

In attempting to distinguish the D.C. Circuit's *Big Mama Rag* decision, the Northern District of Texas did not address the specific vagueness problems posed by the IRS's Facts and Circumstances Test's factors. Instead, the court concluded that the factors "primarily address who, what, where, when, why, or how types of questions about the contents of communications." 2017 WL 2902626, at *5. This non sequitur ignores the various problems posed by a non-exhaustive 11-factor test for evaluating political speech, and the Northern District of Texas did not address the Supreme Court's admonition regarding the use of multifactor tests. *See Citizens United*, 558 U.S. at 336.

### A. The Supreme Court Already Has Rejected As "Ambiguous" A Nearly Identical 11-Factor Test For Regulating Political Speech.

As an initial matter, existing precedent already confirms that a nearly identical "two-part, 11-factor balancing test" for assessing whether political speech is issue advocacy is unconstitutionally "ambiguous." *Citizens United*, 558 U.S. at 335, 336. The IRS may not "select what political speech" constitutes political campaign intervention for prospective § 501(c)(4) organizations "by applying ambiguous tests" requiring IRS officials to "pore over each word of a text to see if, in their judgment, it accords with the 11-factor test they have promulgated." *Id.* at 336.

The Facts and Circumstances Test is nearly identical to—and has the same infirmities as— a test rejected as impermissibly vague by the Supreme Court. *See id.* The Supreme Court had previously admonished the FEC that standards for evaluating political speech require an objective test that "eschew[s] 'the open-ended rough-and-tumble of factors.'" *WRTL*, 551 U.S. at 451 (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 547 (1995)). But the FEC responded by creating an 11-factor test for determining whether speech is issue advocacy, and the Supreme Court rejected this standard as unconstitutionally "ambiguous." *Citizens United*, 558 U.S. at 336.

The FEC's 11-part test at issue in *Citizens United* overlaps substantially with the IRS's 11-factor Facts and Circumstances Test applied here to Freedom Path's application and speech. For example, the IRS's Facts and Circumstances Test inquires whether "[t]he communication identifies a candidate for public office," "targets voters in a particular election," or its timing "coincides with an electoral campaign"; the FEC's test asked whether the communication "[m]ention[ed] any election, candidacy, political party, opposing candidate, or voting by the general public." 11 C.F.R.

§ 114.15(c)(1) (2007).[15] Like the IRS's Facts and Circumstances Test, the FEC's test also considered whether the communication "[f]ocuse[d] on a public policy issue and either urge[d] a candidate to take a position on the issue or urge[d] the public to contact the candidate about the issue." *Id.* § 114.15(c)(2)(i).[16]

If anything, the IRS's 11-part Facts and Circumstances Test is even *more ambiguous* than the FEC's unlawful 11-part test in *Citizens United*—for at least three reasons.

First, the FEC provided a "safe harbor" for communications meeting certain objective criteria. *See id.* § 114.15(b) (2007).[17] Only if a communication did not qualify under the safe-harbor provision would the FEC resort to its 11-part balancing test. *Id.* § 114.15(c). And even with that safe harbor, the Supreme Court still found this "ambiguous" test unlawful. *Citizens United*, 558 U.S. at 336. Under the IRS's Facts and Circumstances Test, there is no way for organizations to avoid the "open-ended rough-and-tumble of factors" that the FEC's unlawful test included as simply a secondary analysis. *Id.* (citation and quotation marks omitted).

---

[15] The FEC's "indicia of express advocacy" prong included two factors: "A communication includes indicia of express advocacy if it: (i) Mentions any election, candidacy, political party, opposing candidate, or voting by the general public; or (ii) Takes a position on any candidate's or officeholder's character, qualifications, or fitness for office." 11 C.F.R. § 114.15(c)(1) (2007).

[16] The FEC's countervailing three factors "that would support a determination that a communication has an interpretation other than as an appeal to vote for or against a clearly identified Federal candidate includes content that: (i) Focuses on a public policy issue and either urges a candidate to take a position on the issue or urges the public to contact the candidate about the issue; or (ii) Proposes a commercial transaction, such as purchase of a book, video or other product or service, or such as attendance (for a fee) at a film exhibition or other event; or (iii) Includes a call to action or other appeal that interpreted in conjunction with the rest of the communication urges an action other than voting for or against or contributing to a clearly identified Federal candidate or political party." 11 C.F.R. § 114.15(c)(2) (2007).

[17] This safe-harbor provision included the remaining six factors: "An electioneering communication is permissible under paragraph (a) of this section if it: (1) Does not mention any election, candidacy, political party, opposing candidate, or voting by the general public; (2) Does not take a position on any candidate's or officeholder's character, qualifications, or fitness for office; and (3) Either:
　　(i) Focuses on a legislative, executive or judicial matter or issue; and
　　　　(A) Urges a candidate to take a particular position or action with respect to the matter or issue, or
　　　　(B) Urges the public to adopt a particular position and to contact the candidate with respect to the matter or issue; or
　　(ii) Proposes a commercial transaction, such as purchase of a book, video, or other product or service, or such as attendance (for a fee) at a film exhibition or other event."
11 C.F.R. § 114.15(b) (2007).

Second, the FEC expressly provided that "any doubt will be resolved in favor of permitting the communication." 11 C.F.R. § 114.15(c) (2007). The IRS's Facts and Circumstances Test includes no such presumption favoring political speech.

Third, the FEC's unlawful test did not permit evaluation of facts beyond the contents of the communication itself—which meant that organizations engaging in political speech were only responsible for the things they said. *Id.* § 114.15(d) ("[T]he Commission may consider only the communication itself and basic background information that may be necessary to put the communication in context and which can be established with minimal, if any, discovery . . . [like] whether a named individual is a candidate for office or whether a communication describes a public policy issue."). The IRS's Facts and Circumstances Test, by contrast, allows the IRS to consider factors external to the communication itself, including the content of other organizations' political speech. *See, e.g.*, Rev. Rul. 2004-06, 2003 WL 23009324, at *1 (permitting IRS to consider "other public communications").

### B. The Facts And Circumstances Test Does Not Provide The "Objective And Workable Standards" Necessary To Provide Fair Notice To Regulated Parties Or To Limit Arbitrary Enforcement By The IRS.

Even beyond the precedential force of *Citizens United*'s treatment of 11-factor tests for evaluating political speech, the IRS's Facts and Circumstances Test is unconstitutionally vague because it does not provide fair notice and it invites arbitrary enforcement. The harms of vagueness are heightened here where the law deals with core political speech.

#### 1. The Test's 11 Factors Can Include Issue Advocacy Communications, And They Are Individually Vague And Often Contradictory.

The IRS's 11-part Facts and Circumstances Test is a collection of vague and often contradictory factors that fail to (1) provide any fair notice to organizations about what political speech

will be treated as issue advocacy warranting § 501(c)(4) status and (2) limit the IRS's enforcement discretion.

      a.      Notably, the IRS itself has recognized that its Facts and Circumstances Test has "created considerable confusion for both the public and the IRS" by not drawing a clear line between social-welfare activity like issue advocacy seeking legislation versus political campaign intervention:

> "The distinction between campaign intervention and social welfare activity, and the measurement of the organization's social welfare activities relative to its total activities, have created considerable confusion for both the public and the IRS in making appropriate § 501(c)(4) determinations." The Treasury Department and the IRS recognize that both the public and the IRS would benefit from clearer definitions of these concepts.

78 Fed. Reg. at 71536 (alteration omitted; quoting Daniel Werfel, *Charting a Path Forward at the IRS: Initial Assessment and Plan of Action* 28 (June 24, 2013)); *see also* Werfel, *Initial Assessment* at 28 ("It has been a common refrain from Congress and the public that the rules that are applicable for 501(c)(4) eligibility are ambiguous and confusing, both for the taxpayer and for the staff within the IRS whose responsibility it is to administer those laws and regulations.").

      In addition to the IRS, civil liberties organizations have criticized the Facts and Circumstances Test. For example, the American Civil Liberties Union has criticized the Test as "inherently vague" and offending "basic notions of due process":

> While the ruling is clear regarding activities involving "express advocacy," other situations are judged by the inherently vague "facts and circumstances" test. Application of such a vague test offends basic notions of due process, enhances the risk of arbitrary and discriminatory enforcement, and most importantly, inhibits the exercise of First Amendment freedoms.

ACLU Letter (footnote omitted).

      b.      The IRS's and ACLU's concerns are well founded. As an initial matter, the non-exhaustive 11-factor Test is the kind of "open-ended balancing test[ ]" that "can yield unpredictable

and at times arbitrary results." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 136 (2014); *see Grubart*, 513 U.S. at 547 ("practical consequences of adopting a multifactor test" include "jettisoning relative predictability" and "inviting complex argument in a trial court and a virtually inevitable appeal"); *see also* Barton Beebe, *An Empirical Study of the Multifactor Tests for Trademark Infringement*, 94 Cal. L. Rev. 1581, 1645-46 (2006) ("[M]ultifactor tests of ten or even eight factors appear to ask too much of the judge's ability simultaneously to weigh competing concerns and may simply result in the stampeding of less significant factors.").

Under the Facts and Circumstances Test, organizations have no guidance whether the IRS will deem their communications political campaign intervention, as the Test foregoes bright lines for muddled factors. The Test does not weigh or otherwise prioritize any of its 11 factors, so issue advocacy organizations have no lodestar to follow or pitfalls to avoid. Plus, the IRS defines what these factors mean, and it can emphasize—or deemphasize—the factors on an ad hoc basis. As a result, application of the Facts and Circumstances Test can result in contradictory conclusions, leaving covered organizations with no notice of what the law requires. But the vagueness doctrine requires that IRS officials have "explicit guidelines in order to avoid arbitrary and discriminatory enforcement." *Big Mama Rag*, 631 F.2d at 1035. In short, the IRS's Test is little better than a grant of authority to the IRS to conclude "I know it when I see it." *Id.* at 1040 (citing *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring)).

c.      Beyond the uncertainty that the Test as a whole poses, many individual factors likewise impede "reasoned application" and encourage arbitrary enforcement. *Minn. Voters All.*, 138 S. Ct. at 1892.

At the outset, the Test includes factors that could easily allow the IRS to classify issue advocacy seeking legislation as political campaign intervention. Issue advocacy includes commu-

nications that "focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter." *WRTL*, 551 U.S. at 470. Sometimes, such advocacy will involve, or even require, informing the public about candidates' positions on such policy positions as "[c]andidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions." *Id.* at 456-57 (quoting *Buckley*, 424 U.S. at 42); *see supra* p.2 (collecting cases). But the IRS has conceded that its Facts and Circumstances Test can sweep in issue advocacy: Mere "discussion of the positions of public officials who are also candidates for public office" can constitute political campaign intervention under this Test. Rev. Rul. 2004-06, 2003 WL 23009324, at *1.

Laws capable of covering issue advocacy heighten vagueness concerns because of their potential for overbreadth. This is especially true here where the IRS recognizes that issue advocacy and speech seeking legislation have valid social-welfare purposes warranting § 501(c)(4) status. *See, e.g.*, Rev. Rul. 68-656, 1968 WL 15166, at *1. The Supreme Court has "traditionally viewed vagueness and overbreadth as logically related and similar doctrines." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). So a law's propensity for overbreadth indicates that the law is likewise unlawfully vague. Here, the Test emphasizes "contextual factors," which "should seldom play a significant role in the inquiry[.]" *WRTL*, 551 U.S. at 473-74. To be sure, some of the Test's factors might be "indicia of express advocacy," like "mention[ing] an election, candidacy, political party, or challenger." *Id.* at 470. But many of the Test's other factors could easily include issue advocacy, including: "The timing of the communication coincides with an electoral campaign"; "The communication targets voters in a particular election"; and "The communication is not part of an ongoing series of substantially similar advocacy communications by the organization on the same issue." Rev. Rul. 2004-06, 2003 WL 23009324, at *1.

In addition to placing issue advocacy within its sweep, the Test's factors cannot be applied with any articulable certainty or structure. For instance, the Test identifies a communication's timing—and whether the communication "coincides with an electoral campaign"—as a factor that "tends" to show the communication is political campaign intervention. But it provides no guidance for when a communication "coincides" with a campaign. *See id.* And the Supreme Court has stated that "a group can certainly choose to run an issue ad to coincide with public interest," *WRTL*, 551 U.S. at 473, including before an election when the public is most engaged. *See supra* p.2 (collecting cases). The Court has similarly recognized that a communication's proximity to an election does not transform issue advocacy into express advocacy or even its functional equivalent. *See WRTL*, 551 U.S. at 472 ("That the ads were run close to an election is unremarkable in a challenge like this. Every ad covered by BCRA § 203 will by definition air just before a primary or general election. If this were enough to prove that an ad is the functional equivalent of express advocacy, *then BCRA would be unconstitutional in all of its applications*.") (emphasis added)

Moreover, this timing factor is incapable of reasoned application. The factor seems to suggest that some communications may come too close to ("shortly before") an election. *See* Rev. Rul. 2004-06, 2003 WL 23009324, at *1. What is too close is left to the undefined discretion of the IRS. *See* Edward A. Zelinsky, *Applying the First Amendment to the Internal Revenue Code: Minnesota Voters Alliance and the Tax Law's Regulation of Nonprofit Organizations' Political Speech*, 83 Alb. L. Rev. 1, 18 (2020) ("But how close is too close? Six months? Six weeks? Six days? If this 501(c)(4) organization guesses wrong under the 'facts and circumstances' test of Revenue Ruling 2004-06, the organization owes the section 527(f) penalty tax for expressing its views on a matter of public concern."). And the IRS's Appeals Officer in this case acknowledged that this timing factor does not provide clear guidance: "Revenue Ruling 2004-06 covering Section

§501(c)(4) organizations do not provide specific time deadlines. They look at how close the communication is to specific pending legislation." AR.852.

The Test's timing factor has the potential to sweep in all sorts of protected political speech because "electoral campaigns" are often not centralized around election dates and are instead spread over months and even years. *See, e.g.*, *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 582 (6th Cir. 2006) (noting that primary elections have been moved to earlier dates in the last few decades); *Minn. Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1114 (8th Cir. 2005) (noting "multi-year election cycle").

The Test also includes factors whose application depends on circumstances beyond the authority—or even knowledge—of the speaking organization. For example, if an organization issues a communication on an issue that "has been raised as distinguishing [a] candidate from others in the campaign, . . . *in other public communications*," that communication may be deemed political campaign intervention. *See* Rev. Rul. 2004-06, 2003 WL 23009324, at *1 (emphasis added). This means that an organization's protected political speech may be considered political campaign intervention simply because some *other* organization has engaged in speech that the IRS concludes distinguishes candidates from one another.

For some factors, the Test often identifies other countervailing factors—which grants the IRS broad discretion to choose which factor should prevail in determining whether a communication is political campaign intervention. The Test has relatively objective, yet contradictory, factors concerning whether communications may identify a candidate for office. The Test identifies two factors that "tend to show" a communication is not political campaign intervention: The communication (1) "identifies the candidate solely as a government official who is in a position to act on the public policy issue in connection with a specific event (such as a legislator who is eligible to

vote on the legislation)"; or (2) "identifies the candidate solely in the list of key or principal spon-sors of the legislation that is the subject of the communication." *Id.* So acting in reliance on these two positive factors, an organization might reasonably conclude it can mention a candidate for office without losing § 501(c)(4) status. But the Test identifies two opposite factors that "tend to show" the communication is political campaign intervention: (1) "The communication identifies a candidate for public office" *at all*; or (2) "The position of the candidate on the public policy issue has been raised as distinguishing the candidate from others in the campaign, either in the commu-nication itself or in other public communications[.]" *Id.*

This set of four factors grants the IRS broad discretion in evaluating communications that mention political candidates. For example, a communication that identifies a candidate "in the list of key or principal sponsors of the legislation" (which receives favorable treatment under the Test) may often "distinguish[] the candidate from others in the campaign" (which is impermissible under the Test) precisely because the candidate is a "key or principal sponsor." *Id.* So whether such a communication is deemed political campaign intervention depends on which factor the IRS em-phasizes—or by the IRS shifting the analysis to the other more nebulous factors.

The Facts and Circumstances Test's collection of factors seemed designed to discern the intent behind, and the effect of, an organization's communications. Whether the communication targets voters in a particular election, discusses a candidate's position on an issue that has been raised as distinguishing the candidate, or follows a series of substantially similar advocacy com-munications, these are all factors that seem designed to divine the intent of the organization and hypothesize the communication's effect. But the Supreme Court has repeatedly rejected an intent-and-effect test for evaluating political speech. *WRTL*, 551 U.S. at 467. "An intent-based standard 'blankets with uncertainty whatever may be said,' and 'offers no security for free discussion.'" *Id.*

at 468 (quoting *Buckley*, 424 U.S. at 43). The uncertainty inherent in an intent-based standard "chill[s] core political speech" because it "puts the speaker wholly at the mercy of the varied understanding of his hearers." *Id.* at 468-69 (citation and internal quotation marks omitted).

d.      The Facts and Circumstances Test's own vagueness is exacerbated by its context within the federal government's broader regulatory scheme. *See Citizens United*, 558 U.S. at 324 ("Prolix laws chill speech for the same reason that vague laws chill speech[.]"); *Keyishian v. Bd. of Regents of Univ. of State of New York*, 385 U.S. 589, 604 (1967) ("Vagueness of wording is aggravated by prolixity and profusion of statutes, regulations, and administrative machinery, and by manifold cross-references to interrelated enactments and rules."). The Facts and Circumstances Test is merely one part of a complicated web of federal agency regulations of political speech— involving the Internal Revenue Code, the Federal Election Campaign Act ("FECA") and its various amendments, IRS regulations, and complementary IRS Revenue Ruling guidance. The Test's divergence from well-established principles governing the regulation of political speech adds yet another layer of regulatory compliance complexity.

### 2.      Revenue Ruling 2004-06's Six Hypothetical Applications Of The 11-Factor Test Provide Little Further Guidance And Only Confirm The Test's Vagueness.

After identifying the non-exhaustive list of 11 factors, the IRS's Revenue Ruling 2004-06 evaluates six hypothetical situations applying the Facts and Circumstances Test. But these situations merely highlight the indeterminacy of the test because the IRS does not provide any analysis about how the Test applies to each situation. Instead, the IRS identifies which factors apply to each hypothetical, and it then provides a bare conclusion. These hypotheticals do not establish any rules confining the agency's discretion, and none can be teased out by implication. The Revenue Ruling's application of those factors is reproduced on the following page:

| Factors | Revenue Ruling Scenarios[18] | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| Identifies Candidate | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Timing Coincides With Electoral Campaign | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Targets Voters in a Particular Election | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Identifies Candidate's Position on Policy at Issue | ✗ | ✓ | ✓ | ✗ | ✓ | ✓ |
| Policy Has Been Raised as Distinguishing Candidates | ✗ | ✗ | ✗ | ✓ | ✓ | ✓ |
| Communication *Not* Part of an Ongoing Series | ✗ | – | ✓ | ✓ | ✗ | ✓ |
| | | | | | | |
| Absence of Any One of Above Factors | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ |
| Identifies *Specific* Legislation/Event Out of Control of Organization | ✗ | ✓ | ✗ | ✗ | ✓ | ✗ |
| Coincides With Event Outside The Control of the Organization | ✗ | ✓ | ✗ | ✗ | ✓ | ✗ |
| Identifies Candidate Solely as Person Authorized to Act | ✓ | ✓ | – | – | ✓ | – |
| Identifies Candidate Solely In List of Key or Principal Sponsors | – | – | – | – | – | – |

In addition to lacking explicit analysis, these hypothetical situations do not provide any patterns, principles, or methods guiding how to balance the factors and apply the Test. At best, these situations only inform organizations what the outcome should be under precise groupings of factors. After changing merely one factor, organizations are left to guess how the Test applies anew. But as explained above, the Test's individual factors leave the IRS wide discretion to determine whether that factor favors or opposes treating speech as political campaign intervention. Certain factors are individually ambiguous and the hypothetical situations do little to resolve their ambiguities. So even an organization that believes its advertisement is like "Situation 1," for example, cannot be sure that the IRS will view its advertisement the same way and conclude the same factors apply.

This case presents a perfect example of how the IRS's treatment of similar communications may vary from the IRS's hypothetical situations. Both the "Repeal It" and "Three Men" advertise-

---

[18] Green squares reflect either the absence of negative factors or the presence of positive factors in favor of finding the speech to be issue advocacy. Red squares reflect the opposite: the presence of negative factors or the absence of positive factors in favor of finding the speech to be political campaign intervention.

ments appear to be similar to Situations 2 and 5 in that they identify specific legislation, coincide with legislators taking action on the proposed legislation, and identify candidates in their role in advancing Freedom Path's preferred legislation. Moreover, like Situation 5, Freedom Path issued other advocacy communications regarding the Balanced Budget Amendment and the Affordable Care Act. Nevertheless, the IRS concluded that, unlike Situation 5, both advertisements were political campaign intervention.

Finally, the six hypothetical situations fail to articulate how the Test's non-exhaustive factors interact with the hypothetical situations. Because the situations emphasize the enumerated 11 factors, they do not seriously consider which *un*enumerated factors may overcome any of the enumerated factors.

## II.    To Cure The Vagueness Problems, The IRS's Standard For "Political Campaign Intervention" Should Be Limited To Express Advocacy.

The IRS's application of the Facts and Circumstances Test to Freedom Path's protected political speech confirms that the IRS's "political campaign intervention" standard is unconstitutionally vague. This standard poses the same vagueness concerns as the political campaign "influencing" standard that the Supreme Court already concluded was unconstitutionally vague in *Buckley v. Valeo*. Just like that "influencing" standard, the IRS's "political campaign intervention" standard overbroadly covers issue advocacy, including speech "seeking legislation" that the IRS has correctly concluded serves a social-welfare purpose. So as in *Buckley*, this Court should limit the IRS's "political campaign intervention" standard at 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii) to cover only express advocacy. This express advocacy standard is the only administrable way to distinguish between issue advocacy seeking legislation—which often will reference candidates for office—and political campaign intervention.

*Buckley* held, among other things, that a standard for regulating speech that depended on political-campaign "influencing" raised "constitutional problems" due to its "ambiguity." 424 U.S. at 77.[19] Specifically, the FECA disclosure requirement at issue in *Buckley* covered any "expenditure" as "use of money or other valuable assets 'for the purpose of . . . influencing' the nomination or election of candidates for federal office." *Id.* The Court narrowed this "influencing" standard "to avoid the shoals of vagueness" because of its "potential for encompassing both issue discussion and advocacy of a political result." *Id.* at 78, 79. As *Buckley* recognized:

> the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest.

*Id.* at 42 (footnote omitted). The Court then remedied the unconstitutional vagueness of FECA's "influencing" standard for disclosures by limiting it to express advocacy—that is, "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate."[20] *Id.* at 80; *see McConnell v. FEC*, 540 U.S. 93, 126 (2003) ("the use or omission of 'magic words' such as 'Elect John Smith' or 'Vote Against Jane Doe' marked a bright statutory line separating 'express advocacy' from 'issue advocacy' ").

This Court should follow *Buckley* and cure the vagueness stemming from both the IRS's Facts and Circumstances Test and its "political campaign intervention" standard to cover only express advocacy. There is no meaningful difference in this context between the IRS's political

---

[19] *Buckley* also held, as unconstitutionally vague, FECA's separate expenditure-limitation provision defining "expenditure" as any payment "relative to a clearly identified candidate." 424 U.S. at 39 (citing 18 U.S.C. § 608(e)(1) (1970)). "Although the phrase, 'for the purpose of . . . influencing' an election or nomination, differ[ed] from the language used in" the expenditure-limitation provision, "it share[d] the same potential for encompassing both issue discussion and advocacy of a political result." *Id.* at 79.

[20] Likewise, *Buckley* had similarly narrowed FECA's expenditure-limitation provision based on these vagueness concerns. 424 U.S. at 43.

campaign "intervention" standard and FECA's political campaign "influencing" standard.[21] Without an express-advocacy limiting construction, these standards have the "potential for encompassing both issue discussion and advocacy of a political result." *Buckley*, 424 U.S. at 79.

If anything, the IRS's "political campaign intervention" standard is *more* amenable to *Buckley*'s express-advocacy narrowing construction than FECA's "influencing" standard, because the IRS's regulation already poses a candidate-centered inquiry emphasizing whether the speech is "on behalf of or in opposition to" a candidate.[22] The "political campaign intervention" standard hinges on whether a communication is "on behalf of or in opposition to any candidate for public office." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii). As the Supreme Court has recognized, many issues of public concern will naturally refer to candidates for office when the issues are discussed. *See supra* p.2 (collecting cases). So the standard does not provide enough guidance about how the IRS should determine whether a communication that merely *mentions* a candidate will be construed as "on behalf of" or "in opposition" to that candidate. Instead, the standard leaves this up to the IRS's discretion. So the "political campaign intervention" standard is no clearer than the "influence an election" standard in *Buckley*.

---

[21] In fact, the IRS initially created its 11-part Facts and Circumstances Test to provide a standard for determining whether political speech had the purpose of "*influencing*" an "election" (under 26 U.S.C. § 527). *See* Rev. Rul. 2004-06, 2003 WL 23009324, at *1 (emphasis added). This "purpose of influencing" language is precisely what *Buckley* held unconstitutionally vague unless limited to express advocacy. 424 U.S. at 77. And the IRS itself acknowledges that the "political campaign intervention" standard for § 501(c)(4) status is substantively the same standard as § 527's "for the purpose of influencing an election" standard. *See* 78 Fed. Reg. at 71536. The only significant difference between the two standards is the range of officials reached. *See id.* (IRS: "[A] section 527 exempt function encompasses activities related to a broader range of officials, including those who are appointed or nominated, such as executive branch officials and certain judges.").

[22] BCRA's "electioneering communication" standard is incompatible as a narrowing construction for the IRS's "political campaign intervention" standard for denying § 501(c)(4) status. The IRS has correctly concluded that issue advocacy "seeking legislation" is a permissible "primary purpose" for prospective § 501(c)(4) organizations. *See* Rev. Rul. 68-656, 1968 WL 15166, at *1. Yet BCRA's "electioneering communication" test covers speech that simply mentions political candidates within periods close to elections. *See* 52 U.S.C. § 30104(f)(3)(A)(i). The electioneering communication test, therefore, would necessarily cover issue advocacy speech that the IRS has determined warrants § 501(c)(4) status—as issue advocacy "seeking legislation" will often refer to political candidates and "coincide with public interest," like an election. *WRTL*, 551 U.S. at 473.

In sum, this Court should cure the vagueness inherent in the IRS's standard for political campaign intervention the same way that *Buckley* construed comparably vague standards: limiting amorphous standards capable of covering issue advocacy by construing them to reach only express advocacy.

## III. Freedom Path Qualifies As A § 501(c)(4) Organization Because Its Primary Activity Is Issue Advocacy Seeking Legislation, Which Is Precisely What Freedom Path's "Repeal It" And "Three Men" Advertisements Were Here.

The IRS erroneously denied Freedom Path § 501(c)(4) status by misclassifying two of Freedom Path's television advertisements as "political campaign intervention," and neither advertisement was express advocacy. Freedom Path is "operated primarily for the purpose of bringing about civic betterments and social improvements," because its primary activity is engaging in issue advocacy. 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i). This issue advocacy includes precisely the kind of "seeking legislation" issue advocacy that the IRS has deemed a social-welfare purpose warranting § 501(c)(4) status. *See* Rev. Rul. 68-656, 1968 WL 15166, at *1. When the "Repeal It" and "Three Men" advertisements are properly classified as issue advocacy seeking legislation, the proportion of Freedom Path's expenditures for political campaign intervention falls far below half of its activities. Freedom Path's primary activity is therefore not political campaign intervention, so the IRS erred in denying Freedom Path's application for § 501(c)(4) status. *See* 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i).

As discussed above (at p.15), Freedom Path spent at most $360,748.91 of its total 2012 expenditures on "political campaign intervention" limited to express advocacy, which is approximately 39% of the $917,435 "direct expenditure" figure used by the IRS. AR.239.[23] These political

---

[23] This percentage drops if the total expenditures are as Freedom Path reported them to the IRS: $360,748.91 in political campaign intervention is only about 30% of Freedom Path's reported $1,178,927 total 2012 expenditures. *See supra* p.14.

campaign intervention expenditures include Freedom Path's communications reported to the FEC as express advocacy. AR.889-921.[24]

But crucially, Freedom Path's "Repeal It" and "Three Men" advertisements (accounting for about $319,400 and nearly 35% of Freedom Path's "direct expenditures") do not qualify as "political campaign intervention" because neither are express advocacy. This is a pure question of law, and the material facts on these advertisements are not disputed. Both advertisements are quintessential examples of issue advocacy speech "seeking legislation." Rev. Rul. 68-656, 1968 WL 15166, at *1. And both advertisements contain the hallmarks of issue advocacy: "The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter." *WRTL*, 551 U.S. at 470.

Freedom Path's "Three Men" advertisement was Freedom Path's issue advocacy in favor of legislation enacting a Balanced Budget Amendment. In addition to identifying U.S. Senator Hatch—who was a candidate for office—the advertisement references other non-candidate politicians who supported the Balanced Budget Amendment. Furthermore, the "Three Men" advertisement was wholly consistent with Freedom Path's ongoing advocacy about the national debt. In fact, the IRS noted that Freedom Path "provided a few mailers that criticized the national debt without also praising [Senator Hatch] for trying to address it[.]" AR.293.

And "Repeal It" was issue advocacy in favor of repealing the Affordable Care Act—arguably the most important piece of legislation last decade.[25] The Affordable Care Act has remained central to political debate and subject to myriad attempts at repeal and amendment since it was

---

[24] Though the remaining five direct mailings were not express advocacy, they constituted a relatively smaller portion of Freedom Path's expenditures. So they would have a negligible effect on the IRS's primary-activity analysis for § 501(c)(4) status. Freedom Path therefore does not address these five direct mailings in this motion, as summary judgment should be granted for Freedom Path in all events.

[25] Unlike the "Three Men" advertisement, "Repeal It" did *not* qualify as a BCRA electioneering communication because it finished airing more than sixty days before the Utah Republican Party State Convention and more than four months before the Republican primary election. *See* 52 U.S.C. § 30104(f)(3)(A)(i).

enacted. *See, e.g.*, Richard Cowan & Susan Cornwell, *House Votes to Begin Repealing Obamacare*, Reuters (Jan. 13, 2017), https://reut.rs/2JWl2k5 ("In the past few years, the House has voted more than 60 times to repeal or alter Obamacare[.]"). This advertisement mentioned U.S. Senator Hatch who, at the time the advertisement aired, served as a member of two committees with important oversight responsibilities involving the Affordable Care Act. AR.296. He was the ranking member of the Senate Finance Committee, which has oversight over the IRS—a federal agency tasked with implementation of many aspects of the Affordable Care Act. *Id.* He was also a member of the Senate Health, Education, Labor and Pensions Committee, which has oversight over the Department of Health and Human Services. *Id.*

"Repeal It" and "Three Men" are not express advocacy—or even the functional equivalent of express advocacy. Both advertisements lack the "magic words" that "mark[] a bright [] line" between express advocacy and issue advocacy because there is no express call to vote for or against any candidate in either advertisement. *McConnell*, 540 U.S. at 126. And both advertisements can be reasonably understood as issue advocacy, rather than "as an appeal to vote for or against a specific candidate." *WRTL*, 551 U.S. at 469-70; *see Van Hollen v. FEC*, 811 F.3d 486, 490 (D.C. Cir. 2016) (noting that communications constituting the functional equivalent of express advocacy will be rare). To be sure, both advertisements mention officeholders, and some of those officeholders (namely, U.S. Senator Hatch) were candidates for public office at that time. But the Supreme Court has recognized that there are topics where "mere discussion of public issues [] by their nature raise the names of certain politicians." *MCFL*, 479 U.S. at 249; *see supra* p.2 (collecting cases).

Both the Balanced Budget Amendment and the Affordable Care Act are precisely the kinds of legislation that necessarily raise the names of politicians. The Supreme Court has rejected the

notion "that *any* ad . . . that includes 'an appeal to citizens to contact their elected representative' is the 'functional equivalent' of" express advocacy. *WRTL*, 551 U.S. at 470. So the mere mention of an elected representative who is also a current political candidate is not enough to classify either advertisement as the functional equivalent of express advocacy. In short, the references to candidates in both advertisements are a far cry from being "explicit directive[s] [to] vote for these (named) candidates." *MCFL*, 479 U.S. at 249. Instead, the advertisements take a position on public policy and direct citizens to contact those legislators in a position to take action on that legislation. This is precisely the kind of issue advocacy that the IRS has concluded can form a § 501(c)(4) organization's primary purpose. *See* Rev. Rul. 68-656, 1968 WL 15166, at *1.

After properly classifying the "Repeal It" and "Three Men" advertisements as issue advocacy rather than political campaign intervention, Freedom Path's "primary activity" was engaging in issue advocacy seeking legislation—as this accounted for at minimum 60% of Freedom Path's total expenditures. Freedom Path's advocacy seeking legislation, therefore, plainly exceeded the 50% threshold that—consistent with the plain meaning of "primarily"—the IRS itself has suggested should constitute an organization's "primary purpose." *See supra* p.8. Though the IRS has not formally adopted the 50% threshold in guidance or regulation, not heeding the 50% primary-purpose standard here would only compound the vagueness problems running throughout the IRS's evaluation of § 501(c)(4) organizations. And, in all events, Freedom Path's 60% of expend-

itures on advocacy seeking legislation would far exceed any reasonable threshold for an organization's "primary purpose."

This question of law is dispositive, so summary judgment is appropriate to grant Freedom Path § 501(c)(4) status.

## CONCLUSION

This Court should grant Freedom Path's Motion for Summary Judgment, declaring that the IRS's 11-part Facts and Circumstances Test for determining the tax implications of public policy advocacy communications is unconstitutionally vague and that Freedom Path is entitled to 26 U.S.C. § 501(c)(4) tax-exempt status.


Dated: January 15, 2021                    Respectfully submitted,


                                           s/ *Scott A. Keller*

                                           Scott A. Keller
                                           D.C. Bar No. 1632053
                                           Baker Botts LLP
                                           700 K St. NW
                                           Washington, D.C. 20001
                                           (202) 639-7837
                                           scott.keller@bakerbotts.com

                                           Chris K. Gober
                                           D.C. Bar No. 975981
                                           The Gober Group PLLC
                                           14425 Falcon Head Blvd, Bldg E
                                           Austin, TX 78738
                                           (512) 354-1787
                                           cg@gobergroup.com

                                           *Counsel for Plaintiff Freedom Path, Inc.*