## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FREEDOM PATH, INC.,

               Plaintiff,

     v.

INTERNAL REVENUE SERVICE, *et al.*,

           Defendants.

Case No. 20-cv-1349 (JMC)

## MEMORANDUM OPINION AND ORDER

Plaintiff Freedom Path, Inc., a nonprofit advocacy organization, moves for summary judgment, asking this Court to grant it a tax exemption applicable to social welfare organizations under 26 U.S.C. § 501(c)(4) despite the Internal Revenue Service's denial of Freedom Path's exemption application. Freedom Path argues that the standards the IRS applied in denying its application are unconstitutionally vague and that, under the proper non-vague standard, Freedom Path is entitled to the tax exemption. Defendants, the IRS and other associated Treasury Department officials (referred to herein collectively as the IRS), disagree and cross-move for summary judgment in defense of the agency's denial decision.

The Court agrees with Freedom Path to a point. The Treasury regulation and IRS Revenue Ruling that the IRS applied in denying Freedom Path's application transgress the heightened vagueness standard applicable to civil regulations, including tax-exemption regulations, that affect speech covered by the First Amendment. On that threshold question, the Court finds that Freedom Path is right and the IRS is wrong. Unfortunately, neither the IRS nor Freedom Path offers an alternative standard for deciding the ultimate question of Freedom Path's exemption eligibility that is both constitutionally permissible and appropriately grounded in the statutory and regulatory

1

scheme. Accordingly, the Court will **GRANT in part** and **DENY in part** Freedom Path's motion for summary judgment, ECF 30, and it will **DENY** the IRS's cross-motion for summary judgment, ECF 32, in full.[1]

## I.     BACKGROUND

### A.  Statutory and Regulatory Framework

The federal tax code exempts certain kinds of organizations from tax obligations depending on their purpose and the types of activities the organizations conduct. Three such exemptions are relevant here. First, 26 U.S.C. § 501(c)(3) exempts from taxation organizations "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes" and those with similar purposes (referred to herein as "501(c)(3)s" or "(c)(3)s"). Second, section 501(c)(4) exempts from taxation "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare" and similar organizations (referred to herein as "501(c)(4)s" or "(c)(4)s"). *Id.* § 501(c)(4)(A). Third, section 527 of the tax code exempts "political organization[s]," defined as "a party, committee, association, fund, or other organization (whether or not incorporated) organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both" to "influenc[e] or attempt[] to influence the selection, nomination, election, or appointment" of a candidate for elected office (referred to herein as "527s"). *Id.* § 527(a), (e)(1)–(e)(2).

Each of those types of tax-exempt organizations faces distinct limits on the amount of political campaign activity they can conduct while retaining their tax exemption. For the first and

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

third kinds of organizations, that threshold is described in the statute. By statute, a 501(c)(3) organization may not "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). The implementing Treasury regulation repeats that bright-line rule: an organization does not qualify for (c)(3) status if it "participates or intervenes, directly or indirectly, in any political campaign on behalf of or in opposition to any candidate for public office." 26 C.F.R. § 1.501(c)(3)-1(c)(3)(iii). Relatedly, the statute and regulation also prohibit a (c)(3) from making "carrying on propaganda, or otherwise attempting, to influence legislation"— as distinct from trying to influence an election—a "substantial part" of its activities. 26 U.S.C. § 501(c)(3); *see* 26 C.F.R. § 1.501(c)(3)-1(c)(3)(ii). If an organization engages in such activities, it qualifies as an "action organization" and is not eligible for (c)(3) tax-exempt status. 26 C.F.R. § 1.501(c)(3)-1(c)(3)(i). A 527 organization, by contrast, may engage in as much political activity as it desires—and, indeed, must be operated "primarily" for that purpose, rather than, say, a lobbying or charitable purpose, in order to qualify for 527 status. 26 U.S.C. § 527(e)(1); 26 C.F.R. § 1.527-1.

The limits on a 501(c)(4)'s ability to engage in political campaign activity are less clear from the face of the statue and implementing regulation. The statute itself merely says, in relevant part, that a (c)(4) must be operated "exclusively for the promotion of social welfare." 26 U.S.C. § 501(c)(4)(A). Unlike sections 501(c)(3) and 527, 501(c)(4) does not specify any quantum of political campaign activity that is permissible (or required), or indeed say anything about such activity at all. But the implementing regulation does. That regulation, promulgated in 1959, repeats the requirement that a (c)(4) be operated "exclusively for the promotion of social welfare." 26 C.F.R. § 1.501(c)(4)-1(a)(1)(ii). It then provides that "[t]he promotion of social welfare does

not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." *Id.* § 1.501(c)(4)-1(a)(2)(ii). However, the regulation provides that an organization can be a (c)(4) even if it qualifies as an "action organization" by participating in lobbying or legislative advocacy under the (c)(3) regulations. *Id.*; *see also id.* § 1.501(c)(3)-1(c)(3)(v) (stating that an action organization "may nevertheless qualify" as a (c)(4) if it meets that regulation's requirements). Notably, that provision specifically calls out organizations classified as "action organizations" by virtue of engaging in legislative advocacy as qualifying for (c)(4) status, but *does not* do the same for organizations classified as "action organizations" by virtue of engaging in political campaign activity. Taken together, those provisions suggest two things. First, a (c)(4), like a (c)(3), may not engage in any political campaign activity. And second, unlike a (c)(3), a (c)(4) may engage in substantial legislative advocacy.

However, longstanding IRS guidance muddies those seemingly clear waters—specifically, as to political campaign activity. In 1967, the IRS issued a Revenue Ruling (a guidance document) holding that "[a]n organization whose primary activity is rating candidates for public office" did not qualify as a (c)(4) because such rating constitutes political campaign intervention and such activity "is the organization's primary activity." Rev. Rul. 67-368, 1967-2 C.B. 194. That ruling suggested that a (c)(4) can engage in some political campaign activity as long as any such activity is not its "primary activity." *Id.* In a 1981 Revenue Ruling, the agency stated that suggestion more explicitly. It explained that the (c)(4) regulation "do[es] not impose a complete ban on [political campaign] activities for section 501(c)(4) organizations" and that "an organization may carry on lawful political activities and remain exempt under section 501(c)(4) as long as it is *primarily*

engaged in activities that promote social welfare." Rev. Rul. 81-95, 1981-1 C.B. 332 (emphasis added).[2]

The 1981 Revenue Ruling arrived at that interpretation by pointing to the part of the Treasury regulation that states that "[a]n organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i); *see* 1981-1 C.B. 332 (citing that provision). Even though the regulation also says that "[t]he promotion of social welfare does not include direct or indirect participation or intervention in political campaigns," 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii), the Revenue Ruling reads the regulation to instruct that some amount of political campaign activity is permitted as long as the organization is still "primarily" engaged in something else—i.e., promoting "the common good and general welfare of the people of the community," *id.* § 1.501(c)(4)-1(a)(2)(i); 1981-1 C.B. 332. The 1981 Revenue Ruling further notes that the Senate Finance Committee report accompanying legislation passed in 1974 recognized that "[u]nder present law, certain tax-exempt organizations (such as sec. 501(c)(4) organizations) may engage in political campaign activities," as long as they pay a designated tax on such expenditures. 1981-1 C.B. 332 (quoting S. Rep. No. 93-1358, 93d Cong., 2d Sess., 29 (1974), 1975-1 C.B. 517, 533). Thus, whatever ambiguity might exist in the regulation, the IRS concluded—based in part on apparent acquiescence from Congress—that (c)(4)s could engage in some amount of political campaign activity as long as that was not their "primary" activity. And if it became their primary activity, those organizations would instead become 527s.

---

[2] IRS Revenue Rulings are not binding on courts. However, they "are entitled to some degree of deference," and those that "reflect[] IRS's longstanding, reasonable, and consistent interpretation of a Treasury Regulation 'attract[] substantial judicial deference.'" *Mellow Partners v. Comm'r of IRS*, 890 F.3d 1070, 1077–78 (D.C. Cir. 2018) (quoting *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001)).

In short, the statue and regulations, at least as interpreted by the IRS, provide for three degrees of permissible political campaign activity depending on the organization's specific tax exemption. An organization exempt under section 501(c)(3) may not engage in any political campaign activity. An organization exempt under section 501(c)(4) may engage in some political campaign activity, as long as such activity is not its "primary" activity. And an organization exempt under section 527 may—indeed, must—engage in political campaign activity as its "primary" activity.

The next question, of course, is what qualifies as the organization's "primary" activity. In the context of 501(c)(4) organizations, no regulation or Revenue Ruling appears to address that question. In 2015, then-IRS Commissioner Josh Koskinen stated that an organization's primary activity is not political activity as long as "[the organization] spend[s] at this point, less than 49 percent of [its] money on politics." Paul C. Barton, *Koskinen's Comments on Political Spending of Nonprofits Disputed*, Tax Notes (May 1, 2015), https://perma.cc/7SJV-MAWK; *see also* Lindsey McPherson*, EO Training Materials Suggest 51 Percent Threshold for Social Welfare Activity*, 73 Exempt Org. Tax Rev. 122 (2014) (stating that IRS staff read "primary" as requiring that 51% of a (c)(4)'s expenditures be for exempt, non-political activities). Koskinen's statement came as the agency was working to finalize a rulemaking clarifying this and other issues in 26 C.F.R. § 1.501(c)(4)-1. Barton, *supra*; *see also* Guidance for Tax-Exempt Social Welfare Organizations on Candidate-Related Political Activities, 78 Fed. Reg. 71535 (proposed Nov. 29, 2013) [*hereinafter* 2013 NPRM]. In the 2013 NPRM, the IRS acknowledged that "both the public and the IRS would benefit from clearer definitions of" the primary activity question. 2013 NPRM at 71536 (noting public feedback, as well as the IRS's own internal findings, that "the distinction between campaign intervention and social welfare activity, and the measurement of the

organization's social welfare activities relative to its total activities, have created considerable confusion for both the public and the IRS in making appropriate section 501(c)(4) determinations"). However, Treasury or the IRS have never taken further regulatory action on the issue. A longstanding appropriations rider, first added to Congress's fiscal year 2016 appropriations law, has prohibited Treasury or the IRS from "issu[ing], revis[ing], or finaliz[ing] any regulation, revenue ruling, or other guidance not limited to a particular taxpayer relating to the standard which is used to determine whether an organization is operated exclusively for the promotion of social welfare for purposes of section 501(c)(4)," including the 2013 NPRM. *See, e.g.*, Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2433 (2015) (introducing the rider); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 530 (2024); *see also* Justin C. Chung, Cong. Rsch. Serv., RL33377, *Tax-Exempt Organizations Under Internal Revenue Code Section 501(c): Political Activity Restrictions* 18 (updated Jan. 3, 2025).

The IRS and other parties have sometimes looked to the use of the "primarily" standard in other regulations to divine its meaning in the (c)(4) context. *See, e.g.*, 2013 NPRM at 71536. The (c)(3) regulation provides, in pertinent part, that "[a]n organization will be regarded as operated exclusively for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes." 26 C.F.R. § 1.501(c)(3)-1(c)(1). The regulation's next sentence then clarifies that "[a]n organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." *Id.* In other words, if a "more than [] insubstantial" part of an organization's activities are not in furtherance of an exempt purpose, then the organization is not "primarily" engaged in activity in furtherance of an exempt purpose, and therefore it is not "operated exclusively for one or more exempt

purposes." *Id*.[3] The IRS adopts that interpretation in this litigation, citing the (c)(3) regulation and court interpretations thereof to argue that "primarily" in the (c)(4) regulation means "more than insubstantial." ECF 31 at 16–18. And, according to the IRS, the bar for "more than insubstantial" is significantly less than 49%, though it rejects the existence of any precise numerical threshold. *See id.* at 22–24.

Alternatively, comparison to section 527 suggests that "primarily" means something closer to the more-than-49% rule. Recall that section 527 creates a tax exemption for organizations "organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both" to influence the "selection, nomination, election, or appointment" of any public official. 26 U.S.C. § 527(e)(1)–(2). That purpose is similar, though not identical, to the political campaign activity that the (c)(4) regulation says may not be a (c)(4) organization's primary activity. *See* 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii); 2013 NPRM at 71536 (noting the similarity but that (c)(4)'s prohibition covers only "candidates for elective public office," whereas 527 also covers appointment or nomination). At least one court interpreting these two provisions has held that an organization cannot qualify as both a (c)(4) and a 527 because an organization "cannot be both 'primarily engaged' and 'primarily operated' in two mutually exclusive initiatives." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of the Treasury*, 21 F. Supp. 3d 25, 33 (D.D.C. 2014). That reading relies on the notion that an organization may have only one "primary" purpose or activity. The implication, then, is that "primarily" means either the majority of the organization's activity (if its activities pursue just two purposes) or, at minimum, the

---

[3] That general provision is distinct from the more specific provision in the (c)(3) statue and regulation prohibiting an organization from qualifying as a (c)(3) if it engages in "any" political campaign intervention. 26 C.F.R. § 1.501(c)(3)-1(c)(3)(iii).

plurality of the organization's activity (if more than two distinct purposes)—not just a "more than insubstantial" portion of the organization's activity.

The final relevant question that the (c)(4) regulation poses is what constitutes "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office"—the proscribed, or at least circumscribed, political activity under 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii). Those terms, too, go undefined in the (c)(4) regulation. But the IRS has long applied guidance issued in the context of 501(c)(3) eligibility and 527 tax liability to decide whether activity conducted by an organization constitutes political campaign intervention for the purposes of (c)(4) eligibility. *See* 2013 NPRM at 71536. Most pertinent here, the IRS applies to the question of (c)(4) eligibility a facts-and-circumstances test that it initially developed to determine whether a given expenditure qualifies as a political "exempt function" subject to taxation under section 527 or as mere public policy advocacy (which section 501(c)(4) permits as a primary activity and which section 527 does not tax). *See* Rev. Rul. 2004-06, 2004-1 C.B. 328; ECF 31 at 28. That Revenue Ruling states:

> All the facts and circumstances must be considered to determine whether an expenditure for an advocacy communication relating to a public policy issue is for an exempt function under § 527(e)(2). When an advocacy communication explicitly advocates the election or defeat of an individual to public office, the expenditure clearly is for an exempt function under § 527(e)(2). However, when an advocacy communication relating to a public policy issue does not explicitly advocate the election or defeat of a candidate, all the facts and circumstances need to be considered to determine whether the expenditure is for an exempt function under § 527(e)(2).

2004-1 C.B. 328. The Revenue Ruling then provides a non-exhaustive list of factors for the agency to consider when making that facts-and-circumstances determination:

> [F]actors that tend to show that an advocacy communication on a public policy issue is for an exempt function under § 527(e)(2) include, but are not limited to, the following:
>
> a) The communication identifies a candidate for public office;

9

b) The timing of the communication coincides with an electoral campaign;

c) The communication targets voters in a particular election;

d) The communication identifies that candidate's position on the public policy issue that is the subject of the communication;

e) The position of the candidate on the public policy issue has been raised as distinguishing the candidate from others in the campaign, either in the communication itself or in other public communications; and

f) The communication is not part of an ongoing series of substantially similar advocacy communications by the organization on the same issue.

In facts and circumstances such as those described in the six situations, factors that tend to show that an advocacy communication on a public policy issue is not for an exempt function under § 527(e)(2) include, but are not limited to, the following:

a) The absence of any one or more of the factors listed in a) through f) above;

b) The communication identifies specific legislation, or a specific event outside the control of the organization, that the organization hopes to influence;

c) The timing of the communication coincides with a specific event outside the control of the organization that the organization hopes to influence, such as a legislative vote or other major legislative action (for example, a hearing before a legislative committee on the issue that is the subject of the communication);

d) The communication identifies the candidate solely as a government official who is in a position to act on the public policy issue in connection with the specific event (such as a legislator who is eligible to vote on the legislation); and

e) The communication identifies the candidate solely in the list of key or principal sponsors of the legislation that is the subject of the communication.

*Id.* Finally, the Revenue Ruling presents six hypothetical "situations" and indicates whether the described activity qualifies as an "exempt function" activity under that facts-and-circumstances test. *See id.*

Similarly, the IRS has sometimes applied to the (c)(4) eligibility question a Revenue Ruling it issued to assess the question of whether an organization has engaged in political campaign activity prohibited by the (c)(3) regulation. *See* Rev. Rul. 2007-41, 2007-1 C.B. 1421; 2013 NPRM 71536 (stating that the IRS "generally applies the same facts and circumstances analysis under section 501(c)(4)" as it does under section 501(c)(3) and citing Revenue Ruling 2007-41 as an example). That Revenue Ruling includes a set of seven factors for differentiating issue advocacy from political campaign intervention that closely resemble the 11 factors listed in Revenue Rule 2004-06. *See* 2007-1 C.B. 1421; ECF 30-1 at 19 n.7.

An organization's failure to qualify as a 501(c)(4) comes with two main consequences. First, of course, the organization may not take advantage of section 501(c)(4)'s exemption from income taxes. *See* 26 U.S.C. § 501(b). However, if the organization instead meets the requirements of section 527 by engaging primarily in political-campaign activity, it can still deduct from its tax liability its income from that political activity—granting it a similar tax benefit on net. *See id.* § 527(b)–(c); Roger Colinvaux, *Political Activity Limits and Tax Exemption: A Gordian's Knot*, 34 Va. Tax Rev. 1, 9–10 (2014). Second, and often more significant a consequence, section 527 organizations must disclose their donors, whereas 501(c)(4)s need not. *See* 26 U.S.C. § 527(j); Colinvaux, *supra*, at 22.

### B.  Factual Background

Freedom Path is a nonprofit corporation, ECF 31-1 ¶ 1, officially formed on January 18, 2011, ECF 38-2 at 7. Freedom Path's stated mission is to "promote and defend the causes that recognize the individual rights and liberties guaranteed to all Americans." ECF 31-1 ¶ 2. It "has advocated against excessive government spending, in favor of a Balanced Budget Amendment"

and "against the Patient Protection and Affordable Care Act and various healthcare policies of the federal government." *Id.* at ¶ 3.

On January 21, 2011, Freedom Path applied to the IRS for 501(c)(4) tax-exempt status by submitting a Form 1024. ECF 38-2 at 1. The IRS received the form three days later. *Id.* A protracted exchange ensued, culminating in the IRS's denying Freedom Path's application. *See* ECF 38-10 at 24.

First, on February 28, 2011, the IRS indicated to Freedom Path that Freedom Path's "application ha[d] not been fully completed." ECF 38-2 at 9. The IRS requested an additional document: a copy of Freedom Path's articles of incorporation, with documentation of its filing. *Id.* at 9–11 (including the "Missing Information Checksheet" from the IRS which did not list any other documentation as missing). Freedom Path submitted the missing articles of incorporation on March 7, 2011. ECF 31-1 ¶ 4; ECF 38-2 at 12–16. Freedom Path asserted that that submission completed its section 501(c)(4) application. ECF 31-1 ¶ 4. But the IRS responded that it still lacked sufficient information to determine whether Freedom Path was tax-exempt. *Id.*

Accordingly, the IRS made additional requests for information. *Id.* ¶ 5. For instance, the IRS requested a list of names of Freedom Path's donors on February 13, 2012, ECF 31-1 ¶ 5, following up on April 5, 2012, ECF 38-2 at 26–35. Freedom Path replied on June 3, 2012—not providing the names but stating it was "pleased to" do so and would through filing the IRS's Form 990. ECF 31-1 at ¶¶ 6–7; ECF 38-2 at 38. Then the IRS requested additional information about Freedom Path's activities and communications on February 20, 2013. ECF 31-1 ¶ 8; ECF 38-3 at 66–69. Freedom Path replied on April 10, 2013. ECF 38-3 at 70–82. It provided "some responses" to the IRS's requests but "largely declined to provide more detailed information," citing the IRS's disclosure of confidential contents of Freedom Path's pending application to a news organization.

ECF 31-1 ¶ 9; ECF 38-3 at 72. On April 24, 2013, the IRS sent a follow-up letter requiring the requested information to avoid the IRS "clos[ing its] case" and potentially depriving Freedom Path of its "right to ask a court for declaratory judgment on [its] exempt status." ECF 31-1 ¶ 10; ECF 38-3 at 83.

As the Parties went back and forth on Freedom Path's application, a broader dispute over the IRS's treatment of 501(c)(4) applications was coming into public view. On May 14, 2013, the Treasury Inspector General for Tax Administration (TIGTA) released a report finding that "[t]he IRS used inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based upon their names or policy positions instead of indications of potential political campaign intervention." TIGTA, Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review, Highlights (May 14, 2013), https://perma.cc/T573-9Y4R [*hereinafter* 2013 TIGTA Report]. The criteria the Determinations Unit used to identify applicants for additional review included not just the words "Tea Party" or "Patriots" but also issue areas like "government spending, government debt or taxes," as well as statements by the organization "criticiz[ing] how the country is being run." *Id.* at 6. The TIGTA Report also found that applications that the Determinations Unit flagged for further review "experienced substantial delays," often of more than two years. *Id.* at 11. Finally, the Report found that the IRS requested "unnecessary" information from many of the organizations flagged for further review, including information about the organization's donors and their political affiliations, as well as the organization's positions on "all issues that are important to the organization." *Id.* at 18–20.

Four days prior to the TIGTA Report's release, then-IRS Director of Exempt Organizations Lois Lerner publicly acknowledged its key findings for the first time. Lerner apologized for the IRS's conduct in targeting and delaying certain applications and stated, "[t]hat was wrong, that

was absolutely incorrect, it was insensitive, and it was inappropriate." ECF 31-1 ¶ 11 (quoting
S. Rep. No. 114-119, *The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4)
Applications for Tax-Exempt Status Submitted By "Political Advocacy" Organizations From
2010–2013* at 173 (Aug. 5, 2015)). Freedom Path characterizes Lerner's statement as an apology
for the IRS's "pattern of intentionally and systematically targeting conservative organizations that
applied for tax exemptions for additional and unconstitutional scrutiny." ECF 31-1 ¶ 11. The IRS
agrees in calling it an "apolog[y]" for the IRS's "method of centralization for certain organizations
based on their names" and for "the delay in processing many of those applications." *Id.* But the
IRS disputes that the IRS admitted, or that the TIGTA report found, that the IRS "intentionally
discriminated against any group, much less Plaintiff in particular." *Id.* Instead, according to the
IRS in this case, TIGTA found merely that "the IRS's selection of applications for review based
on applicants' names and policy positions '*gives the appearance* that the IRS is not impartial in
conducting its mission.'" *Id.* (quoting 2013 TIGTA Report at 6) (emphasis in IRS briefing). The
IRS also notes that TIGTA found in a subsequent report that the IRS also targeted certain
politically liberal groups for further review during that same time period. *See* TIGTA, Review of
Selected Criteria Used to Identify Tax-Exempt Applications for Review 12 (Sept. 28, 2017),
https://perma.cc/57ND-FMU2 [*hereinafter* 2017 TIGTA Report].

The 2013 TIGTA Report included a set of recommendations to remedy the problems it
found. One of those was that the IRS prioritize issuing "guidance on how to measure the 'primary
activity' of I.R.C. § 501(c)(4) social welfare organizations" in the form of "regulations, revenue
rulings, revenue procedures, notices, [or] other published administrative guidance." 2013 TIGTA
Report at 17 & n.41. The Report noted that existing IRS regulations "do not define how to measure
whether social welfare is an organization's 'primary activity'" and found that this gap created

"confusion" among application reviewers and contributed to the extensive delays. *Id.* at 14. Along similar lines, TIGTA found that the IRS's use of certain targeted nomenclature and policy positions as criteria for additional review "showed a lack of knowledge in the Determinations Unit of what activities are allowed by . . . § 501(c)(4) organizations." *Id.* at 7.

About a month after the 2013 TIGTA Report's release, the IRS wrote to Freedom Path offering a new "Optional Expedited Process for Certain Applications Under Section 501(c)(4)." ECF 31-1 ¶ 12. This "expedited process" would have required Freedom Path to make certain representations, including that it "satisfies, and will continue to satisfy, set percentages with respect to the level of its social welfare activities and political campaign intervention activities" and that "for purposes of the expedited process, political campaign intervention would include any expenditure incurred or time spent by the organization on . . . any public communication within 60 days prior to a general election or 30 days prior to a primary election that identifies a candidate in the election." *Id.* ¶ 13; ECF 38-3 at 85–91. Freedom Path declined participation in that optional expedited process. ECF 31-1 ¶ 14.

A few months later, on September 30, 2013, the IRS sent Freedom Path a "proposed denial" of its 501(c)(4) application. ECF 31-1 ¶ 15. The IRS found that Freedom Path was "not operated exclusively for the promotion of social welfare within the meaning of § 501(c)(4) and the regulations thereunder" based on its assessment of Freedom Path's submitted television advertisements and mailers. ECF 38-4 at 22. In making that determination, the IRS cited the 11 non-exhaustive factors for identifying activities done for an "exempt function" under section 527 that are spelled out in Revenue Ruling 2004-06, as well as the seven "key factors" for identifying political campaign intervention for section 501(c)(3) eligibility purposes provided in Revenue

Ruling 2007-41. *See* ECF 38-4 at 20–22.[4] After assessing all the facts and circumstances, the IRS found that about 60% of Freedom Path's direct expenditures for 2012 constituted political campaign intervention, at least based on the information that Freedom Path provided about its advertisements and direct mailings. ECF 31-1 ¶ 21. By contrast, only about 30% of Freedom Path's expenditures constituted "express advocacy" as defined by the Federal Election Commission— meaning communications "expressly advocating the election or defeat of a clearly identified candidate." *Id.* ¶¶ 20, 22.

Freedom Path responded to the IRS's proposed determination letter on December 2, 2013, contesting both the constitutionality of the facts-and-circumstances test that the IRS referenced and the determinations that the IRS made under that test. *See* ECF 38-4 at 69–81. Per Freedom Path's request, the Parties held an administrative appeals conference in February 2014. ECF 33-2 ¶ 23. In April 2014, while its appeal was pending, Freedom Path sued in the United States District Court for the Northern District of Texas, arguing among other claims that the facts-and-circumstances test of Revenue Ruling 2004-06 is unconstitutionally vague. *Id.* ¶ 24 (citing *Freedom Path, Inc. v. IRS*, No. 3:14-cv-01537-D (N.D. Tex.)). As a result of the litigation, the IRS paused its review of Freedom Path's application through the pendency of the suit. *Id.* ¶¶ 25–26.

In July 2017, the Northern District of Texas rejected Freedom Path's constitutional challenge to Revenue Ruling 2004-06. *See Freedom Path, Inc. v. IRS*, No. 3:14-cv-1537-D, 2017 WL 2902626 (N.D. Tex. July 7, 2017). First, that court held that the Revenue Ruling's facts-and-circumstances test was not void for vagueness under the Fifth Amendment because its "11 non-

---

[4] Freedom Path contends that the IRS's proposed denial "applied" the 11-factor Facts and Circumstances test from Revenue Ruling 2004-06, whereas the IRS insists that it merely "borrowed the factors of Revenue Ruling 2004-06 by analogy in analyzing Freedom Path's television advertisements and mailers." ECF 31-1 ¶ 16. To the extent that distinction contains a difference, both Parties appear to agree (as can the Court on its own review of the record) that the 11-factor test formed at least part of the basis for the IRS's proposed denial decision.

exclusive factors . . . primarily address who, what, where, when, why, or how types of questions about the contents of communications" and were thus not as "indefinite and subject to varying individual sensitivities" as the comparable tax regulation that the D.C. Circuit found void for vagueness in *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030 (D.C. Cir. 1980). *Freedom Path*, 2017 WL 2902626, at \*5. Second, that court rebuffed Freedom Path's claim that the Revenue Ruling violated the First Amendment on the grounds that it is vague and overbroad, and that it promotes viewpoint discrimination. *Id.* at \*6. Because the Revenue Ruling "does not ban, restrain, or punish speech" but instead "regulates whether expenditures for certain types of speech will be subsidized through their treatment for federal income tax purposes," that court held, Freedom Path's cited authorities from other First Amendment campaign finance cases did not apply. *Id.* at \*7 (relying on *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983)). To the extent the D.C. Circuit's ruling in *Big Mama Rag* suggested otherwise, that court continued, the Supreme Court's later decision in *Regan*, 461 U.S. 540, undermined *Big Mama Rag*'s reasoning. *Freedom Path*, 2017 WL 2902626, at \*7–8.

On appeal of that decision, the Fifth Circuit vacated and remanded on the grounds that Freedom Path lacked standing to facially challenge the Revenue Ruling. *Freedom Path, Inc. v. IRS*, 913 F.3d 503, 508 (5th Cir. 2019). According to the Fifth Circuit, Freedom Path's injury (denial of 501(c)(4) status) was not fairly traceable to the text of the Revenue Ruling, since its text applies to taxability under section 527(e) rather than 501(c)(4) eligibility. *Id.* But a facial challenge "considers only the text of the [challenged regulation] itself," not how an agency may apply the regulation "beyond [its] text." *Id.* (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d. Cir. 2006)).

17

After that decision, the IRS Independent Office of Appeals ("IRS Appeals") resumed its consideration of Freedom Path's appeal. ECF 33-2 ¶ 27. Following multiple conferences with Freedom Path, IRS Appeals sustained the IRS's proposed determination, and the IRS issued a final adverse determination letter on February 20, 2020. *Id.* ¶¶ 28–30. The IRS Appeals Officer's analysis differed in some respects from the IRS's initial analysis. For example, the Appeals Officer found that 52%, rather than 60%, of Freedom Path's 2012 expenditures went toward political campaign intervention. ECF 38-10 at 15. The Appeals Officer explicitly applied Revenue Ruling 2004-06 in his determinations, and he rejected Freedom Path's constitutional objection to the Revenue Ruling. *See id.* at 16–21.

Following the IRS's final adverse determination letter, Freedom Path sued in this Court. After Defendants moved to dismiss, Freedom Path amended its complaint to remove all but one of its claims. *See* ECF 20. Freedom Path's sole remaining claim seeks a declaratory ruling under 26 U.S.C. § 7428 that Freedom Path qualifies for a section 501(c)(4) tax exemption on the ground that the Revenue Ruling is unconstitutional as applied to Freedom Path. ECF 20-1 ¶¶ 200–19. After the IRS answered, ECF 23, Freedom Path filed for summary judgment, ECF 30. Freedom Path seeks a declaration that (1) the Revenue Ruling's 11-part facts-and-circumstances test is unconstitutionally vague as applied to Freedom Path, and (2) Freedom Path is entitled to 501(c)(4) status. *Id.* at 1.[5]

---

[5] In its reply in support of its motion for summary judgment and opposition to the IRS's motion for summary judgment, Freedom Path argues for the first time that the IRS's test for what constitutes an organization's "primary" activity is also unconstitutionally vague and contributes to the overall vagueness of the 501(c)(4) test as applied to Freedom Path. ECF 33 at 45. The Court will consider that argument as part of Freedom Path's challenge to the IRS's application of the Revenue Ruling because they are closely related in affecting how the IRS assessed the impact of Freedom Path's political campaign activity on its 501(c)(4) eligibility. Further, the IRS does not argue that Freedom Path waived that argument, and the IRS had a chance to respond to that argument in its reply in support of its own motion for summary judgment. *See United States v. Mejia*, 657 F. Supp. 3d 123, 130 n.2 (D.D.C. 2023).

## II.   LEGAL STANDARD

The Court will grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). "When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, 'for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Howard Town Ctr. Dev., LLC v. Howard Univ.*, 267 F. Supp. 3d 229, 236 (D.D.C. 2017) (quoting *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016)); 10A Wright & Miller's Federal Practice & Procedure § 2720 (4th ed. 2025).

26 U.S.C. § 7428 permits this Court (alongside the Court of Federal Claims and the U.S. Tax Court) to declare that an organization qualifies for tax-exempt status under section 501(c), including section 501(c)(4), upon a challenge to the IRS's determination. In making that assessment, the Court reviews the record *de novo*. *Airlie Found. v. IRS*, 283 F. Supp. 2d 58, 61–62 (D.D.C. 2003); *Basic Unit Ministry of Alma Karl Schurig v. Comm'r of Internal Revenue*, 670 F.2d 1210, 1213 (D.C. Cir. 1982) (per curiam). The scope of the Court's review is "limited to the administrative record in the absence of a showing of good cause." *Airlie Found.*, 283 F. Supp. 2d at 61–62. However, the Court "may make findings of fact which differ from the administrative record." *Fund For Study of Econ. Growth & Tax Reform v. IRS*, 997 F. Supp. 15, 18 (D.D.C.), *aff'd sub nom. Fund for the Study of Econ. Growth & Tax Reform v. IRS*, 161 F.3d 755 (D.C. Cir.

1998). Courts reviewing IRS tax-exemption determinations "are to consider the overall picture presented by the administrative record." *Id.* (citing *Dumaine Farms v. Comm'r*, 73 T.C. 650 (1980)). The burden of proof rests with the taxpaying organization to show its entitlement to a tax exemption. *Fund for the Study of Econ. Growth & Tax Reform*, 161 F.3d at 759 (citing *Granzow v. Comm'r*, 739 F.2d 265, 268 (7th Cir. 1984) (per curiam)).

## III.    ANALYSIS

### A.    The Challenged Regulation and Revenue Ruling Are Unconstitutionally Vague As Applied to Freedom Path.

The Parties vigorously dispute the standard that the Revenue Ruling, as applied to Freedom Path, must meet in order to avoid unconstitutional vagueness under the Fifth Amendment. The Court must answer that threshold question before determining whether the Revenue Ruling, and the related IRS regulation, meets that standard. On that threshold question, the Court finds applicable the heightened vagueness review that applies to civil regulations of speech, like political speech, fully protected by the First Amendment. Then, applying that standard, the Court finds the relevant portions of both 26 C.F.R. § 1.501(c)(4)-1 and Revenue Ruling 2004-06 to be unconstitutionally vague as applied to Freedom Path's application for 501(c)(4) status.

#### 1.    *The Applicable Vagueness Standard*

The Fifth Amendment's Due Process Clause prohibits enactments as "void for vagueness" when their "prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). At bottom, a law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Accordingly, the caselaw focuses on two related but distinct "values" that vague laws defy:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable

opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned*, 408 U.S. at 108–09 (footnotes omitted).

Those two basic requirements—(a) fair notice and (b) explicit standards to prevent arbitrary and discriminatory enforcement—do not apply "mechanically" or to the same "degree" in all contexts. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Instead, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Id.* Thus, "economic regulation is subject to a less strict vagueness test," as are civil penalties, whereas criminal penalties must meet a more rigorous standard. *Id.* at 498–99. At the same time, a "more stringent vagueness test" applies to laws that "threaten[] to inhibit the exercise of constitutionally protected rights," including "the right of free speech or of association." *Id.* at 499.

Indeed, the Supreme Court has repeatedly emphasized that "standards of permissible statutory vagueness are strict in the area of free expression." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 604 (1967) (quoting *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 432 (1963)). "Because First Amendment freedoms need breathing space to survive," the Court has stressed, "government may regulate in the area only with narrow specificity." *Id.* (quoting *Button*, 371 U.S. at 433). Still, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Williams,* 553 U.S. at 304 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989)).

The Parties here disagree as to how stringent the Court's vagueness review must be under that caselaw. Freedom Path points this Court primarily to the D.C. Circuit's decision in *Big Mama*

21

*Rag*, which also involved a declaratory judgment action for a tax exemption under the same statute invoked here. 631 F.2d at 1033. There, a feminist organization that published a monthly newspaper, BMR, Inc., sought tax-exempt status under section 501(c)(3) as a charitable and educational institution. *Id.* at 1032. The IRS denied BMR, Inc.'s application, finding that "the content of BMR was not educational and the manner of distribution was that of ordinary commercial publishing organizations." *Id.* at 1033. The questions for the courts were whether BMR, Inc. satisfied the Treasury regulation's definitions of "educational" and "charitable," or whether those definitions were unconstitutionally vague. *Id.* at 1032. The D.C. Circuit found the latter, holding that the regulation's definition of the term "educational" "lack[ed] sufficient specificity to pass constitutional muster." *Id.* at 1039. In making that determination, the Circuit invoked the "strict [vagueness] standard that must be applied when First Amendment rights are involved." *Id.* at 1035. Under that standard, the Circuit explained, "regulations authorizing tax exemptions may not be so unclear as to afford latitude for subjective application by IRS officials." *Id.* at 1034. And because Freedom Path argues that *Big Mama Rag*'s heightened First Amendment vagueness review applies, the Supreme Court's decisions striking down as vague multi-factor tests like the Revenue Ruling in the context of campaign finance regulation demand the same result here. ECF 30-1 at 29–31 (discussing *Citizens United v. FEC*, 558 U.S. 310 (2010); *FEC v. Wisconsin Right to Life, Inc.* (*WRTL*), 551 U.S. 449 (2007) (Roberts, J., controlling op.)); *id.* at 40–41 (discussing *Buckley v. Valeo*, 424 U.S. 1 (1976)).

The IRS, by contrast, insists that a "more lenient vagueness standard" applies because the Revenue Ruling and associated IRS regulation are economic regulations that "neither criminalize[] nor restrict[] the exercise of a constitutional right." ECF 31 at 39. To get there, the IRS relies in large part on the Supreme Court's opinion in *Regan*, which came down three years after the D.C.

Circuit's decision in *Big Mama Rag*. In *Regan*, the Supreme Court upheld section 501(c)(3)'s limitation on (c)(3) organizations engaging in "substantial" amounts of "propaganda, or otherwise attempting to influence legislation." 461 U.S. at 542 & n.1 (quoting 26 U.S.C. § 501(c)(3)). The Court framed the law as a question of subsidy, saying that the lobbying restriction represented Congress's choice "not to subsidize lobbying as extensively as it chose to subsidize other activities that non-profit organizations undertake to promote the public welfare" by not allowing tax exemptions for organizations engaged in "substantial lobbying." *Id.* at 544. And the Court had already decided, in *Cammarano v. United States*, that "Congress is not required by the First Amendment to subsidize lobbying." *Id.* at 546 (citing *Cammarano*, 385 U.S. 498 (1959)). Thus, by merely refusing to subsidize substantial lobbying with a tax benefit, the Court held, "Congress has not infringed any First Amendment rights or regulated any First Amendment activity." *Id.* The IRS argues from that premise: because refusal to grant a tax exemption does not infringe First Amendment rights or regulate First Amendment activity, the IRS contends, the heightened vagueness test that attaches in the First Amendment context does not apply here. ECF 31 at 41–43 (noting that the Northern District of Texas agreed with that argument in *Freedom Path*, 2017 WL 2902626 at \*5, \*7).

Before resolving this dispute, it is worth first pausing to note a key proposition on which the Parties do not, and could not, disagree: that Freedom Path engages in core political speech protected by the First Amendment. Freedom Path spends money on advertisements, mailers, and other expressive activity regarding government spending, fiscal issues, and federal health-care policies. ECF 31-1 ¶ 3. There is no question under Supreme Court precedent that such expenditures "operate in an area of the most fundamental First Amendment activities," *Buckley*, 424 U.S. at 14, and constitute "core political speech" at the heart of the First Amendment's protections, *WRTL*,

551 U.S. at 477 (explaining that both "so-called issue advocacy" and "words of express advocacy" are "core political speech"). The IRS does not contest that conclusion. Instead, the IRS argues that heightened First Amendment scrutiny nonetheless does not apply because *Regan* stands for the proposition that regulations regarding tax expenditures "do not restrict or regulate First Amendment rights" and therefore do not "raise First Amendment concerns." ECF 35 at 29 n.20, 30. As Freedom Path observes, however, the IRS's argument defies *Big Mama Rag*'s repeated references to "the strict [vagueness] standard that must be applied when First Amendment rights are involved." *Big Mama Rag*, 631 F.3d at 1035.

The nub of the Parties' dispute, then, is how to square *Big Mama Rag* and *Regan*. The Northern District of Texas did so by suggesting that *Regan* effectively overruled, or at least "undermine[d]," *Big Mama Rag*. *See Freedom Path*, 2017 WL 2902626 at *8. But neither Party here makes quite that claim. Freedom Path, for its part, sees the cases as perfectly consistent. First, Freedom Path argues, *Regan* did not involve a vagueness claim and so has no direct holding on that issue. ECF 33 at 28–29. Second, in *Regan*, the Court caveated its decision not to apply First Amendment strict scrutiny to the lobbying limitation by clarifying that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'aim[] at the suppression of dangerous ideas.'" 461 U.S. at 548 (quoting *Cammarano*, 358 U.S. at 513). In other words, Freedom Path says, "*Regan* 'reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits.'" ECF 33 at 29 (quoting *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 834 (1995)). And *Big Mama Rag* stands, undisturbed, for the proposition that regulations on tax exemptions merit heightened scrutiny because they risk permitting the Government to engage in viewpoint discrimination by being "so unclear as to afford latitude for subjective application by IRS officials." *Id.* (quoting *Big Mama Rag*, 631 F.2d at 1034).

Finally, Freedom Path notes that the D.C. Circuit, like other courts, has treated *Big Mama Rag* as good law and cited it alongside *Regan*. ECF 33 at 30 n.15 (citing *Nat'l All. v. United States*, 710 F.2d 868, 875 (D.C. Cir. 1983); *Bd. of Tr. of Leland Stanford Jr. Univ. v. Sullivan*, 773 F. Supp. 472, 475–77 (D.D.C. 1991)).

The IRS, by contrast, calls for a "narrow reading of *Big Mama Rag*" in which it applies only to tax regulations that "inevitably foster[] viewpoint discrimination." ECF 35 at 31–32. The IRS points to language in *Big Mama Rag* that suggested that the problem with the challenged tax exemption language was that it "*could not* be applied in a viewpoint neutral manner." *Id.* at 31 (citing *Big Mama Rag*, 631 F.2d at 1038, in which the Circuit found that the IRS's standard for what counts as "educational" was not capable of "value-free measurement" or "principled and objective application" and instead required "resorting to . . . subjective notion[s]"). And the IRS notes that *Big Mama Rag* relied on the Supreme Court's earlier decision in *Speiser v. Randall*, 357 U.S. 513 (1958), which invalidated a state constitutional provision that denied tax exemptions to those who advocated certain political positions associated with the Communist Party on the basis that "a discriminatory denial of a tax exemption for engaging in speech is a limitation on free speech." *Speiser*, 357 U.S. at 518. As discussed above, *Regan* recognized and reaffirmed *Speiser's* viewpoint-discrimination exception to its rule of limited First Amendment scrutiny for tax exemptions. *See Regan*, 461 U.S. at 548 (citing *Speiser*, 357 U.S. at 519)). Thus, the IRS reasons, *Big Mama Rag* is consistent with *Regan* if (and only if) it is read as falling into "the *Speiser* line of cases" that find actual (or, at least, "inevitabl[e]") viewpoint discrimination. ECF 35 at 32.

Freedom Path's argument better accords with the caselaw and basic First Amendment principles. First take *Big Mama Rag* itself, the closest analogue to our case here. Contrary to the IRS's reading, the *Big Mama Rag* court did not rest its holding on a finding that the IRS had

actually or inevitably discriminated against BMR, Inc., on the basis of viewpoint. The Circuit found, in the passage the IRS quotes, that the IRS's vague standard was not capable of "principled and objective application" and was instead inherently "subjective." *Big Mama Rag*, 631 F.2d at 1038. That subjectivity, the Circuit continued, was "so imprecise that [it] afford[ed] latitude to individual IRS officials to pass judgment on the content and quality of an applicant's views and goals and therefore to discriminate against those engaged in protected First Amendment activities." *Id.* at 1040. But that is as far as the Circuit went—that the regulation's vagueness gave the IRS "latitude" to discriminate on the basis of viewpoint. The Circuit explicitly declined to rely upon the pieces of evidence in the record suggesting actual viewpoint discrimination against BMR, Inc.—specifically, comments from IRS officials early in the tax exemption review process that BMR, Inc.'s exemption would only be approved if it agreed not to advocate for regarding homosexuality as "normal." *Id.* The *Big Mama Rag* court was unable to find that such a position represented "official IRS policy" and therefore constituted actual viewpoint discrimination against BMR by the IRS. *Id.* Instead, the Circuit called such a question "irrelevant." *Id.* The case turned, then, not on any finding of actual viewpoint discrimination but on the regulation's "inherent *susceptibility* to discriminatory enforcement." *Id.* (emphasis added). And the Circuit never indicated whether such potential discrimination was "inevitabl[e]," likely, or merely possible. ECF 35 at 31.

That broader interpretation of *Big Mama Rag* also aligns more closely with the D.C. Circuit's discussion of *Big Mama Rag* after the Supreme Court decided *Regan*. In *National Alliance v. United States*, decided about a month after *Regan*, the Circuit characterized *Big Mama Rag* as "h[o]ld[ing] invalid a standard so vague that it *might permit* an IRS official to discriminate between applications on the basis of approval or rejection of the ideas expressed by the applying

organizations." *Nat'l All.*, 710 F.2d at 875 (emphasis added). The *National Alliance* court contrasted that holding with *Regan*, which it said stood for the proposition that a tax exemption may be "denied on criteria neutral with regard to viewpoint." *Id.* (citing, *inter alia*, *Regan*, 461 U.S. 540 and *Cammarano*, 358 U.S. at 513). Thus, the D.C. Circuit plainly did not understand *Regan* to undermine *Big Mama Rag*'s holding that the *possibility* of viewpoint discrimination that arises from vagueness can render a tax exemption unconstitutional even without a finding of actual viewpoint discrimination.[6] Further, the D.C. Circuit has not revisited or narrowed its holding in *Big Mama Rag* since then.

In that sense, the fundamental problem with the IRS's narrow interpretation of *Big Mama Rag* is that, per Freedom Path, it "suggest[s] that stringent vagueness review should only apply when a law [or, at least, a tax-exemption rule] actually violates some other First Amendment doctrine besides vagueness." ECF 33 at 26. The IRS's argument thereby "render[s] any First Amendment stringent vagueness doctrine superfluous." *Id.* Specifically, the IRS's interpretation requires a violation of the related but distinct First Amendment rule that a tax exemption may not be denied on the basis of viewpoint. That's the *Speiser* rule. But *Big Mama Rag* went beyond *Speiser*. *See Big Mama Rag*, 631 F.2d at 1034 (articulating two distinct but "similar[]" rules: first, that "the discriminatory denial of tax exemptions can impermissibly infringe free speech," citing *Speiser*; and second, that "regulations authorizing tax exemptions may not be so unclear as to afford latitude for subjective application by IRS officials," which was *Big Mama Rag*'s holding). The IRS's interpretation would erase *Big Mama Rag*'s extension of *Speiser* altogether.

---

[6] One might argue that the *National Alliance* court's statement about *Big Mama Rag* was dicta, since that panel ultimately did not need to, and chose not to, reach the question of whether the updated IRS guidance issued after *Big Mama Rag* was unconstitutionally vague. Indeed, *National Alliance* conducted no vagueness analysis at all. *See* 710 F.2d at 876. But the *National Alliance* court did rely on *Big Mama Rag* for the related proposition that vague tax exemption laws can violate the Constitution in ways that viewpoint-neutral regulations, as in *Regan*, would not. 710 F.2d at 875. How that conclusion fit into the *National Alliance* court's ultimate holding is, admittedly, unclear. But regardless, nothing in *National Alliance* supports the IRS's narrow reading of *Big Mama Rag* here.

Indeed, the Supreme Court's First Amendment caselaw supports *Big Mama Rag*'s distinction between vagueness and viewpoint discrimination. For starters, the two violations arise from different constitutional provisions: vagueness from the Fifth and Fourteenth Amendment's Due Process Clauses, *see Williams*, 553 U.S. at 304, and viewpoint discrimination from the First Amendment's Free Speech Clause, *see Rosenberger*, 515 U.S. at 828–29. Accordingly, vagueness operates as a distinct evil that requires no concomitant finding of a First Amendment violation.

Take *Smith v. Goguen*, 415 U.S. 566 (1974), which evinced that distinction. In that case, Goguen was charged and convicted under a state statute that prohibited, *inter alia*, "publicly treat[ing] contemptuously the flag of the United States." *Smith*, 415 U.S. at 568–69. Goguen filed a habeas action following his jury conviction, and the district court and court of appeals found that the state statute was both unconstitutionally vague (in violation of the Fourteenth Amendment) and unconstitutionally overbroad (in violation of the First Amendment). *Id.* at 571. First Amendment overbreadth doctrine permits facial challenges to laws that "prohibit[] a substantial amount" of protected speech "relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292. In *Smith*, the Supreme Court affirmed the district court's holding that the statute was vague as applied to Goguen but "d[id] not reach the correctness of the holding below on overbreadth or other First Amendment grounds." 415 U.S. at 568. Further, in reaching its vagueness holding, the Court highlighted a "candid concession" by the State that the statute's text would permit prosecution of a "war protestor" who covered themselves with a flag for the purpose of showing "disrespect," but not a "member of the American Legion" who covered themselves with a flag using the exact same physical motions but "d[id] so regrettably and without a contemptuous attitude." *Id.* at 575–76. The Court held that "there is a denial of due process" when "inherently vague statutory language permits such selective law enforcement." *Id.* at 576. The

Court did *not* find that such selective, viewpoint-discriminatory law enforcement had actually occurred, nor that it would inevitably occur. Instead, it found the statute unconstitutional as applied to Goguen merely because the statute would "*permit*[]" that kind of "arbitrary and discriminatory enforcement" in a context where the statute was "capable of reaching expression sheltered by the First Amendment." *Id.* at 573, 576 (emphasis added).

Other Supreme Court cases have maintained that distinction—and have done so in challenges to *civil* laws, not just criminal laws, that reach or are capable of reaching speech covered by the First Amendment. Consider next the case of *Keyishian v. Board of Regents of University of State of N.Y.*, 385 U.S. 589 (1967). There, a set of university faculty and other employees challenged a statutory and regulatory scheme under which they were fired from their jobs for refusing to sign a certificate or answer questions indicating whether they were members of the Communist Party or similar organizations. *See id.* at 591–92. That scheme required removal of university employees for "treasonable or seditious" utterances or acts." *Id.* at 597. The Supreme Court observed that one of the related provisions defined those terms as being coextensive with a penal statute punishing "criminal anarchy," which presented "no particular problem" under the First Amendment. *Id.* at 598. But in other sections, the terms went undefined and appeared to reach much more broadly. *Id.* at 598–99. And as a result, "no teacher c[ould] know just where the line [was] drawn between 'seditious' and nonseditious utterances and acts" under the regulatory scheme, and it could reach clearly protected First Amendment activity like distributing books about "the evolution of Marxist doctrine" or other "mere expression[s] of belief." *Id.* at 598–601. Again, as in *Smith*, the Court did not find that any of those hypotheticals had actually occurred. Nor did the Court find that the plaintiffs had been fired because of any of their beliefs or viewpoints at all. Instead, the challenged provisions' vagueness alone threatened a "chilling effect upon the

exercise of vital First Amendment rights" without their employer firing them for anything they said or believed and even though the provisions could also reach constitutionally regulable speech. *Id.* at 604.

In short, those cases stand for the proposition that vagueness challenges touching First Amendment speech, even in the civil context, do not require a finding of actual or "inevitable" viewpoint discrimination. *See also Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991) ("The question is not whether discriminatory enforcement occurred here, and we assume it did not, but whether the Rule is so imprecise that discriminatory enforcement is a real possibility."). But that still, arguably, leaves open our question of whether that same basic rule applies to regulations of tax exemptions rather than speech prohibitions—as *Big Mama Rag* held but the IRS denies.

Thankfully, the Supreme Court's cases offer guidance on that front, too. As the Supreme Court later explained, even after its ruling in *Regan*, *Keyishian* held that "the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of *conditions attached to the expenditure of Government funds* is restricted by the vagueness and overbreadth doctrines of the First Amendment." *Rust v. Sullivan*, 500 U.S. 173, 200 (1991) (emphasis added). And recall that the Supreme Court described the tax-exemption limitation challenged in *Regan* as, effectively, a "condition" on a government "subsidy that is administered through the tax system." *Regan*, 461 U.S. at 544–45; *see also Big Mama Rag*, 631 F.2d at 1034 (describing the 501(c)(3) tax exemption as a "subsid[y] by the state"). Nowhere has either the Supreme Court or the D.C. Circuit indicated that the applicable vagueness doctrine in those government-expenditure cases requires a separate finding of viewpoint discrimination, given that no other vagueness cases so require. To be sure, *Rust*'s statement about *Keyishian* is specific on its face to the context of university expenditures

30

(such as on employment of university faculty). But there is no good reason to view the principle as quite so limited. And in particular, the kinds of core political speech governed by section 501(c)(4) and its accompanying regulation seem a uniquely appropriate context to which to extend *Keyishian*'s rule. *See Citizens United*, 558 U.S. at 339 (calling political speech "an essential mechanism of democracy" and stating that "'[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office'" (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989))).

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), is another post-*Regan* case that supports the vagueness doctrine's independent applicability to the tax-expenditure context—with no separate finding of viewpoint discrimination required. In *City of Lakewood*, the plaintiff newspaper publisher challenged a local city ordinance that prohibited the placement of newspaper racks on public property (e.g., sidewalks) without a permit. 486 U.S. at 753. The ordinance gave the mayor unbounded discretion to grant or deny permit applications, though the mayor did have to "state the reasons for such denial." *Id.* In addition, the mayor could impose any "terms and conditions" on the permit that he or she "deemed necessary and reasonable." *Id.* at 753–54. The Supreme Court found the ordinance unconstitutional because it "contain[ed] no explicit limits on the mayor's discretion," and therefore the mayor could use it to "decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *Id.* at 763–64, 769. As in the other case discussed above, the Court did not find that any actual viewpoint discrimination had occurred, just that it *could*. And although the case did not involve tax expenditures or subsidies per se, it involved a government benefit of an analogous kind. As the dissent in that case pointed out, newspaper publishers had "ample alternative means of 24-hour distribution of [their] newspapers" besides building a newspaper rack on public property. *Id.* at

773 (White, J., dissenting). Further, the Court's majority insisted that its holding would apply even if, as the dissent insisted, "a total ban on newsracks would be constitutional," *id.* at 762, although the majority declined to opine on whether such a total ban would be constitutional, *id.* at 762 n.7. Because of the selective-enforcement risks that vague statutes impose, the majority explained, "even if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion." *Id.* at 764. The "greater" power of a total ban on the use of public property for newspaper racks, in other words, did not include the "lesser" power of a selective ban subject to official discretion. *Id.* at 762–63.

Notice the parallel to tax exemptions. In *Regan*, the Court held that Congress did not have to "subsidize" lobbying under section 501(c)(3) because "a legislature's decision not to subsidize the exercise of a fundamental right [such as the First Amendment] does not infringe the right," as long as that denial is not "aimed at the suppression of dangerous ideas." *Regan*, 461 U.S. at 449–50. Or, as the D.C. Circuit put it in *Big Mama Rag*, "although First Amendment activities need not be subsidized by the state," both "the discriminatory denial of tax exemptions" and vague tax-exemption regulations that "afford latitude for subjective application by IRS officials" can "impermissibly infringe free speech." 631 F.2d at 1034. Just as the *City of Lakewood* Court countenanced the possibility that a municipality could constitutionally refuse to lend its public spaces to publishers for newspaper racks—but could not impose a vague enforcement regime for doling out such a privilege—the *Big Mama Rag* court forbade vague tax-exemption criteria as inconsistent with the First Amendment even though the First Amendment does not require that the government grant such an exemption to any given speaker. In that way, the IRS's argument that *Regan* overruled or narrowed *Big Mama Rag* commits the same basic greater-includes-the-lesser

error that the Court condemned in *City of Lakewood*. *See also Freedom Path*, 2017 WL 2902626, at *7 (concluding, using the same impermissible greater-includes-the-lesser reasoning, that *Regan* "undermine[d] th[e] premise" of *Big Mama Rag* that "tax regulations could chill speech" because *Regan* "held that, in general, denial of a tax deduction does not infringe the right to free speech").

Another body of First Amendment law that the IRS references, in vain, leads to the same basic conclusion. To support its argument that heightened First Amendment vagueness scrutiny does not apply to tax exemption regulations, the IRS points to the Supreme Court's caselaw in the analogous context of conditions attached to government subsidies of speech. *See* ECF 35 at 30. Under that caselaw, the government may choose to subsidize only certain speech, but not other speech, based on viewpoint as long as the conditions "define the limits of the government spending program" or "specify the activities Congress wants to subsidize," rather than "seek[ing] to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). For instance, the Supreme Court has held that "Congress can, without offending the Constitution," condition certain family-planning funding on an organization not engaging in abortion advocacy as part of its federally funded programming. *Id.* at 217 (citing *Rust*, 500 U.S. at 193, 196). By contrast, Congress may not impose viewpoint-based restrictions on funding "when the government does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers," such as legal services funding for pro bono attorneys representing indigent clients. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (quoting *Rosenberger*, 515 U.S. at 834). The IRS argues that section 501(c) tax exemptions fall on the prior side of the line "because the terms of the tax exemptions are tied to their purpose, and are not a means to dissuade unrelated speech." ECF 35 at 30.

33

That seems unlikely. Although the line between those two types of conditions "is hardly clear," *All. for Open Soc'y*, 570 U.S. at 215, the condition at issue in this case would seem to raise just the kind of risk of viewpoint discrimination that the Supreme Court's cases abjure. First, section 501(c)(4)'s tax exemption looks like exactly the kind of government funding that seeks to "encourage a diversity of views from private speakers" by subsidizing social welfare activities, including issue advocacy, on any topic and of any ideological persuasion or viewpoint. *Velazquez*, 531 U.S. at 542. Moreover, one of the key cases in this area, *Rosenberger*, characterizes *Regan* as "reaffirm[ing] the requirement of viewpoint neutrality in the Government's provision of financial benefits," citing the *Speiser* and *Cammarano* line of viewpoint-discrimination cases that *Regan* leaves in place. *Rosenberger*, 515 U.S. at 834.[7] Or as the *Velazquez* Court put it, citing *Regan* and *Speiser*, "[w]here private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Velazquez*, 531 U.S. at 548–49. *Alliance for Open Society*, meanwhile, distinguished *Regan* from impermissible funding conditions on slightly different grounds, but it did not contradict the notion that *Regan* found no First Amendment violation because the tax provision at issue involved no threat of viewpoint discrimination. Here, by contrast, Freedom Path contends that the IRS's vague (c)(4) regulations and guidance permit the agency to selectively dole out tax exemptions based on the organization's viewpoint, such as its conservative or progressive ideology. ECF 33 at 35. None of the Supreme Court's cases suggests that Congress could distribute government funding only to groups engaged in ideologically progressive speech based on a programmatic purpose to fund progressive speech, nor is it easy to imagine that the Court ever would allow such a thing. Neither,

---

[7] Note that *Rosenberger* was decided several years after *Rust*, which is a key case upon which the IRS's argument relies. Thus, to the extent anything in *Rust* conflicts with the above interpretation of *Regan*, *Rosenberger* renders that conflict moot.

equivalently, could Congress or the IRS provide tax exemptions only to progressive groups based on such a programmatic purpose. Such a condition would plainly violate *Speiser*. *See also True the Vote, Inc. v. IRS*, 831 F.3d 551, 560 (D.C. Cir. 2016) ("In administering the tax code, the IRS may not discriminate on the basis of viewpoint." (quoting *Z St. v. Koskinen*, 791 F.3d 24, 30 (D.C. Cir. 2015))). On that same logic, an IRS regulation so vague that it raised the possibility of tax exemptions being awarded in that manner would also raise First Amendment concerns.[8]

Thus, both the pre- and post-*Regan* caselaw support *Big Mama Rag*'s plain holding that tax exemption regulations are subject to heightened First Amendment vagueness review. The IRS's narrow interpretation of *Big Mama Rag*, by contrast, runs headlong into those cases' reasoning. The Supreme Court's cases do not require a finding of actual or inevitable viewpoint discrimination. Neither do they limit heightened First Amendment vagueness review to regulations that criminalize or civilly prohibit protected speech. Rather, they extend that heightened standard to conditions on government employment, subsidies, or privileges that "regulate in the area" of "First Amendment freedoms." *Keyishian*, 385 U.S. at 604. Accordingly, the Court finds that Freedom Path's broader reading of *Big Mama Rag* is still good law and applies here.

The IRS also attempts a narrower way out of *Big Mama Rag* in this case: that, even if tax exemptions on speech-related expenditures in general may qualify for heightened vagueness review, the exemption here does not because Freedom Path could instead apply for tax exemption

---

[8] In its reply, the IRS also cites *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), in which the Supreme Court upheld, over a vagueness challenge, a statute creating subjective criteria for the awarding of National Endowment for the Arts grants to artists. *See* ECF 35 at 32 n.22. The IRS suggests that *Finley* undermines *Big Mama Rag* based on its holding that the grants at issue were subject to less stringent vagueness review than "a criminal statute or regulatory scheme." *Finley*, 524 U.S. at 588. But *Finley* does not purport to apply generally to all government grants or subsidies. Instead, its holding explicitly applies only to "grants of this nature," meaning "selective subsidies" that "award[] scholarships and grants on the basis of subjective criteria such as 'excellence'" and which have an "already subjective selection process." *Id.* at 589–90. The 501(c)(4) tax exemption is neither inherently "selective" or "subjective," in the way that arts grants or educational scholarships are, and so *Finley*'s lowered vagueness burden does not apply here. *See* ECF 33 at 27 n.13.

under section 527. *See* ECF 31 at 42–43. For support, the IRS points out that the availability of an alternative tax exemption (there, 501(c)(4)) appeared to be a factor in the Supreme Court's holding in *Regan* that section 501(c)(3)'s lobbying prohibition did not violate the First Amendment. *See* ECF 31 at 42–43 (citing the discussion of *Regan* in *Branch Ministries v. Rossotti*, 211 F.3d 137, 143 (D.C. Cir. 2000)). But that part of *Regan* was just another statement of its core holding: that the Government can generally deny a tax exemption/subsidy for speech without infringing the First Amendment if it is not engaged in viewpoint discrimination. There, the (c)(4) alternative offered less favorable tax treatment than (c)(3)—specifically, no tax-deductible contributions— and the Court said nonetheless that the Government could only that apply that lesser benefit to lobbying activities as long as such treatment was not "aim[ed] at the suppression of dangerous ideas." *Regan*, 461 U.S. at 544, 548 (citation omitted). Here, similarly, section 527 offers different tax treatment than 501(c)(4), treatment that may be less favorable to an organization depending on its specific activities. *See* ECF 31 at 28 n.10 (IRS discussing differences in tax treatment between the two types of organizations; *see also* ECF 20-1 ¶¶ 30–41 (discussing the disadvantages, from Freedom Path's perspective, of being classified as a 527 organization instead of a 501(c)(4)). Under *Big Mama Rag*, and consistent with *Regan* and the other cases just discussed, regulations awarding less or more favorable tax treatment for speech triggers heightened First Amendment vagueness review. The regulations at issue here are just such regulations, because (c)(4) status offers better, or at least different, benefits than section 527.[9]

---

[9] Freedom Path also notes that the *Citizens United* Court rejected the idea that the availability of an alternative corporate form—under section 527, the same as the alternative proposed here—"alleviate[d] the First Amendment problems with" the statute overturned in that case. *Citizens United*, 558 U.S. at 337; *see* ECF 33 at 32 n.17. There, the Supreme Court pointed to the "onerous" administrative and regulatory "burdens[]" imposed by section 527 regulations, which collectively meant that "a corporation may not be able to establish a PAC in time to make its views known regarding candidates and issues in a current campaign." *Id.* at 337, 339. Freedom Path does not raise most of the burdens discussed in *Citizens United*, although it does discuss the burden of donor disclosure. The donor disclosure issue is addressed separately below. Regardless, Freedom Path raises other meaningful burdens, including differences

One question remains with respect to the degree of vagueness scrutiny that the challenged regulation and Revenue Ruling here should receive—a question that *Big Mama Rag* does not explicitly answer. As the IRS points out, the Supreme Court has laid out multiple factors that ratchet either up or down the stringency of a court's vagueness review. Regulation in the area of First Amendment freedoms increases the scrutiny, as discussed above. Civil, rather than criminal, sanctions decrease it. *Vill. of Hoffman Estates*, 455 U.S. at 498–99. The instant case, *Big Mama Rag*, and cases like *Keyishian* and *City of Lakewood* fall into both of those buckets, suggesting that the review applied in all three should be the same.[10] But another factor that none of those precedents mentions explicitly is the rule that "economic regulation is subject to a less strict vagueness test." *Vill. of Hoffman Estates*, 455 U.S. at 498. The IRS cites that rule to argue for a looser vagueness standard here. *See* ECF 31 at 40. Yet, the IRS points to no case applying that rule to regulations of businesses engaged in speech, like political speech, fully covered by the First Amendment. Neither does the IRS's key cite, *Village of Hoffman Estates*.[11] To the contrary, the *City of Lakewood* majority rejected an argument along those lines from the dissenters, explaining that the vagueness considerations applicable to regulations of newsracks differ from those

---

in tax liability, imposed by classification as a 527 rather than a (c)(4). Thus, under the reasoning of *Citizens United*, too, the IRS's argument about the 527 alternative fails.

[10] The *City of Lakewood* opinion did not specify the punishment that businesses faced under the challenged ordinance for failure to obtain a permit before erecting a newsstand on public property. But a footnote implied that the ordinance imposed only civil, not criminal, punishments for violation. *See City of Lakewood*, 486 U.S. at 766 n.10.

[11] *Village of Hoffman Estates* cites dicta in *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) to support its proposition that economic regulation is subject to a less strict vagueness test. *Vill. Of Hoffman Estates*, 455 U.S. at 498 n.10. That case, in turn, cites two vagueness challenges that do not involve speech at all: *Boyce Motor Lines v. United States*, 342 U.S. 337 (1952), and *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29 (1963). *See Papachristou*, 405 U.S. at 162. *Papachristou*'s final citation, *United States v. Petrillo*, 332 U.S. 1 (1947), involved regulations governing licensed radio stations and did implicate speech. However, the challenger in that case was an *individual* charged with criminal violation of a provision of the Communications Act of 1934, so its holding is not relevant to the question of regulations of *businesses* engaged in First Amendment activity. And the Supreme Court made clear in *Village of Hoffman Estates* that this rule applies to regulation of business—because "businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." 455 U.S. at 498.

applicable to regulations of, say, soda vending machines because "[n]ewspapers are in the business of expression, while soda vendors are in the business of selling soft drinks." 486 U.S. at 761.

Finally, a word on Freedom Path's alternative argument for heightened First Amendment scrutiny. Freedom Path argues that, independent of their implications for its tax liability, the challenged regulations also burden Freedom Path's speech by compelling disclosure of Freedom Path's donors if it fails to qualify as a (c)(4). ECF 33 at 30–33. To support its argument, Freedom Path observes that "[t]he Supreme Court has held for years that heightened First Amendment scrutiny applies to disclosure requirements" in the campaign finance context. *Id.* at 32 (citing *Buckley*, 424 U.S. at 64–68; *Citizens United*, 558 U.S. at 366). It thus follows, Freedom Path contends, that "*a fortiori* disclosure laws must also face heightened First Amendment vagueness review." *Id.* The IRS calls Freedom Path's argument untimely, since Freedom Path did not raise it until its reply. ECF 35 at 33–34. Because "[a]rguments asserted for the first time in reply are waived"—and because Freedom Path's other argument for heightened First Amendment scrutiny persuades regardless—the Court need not address this alternative argument any further. *Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 313 n.51 (D.D.C. 2016), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018).

In sum, the caselaw does not support the IRS's contention that the regulations challenged in the instant case should receive less stringent vagueness review than other civil regulations of speech covered by the First Amendment. And accordingly, the appropriate vagueness standard applicable to this case is the same one applied not just in *Big Mama Rag* but also cases like *City of Lakewood* and *Keyishian*.

### 2. *Applying That Standard*

Having established that the challenged portion of 26 C.F.R. § 1.501(c)(4)-1 and Revenue Ruling 2004-06 are subject to the heightened vagueness scrutiny applicable to civil regulations

affecting First Amendment-protected speech, the next step is to apply that scrutiny to the challenged provisions. But first, the Court must decide what exactly that degree of vagueness scrutiny requires. That is not such a straightforward question either. Cases considering vagueness challenges to civil regulations affecting speech apply a range of factors, each of which may be relevant to the case here. Cases challenging criminal prohibitions also provide guidance, particularly in the campaign finance context, but with the caveat that they may impose a higher standard than is applicable here.

Start with *Big Mama Rag*. As the only controlling case involving a vagueness challenge to tax exemption regulations, it provides one of the closest legal analogues to the question in our case. In that case, three interrelated concerns gave rise to the D.C. Circuit's vagueness finding. First was the lack of regulatory language to guide IRS officials' application of the regulations' requirements. For instance, the Circuit took issue with the fact that whether the challenged "full and fair exposition" test even applied to any given organization applying for 501(c)(3) status depended on an initial IRS determination that the organization "advocate[d] a particular position or viewpoint." *Big Mama Rag*, 631 F.2d at 1036. The Circuit found that the regulation's limited text on that question made it "difficult to ascertain . . . exactly what organizations are intended to be covered by the 'full and fair exposition' standard.'" *Id.* Similarly, the *Big Mama Rag* court found that the "full and fair exposition" standard itself gave "no aid in interpreting" its meaning and therefore left both applicant organizations and reviewing officials guessing as to how to apply it. *Id.* at 1037–38. Along those same lines, the regulation's inquiry into the amount of a given organizational communication that was "fact" versus "unsupported opinion" was underdetermined because "material often combines elements of each" and the regulation did not say how much of a

communication needed to be factual in order to fall on the permissible side of the "full and fair exposition" standard. *Id.* at 1039.

Second, the Circuit took issue with the "subjective" nature of both the Treasury Department guidance as to which organizations were subject to the "full and fair exposition" test and the regulatory language of the "full and fair exposition" test itself. *See id.* at 1036–37. The threshold inquiry required IRS officials to determine whether an organization's positions were "controversial," per IRS guidance—a term that "g[ave] IRS officials no objective standard by which to judge" and was instead based "solely on the basis of one's subjective notion of what is 'controversial.'" *Id.* at 1036. Meanwhile, the latter inquiry involved what the Circuit called "an individualistic—and therefore necessarily varying and unascertainable—standard: the reactions of members of the public." *Id.* at 1037. That and other determinations required by the "full and fair exposition" test, under the regulation, were not susceptible to "principled and objective application" but instead would "likely be colored by one's attitude towards the [organization's] point of view." *Id.* at 1038.

Finally, the *Big Mama Rag* court pointed to indications of potentially discriminatory application in the appellant's own tax-exemption application process and that of other applicants affiliated with "homosexuality." *Id.* at 1037, 1040. The Circuit noted, for example, that another "tax-exempt homosexual organization" that the Government pointed to as evidence that it did not discriminate on that basis was subject to the "full and fair exposition" standard for advocacy organizations even though the IRS found that it did not "'advocate or seek to convince individuals that they should or should not be homosexuals.'" *Id.* at 1037 (quoting Rev. Rul. 78-305, 1978-2 C.B. 172). This provided further evidence of the susceptibility of the initial threshold inquiry to discriminatory enforcement. In addition, the Circuit pointed to evidence in the record that IRS

officials told the appellant's counsel that it would only receive an exemption if it "agreed to abstain from advocating that homosexuality is a mere preference, orientation, or propensity on par with heterosexuality and which should otherwise be regarded as normal." *Id.* at 1040 (citation omitted). Although the court did not find that the IRS had actually discriminated against the appellant on that basis, a question it called "irrelevant," the fact that an official could make such a statement without contradicting the applicable regulatory texts "simply highlight[ed] the inherent susceptibility to discriminatory enforcement of vague statutory language." *Id.*

Other vagueness cases involving civil regulations of speech covered by the First Amendment can also help guide the vagueness inquiry here. Several cases echo *Big Mama Rag* in objecting to the lack of any statutory or regulatory guidance as to how broad terms should apply. In *Gentile*, for example, the Supreme Court overturned a challenged Nevada Supreme Court ethics rule that forbade "making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding." *Gentile*, 501 U.S. at 1033. The challenged rule also included a "safe harbor" indicating that a defense attorney could "describe[] the general nature of the defense without elaboration" and not violate the Rule's prohibition. *Id.* at 1033, 1048. The Court held the regulation to be unconstitutionally vague because terms such as "general" and "elaboration" "ha[d] no settled usage or tradition of interpretation in law" and were "both classic terms of degree." *Id.* at 1048–49. Even more problematic under vagueness review, the licensing requirement in *City of Lakewood* lacked any "standards to bound the licensor," allowing the mayor to grant or deny newsrack permits for any reason and to impose any conditions on that permit that he deemed "necessary and reasonable." *City of Lakewood*, 486 U.S. at 753–54, 760.

By contrast, the Minnesota statute challenged in *Roberts v. U.S. Jaycees* did not cross the line into impermissible vagueness because, as construed by the Minnesota Supreme Court, it included "a number of specific and objective criteria" and "familiar standards" "typically employed in determining the applicability of state and federal antidiscrimination statutes." 468 U.S. 609, 629–30 (1984). Similarly, in *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, the D.C. Circuit found that regulatory definitions of the key word "event" in a local D.C. signage ordinance provided sufficient guidance as to prevent "arbitrary or discriminatory" enforcement. 846 F.3d 391, 411 (D.C. Cir. 2017). As the D.C. Circuit put it, quoting the Supreme Court, "What renders a statute vague . . . is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id.* (quoting *Williams*, 553 U.S. at 306); *see also Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 621 (1976) (invalidating a local solicitation ordinance as vague because broad statutory terms offered no guidance as to either which speakers the ordinance covered or "what those within its reach must do in order to comply").

A civil regulation of speech can also fail vagueness review when its meaning is mired in too much regulatory morass. Most illustrative, perhaps, were the university staff hiring and retention criteria challenged in *Keyishian*. There, the Supreme Court took issue with the "regulatory maze" governing the challenged inquiries into whether a university employee had engaged in "treasonable or seditious utterances or acts" or "advocate[d], advise[d] or t[aught] the doctrine of forceful overthrow of government." *Keyishian*, 385 U.S. at 597–600, 604. According to the Court, "[v]agueness of wording is aggravated by prolixity and profusion of statutes, regulations, and administrative machinery, and by manifold cross-references to interrelated

42

enactments and rules." *Id.* at 604. This "intricate administrative machinery for [] enforcement," combined with "uncertainty as to the scope of its proscriptions," the Court held, "ma[de] [the challenged laws] a highly efficient in terrorem mechanism." *Id.* at 601. Conversely, the Supreme Court upheld a provision of the Hatch Act restricting federal employees' political activity because, in part, the Civil Service Commission had consolidated and restated its various adjudicatory holdings interpreting the statute in binding regulations. *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 575–76 (1973). And those regulations, the Court held, were "set out in terms that the ordinary person exercising ordinary common sense c[ould] sufficiently understand and comply with." *Id.* at 579.

The IRS does not concede that any of those cases bind the Court here because all of them applied heightened First Amendment vagueness review, which the IRS denies is applicable to this case. ECF 31 at 39–41. Freedom Path, for its part, relies on some of the above cases but puts greater emphasis on three Supreme Court campaign finance cases that highlighted the vagueness of certain prohibitions on election-related expenditures: *Buckley*, *WRTL*, and *Citizens United*. *See* ECF 30-1 at 29–40. Yet, as the IRS correctly observes, all three of those cases involved criminal prohibitions on speech, rather than civil prohibitions or subsidies. *See Buckley*, 424 U.S. at 40–41; *WRTL*, 551 U.S. at 457; *Citizens United*, 558 U.S. at 321 (civil and criminal penalties). The rule laid out in *Village of Hoffman Estates* suggests that such statutes may receive some degree of more stringent vagueness review, even within the category of heightened vagueness review applicable to all speech regulations. With that caveat, the cases nonetheless provide some guidance into the vagueness inquiry here.

All three of those campaign finance cases found issue with multi-factor tests used to distinguish electioneering communications from mere issue advocacy. In *Buckley*, the Court

upheld a disclosure requirement only after narrowing its coverage provision, which defined "expenditures" to mean "use of money or other valuable assets 'for the purpose of . . . influencing' the nomination or election of candidates for federal office." 424 U.S. at 77. The Court found such language to potentially sweep too far and cover too much protected issue advocacy. Instead, the Court found it constitutionally necessary to construe that provision to cover only "funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80 (footnote omitted). In *WRTL*, Chief Justice Roberts's controlling opinion held that a distinction between prohibited electioneering and unregulated issue advocacy must not be "focused on the speaker's intent" or the speech's "actual effect . . . on an election or on a particular segment of the target audience." *WRTL*, 551 U.S. at 468–69. Nor could it employ an "open-ended rough-and-tumble of factors." *Id.* at 469 (citation omitted). And for those reasons, the Court in *Citizens United* held that the Federal Election Commission's "two-part, 11-factor balancing test" for determining whether ads that were not express advocacy were nonetheless its "functional equivalent" constituted an impermissibly "ambiguous test[]." 558 U.S. at 335–36. That Court also condemned the fact that the FEC had adopted a "unique and complex" set of rules to govern this area and that the line between permitted and prohibited ads was policed through case-by-case adjudications and advisory opinions. *Id.* at 334–36.

In sum, then, the relevant caselaw directs this Court to consider the following in its vagueness review of the challenged regulations in this case: (a) the degree of explicit guidance that the regulatory provisions and accompanying guidance provide for enforcing the speech regulations; (b) whether that guidance provides subjective or objective considerations; (c) whether the regulations make clear who is covered by its prohibition, what fact(s) trigger that coverage, and what fact(s) trigger liability; (d) the complexity and prolixity of the regulatory provisions and

accompanying guidance; (e) whether the standards inquire into difficult-to-determine questions of effect or, in some cases, intent[12]; (f) whether the standards provide a clear criteria or instead an "open-ended rough-and-tumble of factors" for determining the inculpatory fact(s); and (g) any evidence of susceptibility to selective or viewpoint-discriminatory enforcement.[13]

With that table set, the Court can turn to the provisions challenged here. Recall that the question at issue for Freedom Path's 501(c)(4) eligibility under the implementing regulation is whether Freedom Path "is operated exclusively for the promotion of social welfare." 26 C.F.R. § 1.501(c)(4)-1(a)(1)(ii). That regulation goes on to say that "[t]he promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." *Id.* § 1.501(c)(4)-1(a)(2)(ii). Nonetheless, the IRS has long interpreted the regulation to permit (c)(4)s to engage in some political campaign intervention as long as it is not the organization's "primary" activity, *id.*, based on language in the regulation's preceding subsection instructing that "[a]n organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community," as well as other indicia of legislative intent. *Id.* § 1.501(c)(4)-1(a)(2)(i); *see* Rev. Rul. 67-368, 1967-2 C.B. 194; Rev. Rul. 81-95, 1981-

---

[12] That said, intent standards do not always signify vagueness. To the contrary, the Supreme Court in *Williams* held in the context of a criminal prohibition on speech that the statute's intent mens rea requirement did not create a vagueness problem because "[w]hether someone held a belief or had an intent is a true-or-false determination, not a subjective judgment" and "courts and juries every day pass upon knowledge, belief and intent." *Williams*, 553 U.S. at 306. The D.C. Circuit has explained that *Buckley*'s and *WRTL*'s holdings on intent standards were more limited: "Neither *Buckley* nor *WRTL II* suggested that intent standards are generally impermissible in the First Amendment context. Rather, those cases rejected their use 'to distinguish constitutionally protected political speech from speech that [Congress] may proscribe.'" *Nat'l Ass'n of Mfrs.*, 582 F.3d 1, 27 n.21 (D.C. Cir. 2009) (quoting *WRTL*, 551 U.S. at 467). And "*Buckley* itself approved the use of a purpose standard elsewhere in FECA." *Id.* For purposes of this case, the Court can give less consideration to the intent concern in assessing the challenged provisions' vagueness given the caselaw pointing in both directions and the limited relevance of *Buckley* and *WRTL*'s slightly elevated vagueness standard for criminal prohibitions.

[13] Whether, ironically, the Supreme Court's and D.C. Circuit's guidance on First Amendment vagueness review itself provides only an "open-ended rough-and-tumble of factors"—and whether it should—are not questions for this Court.

1 C.B. 332. The IRS has not promulgated any regulations or guidance on what constitutes an organization's "primary" activity for purposes of this (c)(4) test, but it has at times indicated that it is any activity that exceeds 49% of the organization's overall activity (as measured, typically, by money spent). *See* Barton, *supra*; McPherson, *supra*. In this case, however, the IRS takes the position that "primarily" in the (c)(4) regulation means "more than insubstantial," ECF 31 at 16–18, and that while there is no numerical threshold it is likely significantly less than 49%, *see id.* at 22–24. This opinion refers to this inquiry as the "Primary Activity" inquiry, and it is one of two inquiries that Freedom Path challenges as unconstitutionally vague. *See* ECF 33 at 45–51.

The second inquiry that Freedom Path challenges is the test outlined in Revenue Ruling 2004-06, which the IRS uses to decide, among other things, whether any given expenditure constitutes political campaign intervention for purposes of the Primary Activity inquiry. The Court refers to this second inquiry as the "Political Campaign Activity" inquiry. As a reminder, that IRS guidance document states that the question of whether "an expenditure for an advocacy communication relating to a public policy issue" qualifies as political campaign activity requires consideration of "[a]ll the facts and circumstances"—unless the communication "explicitly advocates the election or defeat of an individual to public office," in which case it is clearly political campaign activity. Rev. Rul. 2004-06, 2004-1 C.B. 328. To guide that facts-and-circumstances inquiry, the Revenue Ruling includes both (a) a list of 11 factors that "tend to show that an advocacy communication on a public policy issue" qualifies as political campaign activity, which the Revenue Ruling says are non-exhaustive, and (b) a set of six hypothetical "situations" describing a communication and how the IRS would analyze it under that test. *Id.*

Both inquiries exhibit signs of impermissible vagueness. Taken together, they cross the line into unconstitutionality.

Start with the Primary Activity inquiry. One glaring problem is that the text of the challenged regulation does not explicitly impose a "primary" activity test, but is instead read most naturally to prohibit (c)(4)s from engaging in *any* political campaign intervention at all. *See* 26 C.F.R. § 1.501(c)(4)-1(a)(1)(ii), (2)(ii). And while the IRS has applied a primary-activity inquiry to the political activity question through Revenue Rulings, *see* Rev. Rul. 67-368, 1967-2 C.B. 194; Rev. Rul. 81-95, 1981-1 C.B. 332, it backs away from that interpretation in this very litigation. Instead, the IRS criticizes Freedom Path for "advocating for a 'primary purpose test'" here, arguing that such a standard "invites this Court to rewrite clear statutory language" that requires (c)(4)s to act "exclusively" to promote social welfare. ECF 31 at 22–23. In addition, the IRS contends, Freedom Path's interpretation—and, incidentally, the IRS's own interpretation since 1967—would contravene a 1945 Supreme Court decision interpreting the word "exclusively" in a different tax provision to be violated when another organizational purpose is a "substantial" portion of the organization's activities. ECF 31 at 23 (citing *Better Bus. Bureau of Wash., D.C. v. United States*, 326 U.S. 279 (1945)).[14] Despite this apparent tension, the IRS assures the Court that its "primary" and its "more than insubstantial" standards "can be harmonized" and says the Court "need not spend time parsing" the regulation's text. ECF 31 at 24. But the First Amendment demands that the Court parse closely a regulation affecting speech. Specifically, the Fifth and First Amendments demand that such a regulation make clear, at minimum, "precisely what" the "incriminating fact" is that determines whether the speech is prohibited or penalized. *Williams*, 553 U.S. at 306. Here, Freedom Path does not know how much political campaign intervention is too much, and the IRS cannot even agree with itself on the answer.

---

[14] In the IRS's review of Freedom Path's (c)(4) application, the IRS cited the Revenue Rulings described above and stated that the relevant question is whether political campaign intervention constitutes Freedom Path's "primary activity." *See* ECF 38-4 at 20–23. And the agency never used the "more than insubstantial" standard that it invokes in this litigation. At the same time, the IRS's decision as to Freedom Path also never defined "primary."

In fact, the IRS's confusion runs deep. As the 2013 TIGTA Report found, existing IRS regulations "do not define how to measure whether social welfare is an organization's 'primary activity,'" creating "confusion" among application reviewers that contributed to disparate treatment of Tea Party-aligned and similar organizations in the early 2010s. 2013 TIGTA Report at 14.[15] It is not surprising that IRS officials "lack[ed] . . . knowledge . . . of what activities are allowed by . . . § 501(c)(4) organizations" when the IRS cannot, even now, say how much political activity exceeds its threshold. *Id.* at 7. Freedom Path correctly contends that this lack of guidance "give[s] the IRS" wide "discretion to arbitrarily deny § 501(c)(4) status." ECF 33 at 45. And the IRS concedes that the regulation "lack[s] . . . precision" on this point. ECF 35 at 20. Or as the IRS put it in its 2013 NPRM, "the distinction between campaign intervention and social welfare activity, and the measurement of the organization's social welfare activities relative to its total activities, have created considerable confusion for both the public and the IRS in making appropriate section 501(c)(4) determinations." 2013 NPRM at 71536.

Still, if that was the challenged regulatory scheme's only vagueness problem, it might not be enough to transgress the Constitution's line. After all, the "primary activity" is ostensibly objective, rather than subjective, and would seem to require only a single straightforward determination.

But when paired with the Political Activity inquiry, the regulation's vagueness problems mount. Note first the Revenue Ruling 2004-06's instruction that IRS officials consider "[a]ll the facts and circumstances . . . to determine whether an expenditure for an advocacy communication

---

[15] The Court can consider the 2013 TIGTA Report for its truth because both Parties invoke its findings for their truth, neither Party objects to considering it for that purpose, and the report on its face appears to fall into a hearsay exception for public records. *See* Fed. R. Evid. 803(8); *Czekalski v. Peters*, 475 F.3d 360, 366 (D.C. Cir. 2007) (finding that an agency Office of Inspector General report "appear[s]" to "be admissible as a public report" under Fed. R. Evid. 803(8)).

relating to a public policy issue" qualifies as political campaign intervention. 2004-1 C.B. 328. To be sure, such an inquiry is not inherently vague on its own. *See Act Now*, 846 F.3d at 411–12. But it certainly fails to provide the kind of "explicit guidelines" that would help the agency "avoid arbitrary and discriminatory enforcement." *Big Mama Rag*, 631 F.2d at 1035. And, unfortunately, the rest of the Revenue Ruling does not do much better. Although none of its 11 factors that IRS officials may consider is inherently subjective, the Revenue Ruling offers no guidance as to how officials should weigh the factors against one another or how many it takes to reach the threshold for political campaign intervention. Thus, as Freedom Path puts it, "whether . . . a communication is deemed political campaign intervention depends on which factor the IRS emphasizes—or by the IRS shifting the analysis to the other more nebulous factors." ECF 30-1 at 37. Further, the six hypothetical scenarios in the Revenue Ruling, which are intended to clarify how the agency will apply these factors and other circumstances, lack any "explicit analysis" and "do not provide any patterns, principles, or methods guiding how to balance the factors and apply the [t]est." *Id.* at 39. Instead, they merely recite a set of facts about the hypothetical and then declare, "[b]ased on these facts and circumstances," the communication either does or does not qualify as political activity. *See* Rev. Rul. 2004-06, 2004-1 C.B. 328.

One of the individual factors also presents some vagueness concerns by inquiring into the activities of some other, indeterminate set of other speakers besides the applicant organization. *See* Rev. Rul. 2004-06, 2004-1 C.B. 328 (asking whether "[t]he position of the candidate on the public policy issue has been raised as distinguishing the candidate from others in the campaign, either in the communication itself or in other public communications"). But the Supreme Court in *WRTL* cautioned that, when distinguishing between electioneering and issue advocacy, "contextual factors . . . should seldom play a significant role in the inquiry." *WRTL*, 551 U.S. at 473–74.

The Political Activity test also defies the Supreme Court's admonition that political speech not be subjected to regulation relying upon an "open-ended rough-and-tumble of factors." *WRTL*, 551 U.S. at 469. In *Citizens United*, the Court overturned a campaign finance regulation in which "[g]overnment officials pore[d] over each word of a text to see if, in their judgment, it accords with the 11-factor test they have promulgated," calling such regulation "an unprecedented governmental intervention into the realm of speech." 558 U.S. at 336. Although *WRTL* and *Citizens United* concerned criminal prohibitions on speech, and thus may have imposed a higher vagueness standard than applies here, the test in question certainly raises vagueness concerns that this Court cannot ignore. Moreover, the IRS points to no case from the First Amendment context approving of a non-exhaustive, 11-factor test of the kind challenged here.[16] In fact, the IRS does not even attempt to argue that the Political Activity test would satisfy *WRTL* or *Citizens United* if it were held to the same basic heightened First Amendment vagueness review.[17]

Beyond all that, the two challenged provisions' combined effect renders them unconstitutionally vague. An organization seeking to engage in some political campaign intervention while maintaining eligibility for (c)(4) status must determine both (a) whether any given communication will be considered political campaign intervention (the Political Activity inquiry), and (b) whether that expenditure will tip the scales to make its "primary" activity political

---

[16] The IRS attempts to do so, but unsuccessfully. The IRS cites two out-of-circuit cases that it says "upheld multi-factor tests . . . in the realm of campaign finance regulation": *The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012), and *Free Speech v. FEC*, 720 F.3d 788 (10th Cir. 2013). ECF 31 at 46. But in fact, what both those cases approved was an FEC regulation that effectively codified, or at least closely adhered to, the "functional equivalent of express advocacy" standard that the Chief Justice's controlling opinion in *WRTL* recommended in lieu of the more indeterminate, multi-factor test challenged in that case. *See Free Speech*, 720 F.3d at 795. Thus, those cases provide no real support for the proposition that the non-exhaustive, 11-factor test challenged here passes constitutional muster in the face of the Supreme Court's guidance in *WRTL* and *Citizens United*.

[17] The IRS does attempt to argue that the Revenue Ruling "would pass even a more stringent vagueness review" for cases that impact First Amendment-protected speech but supports that argument with a comparison to the rule challenged in *Big Mama Rag*, not the ones challenged in *WRTL* and *Citizens United*. *See* ECF 31 at 49–51. And, for reasons discussed above, the challenged regulation and Revenue Ruling in fact share vagueness problems with the *Big Mama Rag* regulation.

campaign intervention (the Primary Activity inquiry). If one of those tests is vague, the organization faces only a limited degree of uncertainty. But if both are vague, the uncertainty multiplies. That is particularly true when, as here, the IRS does not even indicate what threshold it is applying for the Primary Activity inquiry. Worse yet, the IRS's initial determination on Freedom Path's (c)(4) status also relied not only on the 11 non-exclusive factors in Revenue Ruling 2004-06, but also to some (unclear) degree on the seven factors listed in Revenue Ruling 2007-41. *See* ECF 38-4 at 20–22. That regulatory "prolixity" provides another mark of vagueness. *Keyishian*, 385 U.S. 604. Thus, in multiple respects, an applicant like Freedom Path has no good way of knowing even which standard its application will be judged under, no less how the IRS will ultimately judge it. Such compounding uncertainty mirrors the vagueness found in cases like *Hynes*, whose challenged ordinance was vague in two respects: both as to which speakers it covered and as to "what those within its reach must do in order to comply." 425 U.S. at 621. Here, by analogy, any given communication may or may not be political campaign intervention *and* may or may not even matter to the overall primary activity determination, depending on what threshold the IRS chooses to apply.

Finally, as in *Big Mama Rag*, evidence of actual selective enforcement solidifies this vagueness finding. The 2013 TIGTA Report found that IRS officials selected applicants for more intensive review, and delayed such review, based on the organizations' names and policy positions (including affiliation with the Tea Party and other conservative-coded causes), considerations that TIGTA called "inappropriate." 2013 TIGTA Report at 5. The IRS also requested unnecessary information from many of these organizations, including about their donors' political affiliations. *Id.* at 18. Although Freedom Path presents no specific evidence that its application was targeted for such review, its application was being reviewed during the period of time covered by the 2013

TIGTA Report, and it was subject to delays and information requests of the kind uncovered in that report. *See, e.g.*, ECF 38-2 at 26–35.[18]

Neither of the IRS's responses negates these concerning facts. First, the IRS insists that the TIGTA report found only that the IRS's "selection of applications for review based on applicants' names and policy positions '*gives the appearance* that the IRS is not impartial.'" ECF 31 at 51 (quoting 2013 TIGTA Report at 6) (emphasis in IRS's version). But TIGTA found much more than that; it found actual selection based on inappropriate criteria. Second, the IRS points out in a footnote that TIGTA also found that the IRS selected certain liberal groups for additional review based on their names during the same time period. *See* ECF 35 at 13 n.5 (citing 2017 TIGTA Report). That provides cold comfort, though, because organizations' names and policy positions are not relevant bases for approval or denial under (c)(4) regulation or Revenue Ruling. And even so, the IRS later reported to Congress that, of the 199 (c)(4) cases that received additional review, approximately 75% were conservative leaning while less than 5% were liberal- or progressive-leaning. 2017 TIGTA Report at 3.

All told, the challenged regulation and Revenue Ruling present multiple indicia of vagueness. As a pair, they cannot pass the heightened vagueness review required in this case. Accordingly, the Court will **GRANT** summary judgment on Freedom Path's vagueness challenge.[19]

---

[18] Freedom Path informed the Court at oral argument that it settled a separate lawsuit with the IRS on the question of whether the IRS discriminated against Freedom Path on the basis of its political views. In that settlement, the IRS did not admit fault. July 2, 2025 Hr'g Draft Tr. 18:1–6. The Court does not take this settlement as evidence either way. *See* Fed. R. Evid. 408. And again, under *Big Mama Rag*, whether the IRS actually discriminated against the applicant based on their viewpoint is ultimately "irrelevant" to the vagueness question and not necessary to find vagueness. 631 F.2d at 1040. The question, instead, is the tax regulation's "inherent susceptibility to discriminatory enforcement." *Id.*

[19] At oral argument, Freedom Path urged this Court for the first time to hold the challenged Revenue Ruling unconstitutional on its face, not just as applied to Freedom Path's application for a tax exemption. *See* July 2, 2025 Hr'g Draft Tr. 3:10–5:21. Because Freedom Path does not make a First Amendment overbreadth argument, facial

**B.  The Court Cannot Decide Freedom Path's Tax Exemption Eligibility on the Briefing Provided.**

Having determined that the challenged regulation and Revenue Ruling are unconstitutionally vague, at least as applied to Freedom Path, the Court must then determine what the non-vague rules should be to govern tax exemption under section 501(c)(4) in order to resolve Freedom Path's application for exemption. The IRS does not offer an alternative, non-vague interpretation of what constitutes political campaign intervention (the Political Activity inquiry) or how much intervention is too much (the Primary Activity inquiry). Instead the agency rests on the vague interpretations it applied when it originally denied Freedom Path's application. *See generally* ECF 35 at 10–11. Because the Court has found that the IRS's interpretations violate the Constitution, the Court of course will not adopt them.

Freedom Path, however, does posit an alternative. On the Political Activity inquiry, Freedom Path asks the Court to interpret "political campaign intervention" to mean "express advocacy"—or, if preferred, express advocacy or its "functional equivalent." ECF 30-1 at 11, 40–43. Freedom Path derives those standards from the Supreme Court's decisions in *Buckley* and *WRTL*, reasoning that those cases inform this question because they, too, had to interpret the line between political campaign activity and "issue advocacy." *Id.* at 40. According to Freedom Path, *Buckley*'s "express advocacy standard"—joined perhaps by *WRTL*'s "or its functional equivalent" supplement—"is the only administrable way to distinguish between issue advocacy seeking legislation—which often will reference candidates for office—and political campaign

---

relief would require Freedom Path to show that the challenged Revenue Ruling "is unconstitutional in every conceivable application." *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984). But the Court's ruling here relies in part on the IRS's inconsistent and shifting application of the regulation and its interaction with the Revenue Ruling to come to the denial decision it made. It does not rely just on the face of the Revenue Ruling. Thus, there may be applications of the Revenue Ruling, if paired with a clear and consistent application of the "primarily" threshold under 26 C.F.R. § 1.501(c)(4)-1, that would not be unconstitutionally vague.

intervention." *Id.* Meanwhile, on the Primary Activity inquiry, Freedom Path argues that the Court must draw "a clear line" at 50%, or at least 40%, based on "past IRS practice." ECF 33 at 45. "In the further alternative," Freedom Path offers, the Primary Activity inquiry would ask whether an organization's total expenditures for political campaign intervention (defined as express advocacy) exceed its total expenditures for "another activity" such as "non-express advocacy speech." *Id.* at 45–46.

Starting with the more straightforward question, Freedom Path's proposal on the Primary Activity inquiry generally makes sense. As discussed above, the IRS has long interpreted its regulation to permit (c)(4) organizations to engage in political campaign intervention as long as it was not "primarily engaged" in such intervention. *See* 26 C.F.R. § 1.501(c)(4)-1(a)(2); Rev. Rul. 67-368, 1967-2 C.B. 194; Rev. Rul. 81-95, 1981-1 C.B. 332. Although that interpretation does not clearly follow from the regulation's plain text, this Court can accept it for present purposes given that neither Party here challenges it and given its apparently longstanding and consistent pedigree as the IRS's reasonable official interpretation of an ambiguous regulation. *Cf. Kisor v. Wilkie*, 588 U.S. 558, 573–80 (upholding deference to an agency's reasonable interpretation of its own ambiguous regulation when such interpretation represents the agency's authoritative or official position, implicates its substantive expertise, and reflects the agency's fair and considered judgment).

Further, Freedom Path's proposals are generally consistent with the plain meaning of the word "primarily." *See Primarily*, Webster's New World Dictionary of the American Language 1157 (College Ed. 1960) (as relevant here, "in the first place; principally"); *Primary*, Webster's New World Dictionary of the American Language 1157 (College Ed. 1960) (as relevant here, "first in importance; chief; principal"); *Primary*, Webster's Seventh New Collegiate Dictionary 676

(1963) (as relevant here, "first in rank, importance, or value"); *see also Malat v. Riddell*, 383 U.S. 569, 571–72 (1966) (holding that, in the context of another tax law, "primarily" means "of first importance" or "principally" rather than just "substantial," under its ordinary meaning). Certainly, they are more consistent than the IRS's interpretation, which effectively defines "primarily" to mean "not insubstantial[ly]." ECF 31 at 23–24. Only Freedom Path's interpretation recognizes that the word "primarily" is necessarily relative.

Freedom Path's interpretation also makes more sense of the statutory scheme, which allows organizations to qualify for section 527 status if they are "primarily" engaged in political activity. Under that interpretation, "§ 501(c)(4) and § 527 status are two sides of the same coin, asking whether an organization's primary purpose is political campaign intervention." ECF 33 at 32. For the reasons Freedom Path explains on reply, that is a sensible interpretation of the relevant statutes. *See id.* at 17–21. By contrast, IRS's definition, to the extent it provides clear guidance at all, would leave an unexplained gap in tax exemption coverage: organizations who engage in some "substantial" amount of political activity that is still not their "primary" activity would not qualify for either (c)(4) 527 status, while those who engage in both less and more political activity than that would be tax exempt. *See id.* at 20. The IRS offers no explanation for such a result, nor any evidence that it is what Congress intended.

Yet Freedom Path's interpretation has problems, too. Specifically, Freedom Path's argument does not make clear which of its multiple alternative political campaign intervention thresholds the Court should choose—50%, 40%, or just more than any other of the organization's activities. All three have some support in the evidence Freedom Path offers. For example, 50% is consistent with remarks IRS officials made around the time of Freedom Path's application and appears to have been commonly understood as the threshold. *See* ECF 30-1 at 14 (citing Barton,

*supra*); ECF 33 at 46 (quoting Donald B. Tobin, *The Internal Revenue Service and a Crisis of Confidence: A New Regulatory Approach for A New Era*, 16 Fla. Tax Rev. 429, 445 n.57 (2014) (quoting Marcus Owens, *Practicing Law Institute Program on Corporate Political Activities*, 3 Exempt Org. Tax Rev. 471 (1990))). 40% is consistent with the IRS's threshold for expedited review of (c)(4) applications, suggesting another reasonable interpretation. *Id.* at 45; ECF 30-1 at 18. And a Primary Activity threshold that is just more than any other activity is most consistent with the ordinary meaning of the word "primarily." *See Malat*, 383 U.S. at 572. Worse still, neither Party offers evidence as to how the IRS interprets "primarily" in its definition of a "political organization" that qualifies for 527 tax-exempt status. 26 U.S.C. § 527(e)(1). Indeed, at oral argument, the IRS could not explain how it interprets that term in the 527 context and said only that it "very well may be different than the 'primarily' in the [(c)(4)] regulation that we are talking about." July 2, 2025 Hr'g Draft Tr. 44:2–45:15. That does not give the Court much to work with.

That said, if that indeterminacy was the only problem, this Court might be able to choose one option from among Freedom Path's reasonable ones and proceed to decide the case. But an even bigger problem arises with Freedom Path's interpretations of the Political Activity inquiry, which bear little relationship to the statutes and regulations this Court must interpret. Instead, both of Freedom Path's proffered definitions of political campaign intervention derive from Supreme Court cases interpreting distinct campaign finance statutes in distinct contexts.

Note first the distinct statutory language. In *Buckley*, the Supreme Court held that a statutory provision capping independent campaign expenditures "relative to a clearly identified candidate" at $1,000 per candidate per year could only avoid constitutional vagueness if it was construed to mean "expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Buckley*, 424 U.S. at 42, 44. That

construction, the Court said, "would restrict the application of [the statutory provision] to communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 44 n.52. The Court applied the same construction to the term "expenditures" made "'for the purpose of . . . influencing' the nomination or election of candidates for federal office" in another statutory provision so as to avoid a similar vagueness problem. *Id.* at 76–80 (citation omitted). Meanwhile, in *WRTL*, the Supreme Court's controlling plurality adopted its "express advocacy or its functional equivalent" standard when interpreting the FEC's definition of "electioneering communication," which the relevant statute defined to include "any broadcast, cable, or satellite communication that refers to a candidate for federal office and that is aired within 30 days of a federal primary election or 60 days of a federal general election in the jurisdiction in which that candidate is running for office." *WRTL,* 551 U.S. at 457–58.

None of those three statutory provisions interpreted in *Buckley* and *WRTL* used the same terms as the IRS's regulatory definition of political campaign activity. *See* 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii) ("The promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office."). Thus, it is not obvious that this Court should apply the same narrowing construction to those distinct terms. In fact, the section of the Federal Election Commission Act (FECA) that contains the only part of the "electioneering communications" statute that *Citizens United* did not later overturn (i.e., the disclosure provision) explicitly states that "[n]othing in this subsection may be construed to establish, modify, or otherwise affect the definition of political activities or electioneering activities (including the definition of participating in, intervening in, or influencing or attempting to influence a political campaign on behalf of or in opposition to any candidate for

public office) for purposes of Title 26." 52 U.S.C. § 30104(f)(7). Title 26 refers to the tax code, which includes the 501(c)(4) statute. In other words, Congress has explicitly warned courts and agencies not to import FECA's "electioneering communications" concept into the tax code's "political campaign intervention" context. Yet Freedom Path asks this Court to do exactly that.

Moreover, both *Buckley* and *WRTL* adopted their narrowing constructions so as to avoid the constitutional problems that would arise if the statutes covered issue advocacy. In *Buckley*, the Court construed "expenditures" as only "express[] advoca[cy]," that is, "those expenditures that expressly advocate a particular election result" because a broader definition would not "bear[] a sufficient relationship to a substantial governmental interest" to justify the regulation. *Buckley*, 424 U.S. at 80. Similarly, in *WRTL*, the Court applied its "express advocacy or its functional equivalent" standard in order "to distinguish constitutionally protected political speech from speech that [the Bipartisan Campaign Reform Act] may [constitutionally] proscribe." *WRTL*, 551 U.S. at 467. That concern does not apply in the distinct context of tax exemptions. Unlike political speech prohibitions, which the Supreme Court has held are justified only by certain compelling governmental interests, speech tax exemptions (i.e., subsidies) need not be justified in the same manner. Instead, *Regan* and the other caselaw previously discussed holds that the First Amendment does not forbid Congress from choosing not to provide tax exemptions to certain categories of speech as long as it does not "discriminate invidiously" in its provision of tax exemptions "in such a way as to aim at the suppression of dangerous ideas." *Regan*, 461 U.S. at 548. Under that rule, Congress (and its delegee the IRS) may choose to deny a tax exemption not just to "express advocacy or its functional equivalent," but also to any broader category of political speech that it chooses—so long as its line neither discriminates on the basis of viewpoint nor is so vague that it permits officials to discriminate in that fashion. *See Big Mama Rag*, 631 F.2d at 1034. For that

reason, too, the line the Supreme Court drew in its campaign-finance cases does not help this Court provide a non-vague construction of Congress's and the IRS's tax-exemption provisions.

Left with no acceptable answer from either Party as to how to interpret the key provisions at issue in this case, one standard route would be for the Court to remand the case to the IRS to adjudicate Freedom Path's tax exemption application again while taking this Court's opinion into account. Indeed, the D.C. Circuit has indicated that such a remand is appropriate in declaratory judgment actions under 26 U.S.C. § 7428 (like this one) when a court finds a tax-exemption provision to be unconstitutionally vague. *See Nat'l All.*, 710 F.2d at 871 n.6. Ordinarily, this Court would be inclined to do so. Unfortunately, that would not work here due to an obscure congressional appropriations rider. As noted above, Congress back in 2015 added an appropriations rider that prohibited Treasury or the IRS from "issu[ing], revis[ing], or finaliz[ing] any regulation, revenue ruling, or other guidance not limited to a particular taxpayer relating to the standard which is used to determine whether an organization is operated exclusively for the promotion of social welfare for purposes of section 501(c)(4)." Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2433 (2015). That rider remains in place to this day, and it prevents the IRS from crafting a non-vague alternative to the vague regulation and Revenue Ruling challenged here that would apply beyond just this case. *See* ECF 47 at 1 (citing Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 123 of Div. B, 138 Stat. 460, 530 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a), (a)(5), 139 Stat. 9, 10-11 (2025)). Worse still, that rider requires the IRS to apply the same "standard and definitions" to its evaluation of 501(c)(4) status "as [were] in effect on January 1, 2010." Pub. L. No. 118-47, 138 Stat. at 530. Thus, if this Court remanded Freedom Path's exemption application to the IRS, the IRS would have to apply the same regulation and Revenue

Ruling, and come to the same decision, despite this Court's order finding those standards unconstitutional. July 2, 2025 Hr'g Draft Tr. 25:5–19 (stating that the IRS "would be in a quandary about what to do with this instruction from Congress" and "very well could feel compelled to apply the same standard that it already has done").

Accordingly, this Court is left with no option but to decide the question of Freedom Path's exempt status itself. Yet neither Party has yet given the Court a satisfying way to do so. The Court will therefore deny both Parties' motions for summary judgment on this question and ask the Parties to file renewed motions advancing interpretations of the Primary Activity inquiry and Political Activity inquiry that are (a) not unconstitutionally vague and (b) appropriately rooted in the statutory and regulatory scheme, and constitutional principles, that govern this tax exemption in light of the Court's findings in this opinion.

*    *    *

For the foregoing reasons, Freedom Path's motion for summary judgment, ECF 30, is **GRANTED** in part and **DENIED** in part.

The IRS's motion for summary judgment, ECF 32, is **DENIED**.

**SO ORDERED.**

_____

JIA M. COBB
United States District Judge

Date: September 30, 2025