**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FREEDOM PATH, INC.,

                    *Plaintiff*,

       v.

INTERNAL REVENUE SERVICE, *et al.*

               *Defendants*.

Civil Action No.: 1:20-cv-01349-JMC

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**<u>PLAINTIFF FREEDOM PATH'S RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

Table of Authorities.................................................................................................ii

Introduction and Summary of Argument ................................................................ 1

Background ............................................................................................................. 4

    A.  Statutory and regulatory background ......................................................... 4

        1.  Section 501(c)(4) social-welfare organizations ................................. 4

        2.  Section 501(c)(3) organizations......................................................... 6

        3.  Section 527 political organizations.................................................... 6

    B.  Factual background ...................................................................................... 7

Standard of Review ............................................................................................... 13

Argument............................................................................................................... 14

    I.  Freedom Path qualifies as a Section 501(c)(4) social-welfare organization because it "exclusively" engages in civic speech, which is an activity "for the promotion of social welfare," under the plain meaning of 26 U.S.C. § 501(c)(4). ......................................................................................................... 14

        A.  Civic speech—both issue advocacy and advocacy for political candidates—"promotes the social welfare" under Section 501(c)(4)'s plain statutory text and its statutory context. ......................................... 14

        B.  The uncontested record evidence demonstrates that Freedom Path qualifies as a Section 501(c)(4) social-welfare organization because it exclusively engages in civic speech, which necessarily promotes the social welfare under the plain statutory text. ....................................... 21

    II.  Additionally, Freedom Path qualifies as a Section 501(c)(4) social-welfare organization under 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i), because it is "primarily engaged in promoting in some way the common good and general welfare of the people of the community"—and thus not "primarily" engaged in political campaign activity..................................................................................... 21

        A.  The IRS's regulatory definition should be defined according to objective standards. ................................................................................................. 22

            1.  The IRS's regulation of "political campaign activity" should be defined according to the longstanding constitutional distinction between candidate express advocacy and issue advocacy............................. 22

            2.  The IRS's "primary activity" threshold should be construed to require an objective numerical threshold of at least 50% of an entity's overall activities................................................................... 26

        B.  The uncontested record evidence demonstrates that Freedom Path qualifies for Section 501(c)(4) status under these IRS regulations. ...................... 31

Conclusion............................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Airlie Found. v. IRS*,
   283 F. Supp. 2d 58 (D.D.C. 2003) ..................................................................... 13, 14

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................ 13

*Big Mama Rag, Inc. v. United States*,
   631 F.2d 1030 (D.C. Cir. 1980) ..................................................................... 12, 24

*Board of Governors of Fed. Reserve Sys. v. Agnew*,
   329 U.S. 441 (1947) ............................................................................................ 28

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ......................................................................................... *passim*

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of the Treasury*,
   21 F. Supp. 3d 25 (D.D.C. 2014) ................................................................... 18, 19

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ................................................................................. 2, 12, 15

*Comm'r v. John Danz Charitable Trust*,
   284 F.2d 726 (9th Cir. 1940) .............................................................................. 17

*Devine v. Comm'r*,
   558 F.2d 807 (5th Cir. 1977) .............................................................................. 27

*Emerson Inst. v. United States*,
   356 F.2d 824 (D.C. Cir. 1966) ............................................................................ 16

*Family Tr. of Mass., Inc. v. United States*,
   892 F. Supp. 2d 149 (D.D.C. 2012) .................................................................... 13

*FEC v. Mass. Citizens for Life, Inc.*,
   479 U.S. 238 (1986) ............................................................................................ 34

*FEC v. Wis. Right To Life, Inc.*,
   551 U.S. 449 (2007) ...................................................................................... *passim*

*Feld v. Fireman's Fund Ins. Co.*,
   909 F.3d 1186 (D.C. Cir. 2018) .......................................................................... 13

*Food Mktg. Inst. v. Argus Leader Media,*
588 U.S. 427 (2019) ...................................................................................28

*Fund for the Study of Economic Growth and Tax Reform v. IRS,*
997 F. Supp. 15 (D.D.C. 1998) ..................................................................14

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006) ...................................................................................17

*United States ex rel. Heath v. AT&T, Inc.,*
791 F.3d 112 (D.C. Cir. 2015) ..................................................................17

*Int'l Reform Fed'n v. District Unemployment Compensation Bd.,*
131 F.2d 337 (D.C. Cir. 1942) ..................................................................16

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .............................................................................19, 20

*Malat v. Riddell,*
383 U.S. 569 (1966) .........................................................................4, 27, 28

*McConnell v. FEC,*
540 U.S. 93 (2003) .....................................................................................32

*McCutcheon v. FEC,*
572 U.S. 185 (2014) ...................................................................................15

*Mun. Bond Corp. v. Comm'r,*
341 F.2d 683 (8th Cir. 1965) ...............................................................27, 28

*N.Y. Times Co. v. Sullivan,*
376 U.S. 254 (1964) ...................................................................................15

*Nat'l Ass'n for Advancement of Colored People v. Button,*
371 U.S. 415 (1963) ...................................................................................15

*New Dynamics Found. v. United States,*
70 Fed. Cl. 782 (2006) ...............................................................................13

*Polselli v. IRS,*
598 U.S. 432 (2023) ...............................................................................2, 17

*Purdue Univ. v. Scalia,*
2020 WL 7340156 (D.D.C. Dec. 14, 2020) ..............................................29

*Rawat v. Comm'r,*
108 F.4th 891 (D.C. Cir. 2024) .................................................................17

*S. La. Area Rate Cases v. Federal Power Comm'n*,
  428 F.2d 407 (5th Cir. 1970) ..................................................................................29

*United States v. Coinbase, Inc.*,
  2017 WL 5890052 (N.D. Cal. Nov. 28, 2017) ..........................................................29

*Wrightsman v. United States*,
  428 F.2d 1316 (Ct. Cl. 1970) ....................................................................................27

**Statutes, Rules and Regulations**

26 C.F.R. § 1.501(c)(4)-1 ................................................................................*passim*

26 C.F.R. § 1.527-2 .....................................................................................................27

26 U.S.C. § 170 ............................................................................................................26

26 U.S.C. § 501 ..................................................................................................*passim*

26 U.S.C. § 527 .................................................................................18, 22, 24, 26, 27

26 U.S.C. § 7428 ..........................................................................................................13

52 U.S.C. § 30101 ...................................................................................................24, 25

52 U.S.C. § 30104 ........................................................................................................25

Fed. R. Civ. P. 56...........................................................................................................13

Fed. R. Evid. 201 ..........................................................................................................29

**IRS Revenue Rulings**

Rev. Rul. 68-656, 1968 WL 15166 ....................................................3, 19, 31, 32, 34

Rev. Rul. 81-95, 1981-1 C.B. 332 ..................................................................................6

Rev. Rul. 1981-95, 1981 WL 166125 .....................................................................26, 27

Rev. Rul. 2004-06, 2004-1 C.B. 328 ........................................................................7, 10

**Other Authorities**

Donald B. Tobin, *The Internal Revenue Service and A Crisis of Confidence: A
  New Regulatory Approach for A New Era*, 16 Fla. Tax Rev. 429 (2014)...............29

Ellen P. Aprill, *Examining the Landscape of § 501(c)(4) Social Welfare
  Organizations*, 21 N.Y.U. J. Legis. & Pub. Pol'y 345 (2018)................................30

IRS, Exempt organization types (Rev. June 5, 2025), https://perma.cc/2VXS-
 F9YP ...................................................................................................................... 26

IRS, Exempt Organizations Determinations Unit (Rev. Sep. 2009),
 https://perma.cc/Y26H-J4L2 .............................................................................. 29

IRS: Initial Assessment and Plan of Action (June 24, 2013),
 https://perma.cc/5PAH-PLBM ............................................................................ 30

Joint Committee on Taxation, Historical Development and Present Law of the
 Federal Tax Exemption for Charities and Other Tax-Exempt Organizations
 (Apr. 20, 2005), https://perma.cc/8KT5-K3MQ .................................................. 18

Lindsey McPherson, *EO Materials Suggest 51 Percent Threshold for Social
 Welfare Activity*, 2014 Tax Notes Today (Jan. 21, 2014)..................................... 30

Marcus Owens, *Practicing Law Institute Program on Corporate Political
 Activities*, 3 Exempt Org. Tax Rev. 471 (1990) .................................................. 29

Paul C. Barton, *Koskinen's Comments on Political Spending of Nonprofits
 Disputed*, Tax Notes and Tax Analysis (March 31, 2015) .................................... 28

Philip Hackney, *Political Justice and Tax Policy: The Social Welfare
 Organization Case*, 8 Tex. A&M L. Rev. 271 (2021)........................................... 30

Richard Cowan & Susan Cornwell, *House Votes to Begin Repealing Obamacare*,
 Reuters (Jan. 14, 2017), https://perma.cc/Z9W9-4YBF ........................................ 33

Roger Colinvaux, *Political Activity Limits and Tax Exemption: A Gordian's Knot*,
 34 Va. Tax Rev. 1 (2014) ........................................................................... 17, 20, 30

S. Con. Res. 39, 112th Cong. (2012) .............................................................................. 9

Treasury Inspector General for Tax Administration, Inappropriate Criteria Were
 Used to Identify Tax-Exempt Applications for Review (May 14, 2013),
 https://perma.cc/3LLZ-5CBP ............................................................................... 12

## INTRODUCTION AND SUMMARY OF ARGUMENT

After this Court declared the IRS's eleven-factor "facts and circumstances" test unconstitutionally vague, ECF 48, there is one question remaining in this case: Whether Plaintiff Freedom Path qualifies as a 26 U.S.C. § 501(c)(4) social-welfare organization—and under what standard. This Court directed the parties to provide interpretations of what this Court called the "Primary Activity inquiry and Political Activity inquiry that are (a) not unconstitutionally vague and (b) appropriately rooted in the statutory and regulatory scheme, and constitutional principles, that govern this tax exemption in light of the Court's findings in this opinion." ECF 48 at 60. As this Court recognized, the IRS must use clear and administrable tests—otherwise the IRS would retain the same unconstitutional discretion it had under the unconstitutionally vague facts-and-circumstances test.

The plain text Congress enacted in the tax code *and* the IRS's regulations and regulatory practice for decades provide two bases to declare that Freedom Path qualifies as a Section 501(c)(4) social-welfare organization.

**I.** Section 501(c)(4)'s plain text provides the first solution. Freedom Path is exclusively engaged in civic speech and thus is a "civic league[ ]" that is "operated exclusively for the promotion of social welfare." 26 U.S.C. § 501(c)(4)(A). Civic speech that educates voters and encourages civic engagement—including independent expenditures that expressly advocate for the election or defeat of particular candidates—serves the social-welfare function.[1]

---

[1] When this Motion discusses "express advocacy" for or against particular political candidates, it limits that discussion to what are called "independent expenditures," that are "made totally independently of the candidate and his campaign." *Buckley v. Valeo*, 424 U.S. 1, 47 (1976) (per curiam). Independent expenditures are distinct from expenditures "coordinated with the candidate and his campaign," which are treated as contributions to political campaigns under campaign finance law. *Id.* at 46.

The vast majority of Freedom Path's civic speech is "speech about public issues," or what the Supreme Court has called "issue advocacy." *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 456 (2007) ("*WRTL*") (controlling plurality op. of Roberts, C.J.).[2] This quintessentially civic speech educates voters and encourages civic engagement. Such "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). So there can be no question that Freedom Path's so-called issue advocacy "promot[es] . . . social welfare." 26 U.S.C. § 501(c)(4)(A).

Freedom Path's additional form of civic speech similarly promotes "social welfare." *Id.* Namely, Freedom Path also engaged in a limited amount of so-called "express advocacy" for the election of particular political candidates through independent expenditures *not* coordinated with candidates. This form of civic speech, too, is consistent with Freedom Path's social-welfare mission as a "means to hold officials accountable to the people." *Citizens United*, 558 U.S. at 339. Nor is express advocacy of particular candidates disqualifying under Congress's statutory scheme. Section 501(c)(4) is unlike the neighboring Section 501(c)(3), which explicitly prohibits "political campaign" activity for organizations described by that section. The Supreme Court has repeatedly held that courts must assume that Congress "acts intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another." *Polselli v. IRS*, 598 U.S. 432, 439 (2023). When Congress wanted to prohibit political activity, it knew exactly how to do so. And it chose not to do so for Section 501(c)(4) organizations.

**II.** This Court can also declare Freedom Path a Section 501(c)(4) social-welfare organization under the IRS's regulations. The undisputed evidence shows that political campaign activity is not Freedom Path's "primary" activity. ECF 48 at 6 ("In short, the statute and regulations, at

---

[2] All citations to *WRTL* are to the Chief Justice's controlling plurality opinion.

least as interpreted by the IRS, provide for three degrees of permissible political campaign activity depending on the organization's specific tax exemption. . . . An organization exempt under section 501(c)(4) may engage in some political campaign activity, as long as such activity is not its 'primary' activity."). Properly understood, Freedom Path's "primary" activity is engaging in the kind of advocacy "seeking . . . legislation"—*i.e.*, issue advocacy—"germane to the organization's programs," that the IRS has "recognized . . . as a permissible means of attaining social welfare purposes." Rev. Rul. 68-656, 1968 WL 15166, at *1. Such civic speech "is deemed beneficial to the community because society benefits from an informed citizenry." *Id.*

Deciding Freedom Path's Section 501(c)(4) status under the IRS's regulation would require this Court to construe the "Political Activity inquiry" and the "Primary Activity inquiry" according to the regulatory scheme, the IRS's regulatory practice, and longstanding constitutional principles. ECF 48 at 60. Put together, the IRS's regulations should provide that an organization qualifies as a Section 501(c)(4) social-welfare organization if 50% or more of its activities are dedicated to issue-advocacy civic speech—as compared to candidate express advocacy.

The "Political Activity Inquiry" into what the IRS calls "political campaign intervention" should be limited to express advocacy or its functional equivalent, which is the constitutional floor the Supreme Court established in *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), and *WRTL*. *Buckley* confronted similarly vague language covering expenditures "for the purpose of . . . influencing" elections. 424 U.S. at 63 (citation omitted). The Court recognized that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application" because "[c]andidates, especially incumbents, are intimately tied to public issues." *Id.* at 42. To avoid vagueness, the Court limited the statute to reach

3

only "communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80.

And the "Primary Activity" inquiry should ask whether at least 50% of an organization's expenditures are for activities other than candidate express advocacy. This threshold is consistent with (1) the plain meaning of "primarily" (meaning "of first importance" or "principally"), *Malat v. Riddell*, 383 U.S. 569, 572 (1966); (2) statements by IRS officials and publications, stating that organizations spending "less than 49 percent" on politics qualify as Section 501(c)(4) organizations, and defining "primary activity" as meaning "51%"; and (3) common understanding. Moreover, a clear numerical threshold provides fair notice and prevents arbitrary enforcement, as constitutional due process requires.

Because Freedom Path qualifies as a Section 501(c)(4) social-welfare organization under the best readings of both the statutory text and the IRS's regulations, this Court should grant Freedom Path summary judgment.

## BACKGROUND

### A.    Statutory and regulatory background

Congress has exempted certain organizations from taxation based on their purpose and activities. These programmatic tax exemptions apply to organizations that serve public purposes Congress deems beneficial to society, such as charitable work, social welfare advocacy, and civic engagement, as well as organizations that simply do not engage in profit-generating activities. Three statutory exemptions and their regulatory counterparts are relevant here.

#### 1.    Section 501(c)(4) social-welfare organizations

*Statute.* Section 501(c)(4) exempts "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare." 26 U.S.C. § 501(c)(4)(A).

Unlike Section 501(c)(3), discussed below, the statute itself imposes no limitation on any form of civic or political speech.

*IRS regulation.* The IRS's implementing regulation provides that "[a]n organization is operated exclusively for the promotion of social welfare," under the meaning of Section 501(c)(4), "if it is *primarily* engaged in promoting in some way the common good and general welfare of the people of the community." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i) (emphasis added). The regulation also provides: "The promotion of social welfare *does not include* direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." *Id.* § 1.501(c)(4)-1(a)(2)(ii) (emphasis added).

Accordingly, when the IRS evaluates a Section 501(c)(4) application, it engages in two inquiries under its regulations. First, it makes a "political campaign activity" inquiry, evaluating whether an organization engages in such activity. But the IRS does not define "direct or indirect participation or intervention in political campaigns." *Id.* Instead, the IRS previously applied its unconstitutionally vague, eleven-factor "facts and circumstances" test to determine "whether any given expenditure constitutes political campaign intervention" for purposes of determining a Section 501(c)(4) organization's "primary activity." ECF 48 at 46.

Second, the IRS makes a "primary activity" inquiry, which asks whether the organization's social-welfare activities are its primary purpose. For prospective 501(c)(4) organizations, like Freedom Path, neither the statute, the regulation, nor any Revenue Ruling expressly defines what constitutes an organization's "primary" activity to qualify for a 501(c)(4) exemption. As this Court explained, "the IRS has applied a primary-activity inquiry . . . through Revenue Rulings" since

1967, but has "back[ed] away from that interpretation" in this litigation and instead taken the position that "primarily" means "more than insubstantial," which is "significantly less than 49%, though it rejects the existence of any precise numerical threshold." ECF 48 at 46-47.

*IRS regulatory practice.* The IRS has long interpreted its implementing regulation to permit *some* political campaign activity, so long as it is not an organization's "primary" activity. For example, in Revenue Ruling 81-95, the IRS explained that "an organization may carry on lawful political activities and remain exempt under section 501(c)(4) as long as it is primarily engaged in activities that promote social welfare." Rev. Rul. 81-95, 1981-1 C.B. 332.

## 2. Section 501(c)(3) organizations

Section 501(c)(3) exempts organizations "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes." 26 U.S.C. § 501(c)(3). Unlike Section 501(c)(4) social-welfare organizations, Section 501(c)(3) provides that qualifying organizations may not "participate in, or intervene in (including the publishing or distributing of statements), *any political campaign on behalf of (or in opposition to) any candidate for public office.*" *Id.* (emphasis added).

## 3. Section 527 political organizations

Section 527 exempts "political organization[s]," defined as organizations "organized and operated *primarily* for the purpose of directly or indirectly accepting contributions or making expenditures, or both" to influence candidate selection or election. *Id.* § 527(a), (e)(1)-(2) (emphasis added). So when an organization's primary purpose is engaging in express advocacy for or against specific political candidates, it may qualify as a Section 527 political organization. Unlike 501(c)(4) organizations, Section 527 organizations must report their donors. *Id.* § 527(j).

## B.    Factual background

The parties and this Court have recounted the long factual background of this case at length. *See, e.g.*, ECF 30-1 at 10-19; ECF 31 at 3-7; ECF 48 at 11-18. Freedom Path incorporates its previous statement, *see* ECF 30-1 at 10-19, and reiterates the most relevant facts here.

1. Freedom Path is a nonprofit corporation formed on January 18, 2011, "to promote and defend the causes that recognize the individual rights and liberties guaranteed to all Americans." AR.15.[3] It does so by engaging in civic speech, focusing on "issues of government accountability and transparency, healthcare, and an array of economic issues." AR.47. To that end, Freedom Path "has advocated against excessive government spending, in favor of a Balanced Budget Amendment," and "against the Patient Protection and Affordable Care Act and various healthcare policies of the federal government." *Id.*

Freedom Path submitted its application for Section 501(c)(4) status on March 7, 2011. AR.20-24. About eleven months later, the IRS sent Freedom Path requests for additional information, including the identities of Freedom Path's donors. AR.25-33. Freedom Path complied with most of these requests, but it did not provide a list of its donors. AR.46.

By the time of the IRS's requests, Freedom Path had already spent most of its funds and decided "it would not accept additional contributions until the IRS provided additional clarity regarding the application process or issued a favorable determination regarding its tax-exempt status." AR.287. After May 15, 2012, Freedom Path stopped accepting contributions and spent its remaining funds "on the legal and accounting fees necessary to respond to the IRS's ongoing inquiries." *Id.* Freedom Path's advocacy was thus chilled by the IRS's delay and requests, limiting the range of activities relevant to Freedom Path's tax-exempt status. *Id.*

---

[3] Citations to the Administrative Record take the following form: AR.[Bates Number].

2. On September 30, 2013, the IRS issued a "proposed denial" of Freedom Path's application. AR.231-83. The IRS applied the eleven-factor "facts-and-circumstances" test from Revenue Ruling 2004-06 and concluded that Freedom Path engaged in too much "political campaign intervention" in 2012 to qualify as a Section 501(c)(4) organization. AR.236-39. The IRS's analysis turned on two television advertisements: "Repeal It," discussing the Affordable Care Act (AR.884), and "Three Men," discussing the Balanced Budget Amendment (AR.885). In the IRS's view, these advertisements were "political campaign intervention" on behalf of then-U.S. Senator Orrin Hatch. The IRS did not consider Freedom Path's 2011 activities, when Freedom Path spent hundreds of thousands of dollars on issue advocacy without any candidate express advocacy expenditures being reported to the Federal Election Commission ("FEC"). AR.48-49.

In its denial, the IRS calculated Freedom Path's total "direct" 2012 expenditures as $917,435. AR.231; AR.233.[4] The IRS further found that Freedom Path spent 60% of its 2012 "direct expenditures" on "political campaign intervention" and 30% on other mailings and television advertisements that did not constitute "political campaign intervention." AR.239. Applying the IRS's finding that Freedom Path spent 60% of its 2012 "direct expenditures" on political campaign intervention, the IRS determined that Freedom Path spent about $550,000 (that is, 60% of $917,435) on political campaign intervention in 2012.

The proper classification of four other television advertisements and all 20 of Freedom Path's direct mailings are either not disputed or were negligible—and thus immaterial—to the

---

[4] Freedom Path reported to the IRS approximately $1,178,927 in total 2012 expenditures— and even the IRS's own Appeals Officer would later calculate Freedom Path's 2012 expenditures as $1,068,966.70. AR.860; AR.846. Nevertheless, this discrepancy does not materially alter Freedom Path's "primary" activities.

IRS's conclusion that Freedom Path engaged primarily in political campaign intervention. Freedom Path acknowledged that three of these other television advertisements were candidate express advocacy counting as political campaign intervention (and Freedom Path reported these three advertisements to the FEC as candidate express advocacy), and the IRS correctly concluded that the "Obamacare" advertisement was not "political campaign intervention." AR.238. For the 20 direct mailings, the IRS found that eight were political campaign intervention while 12 were not. *Id.* Freedom Path disputes the IRS's conclusion that five of the eight direct mailings were political campaign intervention, but these five mailings constituted a relatively smaller portion of Freedom Path's expenditures that would not materially alter the primary-activity analysis.

Consequently, the primary dispute between the parties is likely the proper classification of the "Repeal It" and "Three Men" television advertisements. Combined, they accounted for approximately $319,400—roughly 39%—of Freedom Path's total expenditures in 2012 as calculated by the IRS.

"Repeal It" aired statewide in Utah in late January and early February 2012. AR.295. The advertisement criticized Obamacare's costs and impact on small business, noted that Senator Orrin Hatch had sponsored repeal legislation and "personally signed a brief" to have courts nullify the law, and urged viewers to "Tell Senator Hatch: Keep leading the fight!" AR.884; *see also* ECF 30-1 at 15-16 (detailing the advertisement's audio, on-screen visuals, and on-screen text).

"Three Men" aired statewide in Utah starting March 21, 2012. AR.293. The advertisement discussed the national debt, noted that Senators Hatch and Mike Lee "have authored the Balanced Budget Amendment to stop Washington's runaway spending," described it as "the bold conservative plan supported by Mitt Romney," and urged viewers to call Senators Hatch and Lee to "keep fighting for the Balanced Budget Amendment." AR.885; *see also* ECF 30-1 at 15-16 (detailing the

advertisement's audio, on-screen visuals, and on-screen text). On March 29, 2012, while "Three Men" was still airing, Senator Rand Paul and Senator Lee introduced a budget resolution requiring a balanced budget amendment. S. Con. Res. 39, 112th Cong. (2012).

In reviewing Freedom Path's 501(c)(4) application, the IRS applied the eleven-factor test from Revenue Ruling 2004-06. AR.234. The IRS concluded "based on all of the facts and circumstances" that both advertisements "constituted political campaign intervention." AR.238.

3. In 2019, Freedom Path administratively appealed the denial, but an IRS Appeals Officer again applied the facts-and-circumstances test and sustained the denial. AR.846. The Appeals Officer appears to have contradicted the IRS's 2013 conclusion regarding "Repeal It."[5] The Appeals Officer concluded that Freedom Path's "two advertisements that featured President Obama discussing the Affordable Care Act" were "[a]dvocacy activities and not political activities," noting "this Appeals Officer agree[s]" with that characterization. AR.848. The Appeals Officer also reached opposite conclusions regarding other Freedom Path advertisements, finding that an advertisement the IRS said *would* constitute political campaign intervention *if* it aired in 2012 both did air in 2012 and "is a non-political advertisement because it does not identify any candidates running for office." AR.848; AR.238 n.7. Despite these contradictory findings, the IRS issued a final adverse determination simply affirming the 2013 proposed denial on February 20, 2020. This denial provided no further analysis or reference to the Appeals Officer's contradictory 2019 findings. AR.855-59.

4. Accordingly, Freedom Path, the IRS, and an IRS appeals officer each calculated different amounts of unrestricted versus restricted activities. These analyses materially agree about the

---

[5] The record contains only two Affordable Care Act advertisements: "Repeal It" and another digital video. AR.884; AR.887.

amount of *express* advocacy for or against political candidates. Their primary disagreement is about whether Freedom Path's issue advocacy in the "Repeal It" and "Three Men" advertisements is otherwise political campaign activity under the IRS's regulatory framework:

|  | IRS Original Calculation | IRS Appeals Officer | Freedom Path |
|---|---|---|---|
| **Express Advocacy for or Against a Candidate** | $360,748.91 | $360,748.91 | $360,748.91 |
| **Other Purported "Political Campaign Intervention" Under IRS Regulation** | Approx. $189,250.90 | Approx. $193,001.90 | - |
| **Total Expenditures** | $917,435 | $1,068,966.70 | $1,178,927 |
| **Percentage Attributable to Express Advocacy** | Approx. 39% | Approx. 34% | Approx. 31% |
| **Percentage Attributable to Other Purported Political Campaign Intervention Under IRS Regulation** | Approx. 21% | Approx. 18% | 0% |

5. Freedom Path initiated this litigation on May 20, 2020, to challenge the IRS's adverse determination on its Section 501(c)(4) application. After cross-motions for summary judgment, this Court granted Freedom Path's motion for summary judgment in part. This Court held the challenged Section 501(c)(4) regulation (26 C.F.R. § 1.501(c)(4)-1) and Revenue Ruling 2004-06's facts-and-circumstances test unconstitutionally vague as applied to Freedom Path. ECF 48 at 20. The Court, however, denied both parties' motions on the question of Freedom Path's exemption eligibility. *Id.* at 53-60.

The Court explained that "the heightened vagueness review that applies to civil regulations of speech, like political speech, fully protected by the First Amendment" governs this case. *Id.* at 20. Applying that heightened standard, the IRS's evaluation of Freedom Path's application failed on two counts: The Court found both the primary activity inquiry and the political campaign activity inquiry unconstitutionally vague.

11

As to the primary activity inquiry, the Court noted that the text of the regulation is unclear and the parties cannot agree on an acceptable interpretation *Id.* at 47. And although the IRS has applied a primary-activity standard since 1967, it "back[ed] away from that interpretation in this very litigation." *Id.* The Court observed that "the IRS cannot even agree with itself" on the threshold, noting the IRS's shifting positions and the Treasury Inspector General for Tax Administration's ("TIGTA") 2013 Report's finding that the lack of definition created "confusion" among IRS reviewers. *Id.* at 47-48. TIGTA, Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review 47-48 (May 14, 2013), https://perma.cc/3LLZ-5CBP ("TIGTA Report").

As to the political campaign activity inquiry, the Court found the IRS's eleven-factor facts-and-circumstances test "fails to provide the kind of 'explicit guidelines' that would help the agency 'avoid arbitrary and discriminatory enforcement.'" ECF 48 at 49 (quoting *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1035 (D.C. Cir. 1980)). The ruling "offers no guidance as to how officials should weigh the factors against one another or how many it takes to reach the threshold," such that "whether . . . a communication is deemed political campaign intervention depends on which factor the IRS emphasizes." *Id.* (citation omitted). The Court found this "open-ended rough-and-tumble of factors" violated the Supreme Court's guidance in *WRTL* and noted that the Supreme Court struck down a similar test in *Citizens United*, 558 U.S. at 336. ECF 48 at 50.

The Court emphasized that the "combined effect renders" the IRS's standards "unconstitutionally vague" because when both tests are vague, "the uncertainty multiplies." *Id.* at 50-51.

Having found the challenged provisions unconstitutionally vague, the Court turned to "what the non-vague rules should be to govern tax exemption under section 501(c)(4)." *Id.* at 53. But the Court found that neither party had provided "an alternative standard . . . that is both constitutionally permissible and appropriately grounded in the statutory and regulatory scheme." *Id.*

12

at 1-2. Moreover, the Court found it could not remand to the IRS because a congressional appro-priations rider prevents the IRS from crafting a non-vague alternative and requires the IRS to apply the same "standard and definitions as [were] in effect on January 1, 2010." *Id.* at 59-60. Accord-ingly, the Court ordered the parties to "file renewed motions advancing interpretations of the Pri-mary Activity inquiry and Political Campaign Activity inquiry that are (a) not unconstitutionally vague and (b) appropriately rooted in the statutory and regulatory scheme, and constitutional prin-ciples, that govern this tax exemption in light of the Court's findings in this opinion." *Id.* at 60.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is proper only if, viewing the evidence in the light most favor-able to the non-movant and drawing all justifiable inferences in its favor, there are no genuine disputes of material fact for a jury to resolve." *Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1190 (D.C. Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

"The standard of review in" cases challenging denials of tax-exempt status under 26 U.S.C. § 7428 "is *de novo* and the scope of review is limited to the administrative record in the absence of a showing of good cause." *Airlie Found. v. IRS*, 283 F. Supp. 2d 58, 61 (D.D.C. 2003) (citation omitted). The review is "de novo" in the sense that "it is for the court, *ab initio*, to determine whether the organization in question is entitled to exemption." *New Dynamics Found. v. United States*, 70 Fed. Cl. 782, 794 (2006), *cited favorably by Family Tr. of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012). Consequently, this Court does not defer to the IRS's adverse determination and, to the extent necessary, could "make findings of fact which differ from

the administrative record." *Airlie*, 283 F. Supp. 2d at 62 (quoting *Fund for the Study of Economic Growth and Tax Reform v. IRS*, 997 F. Supp. 15, 18 (D.D.C. 1998)).

## ARGUMENT

**I.**     **Freedom Path qualifies as a Section 501(c)(4) social-welfare organization because it "exclusively" engages in civic speech, which is an activity "for the promotion of social welfare," under the plain meaning of 26 U.S.C. § 501(c)(4).**

This Court should declare that Freedom Path is "operated exclusively for the promotion of social welfare." 26 U.S.C. § 501(c)(4). The uncontested facts demonstrate that Freedom Path exclusively engages in civic speech, which necessarily promotes social welfare. This interpretation both accords with Congress's plain statutory text and provides the IRS with objective criteria to conduct the "Political Activity inquiry" and the "Primary Activity inquiry." ECF 48 at 60.

### A. Civic speech—both issue advocacy and advocacy for political candidates—"promotes the social welfare" under Section 501(c)(4)'s plain statutory text and its statutory context.

Under 26 U.S.C. § 501(c)(4)'s plain text, civic speech promotes "social welfare." Consequently, an organization that operates exclusively to engage in civic speech is "operated exclusively for the promotion of social welfare" and qualifies as a Section 501(c)(4) social-welfare organization. If there were any doubt about the plain meaning of "social welfare" in isolation, statutory context confirms that Section 501(c)(4) organizations can engage in civic speech, including political campaign activity. Under this interpretation, the "Political Activity Inquiry," ECF 48 at 60, is straightforward: Engaging in civic speech is a permissible social-welfare purpose. Likewise, the "Primary Activity Inquiry" here, *id.*, would ask whether civic political speech—or another valid social-welfare activity—is Freedom Path's "exclusive" purpose.

**1. Plain meaning of "social welfare."** Congress's deliberate use of the terms "civic leagues" and "promotion of social welfare" in Section 501(c)(4) encompasses all manner of civic speech—be it issue advocacy or candidate express advocacy—that mobilizes the public behind a

14

cause, educates voters, and encourages public engagement in elections. Civic speech, no less than anti-littering campaigns or small-business support programs, allows people to advocate for the kind of society they wish to see. That necessarily includes people's conceptions of social welfare.

As the Supreme Court has noted, "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United*, 558 U.S. at 339. Not only is speech and the right to "use information to reach consensus" a "precondition to enlightened self-government," it is "a necessary means to protect it." *Id.* Safeguarding and promoting civic speech helps "assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (citation omitted).

These observations apply equally to "vigorous advocacy" and "abstract discussion." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429 (1963). For purposes of promoting social welfare, there is no distinction between issue advocacy and express advocacy for or against political candidates. The betterment of society can be brought about through political actors just as readily as it can come from specific policy proposals. They are just different components of the same civic process, and they equally promote social welfare. In practice, therefore, "candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest." *Buckley*, 424 U.S. at 42 (cleaned up); *see McCutcheon v. FEC*, 572 U.S. 185, 203-04 (2014) ("[P]articipating in an electoral debate . . . is integral to the operation of the system of government established by our Constitution." (citation omitted)).

As a result, both issue advocacy and express advocacy for political candidates allows people to "promot[e] . . . social welfare," and thus both are permissible social-welfare purposes under Section 501(c)(4).

**2. Statutory context.** The notably distinct Sections 501(c)(3) and 527 of the Internal Revenue Code confirm that Section 501(c)(4) social-welfare organizations may engage in political campaign activity.

*Section 501(c)(3).* Section 501(c)(3)'s contrast with Section 501(c)(4) confirms that political campaign activity is a valid Section 501(c)(4) social-welfare purpose. Congress twice amended Section 501(c)(3) to restrict different kinds of civic speech by Section 501(c)(3) organizations. And it twice *declined* to restrict 501(c)(4) organizations from engaging in that same civic speech—or any form of civic speech whatsoever. To the contrary, Section 501(c)(4) imposes no limitation whatsoever on any form of civic speech; it does not even mention political activity, political campaign intervention, or electioneering in any way.

In 1934, Congress amended Section 501(c)(3) to provide that "no substantial part" of a Section 501(c)(3) charitable organization's activities may "*influence legislation.*" *See Int'l Reform Fed'n v. District Unemployment Compensation Bd.*, 131 F.2d 337, 341 (D.C. Cir. 1942) (emphasis added). Put another way, Congress nearly 100 years ago determined that Section 501(c)(3) organizations cannot engage in a substantial portion of advocacy related to legislation. It declined to do the same in Section 501(c)(4).

In 1954, Congress made clear that Section 501(c)(3) organizations may not "participate in, or intervene in . . . any political campaign"—*i.e.*, engage in express advocacy for or against political candidates. *See Emerson Inst. v. United States*, 356 F.2d 824, 825 & n.1 (D.C. Cir. 1966);

*Comm'r v. John Danz Charitable Trust*, 284 F.2d 726, 736 (9th Cir. 1940). Again, Congress did not make any such amendment to Section 501(c)(4).

As the Supreme Court recently confirmed, "[w]e assume that Congress 'acts intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another section of the same Act.'" *Polselli*, 598 U.S. at 439; *see United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 120 n.3 (D.C. Cir. 2015) (similar). "Had Congress wanted to include" a limitation on any kind of political speech in Section 501(c)(4), "it certainly knew how to do so" based on its amendments to Section 501(c)(3). *See Polselli*, 598 U.S. at 439; *see, e.g.*, Roger Colinvaux, *Political Activity Limits and Tax Exemption: A Gordian's Knot*, 34 Va. Tax Rev. 1, 32-33 (2014) ("[T]here is a strong negative implication from the presence of the express prohibition in section 501(c)(3) and the absence of one in section 501(c)(4).").

If anything, Congress's disparate treatment of these two *adjacent* provisions in tax statutes provides an even stronger basis to show Congress did not prohibit Section 501(c)(4) organizations from engaging in political advocacy. The inference applies more strongly when Congress considered the statutory text contemporaneously and chose different statutory language for different sections. For example, the D.C. Circuit has explained that this "familiar principle of statutory construction" "has particular force when the contrasting statutory sections were originally enacted simultaneously." *Rawat v. Comm'r*, 108 F.4th 891, 898 (D.C. Cir. 2024) (citations omitted). "[D]istinctions between provisions arising from 'Congress' tandem review and approval' are more likely intentional." *Id.* (quoting *Hamdan v. Rumsfeld*, 548 U.S. 557, 579 (2006)). Here, Congress added the prohibition on express advocacy for Section 501(c)(3) organizations in 1954, when both exemptions had long coexisted and Congress had the benefit of reviewing them side-by-side. *See*

Joint Committee on Taxation, Historical Development and Present Law of the Federal Tax Exemption for Charities and Other Tax-Exempt Organizations 46 (Apr. 20, 2005), https://perma.cc/8KT5-K3MQ. Congress's decision to impose the prohibition on Section 501(c)(3) organizations while leaving Section 501(c)(4) silent on the subject reflects a deliberate choice.

*Section 527.* Section 527 explains what happens when advocacy regarding elections in particular is an organization's primary activity. Specifically, Section 527 applies to entities that are "organized and operated *primarily* for the purpose of directly or indirectly accepting contributions or making expenditures, or both" to "*influence*" candidate selection or election. 26 U.S.C. § 527(a), (e)(1)-(2) (emphasis added) (defining a Section 527 "exempt function" as attempting to "influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office or office in a political organization, or the election of Presidential or Vice-Presidential electors"). Put another way, a Section 527 organization is primarily engaged in activities tied to the *electoral* process, including candidate express advocacy.[6]

For organizations that engage in civic speech, Section 527 political-organization status and Section 501(c)(4) status can be two sides of the same coin: If an organization *primarily* operates to *influence elections*, then it is a Section 527 political organization. That is true even if it engages in some amount of issue advocacy. But if an organization is dedicated exclusively to engaging in civic speech, and its civic speech is primarily issue advocacy (as compared to influencing elections), then it is a Section 501(c)(4) organization. *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of the Treasury*, 21 F. Supp. 3d 25, 33 (D.D.C. 2014) ("an organization that qualifies for

---

[6] Section 527 uses language similar to what the Supreme Court examined in *Buckley* when determining the necessity of the express advocacy standard. *See infra* pp.22-23.

a tax exemption under section 501(c)(4) should not qualify for a tax exemption under section 527, because it cannot be both 'primarily engage[d]' and 'primarily operated' in two mutually exclusive initiatives") (alteration in original).[7]

**3. IRS regulation.** The IRS's regulations and guidance partially support Freedom Path's proposed interpretation of 26 U.S.C. § 501(c)(4). To the extent the IRS's regulations and guidance are contrary to Section 501(c)(4)'s plain text, they are not entitled to any deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412, 378 (2024).

The IRS has long agreed that Section 501(c)(4) organizations can engage in issue advocacy and lobbying supporting legislation: Speech "seeking . . . legislation germane to the organization's programs is recognized . . . as a permissible means of attaining social welfare purposes." Rev. Rul. 68-656, 1968 WL 15166, at *1. Such issue advocacy "is deemed beneficial to the community because society benefits from an informed citizenry." *Id.* (IRS determining that issue advocacy and lobbying to influence legislation is a valid Section 501(c)(4) social-welfare purpose). Put otherwise, the IRS itself recognizes that a broad array of civic speech can "promot[e]" "social welfare." 26 U.S.C. § 501(c)(4).

Yet, the IRS's regulation interpreting Section 501(c)(4) states that "[t]he promotion of social welfare *does not include* direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." 26 C.F.R. § 1.501(c)(4)-1 (emphasis added). Though this interpretation, the IRS has split up civic speech into two categories: unrestricted issue advocacy and restricted "political campaign intervention." *Id.* This false dichotomy about what promotes social welfare lacks support in both the statutory and regulatory text. And

---

[7] Although *Citizens for Responsibility* addressed the IRS's Section 501(c)(4) regulatory standard, its analysis is still instructive.

the "rationale behind the regulatory conclusion that political activity categorically does not further social welfare is unknown." Colinvaux, 34 Va. Tax Rev. at 34. Again, both forms of speech promote private citizens' view of social welfare, merely focusing on different parts of the political process.

Whatever the justification, the IRS's interpretation cannot withstand scrutiny under the post-*Loper Bright* framework requiring independent judicial review of agency statutory interpretations. DOJ previously argued to this Court that the IRS regulation was "entitled to deference under *Chevron*." ECF 35 at 16. But "*Chevron* is overruled" and courts may not "defer to 'permissible' agency interpretations of the statutes those agencies administer." *Loper Bright*, 603 U.S. at 412, 378. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the [Administrative Procedure Act] requires." *Id.* at 412. Rather than deferring to the IRS regulatory overreach, which lies in direct tension with the text of Section 501(c)(4), the Court should apply its independent judgment to properly read Section 501(c)(4).

Consistent with the statutory structure, the proper reading of Section 501(c)(4) is as the Court has explained it:

> An organization exempt under section 501(c)(3) may not engage in any political campaign activity. An organization exempt under section 501(c)(4) may engage in some political campaign activity, as long as such activity is not its "primary" activity. And an organization exempt under section 527 may—indeed, must—engage in political campaign activity as its "primary" activity.

ECF 48 at 6.

  **B. The uncontested record evidence demonstrates that Freedom Path qualifies as a Section 501(c)(4) social-welfare organization because it exclusively engages in civic speech, which necessarily promotes the social welfare under the plain statutory text.**

  According to the undisputed facts, Freedom Path's exclusive focus on civic speech means that it qualifies as a Section 501(c)(4) social-welfare organization under the statute's plain text.

  Freedom Path's expenditures on "advertisements, mailers, and other expressive activity regarding government spending, fiscal issues, and federal health-care policies," ECF 48 at 23, easily qualify as speech promoting social welfare. And under Freedom Path's interpretation of Section 501(c)(4), this Court need not place Freedom Path's undisputedly political speech into the IRS's proposed buckets of unrestricted speech "seeking legislation" and restricted "political campaign intervention." 26 C.F.R. § 1.501(c)(4)-1. Rather, all of Freedom Path's civic speech "promot[es] the social welfare," and thus is Freedom Path's "exclusive[]" purpose. 26 U.S.C. § 501(c)(4).

**II. Additionally, Freedom Path qualifies as a Section 501(c)(4) social-welfare organization under 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i), because it is "primarily engaged in promoting in some way the common good and general welfare of the people of the community"—and thus not "primarily" engaged in political campaign activity.**

  The IRS's implementing regulations provide another way for this Court to declare Freedom Path a Section 501(c)(4) social-welfare organization: The uncontested facts demonstrate that Freedom Path is "primarily engaged in promoting in some way the common good and general welfare of the people of the community." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i). That is true even under the IRS's erroneous interpretation that "[t]he promotion of social welfare *does not include* direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." *Id.* § 1.501(c)(4)-1(a)(2)(ii) (emphasis added); *see supra* pp.14-20 (demonstrating that "promotion of social welfare" includes all civic speech). By that same token,

Freedom Path is not "primarily" engaged in political campaign activity such that it would be classified as a Section 527 political organization. *See* 26 U.S.C. § 527(e)(1); ECF 48 at 6.

The IRS's previous application of the regulatory framework failed to "pass the heightened vagueness review required in this case." ECF 48 at 52. So Freedom Path proposes applying clear limitations to the "Political Activity inquiry" and "Primary Activity inquiry." ECF 48 at 60. So construed, Freedom Path qualifies as a Section 501(c)(4) social-welfare organization.

## A. The IRS's regulatory definition should be defined according to objective standards.

Both the IRS's "Political Activity inquiry" and "Primary Activity inquiry" require objective, workable standards. ECF 48 at 60. Otherwise, the IRS's application of its regulations would suffer from the same problems as its application of the facts-and-circumstances test that the Court has already declared unconstitutionally vague. ECF 48 at 46.

As to the political campaign activity inquiry, the Court should interpret political campaign "intervention" to mean candidate express advocacy or its functional equivalent. And the primary activity inquiry should entail a clear numerical threshold of at least 50% of an entity's overall activities.

### 1. The IRS's regulation of "political campaign activity" should be defined according to the longstanding constitutional distinction between candidate express advocacy and issue advocacy.

This Court should narrowly construe the IRS's regulation of political campaign activity. 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii). In particular, the Court should adopt the objective and clear "express advocacy" test from *Buckley v. Valeo* and its progeny. *See* ECF 30-1 at 34-41. This express advocacy standard is the only administrable and constitutionally sound way to distinguish between issue advocacy seeking legislation—which often will reference candidates for office— and political campaign intervention.

Relevant here, *Buckley* held that a standard for regulating speech that depended on political-campaign "influencing" raised "constitutional problems" due to its "ambiguity." 424 U.S. at 77. Specifically, the disclosure requirement under the Federal Election Campaign Act ("FECA") at issue in *Buckley* covered any "expenditure," which was defined as "use of money or other valuable assets 'for the purpose of . . . influencing' the nomination or election of candidates for federal office." *Id.* The Supreme Court narrowed this "influencing" standard "to avoid the shoals of vagueness" because of its "potential for encompassing both issue discussion and advocacy of a political result." *Id.* at 78, 79. As *Buckley* recognized:

> the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest.

*Id.* at 42 (footnote omitted). The Court then remedied the unconstitutional vagueness of FECA's "influencing" standard for disclosures by limiting it to express advocacy—that is, "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80.

In *WRTL*, the Supreme Court further articulated a "functional equivalent of express advocacy" standard. 551 U.S. at 469. Under this objective standard, speech is regulated only if it is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 470. Advertisements do not trigger the "functional equivalent" standard if:

> [T]heir content is consistent with that of a genuine issue ad: The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter. Second, their content lacks indicia of express advocacy: The ads do not mention an election, candidacy, political party, or challenger; and they do not take a position on a candidate's character, qualifications, or fitness for office.

*Id.*

23

The express advocacy and functional equivalent tests are the kind of clear and objective tests that avoids the vagueness concerns this Court had with the IRS's previous regulatory standard under the facts-and-circumstances test. *E.g.*, ECF 48 at 46. It "provide[s] the kind of 'explicit guidelines' that would help the agency 'avoid arbitrary and discriminatory enforcement.'" ECF 48 at 49 (quoting *Big Mama Rag*, 631 F.2d at 1035). It avoids the "open-ended rough-and-tumble of factors." *WRTL*, 551 U.S. at 469 (citation omitted). And it provides prospective Section 501(c)(4) organizations with clear notice.

Previously, this Court expressed skepticism that the Supreme Court's decisions in *Buckley* and other FECA cases could apply in this context where they do not "use[] the same terms as the IRS's regulatory definition of political campaign activity." ECF 48 at 57. But those concerns are easily allayed.

Here, the question is how to interpret a vague regulatory standard attempting to distinguish forms of unrestricted issue advocacy from forms of restricted political campaign intervention. *See* 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii) ("direct *or indirect* participation or intervention in political campaigns *on behalf of or in opposition to* any candidate for public office") (emphasis added). The IRS's regulation poses the same vagueness issues as FECA and, indeed, the underlying tax code even uses the same "influencing" language as FECA. *Compare* 26 U.S.C. § 527(e)(2), *with* 52 U.S.C. § 30101(9)(A)(i), and *Buckley*, 424 U.S. at 77. Therefore, the question for this Court mirrors the question the Supreme Court addressed in *Buckley* and subsequent cases.

If anything, the IRS's "political campaign intervention" standard is *more* textually amenable to *Buckley*'s express advocacy narrowing construction than FECA's "influencing" standard. The IRS's rule is broader than FECA's standard insofar as the IRS purports to regulate "direct" and even "*indirect* participation or intervention in political campaigns on behalf of or in opposition

to any candidate for public office," whatever "indirect" means. 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii) (emphasis added). This potentially reaches more broadly than FECA's regulation of expenditures "for the purpose of influencing any election." 52 U.S.C. § 30101(9)(A)(i); *Buckley*, 424 U.S. at 77. This is because—as the Supreme Court has recognized—many issues of public concern will naturally refer to candidates for office when the issues are discussed. *See supra* p.15. It is not clear whether a communication that merely *mentions* a candidate is "on behalf of or in opposition to" that candidate, whether "direct[ly]" or "indirect[ly]," under the IRS's inquiry. 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii). The IRS's facts-and-circumstances test failed to provide the "'explicit guidelines' that would help the agency 'avoid arbitrary and discriminatory enforcement'" and "offer[ed] no guidance as to how officials should weigh the factors against one another or how many it takes to reach" a determination on this question. ECF 48 at 49. If the Supreme Court deemed it necessary to narrow the FECA's "expenditure" definition to an express advocacy standard, it follows that this narrowing construction also would be appropriate to save the broader IRS regulation.

The Court also expressed concern over FECA's provision addressing "electioneering communications," which expressly precludes FECA from being used "to establish, modify, or otherwise affect the definition" of political campaign intervention "for purposes of" the tax code. ECF 48 at 57-58 (quoting 52 U.S.C. § 30104(f)(7)). The Court characterizes Freedom Path's position as "ask[ing] this Court to do exactly that." *Id.* at 58.

To be clear: Freedom Path is not asking the Court to import FECA standards into the tax code, and especially not FECA's "electioneering communications" definition. *Cf. id.*[8] Quite the

---

[8] As Freedom Path argues throughout this brief, express advocacy and its functional equivalent should be the IRS's standard for determining political campaign activity. Those standards are not part of the statutory "electioneering communications" definition. *See* 52 U.S.C. § 30104(f)(3).

contrary: Freedom Path's position is that the Supreme Court's application of "constitutional principles," *see* ECF 48 at 60, providing clear notice to regulations of political speech as articulated in *Buckley* and its progeny apply with equal force here. Specifically, applying the express advocacy standard simply means applying the Supreme Court's constitutional floor for distinguishing between electoral advocacy and issue advocacy. In any event, nothing in either FECA or the campaign finance jurisprudence says that the *judiciary's* constitutional *narrowing constructions* of FECA cannot *inform* the interpretation of similar language and similar regulatory contexts in the tax code regarding tax-exempt status under Sections 527 and 501(c)(4).

Finally, the Court expressed reluctance at looking to the Supreme Court's campaign finance jurisprudence because "speech tax exemptions (*i.e.*, subsidies) need not be justified in the same manner." ECF 48 at 58. However, no tax "subsidies" are actually at issue here. Both Section 501(c)(4) social welfare and Section 527 political organizations are tax-exempt (*i.e.*, exempt from taxation of their revenues as business income) because they are not engaged in profit-making activities. *See* IRS, Exempt organization types (Rev. June 5, 2025), https://perma.cc/2VXS-F9YP. And, unlike Section 501(c)(3) entities, neither receives tax-deductible contributions. *See* 26 U.S.C. § 170(c). Therefore, whether Freedom Path is classified as a Section 501(c)(4) or Section 527 entity (depending on whether political campaigning is its "primary" activity), it would not be receiving a tax subsidy.

### 2.    The IRS's "primary activity" threshold should be construed to require an objective numerical threshold of at least 50% of an entity's overall activities.

After determining what civic speech is unrestricted issue advocacy versus restricted political campaign activity, this Court should also clarify how to determine that a Section 501(c)(4) organization's "primar[y]" activity is not political campaign activity. *See, e.g.*, Rev. Rul. 1981-95, 1981 WL 166125, at *2; 26 USC § 527(e)(1) (a Section 527 political organization—as distinct

from a Section 501(c)(4) organization—is "organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both, for a[] [Section 527] exempt function").

Under the IRS's primary activity inquiry for Section 501(c)(4) status, "an organization may carry on lawful political activities and remain exempt under section 501(c)(4) as long as it is primarily engaged in activities that promote social welfare." Rev. Rul. 1981-95, 1981 WL 166125, at *2; *id.* ("[T]he regulations do not impose a complete ban on ['political campaign activities'] for section 501(c)(4) organizations."). IRS guidance permits an organization to engage in a mix of social welfare activity, including a limited amount of political campaign intervention. Yet, as this Court acknowledged, the "IRS cannot . . . say how much political activity exceeds its threshold" for an organization to lose Section 501(c)(4) status. ECF 48 at 48.

The Court should draw a clear and administrable line for measuring an organization's "primary" activity. Supreme Court guidance, IRS practice, and statements made by IRS officials at the time of Freedom Path's 501(c)(4) application confirms that line is at least 50% of the organization's expenditures.[9]

**a.** The Supreme Court has made clear that the text of "revenue" laws "should be interpreted where possible in their ordinary, everyday senses"—such that "'*primarily*' means 'of *first importance' or 'principally*.'" *Malat*, 383 U.S. at 571-72 (emphases added); *accord Devine v. Comm'r*, 558 F.2d 807, 813-14 (5th Cir. 1977) (same); *Wrightsman v. United States*, 428 F.2d 1316, 1320 (Ct. Cl. 1970) (same); *Mun. Bond Corp. v. Comm'r*, 341 F.2d 683, 688-89 (8th Cir.

---

[9] The Court specifically inquired as to "how the IRS interprets 'primarily' in its definition of a 'political organization' that qualifies for 527 tax-exempt status." ECF 48 at 56 (citing 26 U.S.C. § 527(e)(1)). IRS regulation provides a "political organization does not have to engage exclusively in activities that are an exempt function." 26 C.F.R. § 1.527-2(a)(3).

1965) (same, collecting dictionary definitions and other judicial authorities).[10] An organization that spends more than 50% of its expenditures on issue advocacy supporting legislation (that is, *non*-express advocacy civic speech) is not "primarily" or "principally" engaged in candidate express advocacy. *Malat*, 383 U.S. at 572. Put another way, such an organization's expenditures for issue advocacy are "of first importance." *Id.*

Courts have also implicitly rejected the IRS's preferred (and newfound) interpretation that the regulatory "primarily" standard excludes any organization that has a single "substantial" non-exempt function. ECF 31 at 1 ("Those activities are sufficiently substantial to be disqualifying, regardless of whether some (or even most) of Freedom Path's *other* efforts were focused on advocating for the passage of legislation."). The Eighth Circuit rejected interpreting "primary" as "substantial." *Mun. Bond Corp.*, 341 F.2d at 687. If a single substantial purpose is not enough to be a primary purpose, it stands to reason that such a substantial purpose is not enough to undermine what is otherwise the primary purpose.

**b.** The IRS itself has expressed a similar view in the context of Section 501(c)(4) organizations. Then-IRS Commissioner John Koskinen quantified "primary activity" by explaining that "spend[ing] . . . less than *49 percent of your money on politics*, you can be a (c)(4)." Paul C. Bar-

---

[10] *Malat*'s consideration of revenue laws expressly distinguished a prior case not dealing with revenue, and that earlier case "[d]epart[ed] from a literal reading of statutory language" based on "legislative purpose." 383 U.S. at 571-72 (citing *Board of Governors of Fed. Reserve Sys. v. Agnew*, 329 U.S. 441, 446-48 (1947)). *Malat* controls here because the law deals with revenue. Regardless, "resort to legislative history" rather than literal text "is a relic from a bygone era of statutory construction." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (cleaned up).

ton, *Koskinen's Comments on Political Spending of Nonprofits Disputed*, Tax Notes and Tax Analysis (March 31, 2015) (emphasis added). *See* ECF 30-1 at 8.[11] And this position aligned with the IRS's longstanding interpretation. As explained years earlier by the then-Director of the IRS's Exempt Organization Division: "[w]hen it comes to political activities, that is, giving money to a candidate, telling people to vote for a certain candidate, the rule is that it has to be less than primary. *If it's forty-nine percent of their income, that is less than primary*." Donald B. Tobin, *The Internal Revenue Service and A Crisis of Confidence: A New Regulatory Approach for A New Era*, 16 Fla. Tax Rev. 429, 475 n.57 (2014) (emphasis added) (quoting Marcus Owens, *Practicing Law Institute Program on Corporate Political Activities*, 3 Exempt Org. Tax Rev. 471 (1990)).

Moreover, internal IRS training materials in use at the time of Freedom Path's 501(c)(4) application state that "organizations described in IRC section 501(c) [other than Section 501(c)(3)] may generally make expenditures for political activities so long as such activities, in conjunction with any other non-qualifying activities, *do not constitute the organization's primary activity (51%)*." IRS, Exempt Organizations Determinations Unit 2 at 7-19 (Rev. Sep. 2009), https://perma.cc/Y26H-J4L2 (emphasis added).

---

[11] The Court may consider public remarks by IRS officials regarding their interpretation of relevant statutes and regulations because they are "[l]egislative facts . . . which have relevance to legal reasoning and the lawmaking process." Fed. R. Evid. 201, advisory committee's note (a). Formal judicial notice under Evidence Rule 201 is thus not required. Regardless, the content of the public remarks "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Court should therefore take judicial notice of the statements of government officials in Freedom Path's briefs, as these statements are "representations of the government's position"—at least its previous positions. *Purdue Univ. v. Scalia*, 2020 WL 7340156, at *10 nn.3 & 4 (D.D.C. Dec. 14, 2020); *see S. La. Area Rate Cases v. Federal Power Comm'n*, 428 F.2d 407, 438 n.98 (5th Cir. 1970) (taking judicial notice of commissioner speeches); *United States v. Coinbase, Inc.*, 2017 WL 5890052, at *2 n.1 (N.D. Cal. Nov. 28, 2017) (taking judicial notice of "prepared remarks by IRS Commissioner John A. Koskinen" before private industry association).

This 50% primary activity threshold is also rooted in other IRS practices. To "expedite[]" its "review" of Section 501(c)(4) applications, the IRS set a "40%" expenditure threshold. *See* AR.208, AR.210. This expedited-process 40% threshold reveals the IRS's belief that the actual threshold for satisfying the primary-activity test *exceeds* 40%. After all, the very creation of an expedited process with a 40% expenditure threshold demonstrates that expenditures below 40% fall well short of constituting a "primary" activity. Rather, this framework confirms the IRS's understanding that expenditures in the 40-50% range represent the marginal cases requiring closer scrutiny and precluding expedited review. As then-Acting IRS Commissioner Daniel Werfel explained, any organization below the 40% threshold "should be able to confidently" conclude that it qualifies for Section 501(c)(4) status—but organizations above 40% "involve[] a 'closer call' that would be more appropriate" for the full review process. Acting Commissioner of Internal Revenue Daniel Werfel, Charting a Path Forward at the IRS: Initial Assessment and Plan of Action 25 (June 24, 2013), https://perma.cc/5PAH-PLBM.

**c.** Third-party commentators confirm this IRS practice. "While it is not clear how much political intervention is too much, the IRS seems to operate on the basis that activities or revenue exceeding 50% of a social welfare organization's total activities or revenue is too much." Philip Hackney, *Political Justice and Tax Policy: The Social Welfare Organization Case*, 8 Tex. A&M L. Rev. 271, 296 (2021) (citing Ellen P. Aprill, *Examining the Landscape of § 501(c)(4) Social Welfare Organizations*, 21 N.Y.U. J. Legis. & Pub. Pol'y 345, 347 (2018)); *see* Colinvaux, 34 Va. Tax Rev. at 27 & n.114 (citing Lindsey McPherson, *EO Materials Suggest 51 Percent Threshold for Social Welfare Activity*, 2014 Tax Notes Today 13-15 (Jan. 21, 2014)).

**B.      The uncontested record evidence demonstrates that Freedom Path qualifies for Section 501(c)(4) status under these IRS regulations.**

Based on the uncontested record evidence, Freedom Path is "operated primarily for the purpose of bringing about civic betterments and social improvements," because it "primarily" engages in issue advocacy. 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i).

**1.** Freedom Path's "primary" activity is engaging in the kind of legislative advocacy that the IRS has acknowledged as serving a social-welfare purpose deserving of § 501(c)(4) status. *See* Rev. Rul. 68-656, 1968 WL 15166, at *1 (noting that "seeking . . . legislation germane to the organization's programs is recognized . . . as a permissible means of attaining social welfare purposes"). By contrast, Freedom Path's candidate express advocacy represents a minority of Freedom Path's activities, ranging from 31-39% of Freedom Path's total expenditures.

| | IRS Original Calculation | IRS Appeals Officer | Freedom Path |
|---|---|---|---|
| **Express Advocacy for or Against a Candidate** | $360,748.91 | $360,748.91 | $360,748.91 |
| **Other Purported "Political Campaign Intervention" Under IRS Regulation** | Approx. $189,250.90 | Approx. $193,001.90 | - |
| **Total Expenditures** | $917,435 | $1,068,966.70 | $1,178,927 |
| **Percentage Attributable to Express Advocacy** | Approx. 39% | Approx. 34% | Approx. 31% |
| **Percentage Attributable to Other Purported Political Campaign Intervention Under IRS Regulation** | Approx. 21% | Approx. 18% | 0% |

Because Freedom Path's candidate express advocacy is not 50% or more of its activities, Freedom Path's primary purpose is straightforwardly the kind of issue advocacy that the IRS's

regulations allow. Freedom Path spent at most $360,748.91 of its total 2012 expenditures on candidate express advocacy, which is approximately 39% of even the least favorable $917,435 "direct expenditure" figure used by the IRS.[12]

**2.** But the IRS improperly rejected Freedom Path's § 501(c)(4) application by incorrectly labeling two of its television commercials—the "Three Men" and "Repeal It" commercials—as "political campaign intervention," even though neither advertisement qualified as express advocacy or its functional equivalent. These commercials represent approximately $319,400 and roughly 35% of Freedom Path's "direct expenditures." So when the "Repeal It" and "Three Men" advertisements are correctly identified as legislative issue advocacy, Freedom Path's expenditures on political campaign intervention amount to substantially less than half of its total activities. Therefore, political campaign intervention does not represent Freedom Path's primary activity, demonstrating that the IRS erred in denying Freedom Path's request for Section 501(c)(4) status. *See* 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i).

Whether Freedom Path's "Three Men" and "Repeal It" advertisements constitute express advocacy for or against a political candidate presents a straightforward legal question, and the relevant facts regarding these commercials are undisputed. Neither advertisement contains the "magic words" that "mark[] a bright . . . line" distinguishing express advocacy from issue advocacy, as neither advertisement contains an explicit instruction to vote for or against any candidate. *McConnell v. FEC*, 540 U.S. 93, 126 (2003), *overruled on other grounds by Citizens United*, 558 U.S. 310. Instead, both commercials exemplify classic issue advocacy speech that "seek[s] . . . legislation." Rev. Rul. 68-656, 1968 WL 15166, at *1. Additionally, both commercials exhibit the

---

[12] These political campaign intervention expenditures include Freedom Path's communications reported to the FEC as express advocacy. AR.889-921.

defining characteristics of issue advocacy and therefore also are not the "functional equivalent" of express advocacy either: "The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter." *WRTL*, 551 U.S. at 470.

Specifically, Freedom Path's "Three Men" advertisement was Freedom Path's issue advocacy in favor of legislation enacting a Balanced Budget Amendment. The advertisement identified U.S. Senator Hatch—who was a candidate for office at the time—in addition to another non-candidate U.S. Senator (Lee) and urged viewers to call the Senators to voice their support for the amendment. This advertisement was wholly consistent with Freedom Path's ongoing advocacy about the national debt. In fact, the IRS noted that Freedom Path "provided a few mailers that criticized the national debt without also praising [Senator Hatch] for trying to address it[.]" AR.233.

Similarly, "Repeal It" was issue advocacy in favor of repealing the Affordable Care Act— arguably the most important piece of legislation last decade. The Affordable Care Act has remained central to political debate and subject to myriad attempts at repeal and amendment since it was enacted. *See, e.g.*, Richard Cowan & Susan Cornwell, *House Votes to Begin Repealing Obamacare*, Reuters (Jan. 14, 2017), https://perma.cc/Z9W9-4YBF ("In the past few years, the House has voted more than 60 times to repeal or alter Obamacare[.]"). Like the "Three Men" advertisement, this advertisement mentioned Senator Hatch who, at the time the advertisement aired, served as a member of two committees with important oversight responsibilities involving the Affordable Care Act. AR.296. He was the ranking member of the Senate Finance Committee, which has oversight over the IRS—a federal agency tasked with implementation of many aspects of the Affordable Care Act. *Id.* He was also a member of the Senate Health, Education, Labor and

Pensions Committee, which has oversight over the Department of Health and Human Services. *Id.* Again, the advertisement urged viewers to call in support of Senator Hatch's repeal efforts.

Accordingly, applying a constitutionally permissible standard, neither "Repeal It" nor "Three Men" qualifies as express advocacy, or even its functional equivalent. And both commercials can reasonably be interpreted as issue advocacy, rather than "as an appeal to vote for or against a specific candidate." *WRTL*, 551 U.S. at 476. While both commercials reference officeholders, and some of those individuals (specifically, Senator Hatch) were running for office at the time, the Supreme Court has recognized that certain topics involving "mere discussion of public issues . . . by their nature raise the names of certain politicians." *FEC v. Mass. Citizens for Life, Inc.* ("*MCFL*"), 479 U.S. 238, 249 (1986).

Moreover, certain pieces of legislation, like the Affordable Care Act (popularly known as "Obamacare"), will inevitably raise the names of politicians. The Supreme Court has rejected the notion "that *any* ad . . . that includes 'an appeal to citizens to contact their elected representative' is the 'functional equivalent' of" express advocacy. *WRTL*, 551 U.S. at 470. Merely mentioning an elected representative who is also a current political candidate is not enough to classify either advertisement as the functional equivalent of express advocacy. In short, the references to a candidate in both advertisements are a far cry from being "explicit directive[s] [to] vote for these (named) candidates." *MCFL*, 479 U.S. at 249. Instead, the advertisements take a position on public policy and direct citizens to contact those legislators who are able take action on that legislation. This is precisely the kind of issue advocacy that the IRS has concluded can form a Section 501(c)(4) organization's primary purpose. *See* Rev. Rul. 68-656, 1968 WL 15166, at *1.

After properly classifying the "Repeal It" and "Three Men" advertisements as issue advocacy rather than political campaign intervention, Freedom Path's "primary activity" (at least 60%

of its total expenditures) was engaging in issue advocacy seeking legislation. Freedom Path's advocacy seeking legislation, therefore, plainly exceeded the 50% threshold that—consistent with the plain meaning of "primarily"—the IRS itself has suggested should constitute an organization's "primary purpose." *See supra* pp.27-30. Although the IRS has not formally adopted the 50% threshold in guidance or regulation, not heeding the 50% primary-purpose standard here would only compound the vagueness problems running throughout the IRS's evaluation of § 501(c)(4) organizations.

## CONCLUSION

This Court should grant Freedom Path's Renewed Motion for Summary Judgment and declare that Freedom Path is entitled to 26 U.S.C. § 501(c)(4) tax-exempt status.

Dated: February 27, 2026                    Respectfully submitted,

                                            */s/ Scott A. Keller*
                                            Scott A. Keller (D.C. Bar # 1632053)
Chris K. Gober                              Jeremy Evan Maltz (D.C. Bar # 155451)
D.C. Bar No. 975981                         LEHOTSKY KELLER COHN LLP
Lex Politica PLLC                           200 Massachusetts Ave. NW
14425 Falcon Head Blvd. E-100              Washington, DC 20001
Austin, TX 78738                            (512) 693-8350
(512) 354-1783                              scott@lkcfirm.com
cgober@lexpolitica.com


*Counsel for Plaintiff Freedom Path, Inc.*