**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FREEDOM PATH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-01349 (JMC) |
| | ) | |
| INTERNAL REVENUE SERVICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANTS'**
**<u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ...............................................................................................................1

ARGUMENT .....................................................................................................................6

I.      Standard of Review ................................................................................................6

II.     "Political Activity Inquiry"—Freedom Path Fails to Qualify for Tax-Exempt
        Status Under § 501(c)(4) Because Most of its Communications Constitute Political
        Campaign Intervention that Do Not Promote Social Welfare .......................................7

        Meaning of social welfare ............................................................................................7
        Political campaign intervention does not promote social welfare ...............................8

        Synthesizing plain meaning and case law to determine whether Freedom Path's
        communications constituted "political campaign intervention" ....................................9

        1.  Communication ......................................................................................................10
        2.  By an organization ................................................................................................11
        3.  During an election campaign ................................................................................11
        4.  That supports or opposes .......................................................................................11
        5.  A candidate for public office ................................................................................12

III.    Application to Freedom Path of the Synthesized Elements for Political Campaign
        Intervention .............................................................................................................13

        TV advertisements .......................................................................................................14
        Direct mailings.............................................................................................................18
        Website publications ....................................................................................................19

IV.     Primary Activity Inquiry: Freedom Path did not "Operate Exclusively" for the
        Promotion of Social Welfare Under § 501(c)(4) Because it Operated for a Substantial
        Non-Social-Welfare Purpose .......................................................................................20

        Congressional taxing authority and discretion............................................................20
        The "exclusively" requirement ....................................................................................21
        Plain meaning and statutory context of § 501(c)(4) ...................................................22
        "Exclusively" so far has not been set to a precise percentage ....................................25

CONCLUSION...................................................................................................................28

Table of Authorities

Page(s)

**Cases**

*Airlie Found. v. I.R.S.,*
  283 F. Supp. 2d 58 (D.D.C. 2003) ..........................................................................6

*Am. Ass'n of Christian Sch. Voluntary Employees Beneficiary Ass'n Welfare Plan
  Trust v. United States,*
  850 F.2d 1510 (11th Cir. 1988) ............................................................................25

*American Campaign Academy v. Comm'r,*
  92 T.C. 1053 (1989).............................................................................................8

*Ass'n of the Bar of the City of New York v. Comm'r,*
  858 F.2d 876 (2d Cir. 1988).......................................................................10, 11, 12, 14

*Better Business Bureau v. United States,*
  326 U.S. 279 (1945)......................................................................................20, 22, 24

*Branch Ministries v. Rossotti,*
  211 F.3d 137 (D.C. Cir. 2000) ....................................................................10, 11, 12, 15

*Carter v. United States,*
  973 F.2d 1479 (9th Cir. 1992) ............................................................................ 24-25

*Christian Echoes National Ministry, Inc. v. United States,*
  470 F.2d 849 (10th Cir. 1972) ....................................................................10, 11, 12, 15

*Church by Mail, Inc. v. Comm'r,*
  48 T.C.M. (CCH) 471 (T.C. 1984), *aff'd*, 765 F.2d 1387 (9th Cir. 1985).............................25

*Church in Bos. v. Comm'r,*
  71 T.C. 102 (1978)......................................................................................25, 26, 27

*Comm'r v. Lake Forest, Inc.,*
  305 F.2d 814 (4th Cir. 1962) .......................................................................7, 20, 24

*Contracting Plumbers Co-op. Restoration Corp. v. United States,*
  488 F.2d 684 (2d Cir. 1973)...........................................................................8, 24

*Family Tr. of Massachusetts, Inc. v. United States,*
  722 F.3d 355 (D.C. Cir. 2013)...............................................................................24

*Freedom Path, Inc. v. IRS,*
  2017 WL 2902626 (N.D. Tex. 2017), *vacated and remanded on other
  grounds,* 913 F.3d 503 (5th Cir. 2019) ...............................................................3, 4

*Freedom Path, Inc. v. IRS,*
  913 F. 3d 503 (5th Cir. 2019) ...........................................................................5

*Fulani v. League of Women Voters Educ. Fund,*
  882 F.2d 621 (2d Cir. 1989)............................................................................15

*Fund For Study of Econ. Growth & Tax Reform v. I.R.S.,*
  997 F. Supp. 15 (D.D.C.), *aff'd*, 161 F.3d 755 (D.C. Cir. 1998)...........................13

*Fund for the Study of Econ. Growth & Tax Reform,*
  161 F.3d 755 (D.C. Cir. 1998)........................................................................6, 7

*Geisinger Health Plan v. Comm'r,*
  985 F.2d 1210 (3d Cir. 1993)..........................................................................24

*Greater Se. Cmty. Hosp. Found., Inc. v. Dist. Unemployment Comp. Bd.,*
  407 F.2d 712 (D.C. Cir. 1969) ........................................................................25

*Harding Hosp., Inc. v. United States,*
  505 F.2d 1068 (6th Cir. 1974) ........................................................................24

*Haswell v. United States,*
  500 F.2d 1133 (Ct. Cl. 1974) ...........................................................................8

*Iowaska Church of Healing v. Werfel,*
  105 F.4th 402 (D.C. Cir. 2024)......................................................................6, 24

*Living Faith, Inc. v. Comm'r,*
  950 F.2d 365 (7th Cir. 1991) ..........................................................................24

*Manning Ass'n v. Comm'r,*
  93 T.C. 596 (1989)........................................................................................25

*Memorial Hermann Accountable Care Org. v. Comm'r,*
  120 F.4th 215 (5th Cir 2024) ...............................................................20, 22, 24

*Mut. Aid Ass'n of the Church of the Brethren v. United States,*
  759 F.2d 792 (10th Cir. 1985) ........................................................................25

*Nationalist Movement v. Comm'r,*
  102 T.C. 558, *aff'd*, 37 F.3d 216 (5th Cir. 1994)...........................................25-26

*Nationalist Movement v. Comm'r,*
  37 F.3d 216 (5th Cir. 1994) .............................................................................6

*People's Educ. Camp Soc. Inc. v. Comm'r,*
  331 F.2d 923 (2d Cir. 1964).....................................................................6, 7, 14

*Regan v. Taxation With Representation of Washington,*
  461 U.S. 540 (1983).............................................................................................8, 21

*Slee v. Comm'r of Internal Revenue,*
  42 F.2d 184 (2d Cir. 1930)..........................................................................................8

*St. David's Health Care Sys. v. United States,*
  349 F.3d 232 (5th Cir. 2003) .....................................................................................24

*Stevens Bros. Found. v. Comm'r,*
  324 F.2d 633 (8th Cir. 1963) .....................................................................................24

*World Family Corp. v. Comm'r,*
  81 T.C. 958 (1983)...............................................................................................25, 27

**Statutes**

26 U.S.C. § 1 ...............................................................................................................20

26 U.S.C. § 11 .............................................................................................................20

26 U.S.C. § 61(a) ........................................................................................................20

26 U.S.C. § 170(c) ......................................................................................................26

26 U.S.C. §§ 501(a) ....................................................................................................21

26 U.S.C. §§ 501(c) ..............................................................................................21, 26

26 U.S.C. § 501(c)(3) .................................................................................................21

26 U.S.C. § 501(c)(4)............................................................................................ *passim*

26 U.S.C. §§ 511-513 .................................................................................................23

26 U.S.C. § 527.................................................................................................... *passim*

26 U.S.C. § 527(e)(1) .................................................................................................26

26 U.S.C. § 527(e)(2)...............................................................................................9, 23

26 U.S.C. § 527(f)(1) ..................................................................................................23

26 U.S.C. § 7428 ................................................................................................1, 5, 6

52 U.S.C. § 30104(f)(3)(A)........................................................................................17

Revenue Act of 1913, ch. 16, § II(G)(a), 39 Stat. 172................................................21

**Other Authorities**

U.S. Const. amend. XVI ..............................................................................................20

U.S. Const. Art. I, § 8, cl. 1 .......................................................................................20

Treas. Reg. § 1.501(c)(4)-1 ..........................................................................................9

11 C.F.R. § 100.16(a) ..................................................................................................16

H.R. Rep. No. 391 ......................................................................................................14

S. Rep. No. 93-1357, 1974 U.S.C.C.A.N. ...........................................................23, 26

*Black's Law Dictionary* (12th edition 2024) (available on Westlaw) ...................11, 12

*Oxford English Dictionary* (online version) ........................................................12, 22

## PRELIMINARY STATEMENT

Freedom Path brought this action under § 7428 of the Internal Revenue Code to obtain a declaration that it is entitled to tax-exempt status under 26 U.S.C. § 501(c)(4). To prevail, Freedom Path must prove that it operates "exclusively" to promote social welfare. In making its case, Freedom Path must rely on the administrative record.

Freedom Path cannot meet its burden because the administrative record shows that almost 80 percent of its activities are political campaign intervention (under what the Court captioned the "Political Activity inquiry") in support of Senator Orrin Hatch's 2012 primary campaign and in opposition to his opponent, former Utah State Senator Dan Liljenquist. There is virtually no evidence in the record to establish that Freedom Path promotes social welfare as § 501(c)(4) requires. On the contrary, Freedom Path's activities consist almost entirely of print, internet, and television advertising that advocate for and against candidates seeking elective public office. Under what this Court characterized as the "Primary Activity inquiry," there exists no factual basis to conclude that Freedom Path's political advocacy to influence the outcome of an election is insubstantial. Consequently, Freedom Path cannot establish that it is "operated exclusively" to promote social welfare, and its request to be recognized as a tax-exempt organization should be denied.

## BACKGROUND

In early 2011, Freedom Path applied to the IRS for tax-exempt status as a social welfare organization under § 501(c)(4), describing itself as a nonprofit Texas corporation formed "to promote and defend causes that recognize the individual rights and liberties guaranteed to all Americans" by the Constitution. In its application, Freedom Path stated that it will engage in two activities: (1) public education and outreach (90%); and (2) grants to other organizations (10%).

1

Freedom Path stated that it intended to use print, email and internet to publish information, and that it would "utilize direct mail as well as television and radio advertisements to advocate our positions on issues and legislation." As described below, the vast majority of Freedom Path's expenses in 2012 were for television ads and print mailings.

In answer to the application question, "Has the organization spent or does it plan to spend any money attempting to influence the selection, nomination, election, or appointment of any person to any federal, state, or local public office or to an office in a political organization?" Freedom Path answered "No." In June 2012, Freedom Path revised that answer in response to an IRS request for additional information and acknowledged that it began engaging in political campaign intervention in January 2012 (just ahead of the Utah U.S. Senatorial Republican primary election). Freedom Path provided copies of six television advertisements, seventeen print mailings, and copies of its website pages. From the information provided, it does not appear that any ads or mailings took place after the Utah U.S. Senatorial primary in June 2012.

Shortly after providing that information, Freedom Path responded to a follow-up inquiry from the IRS requesting information about a seventh television advertisement that had aired in June 2012, and details about its ads and mailings, including the place, frequency and cost of each communication. Freedom Path responded by confirming that it had produced the seventh ad and by providing two additional direct mailings. But it did not give any of the details the IRS had requested, even after the IRS afforded Freedom Path with one final opportunity to describe the nature of its communications.

On September 30, 2013, the IRS issued a letter proposing to deny Freedom Path's application for tax-exempt status. Among other things, the IRS estimated that political campaign intervention accounted for "about 60%" of Freedom Path's direct expenditures. Freedom Path

2

filed an administrative appeal of the proposed denial and soon thereafter also filed a lawsuit in

the U.S. District Court for the District of Texas, Civil Action No. 3:14-cv-1537 ("*Freedom

Path I*"). Freedom Path asserted both in the administrative appeal and its district court filings,

among other claims, that the "facts and circumstances test" of Revenue Ruling 2004-6 was

applied by the IRS to its application and that the Revenue Ruling is (1) void for vagueness in

violation of the Fifth Amendment and (2) unconstitutionally vague and/or overbroad in violation

of the First Amendment. *See Freedom Path I*, Doc. 49-1 (Second Amended Compl.) ¶¶ 185,

196.[1]

    After various jurisdictional motions, Freedom Path moved for summary judgment

concerning its constitutional challenges to Revenue Ruling 2004-6. The District Court first

determined that Freedom Path raised "only facial challenges" to the Revenue Ruling, because the

IRS "has not made a final determination regarding Freedom Path's application for tax-exempt

status," and the parties had stipulated to a stay of the administrative review. *Freedom Path, Inc.

v. IRS*, 2017 WL 2902626, at *3 (N.D. Tex. 2017), *vacated and remanded on other grounds*,

913 F.3d 503 (5th Cir. 2019). The court then rejected those facial challenges.

    The District Court rejected Freedom Path's Fifth Amendment vagueness challenge,

concluding that "the use of a multifactor test does not make a tax rule vague per se" and that the

factors set out in Revenue Ruling 2004-6 are "specific and objective." *Id*. at *5. It also rejected

Freedom Path's First Amendment challenge, concluding that "Revenue Ruling 2004-6 does not

ban, restrain, or punish speech," but instead "regulates whether expenditures for certain types of

---

[1] Freedom Path obtained, with the IRS's consent, an order staying the processing of its
application until the Texas litigation was complete. *See Freedom Path I*, Docs. 75 (Freedom
Path's motion), 78 (Notice of parties' consent), 79 (Court's Order).

speech will be subsidized through their treatment for federal income tax purposes." *Id*. at *7. The court accordingly determined that Freedom Path misplaced its reliance on campaign finance cases that prohibited "the use of multifactor tests when deciding whether speech will be punished" under criminal statutes. *Id*. The court explained that, even supposing that the "facts and circumstances test" of Revenue Ruling 2004-6 used an over-inclusive definition of "campaign speech," the First Amendment would not be violated because "no cited authority holds that an over-inclusive tax rule affecting speech equates to an overbroad restriction on speech." *Id*. The court also rejected Freedom Path's argument that Revenue Ruling 2004-6 contributes to viewpoint discrimination, explaining that it "does not on its face single out any viewpoint or inquire into a group's intent." *Id*. at *8.

Shortly after the District Court decision, the parties agreed to a dismissal without prejudice of the allegations that the Revenue Ruling was unconstitutional as applied to Freedom Path, because the IRS had not yet finally determined Freedom Path's exempt status, and reached a resolution of other claims. *See Freedom Path I*, Docs. 103 (Stipulation of Dismissal), 106 (Final Judgment). The District Court therefore dismissed Freedom Path's claims relating to (i) alleged viewpoint discrimination in violation of the First Amendment, (ii) alleged unlawful disclosure of confidential tax-return information, and (iii) its as-applied challenge to Revenue Ruling 2004-6. *Freedom Path I*, Doc. 103. It then entered a final judgment in favor of the Government on Freedom Path's facial constitutional challenge to Revenue Ruling 2004-6. *Freedom Path I*, Doc. 106. Freedom Path appealed the District Court's ruling.

The sole issue on appeal concerned Freedom Path's facial challenge to the constitutionality of Revenue Ruling 2004-6. The Fifth Circuit did not decide that question, however, and held instead that Freedom Path did not have standing to bring the facial challenge.

4

Consequently, the Fifth Circuit vacated the district court's final judgment for lack of jurisdiction. *Freedom Path, Inc. v. IRS*, 913 F. 3d 503 (5th Cir. 2019).

Following the Fifth Circuit's opinion, Freedom Path's administrative appeal resumed and was completed. IRS Appeals sustained the IRS's proposed determination, and on February 20, 2020, the IRS issued a final determination letter to Freedom Path, denying its application for a tax exemption under § 501(c)(4). On the basis of the administrative record before it, the IRS determined that Freedom Path was not operated primarily for the promotion of social welfare, and that its primary activity was making political expenditures in support of or in opposition to candidates running for elected office. Freedom Path filed this action under § 7428 (which waives sovereign immunity for certain actions to obtain a declaratory judgment regarding tax-exempt status) to challenge that determination.

On September 30, 2025, the Court issued an order holding that the Treasury Regulation (§ 1.501(c)(4)-1(a)) and Revenue Ruling (Rev. Rul. 2004-06, which defines "political campaign intervention" for § 527 organizations) that the IRS applied in denying plaintiff's application for exemption transgress the heightened vagueness standard applicable to civil regulations that affect speech covered by the First Amendment. Doc. 48 (Opinion and Order dated September 30, 2025) at 1. The Court also found that neither the IRS nor Freedom Path had identified an alternative standard for deciding the ultimate question of Freedom Path's exemption eligibility that is both constitutionally permissible and appropriately grounded in the statutory and regulatory scheme. *Id.* The Court ordered the parties to file renewed motions advancing interpretations of the "Primary Activity inquiry" (defined as what constitutes an organization's "primary" activity for purposes of § 501(c)(4) exemption), *see id*. at 46, and the "Political Activity inquiry" (defined as whether a communication constitutes political campaign intervention), *see id*. at 46, 50, that are

(a) not unconstitutionally vague and (b) appropriately rooted in the statutory and regulatory scheme, and constitutional principles, that govern § 501(c)(4) tax exemption in light of the Court's findings in the opinion. While we stand by our prior arguments, this Motion addresses those issues.

## ARGUMENT

### I.    Standard of Review

Section 7428 empowers the U.S. District Court for the District of Columbia, the Court of Federal Claims, and the Tax Court to declare that an organization qualifies for tax-exempt status under § 501(c). Where, as here, a plaintiff seeks tax-exempt status under § 501(c)(4), the plaintiff must prove that (1) it is a civic league or organization; (2) it is not organized for profit; and (3) it is operated exclusively for the promotion of social welfare. 26 U.S.C. § 501(c)(4); *People's Educ. Camp Soc. Inc. v. Comm'r*, 331 F.2d 923, 929 (2d Cir. 1964); *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 414 (D.C. Cir. 2024) (burden of proof on taxpayer); *Fund for the Study of Econ. Growth & Tax Reform*, 161 F.3d 755, 759 (D.C. Cir. 1998) (burden of proof on taxpayer). Here, only the third element is in dispute.

In deciding whether an organization is entitled to tax-exempt status, the district court reviews the administrative record *de novo* and can only go beyond the evidence provided to the IRS upon a showing of good cause. *Airlie Found. v. I.R.S.*, 283 F. Supp. 2d 58, 61–62 (D.D.C. 2003). As such, taxpayers that neglect to present evidence of their exempt activities to the IRS during the administrative process may be less likely to prevail in a § 7428 action. *See Nationalist Movement v. Comm'r*, 37 F.3d 216, 220 (5th Cir. 1994) (noting that "Appellant had the duty to present, during the administrative process, evidence establishing its exempt status"). And because tax exemptions are matters of legislative grace, courts are required to construe the

§ 501(c)(4) exemption narrowly. *See Fund for the Study of Econ. Growth & Tax Reform,*

161 F.3d at 759.

**II.    "Political Activity Inquiry"—Freedom Path Fails to Qualify for Tax-Exempt Status Under § 501(c)(4) Because Most of its Communications Constitute Political Campaign Intervention that Do Not Promote Social Welfare**

In support of various policies, Congress has chosen to exempt a variety of organizations

from taxes. Among those types of organizations are those "not organized for profit but operated

exclusively for the *promotion of social welfare*." 26 U.S.C. § 501(c)(4)(A) (emphasis added).

Most of Freedom Path's TV ads and other communications do not promote social welfare within

the meaning of § 501(c)(4) because they constitute political campaign intervention under the

case law and the plain meaning of the phrase. Even assuming for the sake of argument that those

activities did not constitute political campaign intervention, the administrative record does not

establish that they promote social welfare.

<u>Meaning of social welfare</u>

To qualify under § 501(c)(4), Freedom Path must establish that it "operate[s] exclusively

for the promotion of social welfare." 26 U.S.C. § 501(c)(4)(A). "[T]he promotion of social

welfare . . . involv[es] the serving of 'purposes beneficial to the community as a whole,' or the

promotion of the 'welfare of mankind' in the manner generally of the charitable, educational and

religious organizations exempted by like provisions of the Code." *People's Educ. Camp Soc.*,

331 F. 2d at 930. "In short, 'social welfare' is the well-being of persons as a community."

*Comm'r v. Lake Forest, Inc.*, 305 F.2d 814, 818 (4th Cir. 1962) (looking to the plain meaning of

the term.

7

<u>Political campaign intervention does not promote social welfare</u>

Unlike § 501(c)(3), § 501(c)(4)'s statutory language does not expressly address political campaign intervention. But neither the courts nor the IRS have ever found that political campaign intervention promotes social welfare. That is because political campaign intervention does not benefit the community as a whole. *See, e.g.*, *Haswell v. United States*, 500 F.2d 1133, 1140 (Ct. Cl. 1974). From the earliest days of the Code, courts have distinguished this "political agitation" from the educational content deemed consistent with purposes provided in § 501(c)(3) (and, by extension, § 501(c)(4)) because educational content promotes an informed and engaged citizenry. *See Slee v. Comm'r*, 42 F.2d 184, 185 (2d Cir. 1930) (considering activity under a precursor to § 501(c)(3)). Moreover, supporting or opposing only select candidates or one political party provides a substantial private benefit to such candidates or party, not the community as a whole. *See American Campaign Academy v. Comm'r*, 92 T.C. 1053, 1070, 1078-1079 (1989) (organization that "conducted its educational activities with the partisan objective of benefitting Republican candidates and entities" substantially benefited private interests); *see generally Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 550 (1983) (noting that "Congress was concerned that exempt organizations might use tax-deductible contributions to lobby to promote the private interests of their members"); *Contracting Plumbers Co-op. Restoration Corp. v. United States*, 488 F.2d 684, 687 (2d Cir. 1973) (finding "the cooperative is of tremendous value to the private economic interests of its members – a clearly non-exempt purpose").

And even though § 501(c)(4) does not expressly mention political campaign intervention, the statutory context shows that Congress did not consider the promotion of social welfare to encompass political campaign intervention. If political campaign intervention furthered social

8

welfare, then § 527 would have been superfluous because such organizations would have

qualified under § 501(c)(4). Furthermore, Congress has imposed a tax on all § 501(c)

organizations that engage in a § 527(e)(2) exempt function, which includes political campaign

intervention. *See infra* pt. IV. If Congress had considered political campaign intervention to

further exempt purposes for any § 501(c) organization, then it would not have subjected that

activity to tax.

> Synthesizing plain meaning and case law to determine whether Freedom Path's
> communications constituted "political campaign intervention"

The record shows that Freedom Path's activities consisted almost entirely of

advertisements aired on television and/or YouTube, fliers sent as direct mailings, and a banner

published on Freedom Path's website to advocate for and against candidates seeking elective

public office. As a result, and in light of the Court's opinion on the parties' original motions for

summary judgment, we look to determine whether Freedom Path's communications constitute

political campaign intervention.[2] In doing so, we focus on the context of this case. We

necessarily focus on TV, YouTube and website advertisements, as well as printed mailings, as

those are the forms of communication that Freedom Path used. We also focus on the fact that

Freedom Path seeks tax-exempt status as an organization that exclusively promotes social

welfare, under § 501(c)(4). We do not suggest that the elements we present here will cover every

context in which future courts may need to determine whether a communication or other activity

constitutes political campaign intervention, or for every type of organization that purports to

---

[2] Based on the Court's decision, this brief does not cite or rely upon Treas. Reg. § 1.501(c)(4)-1
or the IRS guidance thereunder for the meaning of political campaign intervention. In an
abundance of caution, we note that we do so without abandoning any of our arguments made in
connection with our prior motion for summary judgment.

operate for an exempt purpose. In addition, the presentation for the needs of this case should not be understood as limiting the future ability of the IRS to issue regulations or other guidance on this subject matter, should Congress lift its prohibition, which extends back to the Consolidated Appropriations Act of 2016, for the IRS to expend any funds to issue regulations or other guidance regarding the standards for an organization to quality for tax-exempt status under § 501(c)(4).

The language of the statute regarding social welfare, court cases interpreting that term, and the plain meaning of "political campaign intervention" and court cases interpreting that concept, taken together, provide a guide for evaluating whether Freedom Path's communications are political campaign intervention. Synthesizing these authorities for purposes of this action, a communication is political campaign intervention (and thus does not promote social welfare within the meaning of § 501(c)(4)) if it is a communication by an organization during an election campaign that supports or opposes a candidate for public office. This guide can be broken down into five elements:

1.    **Communication -** A statement, broadcast, publication, distribution, or any other form of circulation of a communication.

*See, e.g.*, *Branch Ministries v. Rossotti,* 211 F.3d 137, 140 (D.C. Cir. 2000) ("Church placed full-page advertisements in *USA Today* and the *Washington Times*"); *Ass'n of the Bar of the City of New York v. Comm'r*, 858 F.2d 876, 877 (2d Cir. 1988) ("The ratings are communicated to the public in the form of press releases" and in regular publications to organization members and other subscribers); *Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d 849, 856 (10th Cir. 1972) (organization "used its publications and broadcasts to attack candidates" and "urged followers to defeat" them).

10

2.    **By an organization -** The organization itself makes the communication.

*See, e.g.*, *Branch Ministries*, 211 F.3d at 140 (each advertisement contained a notation that "[t]his advertisement was co-sponsored by the Church at Pierce Creek"); *Ass'n of the Bar of the City of New York*, 858 F.2d at 877 (the organization's "press releases" and its "regular publication"); *Christian Echoes*, 470 F.2d at 856 (organization "used its publications and broadcasts").

3.    **During an election campaign -** The communication is made after the candidate has announced or registered his/her candidacy for the particular office and continuing through the time of the election.

*See, e.g.*, *Branch Ministries*, 211 F.3d at 139 (ads placed shortly before the 1992 presidential election); *Ass'n of the Bar of the City of New York*, 858 F.2d at 879 (quoting the lower court's finding that "it is 'obvious that the ratings are published with the hope that they will have an impact on the voter'"); *Christian Echoes*, 470 F.2d at 856 ("intervened in political campaigns"). *See also Political*, *Black's Law Dictionary* (12th edition 2024) (available on Westlaw) ("Of, relating to, or involving politics; pertaining to the conduct of government"); *Campaign*, *Black's Law Dictionary* (12th edition 2024) (available on Westlaw) ("An organized series of activities aimed at influencing voters before an election").

4.    **That supports or opposes** - The communication supports or opposes the election of a particular candidate directly (e.g., vote for, vote against) or indirectly (supports or opposes the positions or actions of the candidate).

*See, e.g.*, *Branch Ministries*, 211 F.3d at 139, 140 (ads "urged Christians not to vote for then-presidential candidate" and asserted that the candidate's positions on certain issues "violated Biblical precepts"); *Ass'n of the Bar of the City of New York*, 858 F.2d at 877 (the

11

"rating of candidates for . . . elective judgeships . . . as either 'approved', 'not approved', or 'approved as highly qualified'"); *Christian Echoes*, 470 F.2d at 856 (organization "used its publications and broadcasts to attack candidates and incumbents," "urged its followers to elect" named candidates, "urged followers to defeat" named candidates, and "annual convention endorsed" a named candidate). *See also Political*, *Oxford English Dictionary* (online version) ("Involved, employed, or interested in politics; that takes a side, promotes, or follows a particular party line in political debate"); *Intervention*, *Oxford English Dictionary* (online version) ("The action of intervening, 'stepping in', or interfering in any affair, so as to affect its course or issue"); *Intervention*, *Black's Law Dictionary* (12th edition 2024) (available on Westlaw) ("The act or fact of intruding, being introduced, or otherwise becoming involved; esp., some interposition or involvement that influences what would otherwise take place").

     5.    **A candidate for public office** - The person supported or opposed must be a candidate for a public office.

     *See, e.g.*, *Branch Ministries*, 211 F.3d at 139 ("then-presidential candidate"); *Ass'n of the Bar of the City of New York*, 858 F.2d at 877 (the "rating of candidates for . . . elective judgeships"); *Christian Echoes*, 470 F.2d at 856 (addressing "candidates"). *See also Political*, *Oxford English Dictionary* (online version) ("Relating to or concerned with public life and affairs as involving questions of authority and government; relating to or concerned with the theory or practice of politics"); *Campaign*, *Oxford English Dictionary* (online version) ("A coordinated series of events, actions, etc., designed to influence public opinion throughout a city, region, country, etc., regarding a political issue, candidate for office, etc.; (now) *esp.* one undertaken by a political candidate in an attempt to win an election; […]. Also: the period,

typically preceding an election, during which one or more of these series of activities is under way").

As applied to Freedom Path, these elements satisfy the Court's vagueness concerns. The relevant inquiries (e.g., whether someone is an announced candidate or whether a communication was made) are objective in nature. Regarding whether a given communication "supports" or "opposes" a candidate, the relevant advertisements unambiguously supported Senator Hatch (and opposed his opponent in the election). Similarly, these elements make clear what facts would trigger liability—it is clear and objective whether a campaign is under way, whether a person is a candidate, and whether a communication expresses support for or opposition to the candidate. As applied to Freedom Path, these elements do not require inquiry into the intent of the organization when making the communication. And they do not call for a weighing of factors against each other. Finally, the objectivity and clarity of these elements mean they are not susceptible to viewpoint discrimination.

### III.    Application to Freedom Path of the Synthesized Elements for Political Campaign Intervention

An analysis of the administrative record of Freedom Path's operations under the synthesized elements shows that almost 80 percent of its expenditures were for political campaign intervention. "Courts reviewing a final determination of tax exempt status by the IRS are to consider the overall picture presented by the administrative record." *Fund For Study of Econ. Growth & Tax Reform v. I.R.S.*, 997 F. Supp. 15, 18 (D.D.C.), *aff'd*, 161 F.3d 755 (D.C. Cir. 1998) (citing *Dumaine Farms v. Comm'r*, 73 T.C. 650 (1980)). As a general matter, courts have assessed whether an organization acts exclusively to promote social welfare "on the basis of the effect its operations have on the public . . . as demonstrated by the fact of its operations, and

13

as demonstrated by the actual effect which those operations have on the community of which it is a part." *People's Educ. Camp Soc.*, 331 F.2d at 932.

Utah state senator Dan Liljenquist resigned his state office in December 2011 and announced in early January 2012 his candidacy for the U.S. Senate against incumbent Senator Orrin Hatch. Def. Facts ¶¶ 32, 34. The Utah State Republican convention was held on April 21, 2012. Def. Facts ¶ 35. Because no candidate received a sufficient percentage of the delegate vote, Liljenquist and Hatch faced each other in a primary election that was held on June 26, 2012, to determine the Republican nominee. Def. Facts ¶ 35. It does not appear that any ads or mailings submitted by Freedom Path took place after the U.S. Senatorial primary in June 2012.

The record demonstrates that Freedom Path engages in no substantial activities besides developing print, television, and internet ads, and that nearly 80% of those ads constitute political campaign intervention. Viewed as a whole, they establish that Freedom Path cannot meet the statutory "operated exclusively" requirement, or indeed any more lenient standard (even if one were to use a definition of "primary purpose" that might allow non-exempt activities to approach 50%). *See infra* pt. IV. During the primary campaign between Senator Hatch and his opponent, the administrative record establishes that Freedom Path did the following:

 TV advertisements

Freedom Path aired seven television ads in 2012. At least six expressly supported (or criticized) the votes, positions, abilities and/or experiences of a candidate and were broadcast proximate to the Republican party convention and primary. Those ads clearly contain all the elements of political campaign intervention. *See* H.R. Rep. No. 391 at 1625 (restrictions on campaign activity by exempt organizations reflect Congressional policy of political neutrality); *Ass'n of the Bar of the City of New York*, 858 F.2d at 879-880 (publishing opinions on subjective

14

traits "with the hope that they will have an impact on the voter" and "with an eye toward imminent elections"); *Christian Echoes*, 470 F.2d at 856 (broadcasts attacking some candidates and endorsing others); *Branch Ministries*, 211 F.2d at 140 (publishing ads before election asserting candidate's policies are contrary to its positions); *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 629 (2d Cir. 1989) (selective promotion of certain parties over others inconsistent with tax-exempt status).

Those six television ads that constitute political campaign intervention are:

**227** – Freedom Path paid Strategic Media and November Inc. $60,070 to air the "227" ad on television and the internet in June 2012. The ad identifies a candidate for Senate, Dan Liljenquist, and says if he "can't be bothered to show up for us, why should we vote for him?" and "We shouldn't vote for him"). The ad states at the end that "Freedom Path is responsible for the contents of this message." Def. Facts ¶¶ 42, 43, 59.

**Is it really time?** – Freedom Path paid Strategic Media and November Inc. $129,600 to air the "Is it really time?" ad in February 2012. The ad identifies Liljenquist, contains an audio clip of Liljenquist in which he states he is running for Senate because "it's time," then the ad negatively references his votes on certain issues, notes his absenteeism and stated, "Utah's next US Senator? Not this time." The ad states at the end that "Freedom Path is responsible for the contents of this message." Def. Facts ¶¶ 44, 46, 59.

**Time?** - Freedom Path paid Strategic Media and November Inc. $71,710 to air the "Time?" ad in March 2012. The ad is similar to "Is it really time?". The ad states at the end that "Freedom Path is responsible for the contents of this message." Def. Facts ¶¶ 44, 46, 59.

**Leaders** – According to its protest, Freedom Path paid $109,000 in July 2011 and $60,000 in May 2012 to air the "Leaders" ad. The ad identifies Senator Hatch (and others) and

notes with approval their positions and actions with the Balanced Budget Amendment. The ad states at the end that "Freedom Path is responsible for the contents of this message." Def. Facts ¶¶ 50, 52, 53, 59.

     **Three Men Again –** According to its IRS protest, Freedom Path paid more than $147,000 to air "Three Men Again," although Freedom Path reported more specifically to the FEC that this ad cost $156,00 to produce and air. This ad aired in March and April 2012. The ad identifies Senator Hatch (and others) and notes with approval their positions and actions with the Balanced Budget Amendment. The ad states at the end that "Freedom Path is responsible for the contents of this message." Def. Facts ¶¶ 47-49, 59.

     **Repeal it –** According to its protest, Freedom Path paid at least $150,000 to air "Repeal It," which aired in January and February 2012. The ad notes approvingly of Senator Hatch's efforts to repeal the Affordable Care Act ("Obamacare"). The ad states at the end that "Freedom Path is responsible for the contents of this message." Def. Facts ¶¶ 55, 57, 59.

     Freedom Path reported three of those ads ("227" ($60,070), "Is It Really Time?" ($129,600), and "Time?" ($71,710)) to the Federal Election Commission as "independent expenditures." Def. Facts ¶¶ 42-46. In election law, "independent expenditures" are expenditures made for communications "*expressly advocating the election or defeat* of a clearly identified candidate" that are not made at the request of or in consultation with a candidate or a political party. 11 C.F.R. § 100.16(a) (emphasis added). While the classification as an "independent expenditure" is narrower than "political campaign intervention" for purposes of § 501(c)(4), it certainly falls within that broader category.

     Three additional ads also constituted political campaign intervention under the proposed elements: "Three Men Again," "Repeal It," and "Leaders." "Three Men Again," which cost

16

$156,400, identified Senator Orrin Hatch by name and aired in March and April 2012 (*i.e.*,

coincident with the Republican precinct caucuses, convention, and primary). Def. Facts ¶¶ 35,

48-49. Freedom Path admits that this ad was shown statewide to potential voters in Utah (Doc.

20, Am. Comp. ¶ 165) and was reported to the FEC as an electioneering communication, Def.

Facts ¶ 47.[3] The ad indirectly encourages votes for Senator Hatch by praising his position on the

Balanced Budget Amendment. The ad also touts Senator Hatch's conservative bona-fides by

mentioning his accomplishment in authoring the Balanced Budget Amendment. Def. Facts ¶ 48.

The next ad is "Repeal It", which cost $150,000 to make. Def. Facts ¶ 57. The ad

identified Senator Hatch, and aired in Utah in January and February 2012, coinciding with his

primary campaign. Def. Facts ¶¶ 35, 55. The ad indirectly encourages votes for Senator Hatch. It

touts Senator Hatch's conservative bona-fides by mentioning his accomplishments with respect

to the Affordable Care Act and by exhorting viewers to "tell him to keep fighting for our shared

values." Def. Facts ¶ 55.

The next ad was "Leaders", which cost more than $60,000 and aired in May 2012.[4] Def.

Facts ¶¶ 50, 53. The ad identified Senator Hatch and coincided with his campaign. The ad

favorably identifies Senator Hatch's position on the Balanced Budget Amendment. Def. Facts

¶ 50. It also indirectly encouraged votes for Senator Hatch.

---

[3] In federal election law, the term "electioneering communication" means a broadcast, cable, or satellite communication that: (1) refers to a clearly identified candidate for federal office; (2) is made within 60 days before a general, special, or runoff election for the office sought by the candidate or 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and (3) in the case of a communication that refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate. 52 U.S.C. § 30104(f)(3)(A).

[4] This ad also aired in 2011, at a cost of more than $109,000. Def. Facts ¶ 52.

Direct mailings

Nineteen direct mailings were provided by Freedom Path. Def. Facts ¶ 60. Three direct mailings that mention Dan Liljenquist were reported to the FEC as "independent expenditures" totaling $99,369. Def. Facts ¶¶ 63, 67, 69; ADMIN-000120-21, 187-88, 189-90. Two others focus on Liljenquist's ownership of a firm that outsourced jobs and his earlier vote on access to Utah state documents. ADMIN-000129-30, 135-36. All five of those mailings contain negative comments about Liljenquist. The only difference between the three that were reported as independent expenditures to the FEC and the other two is that the three independent expenditures contain an explicit message to vote "no."

In addition, three other mailings contained compliments about Hatch. One focused on Hatch "fighting for us," and his "tried and true leadership." ADMIN-000114-15. Another was similar to "Repeal It," and the third was similar to the "Three Men Again" and "Leaders" ads. ADMIN-000126-27, 147-48. Accordingly, all three mailings — like "Repeal It," "Three Men Again," and "Leaders" — qualify as political campaign intervention.

Freedom Path paid $99,369 to a firm called Majority Strategies for the three direct mailings that were reported as independent expenditures to the FEC. Def. Facts ¶ 63. Presumably the remaining mailings were by another firm, Next Wave, to which Freedom Path paid $177,111. Def. Facts ¶ 64. Plaintiff provided no information on how much each particular mailing cost, and since Plaintiff carries the burden to establish that the administrative record supports its qualification for tax-exempt status, the Court may assume that all unexplained expenditures were for political campaign intervention. But even taking a middle-of-the-road approach to these expenditures (an approach to which Freedom Path is not legally entitled) demonstrates that Freedom Path's expenditures for direct mailings that constituted political campaign intervention

18

were substantial. For example, if one allocates the unexplained mailing expenditures evenly

between the remaining mailings, then each of those mailings (the ones not reported to the FEC)

cost $11,070. That would come to a total of $55,350 for the five mailings that qualify as political

campaign intervention but that Freedom Path did not report as independent expenditures to the

FEC. Together with the amount spent on the three mailings reported as independent

expenditures, Freedom Path spent at least $154,719 on direct mailings that qualify as political

campaign intervention.

　　　Website publications

　　　Freedom Path published a banner advertisement on its website, a copy of which it

provided as part of its June 3, 2012 response to the IRS. The advertisement rotated between four

images of Orrin Hatch and stated: (1) "Orrin Hatch . . . . Authored the Balanced Budget

Amendment legislation to require a balanced budget"; (2) "Orrin Hatch . . . Named one of the

Club for Growth's top three pre-growth Senators"; (3) "Orrin Hatch . . .100% Score from the

American Conservative Union"; (4) "Orrin Hatch . . . Co-sponsored the bill to repeal

ObamaCare". Def. Facts ¶ 71. This banner ad qualifies as political campaign intervention under

the synthesized elements. Freedom Path's website also featured the "Leaders," "Three Men

Again," and "It's Time" advertisements. Def. Facts ¶ 70. Freedom Path reported spending

"[a]pproximately $30,000 . . . on Internet activities." Def. Facts ¶ 70.

　　　 Freedom Path reported program service expenses of $1,040,362 for 2012 on its

Form 990 return. ADMIN-000869. Summing up from above, Freedom Path in 2012 spent at

least the following on political campaign intervention: $627,780 on TV ads; $154,719 on direct

mailings; and approximately $30,000 for website activities. Accordingly, Freedom Path spent at

least $812,499 out of $1,040,362 on political campaign intervention. That is approximately

78 percent of its total program expenses that Freedom Path spent on activities that do not promote social welfare within the meaning of § 501(c)(4). That is out of bounds under any interpretation of what it means to operate exclusively for the promotion of social welfare.

### IV.    Primary Activity Inquiry: Freedom Path did not "Operate Exclusively" for the Promotion of Social Welfare Under § 501(c)(4) Because it Operated for a Substantial Non-Social-Welfare Purpose

Freedom Path does not qualify for exemption under § 501(c)(4) under the "Primary Activity inquiry" because it operated for a substantial non-social-welfare purpose. As the Supreme Court held what "exclusively" means in the federal tax-exemption context more than 80 years ago, and as every circuit court to rule on § 501(c)(4) exemption has followed for more than 60 years, the "the presence of a single non-[exempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] purposes." *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945). *See, e.g., Lake Forest*, 305 F.2d at 820; *Memorial Hermann Accountable Care Org. v. Comm'r*, 120 F.4th 215, 219-20 (5th Cir 2024).

<u>Congressional taxing authority and discretion</u>

The United States Constitution empowers Congress "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. Art. I, § 8, cl. 1. The Constitution also authorizes a general income tax and does not dictate any exemptions or deductions. U.S. Const. amend. XVI. Consistent with this authorization and Congress's taxing power, Congress has imposed on individuals and corporations an annual tax on "all income from whatever source derived." 26 U.S.C. § 61(a); *see* 26 U.S.C. §§ 1, 11.

20

For policy reasons, Congress has exempted from this annual federal taxation dozens of categories of organizations that meet the requirements specified in § 501(c). *See* 26 U.S.C. §§ 501(a), 501(c)(1)-(29) (certain charitable and other organizations). Congress also provided federal tax exemption for "political organizations." *See* 26 U.S.C. § 527. The Supreme Court has recognized that "[l]egislatures have especially broad latitude in creating classifications and distinctions in tax statutes." *Taxation With Representation of Washington*, 461 U.S. at 547. For example, the Court recognized:

> The system Congress has enacted provides this kind of subsidy to non profit civic welfare organizations generally, and an additional subsidy to those charitable organizations that do not engage in substantial lobbying. In short, Congress chose not to subsidize lobbying as extensively as it chose to subsidize other activities that non profit organizations undertake to promote the public welfare.

*Id*. at 544.

The "exclusively" requirement

Since 1913, Congress has allowed a tax exemption for entities that are organized and operated "exclusively" for charitable or social welfare purposes. Revenue Act of 1913, ch. 16, § II(G)(a), 39 Stat. 172. To this day, the exclusivity requirement remains codified in §§ 501(c)(3) and (c)(4) of the Internal Revenue Code:

> (3) Corporations, and any community chest, fund, or foundation, organized and operated *exclusively* for religious, charitable, scientific, testing for public safety, literary, or educational purposes . . . .
>
> (4)(A) Civic leagues or organizations not organized for profit but operated *exclusively* for the promotion of social welfare . . . .

26 U.S.C. § 501(c)(3), (4) (emphasis added).

More than 80 years of federal court precedent, beginning with the Supreme Court in 1945, has held that "exclusively," as the term Congress used to condition federal tax exemption,

means that an organization does not qualify if its non-exempt purposes are "substantial in

nature." *See Better Business Bureau*, 326 U.S. at 283. Subsequently, every circuit court to decide

§ 501(c)(4) status has uniformly applied the *Better Business Bureau* standard. *See, e.g.,*

*Memorial Hermann,* 120 F.4th at 220 ("Since § 501(c)(3) and (c)(4) both use the crucial phrase

'operated exclusively,' the *Better Business Bureau* standard applies under both provisions.").

That long-standing interpretation comports with the plain meaning and statutory context in which

Congress used "exclusively."

<u>Plain meaning and statutory context of § 501(c)(4)</u>

On its face, (setting aside *Better Business Bureau* and its progeny) the exclusivity

requirement might be read to disqualify an organization from tax-exempt status under

§ 501(c)(3) or 501(c)(4) that engages in *any* amount of activity that falls outside the tax-exempt

purpose. Definitions of "exclusively" include "solely," or "[s]o as to exclude all except some

particular object, subject, etc." *See Exclusively*, *Oxford English Dictionary* (online version).

Under that view, for example, an organization hoping to secure tax-exempt status under

§ 501(c)(4) would fail if it engaged in *any* activity that did not promote social welfare.

But Congress's use of "exclusively" must be interpreted consistently with the overall

statutory scheme applicable to tax-exempt organizations. While Congress has mandated that an

organization must be operated *exclusively* for the promotion of social welfare to qualify for tax

exemption under § 501(c)(4), Congress also has provided that an organization that otherwise is

tax-exempt under § 501(c)(4) may be taxed on activities *that are not related to the purposes for*

*which it is tax-exempt*. For example, an organization that otherwise is tax-exempt under § 501(a)

(which includes organizations described in §§ 501(c)(3) or (c)(4)) generally is taxed on its

"income derived" from "any trade or business the conduct of which is not substantially related to

22

the exercise or performance . . . of its . . . purpose or function constituting the basis for its exemption under section 501." 26 U.S.C. § 513(a). Thus, if a § 501(c)(4) organization also engages in a trade or business that is not substantially related to its social-welfare purpose, it is subject to tax on its unrelated business income. 26 U.S.C. §§ 511-513.

In addition, organizations described in § 501(c) also may be subject to tax if they spend money for a function for which a § 527 political organization is tax-exempt. *See* 26 U.S.C. § 527(f)(1). The "exempt function" of a § 527 political organization means "the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State or local public office or office in a political organization, or the election of Presidential or Vice-Presidential electors, whether or not such individual or electors are selected, nominated, elected, or appointed." 26 U.S.C. § 527(e)(2). The § 501(c) organization is treated as having political organization taxable income in an amount equal to the lesser of its net investment income or its exempt function expenditures. 26 U.S.C. § 527(f)(1). Consequently, § 501(c) organizations may be taxed under § 527 only "to the extent they actually operate as political organizations." *See* S. Rep. No. 93-1357, at 29 (1974). In other words, § 527 directs how "political organizations" are to be taxed, and in a way that "exempts" income related to the function at the heart of such organizations: political campaign expenditures. Meanwhile, for § 501(c) organizations that are *otherwise* tax-exempt, it is that same kind of expenditure – political campaign expenditures – that may subject the organization to tax. Thus, when a § 501(c)(4) social welfare organization conducts an activity that would be "exempt" for a § 527 organization, it is treated differently and taxed under § 527(f). This ensures that social welfare organizations do not get tax benefits for avoiding political campaign intervention while *also*

23

getting the tax benefits afforded "political organizations" whenever they choose to conduct similar activity.

The fact that Congress envisioned the possibility of a § 501(c)(4) organization owing tax for activity *not* in furtherance of its social-welfare function means that Congress could not have intended "exclusively" to mean "solely" in the strictest possible sense. Even so, the plain meaning of "exclusively" must inform the extent to which § 501(c)(4) organizations may engage in non-exempt activities without losing tax-exempt status.

Courts have struck the appropriate balance by consistently finding that more than an insubstantial amount of non-exempt activity will disqualify an organization from tax-exempt status. That is the standard courts have applied in interpreting Congress's use of "exclusively" in both § 501(c)(3) and § 501(c)(4). *See Better Bus. Bureau*, 326 U.S. at 283 (1945) (interpreting a predecessor to § 501(c)(3)); *Iowaska Church of Healing*, 105 F.4th at 414 (citing *Better Business Bureau* in upholding denial of church's tax-exempt status under § 501(c)(3)); *Family Tr. of Massachusetts, Inc. v. United States*, 722 F.3d 355, 359 (D.C. Cir. 2013) (denying (c)(3) status where "more than an insubstantial part" of activities were for non-exempt purpose); *Memorial Hermann*, 120 F.4th at 220 ("Since § 501(c)(3) and (c)(4) both use the crucial phrase 'operated exclusively,' the *Better Business Bureau* standard applies under both provisions."); *Contracting Plumbers*, 488 F.2d at 686 (denying (c)(4) status)); *Geisinger Health Plan v. Comm'r*, 985 F.2d 1210, 1215 (3d Cir. 1993) (section (c)(3)); *Lake Forest*, 305 F.2d at 820 (sections (c)(4) and (c)(12); *St. David's Health Care Sys. v. United States*, 349 F.3d 232, 237 (5th Cir. 2003) (section (c)(3)); *Harding Hosp., Inc. v. United States*, 505 F.2d 1068, 1072 (6th Cir. 1974) (section 501(c)(3)); *Living Faith, Inc. v. Comm'r*, 950 F.2d 365, 370 (7th Cir. 1991) (section (c)(3)); *Stevens Bros. Found. v. Comm'r,* 324 F.2d 633, 638 (8th Cir. 1963); *Carter v. United States*,

24

973 F.2d 1479, 1486 (9th Cir. 1992) (citing *Better Business Bureau* in determination under

26 U.S.C. § 170(a)); *Mut. Aid Ass'n of the Church of the Brethren v. United States*, 759 F.2d

792, 796 (10th Cir. 1985) (sections (c)(3) and (c)(4)); *Am. Ass'n of Christian Sch. Voluntary*

*Employees Beneficiary Ass'n Welfare Plan Trust v. United States*, 850 F.2d 1510, 1513 (11th

Cir. 1988) (sections (c)(3) and (c)(4)); *cf. Greater Se. Cmty. Hosp. Found., Inc. v. Dist.*

*Unemployment Comp. Bd.*, 407 F.2d 712, 713 n.2 (D.C. Cir. 1969) (dicta citing *Better Business*

*Bureau* for the proposition that an entity might lose exempt status if non-exempt activities are

more than "ancillary").

  Freedom Path fails to qualify under any plausible understanding of that standard. The

result remains the same when we consider how that standard might be viewed more

mathematically.

  <u>"Exclusively" so far has not been set to a precise percentage</u>

  None of the case law, dictionary definitions or statutory context discussed above answer

the question of *exactly*, or to a mathematical degree, how much activity not in support of social

welfare is too much to disqualify an organization from the benefits of tax-exempt status. Courts

so far have purposely avoided identifying a single numerical threshold for non-exempt activities.

*See Manning Ass'n v. Comm'r*, 93 T.C. 596, 610 (1989) (recognizing absence of safe-harbor);

*World Family Corp. v. Comm'r*, 81 T.C. 958, 967 n.10 (1983) ("We establish no general rule for

future cases in finding 10 percent to be insubstantial"); *Church in Bos. v. Comm'r*, 71 T.C. 102,

108 (1978) ("we do not set forth a percentage test");  *Church by Mail, Inc. v. Comm'r*, 48 T.C.M.

(CCH) 471 (T.C. 1984) (observing that decisional law provides only "bench-marks"), *aff'd*, 765

F.2d 1387 (9th Cir. 1985); *Nationalist Movement v. Comm'r*, 102 T.C. 558, 589, *aff'd*, 37 F.3d

216 (5th Cir. 1994) (whether "an activity is substantial is a facts-and-circumstances inquiry not always dependent upon time or expenditure percentages").

While also not setting an overarching rule, at least one court, in the circumstances before it, denied exempt status where 21% of the organization's activities were non-exempt. *See Church in Bos.*, 71 T.C. at 108. That result would not create an inappropriate "gap" between the amount of non-exempt political campaign intervention potentially permitted to a § 501(c)(4) social welfare organization and the amount of exempt political activity required for a § 527 political organization to have tax-exempt status. The potential gap is created by Congress's choice of different terms to "define" the required levels of exempt activities for § 501(c)(4) social welfare organizations and § 527 political organizations to qualify for tax-exempt status.

While Congress chose "exclusively" as the standard for § 501(c)(4) organizations, it chose "primarily" as the standard for § 527 political organizations. Specifically, a political organization "means a party, committee, association, fund, or other organization . . . organized and operated *primarily* for the purpose of" accepting contributions and/or making expenditures for its exempt function (defined above). 26 U.S.C. § 527(e)(1). Congress adopted a different threshold to qualify as a § 527 political organization because it "recognized that between elections a political organization, such as a local political party, may not be supporting any specific candidate for election." S. Rep. No. 93-1357, 1974 U.S.C.C.A.N. at 7503. Congress only created federal tax exemptions for certain organizations, which meet the specific statutory requirements for each exception, to further particular Congressional policies. *See, e.g.*, 26 U.S.C. §§ 501(c)(1)-(29). Each category is distinct, with its own specific requirements and tax benefits and burdens. *See, e.g.*, 26 U.S.C. § 170(c) (limiting tax deductible contributions to only certain

26

types of § 501(c) organizations). The boundaries of one group should not be viewed as influencing the boundaries of another.

A test for disqualification under § 501(c)(4) may not permit an organization to conduct substantial non-social welfare operations (including but not limited to commercial activity, social activity, and political campaign intervention). The proper statutory test under § 501(c)(4) is whether social welfare is an organization's exclusive purpose. The statutory term "exclusively" that Congress enacted, in accordance with the term's plain meaning, as informed by *Better Business Bureau* and its § 501(c)(4) progeny and the overall statutory context for tax-exempt organizations, does not permit a qualifying § 501(c)(4) organization to engage in more than insubstantial political campaign intervention (or any other non-social welfare purpose).

At all events, the record in this case shows that Freedom Path fails to qualify under § 501(c)(4) regardless of how the term "exclusively" is defined. The breadth of Freedom Path's political advocacy overwhelms any exempt purpose of the statute. And that is true even if the term "exclusively" were viewed as interchangeable with a definition of "primary" that would allow non-exempt activity to approach 50 percent. As discussed above, nearly 80 percent of Freedom Path's operations were for non-social welfare purposes (here, political campaign intervention). As such, it is not necessary in this case to define a specific maximum percentage of non-social-welfare activity that would not disqualify an organization from tax-exempt status under § 501(c)(4), especially when doing so would be contrary to the case law in the context of § 501(c)(3) that declines to set a percentage threshold or safe harbor. To the extent the Court wishes to do so, our research reveals that 10% non-exempt activity has been found to qualify as insubstantial, *World Family Corp.*, 81 T.C. at 967 n.10, while 21% non-exempt activity has been found to be decidedly too much, *Church in Bos.*, 71 T.C. at 108. Given the meaning of

27

"exclusively" as discussed above, any specific numeric threshold, if one needed to be set, should be toward the lower end of that range. We reiterate, however, that Freedom Path's non-exempt activities are not insubstantial and greatly exceed any reasonable allowance this Court might afford.

## CONCLUSION

The administrative record shows that nearly 80 percent of Freedom Path's activities were political campaign intervention and thereby disqualify it from tax-exempt status as an organization "operated exclusively for the promotion of social welfare" under § 501(c)(4). Accordingly, Freedom Path cannot establish that the administrative record supports its claim that it qualifies for that status. We ask the Court to declare that Freedom Path does not qualify for tax-exempt status under § 501(c)(4).

Dated: February 27, 2026      Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

*/s/ Laura M. Conner*
LAURA M. CONNER (VA Bar No. 40388)
Assistant Director
JOSEPH A. SERGI (DC Bar No. 480837)
Senior Litigation Counsel
Civil Division, Tax Litigation Branch
U.S. Department of Justice
Post Office Box 227
Washington, DC 20044
Tel: (202) 514-2986
Fax: (202) 514-6866
laura.m.conner@usdoj.gov
joseph.a.sergi@usdoj.gov

Counsel for Defendants