**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| FREEDOM PATH INC., | |
| Plaintiff, | |
| v. | No. 20-cv-1349 (JMC) |
| INTERNAL REVENUE SERVICE | |
| Defendant. | |

**AMICUS BRIEF ON BEHALF OF TAX PROFESSOR DONALD B. TOBIN**

**CONSENT OF THE PARTIES TO THE FILING FEDERAL RULE OF APPELLATE PROCEDURE 29(A)(2)**

This brief is filed with the consent of Scott Keller, counsel for Plaintiff. Defendant takes no position on the filing of this brief.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for amici curiae certifies that no amici has a parent corporation and that no publicly held corporation owns 10% or more of any amici's respective stock.

**STATEMENT PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 29(a)(4)(E)**

The undersigned certifies that no party's counsel authored this brief in whole or in part, and that no party, party's counsel, or any other person other than *amicus* contributed money that was intended to fund preparing or submitting this brief. Professor Tobin is an employee of the University of Maryland Carey School of Law.

Dated: March 2, 2026

By: */s/ Jon A. Mueller*
Jon A. Mueller
DC BAR NUMBER 50295
Visiting Associate Professor
University of Maryland Carey School of Law
500 West Baltimore St.
Baltimore, MD 21201
jmueller@law.umaryland.edu
*Counsel for Donald B. Tobin*

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

INTEREST OF AMICUS CURIAE ............................................................................... 1

SUMMARY OF ARGUMENT ....................................................................................... 1

ARGUMENT.................................................................................................................... 3

I.    THE COURT SHOULD INTERPRET THE STATUTE BASED ON ITS PLAIN MEANING AND DETERMINE THAT "OPERATED EXCLUSIVELY" MEANS THAT ONLY AN INSUBSTANTIAL PART OF THE GROUP'S ACTIVITIES CAN BE FOR A NON-EXEMPT PURPOSE.................................................................................................................... 3

        A.    "Operated exclusively" properly interpreted allows for an insubstantial amount of non-exempt activity. ............................................................ 7

        B.    If the Court seeks a bright line test for what would constitute an insubstantial amount of activity, a dollar threshold and a percent limitation would remove any vagueness concerns and be consistent with the statutory language.... 9

II.   THE PLAIN MEANING OF THE TERM "SOCIAL WELFARE" IN 501(C)(4) DOES NOT ENCOMPASS INTERVENTION IN A POLITICAL CAMPAIGN ............................................ 12

III.  IF THE COURT IS SEEKING A BRIGHT LINE TEST FOR POLITICAL CAMPAIGN INTERVENTION IT SHOULD USE THE CURRENT DEFINITIONS FOR EXPRESS ADVOCACY AND ITS EQUIVALENT AND A BROAD DEFINITION OF ELECTIONEERING COMMUNICATION ............................................................... 16

        A.    Express advocacy or its functional equivalent......................................... 17
        B.    Electioneering Communication ............................................................. 19

CONCLUSION ....................................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Better Business Bureau v. United States*, 326 U.S. 279 (1945) ............................................. 7, 8, 9

*Buckley v Valeo*, 424 U.S. 1 (1976) ............................................................................ 17, 18, 19

*Christian Stewardship Assistance, Inc. v. Commissioner*, 70 T.C 1037 (1978) ........................... 10

*Church in Boston v. Commissioner*, 71 T.C. 102 (1978) ........................................................... 11

*Commissioner v. Lake Forest*, 305 F.2d 814 (4th Cir. 1962) ................................................... 8, 15

*Debs Mem'l Radio Fund v. Comm'r*, 148 F.2d 948 (2d Cir. 1945) ............................................... 4

*Federal Election Commission v. Wisconsin Right to Life, Inc*, 551 U.S. 449 (2007) ................... 18

*Freedom Church of Revelation v. United States*, 588 F. Supp. 693 (D.D.C. 1984). ..................... 10

*Fund for Study of Econ. Growth & Tax Reform v. I.R.S*, 997 F. Supp. 15 (D.D.C) ...................... 13

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .................................................. 1, 3, 8, 21

*Manning Ass'n v. Commissioner*, 93 T.C. 596 (1989) ............................................................... 10

*Memorial Hermann Accountable Care Org. v. Commissioner*, 120 F.4th 215 (5th Cir. 2024) ...... 8

*Mutual Aid Ass'n of Church of the Brethren v. United States*, 759 F.2d 792 (10th Cir. 1985) ....... 8

*Perrin v. United States*, 444 U.S. 37 (1979) ........................................................................... 13

*United States v. Anderson*, 225 F. 825 (E.D. Wis. 1915) ......................................................... 15

*Universal Life Church v. United States*, 13 Cl. Ct. 567 (1987) .................................................. 10

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,* 455 U.S. 489 (1982) .............................. 18

*World Family Corp. v. Commissioner*, 81 T.C. 958 (1983) ....................................................... 10

## Statutes

26 U.S.C. § 501(c)(4) .................................................................................................... passim

26 U.S.C. § 501(h) .................................................................................................... 9, 11, 12

26 U.S.C. § 527 ............................................................................................................. passim

52 U.S.C. § 30101 *et seq*. ........................................................................................ 5, 17, 19

52 U.S.C. § 30104(f)(3) ...................................................................................................... 19

Act of Jan. 3, 1975, Pub. L. No. 93-625, § 10(a), 88 Stat. 2108**,** 2116-19 .................................. 4

Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 (codified as amended
    in scattered sections of 52 U.S.C.) ............................................................................. 19

Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, § 123, 140 Stat. 173, 447–48 ......... 6

Full and Fair Political Activity Disclosure Act of 2000, Pub. L. No. 106-230, 114 Stat. 477 ........ 6

Revenue Act of 1913, ch. 16, § II(G)(a), 38 Stat. 114, 172 ...................................................... 4, 14

Section 811(b)(8) of the Social Security Act, ch. 531, 49 Stat. 620, 639 (1935) .......................... 7

The Revenue Act of 1913, ch. 16, 38 Stat. 114 .................................................................... 12, 13

## Other Authorities

146 Cong. Rec. S5995 (daily ed. June 28, 2000) ....................................................................... 5

87 Fed. Reg. 77467 (Dec. 19, 2022) ....................................................................................... 20

Better Homes for Children: Clubwomen Form a National Organization on Social Welfare, *The
    Washington Post*, Apr. 19, 1913 ................................................................................ 14

Brian Galle & Donald Tobin submission to 78 Fed. Reg. 71535-01 (Nov. 29, 2013) (notice of
    Proposed Rulemaking). ............................................................................................... 6

Brian Galle & Donald Tobin, Comment on Proposed Rulemaking, No. IRS-2013-0038-70943
    (Feb. 24, 2014). ......................................................................................................... 6

Donald B. Tobin, *The 2013 IRS Crisis: Where Do We Go from Here?*, 142 Tax Notes 1120 (2014)
    ................................................................................................................................. 5

Donates $650,000 to Welfare Work: Mrs. Anderson Gives a Fund to Promote Cleanliness, Sanitation, and Pure Food. Aims to Prevent Sickness and Thus Diminish Poverty — New Department to Be Separate from Other Poor Society Activities., *N.Y. Times*, Mar. 21, 1913 .. 15

Girl Couldn't Live on 20-Cent Meals*, Grand Rapids Press*, Sep. 20, 1913................................. 14

Help for Blind Urged: Committee on Social Welfare Considers a New Investigation, *Boston Daily Globe*, Feb. 20, 1913................................................................................................................. 15

Internet Communication Disclaimers and Definition of "Public Communication," 87 Fed. Reg. 77467 (Dec. 19, 2022) (to be codified at 11 C.F.R. pts. 100, 110) .......................................... 20

More Talk on School Dances, *Aberdeen American*, Aug. 23, 1913............................................... 14

*Oxford English Dictionary Online* ................................................................................................. 14

Richard L. Hasen, *The Surprisingly Complex Case for Disclosure of Contributions and Expenditures Funding Sham Issue Advocacy*, 48 UCLA L. Rev. 265 (2000) ......................... 19

S. Rep. No. 93-1357 (1974)................................................................................................... 5, 6, 14

Social Welfare League to Shield Young Girls, *San Francisco Chronicle* (1869-1922), Sep. 23, 1913................................................................................................................................ 14

Social Welfare Motorcycle, *Jackson Citizen Patriot*, Sept. 13, 1913 ........................................... 15

The Progressive Era, *Encyclopedia Britannica*, https://www.britannica.com/event/Progressive-Era ................................................................................................................................................ 13

The United Irishwomen, *N.Y. Times*, June 18, 1911 ..................................................................... 15

Webster's *New World Dictionary* 1352 (rev. ed. 1974) ............................................................... 13

**Regulations**

26 C.F.R. § 1.501(c)(4)-1(a)(1)(ii), (a)(2)(ii) ........................................................................... 3, 21

Rev. Rul. 2004-06, 2004-1 C.B. 328......................................................................................... 21

Treas. Reg. 65, art. 519 (1924) ...................................................................................................... 4

## INTEREST OF AMICUS CURIAE

Professor Tobin is a scholar who researches and writes at the intersection of tax and election law. He has written ten articles on the political activity of 501(c)(3), (c)(4) and 527 organizations. Prior to his service as a Professor of Law, Professor Tobin was an appellate attorney in the Tax Section of the Department of Justice. Professor Tobin has also testified before the FEC, the U.S. House of Representatives, and commented on rulemaking by the IRS in this area. Because a statute specifically prohibits the IRS from engaging in rulemaking on these issues, the District Court's decision in Freedom Path may have lasting impact on the regulatory structure. This will have significant impact outside of this particular case and these particular parties and could radically alter the existing campaign finance framework. Amicus believe that additional comments by experts in the field who have written and considered these issues for over 20 years can help inform the Court in this important case.

This brief specifically responds to the Court's request for proposals from the parties on how to proceed following the Court's finding that the current regulatory framework is unconstitutionally vague. Amicus does not address the Court's vagueness holding and is only offering a path forward in light of the Court's holding.

## SUMMARY OF ARGUMENT

In light of the Court's decision that the regulations and rulings at issue are unconstitutionally vague, the Court should apply *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), and interpret the plain language of 26 U.S.C. § 501(c)(4). Applying the plain language will allow enforcement of the statute without having to rely on regulations the Court found unconstitutionally vague. Instead, the Court can apply the statute's clear language to address its vagueness concerns.

The statute requires that organizations be "operated exclusively" for the promotion of social welfare. The regulations interpreted "operated exclusively" to mean "primarily" engaged in social welfare. Absent *Chevron* deference to the agency's interpretation, the clear language of the statute does not support defining "operated exclusively" as "primarily."

The statutory language refers to "operated exclusively," not merely "exclusively." This distinction is significant because "operated exclusively" can be read slightly more broadly than the term "exclusively" standing alone. The phrase "operated exclusively" allows for some activity that is not a social welfare purpose as long as the operation or purpose of the organization remains exclusively social welfare. While the "operated exclusively" language cannot be interpreted to mean "primary," it can be interpreted to allow an insubstantial amount of non-qualifying activity. This reading honors the statutory text while recognizing practical realities of organizational operations.

The IRS issued revenue rulings to help clarify the definition of political campaign intervention in the tax-exempt context. Because political campaign intervention activities do not meet the plain meaning of the term "social welfare," the IRS has applied these factors to communications and activities by social welfare organizations. Social welfare is an activity designed for the common good of society and does not include activities that primarily benefit a specific individual or a small group of individuals. Campaign intervention necessarily benefits a particular candidate or candidates and is not within the meaning of the term social welfare. This understanding of the term social welfare is further supported by the fact that Congress created 26 U.S.C. § 527 specifically to provide an organizational home for political organizations. The creation of § 527 would not have been necessary if Congress believed campaign activity was a social welfare purpose. If campaign activity were a social welfare activity, organizations wishing to engage in campaign activity could simply have organized as § 501(c)(4) organizations, making § 527 superfluous.

A strict statutory interpretation of the word exclusively might lead to an interpretation disallowing all political campaign activity. The Court need not adopt such a strict definition of exclusively. Interpreting "operated exclusively" as allowing an insubstantial amount of activity, with that amount set at a percentage combined with a threshold amount, would remove any vagueness concerns and be consistent with the statutory language. This bright-line threshold provides the clarity necessary to avoid constitutional infirmity while remaining faithful to Congress's intent that organizations be devoted exclusively to social welfare purposes, thus allowing only truly incidental non-exempt activities.

Once "operated exclusively" and "social welfare" are properly clarified according to their plain meaning, the Court can use the factors suggested by the IRS to determine whether particular communications fit the definition of social welfare. If the Court deems that test too vague even with the clarification of the "operated exclusively" language, the Court can alternatively use the election law definitions of express advocacy and its equivalent and electioneering communications broadly defined. Both of these standards are currently employed in campaign finance law and have been found not to raise vagueness concerns, providing a workable framework for identifying impermissible campaign intervention.

## ARGUMENT

**I.    THE COURT SHOULD INTERPRET THE STATUTE BASED ON ITS PLAIN MEANING AND DETERMINE THAT "OPERATED EXCLUSIVELY" MEANS THAT ONLY AN INSUBSTANTIAL PART OF THE GROUP'S ACTIVITIES CAN BE FOR A NON-EXEMPT PURPOSE.**

This Court determined that the IRS regulations,  26 C.F.R. § 1.501(c)(4)-1(a)(1)(ii), (a)(2)(ii), and Revenue Ruling 2004-06, interpreting § 501(c)(4) were unconstitutionally vague. In light of the Supreme Court's decision in *Loper Bright*, this Court may forgo the agency's interpretation and use its independent judgment in interpreting the statutory language. In exercising its independent judgment, the Court should interpret the term "operated exclusively"

to allow for an insubstantial amount of activity that is inconsistent with the organization's exempt purpose.

The legislative history surrounding the original language of § 501(c)(4) is scant, but the history surrounding the abuse of § 501(c)(4) status is not. The 1913 Tax Act implementing the income tax created a group of organizations that were not subject to income tax. Specifically, the Tax Act of 1913 provided an exemption for "any civic league or organization not organized for profit but operated exclusively for the promotion of social welfare." Revenue Act of 1913, ch. 16, § II(G)(a), 38 Stat. 114, 172. The Treasury Regulations, issued in 1924, provided that "[c]ivic leagues entitled to exemption . . . comprise those not organized for profit but operated exclusively for purposes beneficial to the community as a whole, and, in general, include organizations engaged in promoting the welfare of mankind." Treas. Reg. 65, art. 519 (1924), *cited in Debs Mem'l Radio Fund v. Comm'r*, 148 F.2d 948, 951 n.1 (2d Cir. 1945).

At that time, Congress did not exempt political organizations or campaign organizations from the income tax. Over time, Congress recognized that it needed to clarify the tax status of political organizations and enacted § 527 of the Internal Revenue Code.[1] The provision exempted § 527 political organizations from tax on income that the statute refers to as "exempt function" income, which is income it receives to "influence or attempt to influence" the election or nomination of a candidate for public office. 26 U.S.C. § 527(e)(2). Section 501(c)(4) organizations could set up a separate segregated fund to engage in exempt function activity. 26 U.S.C. § 527(f)(3).

When Congress enacted § 527, Congress specifically contemplated that § 501(c)(4) organizations might want to engage in campaign activity and that such activity was not a social welfare activity. The Committee report to the Act creating § 527 political organizations provided:

---

[1] Act of Jan. 3, 1975, Pub. L. No. 93-625, § 10(a), 88 Stat. 2108, 2116-19.

4

The committee expects that, generally, a § 501(c) organization that is permitted to engage in political activities would establish a separate organization that would operate primarily as a political organization, and directly receive and disburse all funds related to nomination, etc., activities. In this way, the campaign-type activities would be taken entirely out of the section 501(c) organization, to the benefit of both the organization and the administration of the tax laws.

S. Rep. No. 93-1357, at 30 (1974).

As Amicus and others have noted, the statutory scheme prior to 2000 presented a coherent framework. Organizations that wanted to engage in political campaign advocacy organized as political organizations under § 527 and organizations that primarily engaged in social welfare organized as § 501(c)(4) organizations. Donald B. Tobin, *The 2013 IRS Crisis: Where Do We Go from Here?*, 142 Tax Notes 1120, 1122 (2014).

Although the statutory scheme was coherent, the organizations stated purposes were often incoherent and contradictory. They sought exempt status as political organizations under the Internal Revenue Code while simultaneously insisting they were *not* political organizations subject to regulation under the Federal Election Campaign Act (FECA). 52 U.S.C. § 30101 *et seq*. Thus, these organizations engaged in campaign activity but argued they were not subject to the disclosure rules under FECA. Congress thus sought to add disclosure requirements to § 527. Senator Lieberman, a sponsor of the legislation, explained:

The risk posed by the 527 loophole goes even farther than depriving the American people of critical information. I believe that it threatens the very heart of our democratic political process. Allowing these groups to operate in the shadows pose[s] a real risk of corruption and makes it difficult for us to vigilantly guard against that risk.

146 Cong. Rec. S5995 (daily ed. June 28, 2000) (statement of Sen. Lieberman).

In response to concerns raised about the "527 loophole," Congress in 2000 amended § 527 of the Code to create a disclosure regime requiring political organizations not already

subject to disclosure with the FEC to disclose campaign contributions and expenditures.[2] Independent groups that wished to avoid the disclosure requirements in 527 instead organized as § 501(c)(4) social welfare organizations. Not surprisingly, the IRS's attempt to enforce an election disclosure regime was fraught with political peril and severely damaged the IRS's enforcement ability in this area. The IRS is now prohibited from rulemaking in this area, which has made it even more difficult for the IRS to address many of the problems posed by the statutory framework through regulation.[3]

In light of the inability of the IRS to clarify these provisions through guidance, the Court should return to the statutory text. In staying true to the statutory language, this Court has an opportunity to reduce abuse in the area and to clearly interpret the statutory text. There is no reason for the Court to expand the potential for abuse in this area as it addresses the concerns regarding vagueness. Instead, the Court should use the plain language of the statute to limit the activities of § 501(c)(4) organizations to social welfare activities while allowing for some small amount of non-social welfare activities. Interpreting the operated exclusively language to mean what it says will encourage those organizations wishing to engage in political advocacy to organize as § 527 political organizations or to create a separate § 527 segregated account as was envisioned by Congress when it passed § 527.[4]

_____

[2] *See* Full and Fair Political Activity Disclosure Act of 2000, Pub. L. No. 106-230, 114 Stat. 477. *See also* Brian Galle & Donald Tobin submission to 78 Fed. Reg. 71535-01 (Nov. 29, 2013) (notice of Proposed Rulemaking). The arguments in this section follow many of the arguments Galle and Tobin made in their submission. Brian Galle & Donald Tobin, Comment on Proposed Rulemaking, No. IRS-2013-0038-70943 (Feb. 24, 2014).
[3] Congress has repeatedly included a rider on the appropriations bills prohibiting the IRS from engaging in rulemaking in this area. *See* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, § 123, 140 Stat. 173, 447–48.
[4] S. Rep. No. 93-1357, at 30 (1974).

### A. "Operated exclusively" properly interpreted allows for an insubstantial amount of non-exempt activity.

Section 501(c)(4) provides that a § 501(c)(4) organization must be "operated exclusively for the promotion of social welfare." The common understanding of the word exclusively would lead to an interpretation that all § 501(c)(4) organizations' activities must be for a social welfare purpose. The language in § 501(c)(4), however, should not be read so restrictively. A proper interpretation of the words "operated exclusively" would allow for an insubstantial amount of non-exempt activity.

In *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945), the Court interpreted the term "operated exclusively" that appeared in § 811(b)(8) of the Social Security Act, ch. 531, 49 Stat. 620, 639 (1935). Section 811(b)(8) of the Social Security Act exempted "[e]mployees of nonprofit institutions operated exclusively for religious, charitable, scientific, literary or educational purposes." *Id.* This definition mirrored the definition contained in § 501(c)(3) for charitable organizations and basically exempted § 501(c)(3) organizations from having to pay social security taxes on their employees. The Better Business Bureau argued that "all of its purposes and activities are directed toward the education of business men and the general public" and it therefore qualified for exemption. *Better Business Bureau*, 326 U.S. at 282–83. The Court rejected the notion that "operated exclusively" should be read broadly and instead determined that "[e]ven the most liberal of constructions does not mean the statutory words and phrases are to be given unusual or tortured meanings." *Id*. at 283. The Court explained that part of the Better Business Bureau's purpose was to promote a "profitable business community" and that even a "single non-educational purpose, if substantial in nature, will destroy the exemption, regardless of the number or importance of truly educational purposes." *Id.* at 283.

Critically, the Court in *Better Business Bureau* recognized that a small amount of a non-exempt activity would not defeat exempt status. It did not, however, hold that an organization could engage in a substantial amount of non-exempt activity. Instead, it held that any non-exempt activity, if substantial, required denial of the exempt status. Thus, if promoting business was only 5% of the Better Business Bureau's activity, as long as that non-exempt activity was itself substantial, denial was appropriate.

In *Better Business Bureau*, the Court did not ask whether promoting business was the organization's primary activity, nor did it apply a numerical threshold (like 50%). The Court analyzed whether the organization engaged in a non-exempt purpose and whether that non-exempt purpose was substantial. Properly read, *Better Business Bureau* does not create a primary purpose or percentage test, but instead, it supports the proposition that an entity is not "operated exclusively" for exempt purposes if it pursues a substantial non-exempt purpose.

Lower Courts have followed this interpretation when analyzing whether an organization is operated exclusively for an exempt activity. Recently, the Fifth Circuit, in *Memorial Hermann Accountable Care Org. v. Commissioner*, 120 F.4th 215 (5th Cir. 2024), followed this reasoning and applied it in the context of § 501(c)(4) organizations. The Fifth Circuit, applying *Loper Bright*, concluded that the "substantial nonexempt purpose test" and not the "primary purpose test" applies when interpreting the "operated exclusively" language. The court explained "[i]t makes little sense to treat the same phrase differently in two neighboring paragraphs of the same statute, and that the test from *Better Business Bureau* should be applied in the § 501(c)(4) context. *Id.* at 220. *See also Commissioner v. Lake Forest*, 305 F.2d 814, 821 (4th Cir. 1962) (using the *Better Business Bureau* test to find an organization did not qualify for § 501(c)(4) status); *Mutual Aid Ass'n of Church of the Brethren v. United States*, 759 F.2d 792, 797 (10th Cir. 1985) (finding organization's providing of insurance was a substantial non-exempt purpose denying both § 501(c)(3) and § 501(c)(4) status).

8

Thus, the first step in interpreting the statute and avoiding vagueness concerns is to interpret the word "operated exclusively" to mean what it says. Organizations should be exclusively engaged in the exempt purpose. A small, insubstantial amount of other activities, however, will not defeat the organization's purpose.

**B. If the Court seeks a bright line test for what would constitute an insubstantial amount of activity, a dollar threshold and a percent limitation would remove any vagueness concerns and be consistent with the statutory language.**

In general, courts have avoided setting a specific percentage activity as insubstantial, instead applying a facts and circumstances approach. If, however, this Court prefers a set threshold amount to avoid vagueness concerns, a dollar limitation combined with a percentage threshold amount would be appropriate. This is the mechanism used in § 501(h)'s safe harbor for lobbying activities by § 501(c)(3) organizations.

In applying the standard in *Better Business Bureau*, it is not the amount of the activity but whether it is substantial that impacts exempt status. Thus, if an organization spends $5 million on a non-exempt purpose that activity would be substantial regardless of whether the organization engaged in $100 million of social welfare activity or $10 million of social welfare activity. It is the substantial nature of the activity, not its percentage of the overall purpose that governs.

While not directly addressing vagueness concerns, in the § 501(c)(3) context, Congress has provided a safe harbor for § 501(c)(3) organizations wishing to engage in lobbying activities. Section 501(h) sets a threshold amount combined with a percentage of activity as a safe harbor. If one applied this in the § 501(c)(4) context, organizations could engage in some limited non-exempt activity while preserving the idea that an organization must be operated exclusively for an exempt purpose.[5]

---

[5] Although it might be simpler to create a percentage threshold, such a threshold is not consistent with the Court's decision in *Better Business Bureau*. It is the activity itself not its percentage that governs whether it is substantial.

In examining whether an activity is insubstantial, courts have generally applied a quantitative and qualitative analysis. *See Universal Life Church v. United States*, 13 Cl. Ct. 567 (1987), *aff'd*, 862 F.2d 321 (Fed. Cir. 1988); *Freedom Church of Revelation v. United States*, 588 F. Supp. 693 (D.D.C. 1984). For example, in *Universal Life Church*, the court determined that although 1% of the organization's publications were related to a non-exempt purpose, those publications were substantial. *Universal Life Church, Inc.*, 13 Cl. Ct. at 582 (recognizing that only 1 percent of church's publications contained tax information). The Court explained "that tax advice and information contained in plaintiff's newsletters, even excluding advertisements, is so highlighted and emphasized in its format, appearing on almost every page of the newsletters that, it is within the contemplation of *Better Business Bureau* as demonstrating a substantial nonexempt purpose." *Id.*

Other Courts, however, have applied a 10% threshold while examining other qualitative factors. In *World Family Corp. v. Commissioner*, 81 T.C. 958 (1983), the Tax Court found that an allocation of 10% of an organization's funding to a non-exempt purpose was insubstantial. *Id.* at 967. The court cautioned that the 10% figure was not a set figure but was "an issue of fact to be determined under the facts and circumstances of each particular case." *Id.*[6] In *Manning Ass'n v. Commissioner*, 93 T.C. 596, 610 (1989), the Tax Court recognized that there was no 10% safe harbor finding that "it is sufficient only to find, as we do, that 'more than an insubstantial part of its activities is not in furtherance of an exempt purpose.'" *Id.* at 611 (quoting *Christian Stewardship Assistance, Inc. v. Commissioner*, 70 T.C 1037, 1042 (1978)).

––––––––––––––––––––––

[6] The Tax Court further elaborated in footnote 10, "We establish no general rule for future cases in finding 10 percent to be insubstantial. We noted a similar caveat in *Church in Boston* in which we found approximately 20 percent of expenditures to constitute more than an insubstantial activity: 'We hasten to point out that while the facts in the instant case merit a denial of exempt status to petitioner, we do not set forth a percentage test which can be relied upon for future reference with respect to nonexempt activities of an organization. Each case must be decided upon its own unique facts and circumstances.'" *See World Family Corp.*, 81 T.C. at 967 n.10.

Similarly, in *Church in Boston v. Commissioner*, 71 T.C. 102 (1978), the Tax Court, while noting that there was no specific percentage amount that triggered the insubstantial standard, found that 20% constituted substantial activity. *Id.* at 107–08. Thus, although courts have been reluctant to apply a specific threshold, there has been some recognition that absent other facts, activity that is below a 10% threshold would meet the insubstantial requirement.

Although the 10% threshold could be supported by a reading of operating exclusively in many cases, there are likely cases where the 10% threshold alone is not a good determinant of the substantiality of an activity. A large organization might engage in substantial activity because of the sheer volume of the activity. Thus the 10% threshold combined with a dollar limit would be the best alternative. Simply put, an organization that engages in $10 million of non-exempt activity should not be able to classify that activity as insubstantial.

In addition to judicial decisions defining "insubstantial," the safe harbor statutory provisions regarding § 501(c)(3) organizations and lobbying provide a concrete example of how a bright-line test can be used to determine whether an activity is insubstantial. Section 501(h) provides a statutory safe harbor for § 501(c)(3) organizations that wish to engage in an insubstantial amount of lobbying. The safe harbor provisions in § 501(h) reference the amounts set forth in § 4911(c)(2) and use a combination of threshold amounts and threshold percentages.

The following amounts provide a safe harbor for entities that make an election under § 501(h): If exempt purpose expenditures are not over $500,000, the insubstantial threshold is 20%. If exempt purpose expenditures are over $500,000 but not over $1,000,000, the threshold amount is 20% of the first $500,000 and 15% of the remaining amounts. If exempt purpose expenditures are over $1,000,000 but not over $1,500,000, the threshold amount is $175,000 plus 10% of the remaining amounts. Finally, if exempt purpose expenditures are over $1,500,000, the threshold amount is $225,000 plus 5% of the remaining amounts. This statutory scheme

recognizes that as expenditures increase, an activity may be substantial even if the non-exempt activity represents a smaller percentage of total activity.

Although § 501(h) specifically addresses lobbying by § 501(c)(3) organizations, the underlying definitional question is identical to the one at issue for § 501(c)(4)s: What amount of activity is "insubstantial" enough that an organization can still be said to "operate exclusively" for exempt purposes. The type of activity differs, but the core interpretive question remains the same.

Applying the § 501(h) framework to define "insubstantial" for purposes of § 501(c)(4) is particularly appropriate because § 501(h) represents Congressional consensus on what constitutes an insubstantial amount of otherwise problematic activity in the tax-exempt context. Where Congress has already determined that specific numerical thresholds preserve an organization's "exclusive" focus on exempt purposes under § 501(c)(3), courts should look to those same thresholds when interpreting identical statutory language in § 501(c)(4). Moreover, the word "exclusively" appears in both § 501(c)(3) and § 501(c)(4), and it has long been interpreted in the § 501(c)(3) context to allow insubstantial amounts of non-exempt activity. There is no textual basis to interpret this identical statutory term differently in the § 501(c)(4) context, particularly where interpreting the terms identically here would avoid the vagueness concerns raised by the Court.

## II.    THE PLAIN MEANING OF THE TERM "SOCIAL WELFARE" IN 501(C)(4) DOES NOT ENCOMPASS INTERVENTION IN A POLITICAL CAMPAIGN

Section 501(c)(4) provides for exempt status for organizations operated exclusively for social welfare. Having addressed the term "operated exclusively" in Section I, Section II addresses the meaning of social welfare. Congress first created tax exemption for social welfare organizations in The Revenue Act of 1913, ch. 16, 38 Stat. 114. It exempted "any civic league or

organization not organized for profit, but operated exclusively for the promotion of social welfare." *Id.* at 172. Thus, in interpreting the common meaning of the term social welfare, we can look to how the word was understood in 1913. *Perrin v. United States*, 444 U.S. 37, 42 (1979). In 1913, "social welfare" was understood within the context of the Progressive Era, which roughly coincided with the late nineteenth century and early twentieth century. The Progressive Era, *Encyclopedia Britannica*, https://www.britannica.com/event/Progressive-Era (last visited Jan. 24, 2026). At that time, social welfare and organizations like civic leagues were started to improve civic life. These organizations often engaged in the promotion of ideas and legislation that sought to improve the human condition. They did not, however, engage in political campaign activity. Thus, allowing § 501(c)(4)s to engage in lobbying but prohibiting them from election-related activity is consistent with the social movements of the time and the term social welfare.[7]

The 1974 version of Webster's *New World Dictionary* defines social welfare as "the welfare of society, esp. of those segments of society that are underprivileged or disadvantaged because of poverty, poor education, unemployment, etc." Webster's *New World Dictionary* 1352 (rev. ed. 1974). The 1974 definition is particularly informative because in 1974 Congress grappled with the regulation of tax-exempt organizations and added § 527 to the Code. Since it was specifically dealing with the political activity of tax-exempt organizations, the 1974 definition would have been in the minds of legislators when interpreting the breadth of the term social welfare in § 501(c)(4). In fact, as discussed earlier, the Senate Finance Committee report

---

[7] This Court in *Fund for Study of Econ. Growth & Tax Reform v. I.R.S*, 997 F. Supp. 15 (D.D.C), recognized that "Courts have long held that the government should not subsidize partisan political advocacy." 997 F. Supp. 15, 20 (D.D.C.), *aff'd sub nom. Fund for the Study of Econ. Growth & Tax Reform v. I.R.S.*, 161 F.3d 755 (D.C. Cir. 1998).

specifically recognizes that other tax-exempt organizations that were engaging in some campaign activities were now expected to create a segregated account or a § 527 political organization.[8]

Other evidence regarding the meaning of social welfare in 1913 aligns with Webster's New World dictionary definition. The *Oxford English Dictionary Online* defines it "as the well-being of a community or society, esp. with regard to health and economic matters." *Oxford English Dictionary Online* (noting first use in 1720 "God himself; who is a God of Order, and must certainly will the Peace and Social Welfare of Mankind"), www.oed.com (last visited Jan. 24, 2026).

Newspaper articles close in time to the passage of the 1913 Act similarly use the term social welfare to mean the wellbeing of the community or society. In searching newspapers within six months of the passage of the 1913 Act, the stories consistently use the term "social welfare" in three related contexts. First, social workers were sometimes referred to as social welfare workers and the field of social work was sometimes referred to as social welfare.[9] Second, there were social welfare groups or committees that were government or quasi-government committees designed to promote the welfare of the community,[10] and third, the term

---

[8] The Senate Finance Committee report on the 1974 Act specifically notes "The committee expects that, generally, a § 501(c) organization that is permitted to engage in political activities would establish a separate organization that would operate primarily as a political organization, and directly receive and disburse all funds related to nomination, etc., activities. In this way, the campaign-type activities would be taken entirely out of the § 501(c) organization, to the benefit of both the organization and the administration of the tax laws." S. Rep. No. 93-1357, at 30 (1974).

[9] Girl Couldn't Live on 20-Cent Meals, *Grand Rapids Press*, Sep. 20, 1913 at 12 (referring to Social welfare workers concerned about the suicide of a young girl).

[10] *See, e.g.*, Better Homes for Children: Clubwomen Form a National Organization on Social Welfare, *The Washington Post*, Apr. 19, 1913, at 5, found in *The Washington Post* (1877-1922); Social Welfare League to Shield Young Girls, *San Francisco Chronicle* (1869-1922), Sep. 23, 1913, at 14; More Talk on School Dances, *Aberdeen American,* Aug. 23, 1913  ("Aberdeen Social Welfare society held another enthusiastic meeting" about school dances).

social welfare was used to describe a type of activity, usually educating children and society, eradicating sin, and promoting a healthy society.

Newspaper stories in 1913 consistently reference social welfare as activities that are designed for the good of society. For example, a story in the *New York Times* references a fund to promote cleanliness, sanitation and pure food, seeking to prevent "sickness and thus diminish poverty,"[11] other stories reference social welfare as helping the blind,[12] encouraging self-help,[13] and checking on the social welfare of absent workers.[14] In this context, social welfare is never used in the context of supporting political candidates. It centers on promoting the welfare of the community, sometimes through the advocacy of changing public policy, but none of the articles reviewed indicate that candidate election activity was social welfare activity.

Courts have similarly interpreted the term "social welfare" in a manner consistent with Webster's definition. In *Commissioner v. Lake Forest, Inc.*, the Fourth Circuit interpreted whether a housing activity that gave preference to veterans was a social welfare activity thus entitling the project to a tax exemption. 305 F.2d 814 (4th Cir. 1962). The court denied the exemption and defined social welfare as "the well-being of persons as a community." *Id.* at 818.[15] The court noted that the project in question was not for the "betterment or improvement of the community as a whole" and that it was a "public-spirited but privately-devoted endeavor." *Id.*

---

[11] Donates $650,000 to Welfare Work: Mrs. Anderson Gives a Fund to Promote Cleanliness, Sanitation, and Pure Food. Aims to Prevent Sickness and Thus Diminish Poverty — New Department to Be Separate from Other Poor Society Activities., *N.Y. Times*, Mar. 21, 1913, at 1.
[12] Help for Blind Urged: Committee on Social Welfare Considers a New Investigation, *Boston Daily Globe*, Feb. 20, 1913, at 8.
[13] The United Irishwomen, *N.Y. Times*, June 18, 1911, at BR388.
[14] Social Welfare Motorcycle, *Jackson Citizen Patriot*, Sept. 13, 1913, at 9.
[15] *See also United States v. Anderson*, 225 F. 825, 830 (E.D. Wis. 1915) (referring to acts impacting Native Americans and their social welfare and referencing "liquor statutes and the like").

When applying the statute's plain text, the central question is whether the organization operates "exclusively for the promotion of social welfare." Intervention in a political campaign is plainly not social welfare, but the reverse is not true: An activity does not become social welfare simply because it is *not* campaign intervention. In 1913 when the statute exempting social welfare organizations was first passed, and at the time § 527 was passed, social welfare required an affirmative benefit to the community, not merely information about candidates or elections. *See Debs Mem'l Radio Fund v. Commissioner*, 148 F.2d 948, 951 & n.1 (2d Cir. 1945) (citing 1924 Treasury regulation defining civic leagues entitled to tax exemption as those "operated exclusively for purposes beneficial to the community as a whole, and, in general, include organizations engaged in promoting the welfare of mankind").

Thus, the statutory inquiry is not limited to distinguishing campaign intervention from non-intervention. Even if an activity does not qualify as intervention in a political campaign, it must still independently satisfy the statute's requirement that it promote social welfare. The key question remains whether the activity provides the type of community-benefiting social good that the statute demands.

### III.   IF THE COURT IS SEEKING A BRIGHT LINE TEST FOR POLITICAL CAMPAIGN INTERVENTION IT SHOULD USE THE CURRENT DEFINITIONS FOR EXPRESS ADVOCACY AND ITS EQUIVALENT AND A BROAD DEFINITION OF ELECTIONEERING COMMUNICATION

Prior to this Court's decision in *Freedom Path* there were different definitions of what constituted campaign related activity depending on whether the term was being used in an election law context under the jurisdiction of the Federal Election Commission or was being applied in the tax context when the Internal Revenue Code applied. Because the Treasury had more detailed and broader definitions of political campaign intervention and because those rules were used to segment activity among tax-exempt groups rather than to prohibit it, the regulations in the tax-exempt context applied a more facts and circumstances approach than the election law

16

jurisprudence. Thus, there were two different jurisprudential approaches depending on which path applied.

If the regulations and rulings at issue in *Freedom Path* and promulgated by the Treasury are unconstitutionally vague, and the Court does not believe that further clarifying "operating exclusively" and the term "social welfare" satisfies vagueness concerns, then this Court should apply the rules developed in the election law context, namely, express advocacy and its functional equivalent and a broad definition of electioneering communication to separate election activity from non-election activity. If a tax-exempt organization engages in activities under these definitions, then the advocacy would clearly not be a social welfare activity. If the activity did not meet these definitions, a court would still need to examine whether the activity was a social welfare activity.

The express advocacy and its functional equivalent definition provide a clear line with regard to whether an activity is campaign intervention and provides clear notice to organizations that the specific activity is not a social welfare activity. The definition, however, fails to capture a tremendous amount of campaign activity. There is no reason that in moving away from the Treasury regulations because of vagueness concerns that the Court should move to a far broader standard and allow tax-exempt organizations to engage in a broad swath of campaign related activity contrary to Congress's clear intent.

## A. Express advocacy or its functional equivalent

The statutory and constitutional schemes that apply today have their genesis in Congress's passage of the Federal Election Campaign Act and the Supreme Court's interpretation of the Act in *Buckley v Valeo*, 424 U.S. 1 (1976). In *Buckley*, the Court grappled with the tension between regulating elections and the First Amendment. This Court's decision in *Freedom Path* similarly grapples with that tension. In *Buckley*, the Court resolved its concerns about ambiguity and vagueness by limiting the definition of election activity in FECA to express advocacy. *Id.* at

43–44. The Court in *Buckley* expressed deep concerns about the criminal penalties contained in FECA and the vagueness of the statute, and courts provide greater latitude when the regulation in question involves civil penalties.[16]

The Court in *Buckley* defined express advocacy as "express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' [or] 'reject.'" *Buckley v. Valeo*, 424 U.S. 1, 44 n.52 (1976). Post *Buckley*, the question remained whether these specific "magic words" were required or whether the reference to "such as" in the footnote meant that words or advocacy similar to those mentioned were express advocacy.[17] Certainly as language changes over time, we could imagine express words that were not mentioned in the footnote, for example "endorse, choose, pick, back, get behind, select, make [X candidate] your new Senator." Language is simply too robust to limit express advocacy to a specific set of words, and such a determination would eviscerate any regulation in this area and make a mockery of what the Court was trying to accomplish in *Buckley*.

Thus, the Court should consider not only communications that contain express advocacy, but also those that are the functional equivalent of express advocacy. In *Federal Election Commission v. Wisconsin Right to Life, Inc.*, the Supreme Court rejected the notion that express advocacy is limited to the use of "magic words," and held instead that a communication may be regulated as express advocacy where it "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 551 U.S. 449, 468, 470 (2007).

---

[16] *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,* 455 U.S. 489, 498–99 (1982) (Court will provide "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe").

[17] *See* Richard Briffault, *Issue Advocacy: Redrawing the Elections/Politics Line*, 77 TEX. L. REV. 1751, 1755–67 (1999); *FEC v. Furgatch*, 807 F.2d 857, 864–65 (9th Cir. 1987).

### B. Electioneering Communication

The express advocacy standard created a relatively bright-line standard, but it also made it possible for organizations to engage in candidate specific campaign-related activity while avoiding application of FECA. By limiting the reach of FECA to express advocacy, *Buckley* permitted organizations to craft election-focused messages that were functionally indistinguishable from campaign advertisements but fell just short of express advocacy. As a result, independent groups routinely avoided campaign-finance regulations, including disclosure requirements, by creating advertisements that were clearly designed to support or oppose a candidate for federal office while avoiding *Buckley*'s "magic words." These advertisements were referred to as "sham issue advocacy" when their true intent was to influence an election, even though they technically did not engage in express advocacy. *See* Richard L. Hasen, *The Surprisingly Complex Case for Disclosure of Contributions and Expenditures Funding Sham Issue Advocacy*, 48 UCLA L. Rev. 265 (2000).

Congress concluded that this regulatory gap had been widely exploited and, in response, enacted the Bipartisan Campaign Reform Act of 2002 (BCRA). Pub. L. No. 107-155, 116 Stat. 81 (codified as amended in scattered sections of 52 U.S.C.). Among other measures, BCRA created the category of "electioneering communications," allowing for regulation of certain broadcast advertisements closely tied to federal elections, while addressing the vagueness concerns that had animated *Buckley* by adopting objective, content-neutral criteria.

Congress did not have the foresight to see what would happen in the Internet age, and the statute defined electioneering communication as "Any broadcast, cable, or satellite communication which" (1) "refers to a clearly identified candidate for Federal office," and is (2) is publicly distributed within "60 days before a general election" or "30 days before a primary," and (3) is "targeted to the relevant electorate." 52 U.S.C. § 30104(f)(3). Simply applying electioneering communications, however, would be useless in the modern Internet age.

19

Since the Court is trying to determine what type of political communication is not social welfare communication, it need not rely on the strict electioneering communication standard. Instead, it can complement the electioneering communication definition with a more expansive rule that also recognizes that public communication of an electoral message can be a political campaign-related activity. *See* Internet Communication Disclaimers and Definition of "Public Communication," 87 Fed. Reg. 77467 (Dec. 19, 2022 (Discussion of Proposal A). Proposal A, which was ultimately not adopted by the FEC, would have defined public communication as "(1) communications produced for a fee and those placed or promoted for a fee on another person's website or digital device, application, service, or platform, and (2) such communications included in section (1) that are then shared by or to a website or digital device, application, service, or platform." 87 Fed. Reg. 77467 (Dec. 19, 2022) (discussion of Proposal A).

Thus, if this Court determines that the current framework is unconstitutionally vague, it can create the following rule:

Campaign intervention that is not classified as a social welfare includes: Express advocacy and its functional equivalent and any public communication, including communication by the (C)(4) delivered to the general public and placed on a website, digital device, application, service, or platform that (1) that refers to a clearly identified candidate for Federal office, (2) is publicly distributed within 60 days before a general election or 30 days before a primary, and (3) is targeted to the relevant electorate.

This definition captures the spirit of express advocacy and electioneering communication while modernizing it to account for the drastic technological changes since 2002. Defining electioneering as only express advocacy and electioneering communication will not create the clear rule the Court seeks, because it will exclude huge amounts of clearly political communication on the Internet that is clearly not a social welfare activity. An advertisement

bashing a candidate but avoiding express advocacy does not become a social welfare activity just because it appears on the Internet.

## CONCLUSION

This Court in *Freedom Path* determined that Treasury Regulation § 1.501(c)(4)-1 and Revenue Ruling 2004-06 are unconstitutionally vague as applied to Freedom Path's application for § 501(c)(4) status. *Freedom Path* at *20;* 26 C.F.R. § 1.501(c)(4)-1(a)(1)(ii), 1(a)(2)(ii); Rev. Rul. 2004-06, 2004-1 C.B. 328. Absent regulations governing political intervention and § 501(c)(4) status, this Court should apply *Loper Bright* and interpret the plain language of § 501(c)(4). The statute requires that organizations be "operated exclusively" for the promotion of "social welfare," and, absent *Chevron* deference, its clear language does not support defining "operated exclusively" as "primarily." Instead, this court should recognize that the "operated exclusively" language can be read to allow only an insubstantial amount of non-social welfare activity. If, after defining "operated exclusively" as allowing an insubstantial amount of activity, the Court still believes that further clarity is necessary to avoid ambiguity, the Court should use the election law definitions of express advocacy and its functional equivalent, and an expansive definition of electioneering communication as the standard for whether something is election-related activity and thus not social welfare activity. Moreover, the Court should explicitly recognize that even if a communication does not meet the definition of election-related activity, it must still be a "social welfare" activity to survive a challenge to whether an organization is operated exclusively for social welfare.

 Dated: March 2, 2026                                  Respectfully submitted,


                                                        /s/ Jon A. Mueller
                                                       Jon A. Mueller
                                                       DC BAR NUMBER 50295
                                                       Visiting Associate Professor
                                                       University of Maryland Carey School of Law

500 West Baltimore St.
Baltimore, MD 21201
jmueller@law.umaryland.edu
*Counsel for Donald B. Tobin*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of March 2026, I caused the foregoing to be electronically

filed with the Clerk of the Court by using the Court's CM/ECF system.  All registered counsel

will be served by the Court's CM/ECF system.

By:    */s/ Jon A. Mueller*
JON A. MUELLER
*Counsel for Donald B. Tobin*
*Amicus Curiae*