**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FREEDOM PATH, INC.,

                    Plaintiff,

          v.

INTERNAL REVENUE SERVICE, *et al.*,

                    Defendants.

No. 20-cv-1349-JMC

***AMICI CURIAE* BRIEF OF CAMPAIGN LEGAL CENTER AND
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
IN SUPPORT OF NEITHER PARTY**

## TABLE OF CONTENTS

INTEREST OF AMICI ...................................................................................................1

INTRODUCTION .........................................................................................................1

ARGUMENT .................................................................................................................3

I.    Agency Interpretations of Section 501(c)(4) Have Enabled Billions in "Dark Money" to Flood U.S. Elections and Harm Voters ...............................................................3

    A.    The Importance of Campaign Finance Disclosure to Voters ....................................3

    B.    Dark Money Is Undermining Disclosure and Harming Voters ...............................4

    C.    The IRS Has Played a Key Role in the Rise of Dark Money ..................................5

II.    The Internal Revenue Code Unambiguously Prohibits 501(c)(4)s from Spending Any Amount on Political Campaign Intervention ......................................................7

    A.    Under *Loper Bright*, the Standard for 501(c)(4) Political Campaign Intervention Must Be Rooted in the Statute ...............................................................7

    B.    The Statute's Use of "Exclusively" Requires 501(c)(4) to Operate Solely for the Promotion of Social Welfare ...............................................................8

    C.    Treasury's (c)(4) Regulation Is Not Rooted in the Statute ....................................10

    D.    The Parties' Proposed Tests Are Not Rooted in the Statute ..................................11

        1.    Plaintiff's 100% Test Is Not Rooted in the Statute ....................................11

        2.    Plaintiff's "Not-More-Than-49%" Test Is Not Rooted in the Statute.......12

        3.    The IRS's "No Substantial Part" Test Is Not Rooted in the Statute..........13

III.    The IRS's Standard for Political Campaign Intervention, Properly Construed, Is Not Vague.......................................................................................17

    A.    The Court Should Reject the Narrow Express Advocacy Test Urged by Freedom Path ...............................................................................18

    B.    Any Adjustments to the Political Campaign Intervention Standard Should Be Drawn from Political Disclosure Laws .......................................................22

CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

*Advocate Christ Medical Center v. Becerra*, 80 F.4th 346 (D.C. Cir. 2023) ...................................9

*Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020) .............................................................8

*Buckley v. Valeo*, 424 U.S. 1 (1976).................................................................................4, 18, 19, 20

*Business Bureau of Washington, D.C., Inc. v. United States*, 326 U.S. 279 (1945).....................15

*Center for Arizona Policy Inc. v. Arizona Secretary of State*, 258 Ariz. 570 (Ariz. App. 2024) ...23

*Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270 (4th Cir. 2013) ............................24

*Center for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012)...................................24

*Christopher v. SmithKline Beecham Corporation*, 567 U.S. 142 (2012) .......................................8

*Citizens United v. FEC*, 558 U.S. 310 (2010)...........................................................3, 4, 18, 19, 21

*CREW v. FEC*, 209 F. Supp. 3d 77 (D.D.C. 2016) ......................................................................22

*Delaware Strong Families v. Attorney General of Delaware*, 793 F.3d 304 (3d Cir. 2015)..........23

*Easter House v. United States*, 12 Cl. Ct. 476 (1987) ..................................................................16

*Family Trust of Massachusetts, Inc. v. United States*, 722 F.3d 355 (D.C. Cir. 2013) ................16

*FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27 (1981) ...................................8

*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ..........................................................21

*Freedom Path, Inc. v. IRS*,
     805 F. Supp. 3d 329 (D.D.C. 2025) ................1, 2, 6, 7, 8, 9, 11, 12, 13, 14, 15, 17, 18, 19, 24

*Gaspee Project v. Mederos*, 13 F.4th 79 (1st Cir. 2021) ...............................................................23

*Geisinger Health Plan v. Commissioner of Internal Revenue*, 985 F.2d 1210 (3d Cir. 1993)......16

*Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010) ..............................21

*Independent Institute v. FEC*, 216 F. Supp. 3d 176 (D.D.C. 2016) ..............................................21

*Iowaska Church of Healing v. Werfel*, 105 F.4th 402 (D.C. Cir. 2024) ........................................16

*James v. United States*, 366 U.S. 213 (1961).................................................................................14

*Living Faith, Inc. v. Commissioner of Internal Revenue*, 950 F.2d 365 (7th Cir. 1991)..............16

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).............................2, 7, 12, 13, 14, 15

*Manning Association v. Commissioner of Internal Revenue*, 93 T.C. 596 (1989) ........................16

*McConnell v. FEC*, 540 U.S. 93 (2003)......................................................................3, 4, 18, 19, 21, 22, 23

*Memorial Hermann Accountable Care Organization v. Commissioner of Internal Revenue*, 120 F.4th 215 (5th Cir. 2024).......................................................................................................7

*National Association for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102 (9th Cir. 2019).................21

*National Organization for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011)..........................21, 24

*New Dynamics Foundation v. United States*, 70 Fed. Cl. 782 (2006) ..........................................16

*People's Educational Camp Society Inc. v. Commissioner of Internal Revenue*, 331 F.2d 923 (2d Cir. 1964)..........................................................................................................16

*Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983) ...............................20

*Seasongood v. Commissioner of Internal Revenue*, 227 F.2d 907 (6th Cir. 1955).......................16

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)..............................................................................10

*SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010).................................................................4

*St. David's Health Care System v. United States*, 349 F.3d 232 (5th Cir. 2003) ........................16

*Texas v. EPA*, 726 F.3d 180 (D.C. Cir. 2013) ..........................................................................8, 11

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001)....................................................................................10

*United States v. Williams*, 553 U.S. 285 (2008)............................................................................25

*Vermont Right to Life Committee, Inc. v. Sorrell*, 758 F.3d 118 (2d Cir. 2014)............................24

*World Family Corporation v. Commissioner of Internal Revenue*, 81 T.C. 958 (1983)..............16

*Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015) ........................................................................24

**Codes and Rules**

2 U.S.C. § 441b (1982 ed.) ............................................................................................................19

26 C.F.R. § 1.501(c)(4)-1(a)(2)(i)...........................................................................................1, 6, 8, 10

26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii)...........................................................................................3, 17, 24

26 U.S.C. § 501(c)(4)....................................................................................................................1, 6, 8

26 U.S.C. § 501(c)(4)(A)....................................................................................................................7

26 U.S.C. § 501(e)(1)(A)-(B)..............................................................................................................9

26 U.S.C. § 527................................................................................................................................20

26 U.S.C. § 527(e)(1).......................................................................................................................10

26 U.S.C. § 527(e)(1)-(2) ...........................................................................................9

26 U.S.C. § 527(j) ....................................................................................................6, 9

26 U.S.C. § 6104(b) .............................................................................................4, 6, 9

52 U.S.C. § 30104 ........................................................................................................4

52 U.S.C. 30104(f)(3) .................................................................................................22

52 U.S.C. § 30118–22 .................................................................................................4

A.R.S. § 16-971(2)(a)(iii) ..........................................................................................23

I.R.C. § 501(c)(3) .......................................................................................................17

Rev. Rul. 81-95, 1981-1 C.B. 332 .............................................................................17

Rev. Rul. 2004-06, 2004-1 C.B. 328 ...................................................................15, 17

Rev. Rul. 2007-41, 2007-1 C.B. 1421 .......................................................................17

## Other Authorities

Anna Massoglia, *Dark Money Hit a Record High of $1.9 Billion in 2024 Federal Races*,
    Brennan Center for Justice (May 7, 2025), https://perma.cc/49UE-VPAW
    (archived Jan. 29, 2026)...................................................................................4, 5

*Electioneering Communications Disclosure Requirements*, National Conference of State
    Legislatures (July 22, 2022), https://www.ncsl.org/elections-and-campaigns/electioneering-
    communications-disclosure-requirements ...........................................................23

*Exclusive*, The Century Dictionary: An Encyclopedic Lexicon of the English Language (William
    Dwight Whitney ed., 1911)....................................................................................8

*Exclusively*, Merriam-Webster, https://perma.cc/MUP8-9LR9 (archived Mar. 4, 2026) ...............8

*Exclusively*, The Century Dictionary: An Encyclopedic Lexicon of the English Language
    (William Dwight Whitney ed., 1911)......................................................................8

General Counsel Memorandum 32394, 1962 WL 14007 (Sep. 14, 1962) ....................................10

General Counsel Memorandum 32395, 1962 WL 14008 (Sep. 14, 1962) ....................................11

IRS Exempt Organizations Technical Guide, TG 3-1 (Feb. 1, 2024), https://perma.cc/YVS9-
    W5T7 (archived Jan. 28, 2026)..............................................................................16

Further Consolidated Appropriations Act, Pub. L. No. 118-47, 138 Stat. 460 (2024) ...................6

Laura Brown Chisolm, *Politics and Charity: A Proposal for Peaceful Coexistence*, 58 Geo.
    Wash. L. Rev. 308 (Jan. 1990)..............................................................................11

Maya Miller, *How the IRS Gave Up Fighting Political Dark Money Groups*, ProPublica (April 18, 2019), https://perma.cc/B6VK-PZS4 (archived Jan. 29, 2026) ........................................... 6

Revenue Act of 1913, ch. 16, sec. II(G)(a), 38 Stat. 114 (1913) ..................................................... 6

## INTEREST OF AMICI

Amici curiae Campaign Legal Center and Citizens for Responsibility and Ethics in Washington are nonprofit, nonpartisan organizations working for a more transparent, ethical, and accountable government. This lawsuit raises questions about whether the Internal Revenue Code must be interpreted to permit nonprofits organized "*exclusively* for the promotion of social welfare" to spend millions of dollars in "dark money" to influence elections, infringing the right of U.S. voters to know who is behind big money efforts to influence their votes. Amici thus submit this brief to provide their expertise on an issue of extraordinary importance to American democracy, which is not fully addressed by either party.

## INTRODUCTION

The Internal Revenue Code ("IRC") grants tax-exempt status to nonprofits organized and operated "exclusively for the promotion of social welfare." 26 U.S.C. § 501(c)(4). Despite this unambiguous statutory command, the Treasury Department's implementing regulation allows (c)(4)s to engage in nonexempt political campaign intervention so long as they are "*primarily* engaged" in promoting social welfare. 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i) (emphasis added). As a result, (c)(4)s currently spend massive sums influencing elections while evading the transparency rules Congress has imposed on groups whose purpose is to spend money influencing elections.

The Court has requested non-vague interpretations of the 501(c)(4) regulation's "Primary Activity" and "Political Activity" inquiries that are "appropriately rooted in the statutory and regulatory scheme, and constitutional principles." *Freedom Path, Inc. v. IRS*, 805 F. Supp. 3d 329, 368 (D.D.C. 2025). Amici respectfully urges the Court, in deciding this case, to consider the broader impact any interpretation of section 501(c)(4) will have on American voters and elections. The standards this Court adopts could shape whether hundreds of millions of Americans receive critical information about who is attempting to influence their votes.

1

Since 2010, 501(c)(4) groups have spent billions on federal elections while shielding their donors from public view. This flood of "dark money" undermines the disclosure requirements that form the backbone of federal campaign finance law and deprives voters of information essential to evaluating political messages and detecting corruption. The IRS bears significant responsibility for this crisis. Although section 501(c)(4) requires qualifying organizations to operate "exclusively" for social welfare, the IRS has interpreted this mandate to permit *significant* political activity—sometimes as much as 49 percent of an organization's expenditures.

Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), this Court must independently interpret section 501(c)(4) without deferring to agency interpretations. Applying fundamental principles of statutory construction, the statute's command that groups operate "exclusively" for social welfare defeats the parties' claims that (c)(4)s may nevertheless spend billions to influence elections. The ordinary public meaning of "exclusively" is "solely," and, as this Court already correctly observed, that language "suggest[s]" that "a (c)(4), like a (c)(3), may not engage in any political campaign activity." *Freedom Path*, 805 F. Supp. 3d at 334. Neither Freedom Path's proposed thresholds nor the IRS's "no substantial part" test is rooted in the statutory text. The only lawful interpretation is that 501(c)(4)s may not engage in *any* political campaign intervention.

So too is it crucial that the IRS's definition of non-exempt "political campaign intervention" effectively delineate spending that impacts electoral campaigns, given voters' well-recognized First Amendment interest in knowing who is funding such messages. In challenging this definition, Freedom Path focuses only on its putative right to run electioneering ads without disclosure, and "ignores the competing First Amendment interests of individual citizens seeking

to make informed choices in the political marketplace." *McConnell v. FEC*, 540 U.S. 93, 197 (2003) (citation omitted).

Although this Court found the IRS's multi-factor "facts and circumstances" guidance unconstitutionally vague as applied to Freedom Path's communications, that guidance is merely an interpretative aid for the regulation's standard for campaign intervention, i.e., "direct or indirect participation or intervention in political campaigns *on behalf of or in opposition to any candidate for public office*." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii) (emphasis added). The facts and circumstances guidance, properly understood as simply an explication of this regulatory definition, and applied with the clear "exclusively" threshold advocated by amici, is not vague.

To the extent this Court concludes otherwise, it should, at the very least, reject Freedom Path's inapposite and overly narrow "express advocacy" test, which arises from early campaign finance case jurisprudence that has been largely superseded. Indeed, the outdated test Freedom Path urges here resulted in decades of dark money political advertising that Congress was compelled to address through enactment of the Bipartisan Campaign Reform Act ("BRCA"). *McConnell*, 540 U.S. at 128-29. The Supreme Court has thus expressly rejected the "contention" that political disclosure could extend no further than express advocacy and its functional equivalent. *Citizens United v. FEC*, 558 U.S. 310, 369 (2010). This Court should do the same here.

## ARGUMENT

### I.    Agency Interpretations of Section 501(c)(4) Have Enabled Billions in "Dark Money" to Flood U.S. Elections and Harm Voters

#### A.    The Importance of Campaign Finance Disclosure to Voters

Disclosure is the structural backbone of the federal campaign finance system. From the inception of the Federal Election Campaign Act ("FECA"), Congress has required candidates and the groups that support and oppose them to disclose their spending and identify their contributors.

3

*See* 52 U.S.C. § 30104. The Supreme Court has repeatedly upheld this transparency regime as constitutionally essential, recognizing three governmental interests that disclosure serves: it informs the electorate by enabling voters to evaluate political messages and their sources, it facilitates enforcement of contribution limits and bans on foreign-national and other illicit funding, and it deters quid pro quo corruption and its appearance by exposing the financial relationships between donors and officeholders. *Buckley v. Valeo*, 424 U.S. 1, 66-68 (1976); *Citizens United*, 558 U.S. at 367; *McConnell*, 540 U.S. at 197. When funding sources are concealed, voters cannot assess whether political messages reflect grassroots support, concentrated wealth, corporate interests, or foreign influence, and enforcement of federal prohibitions on illicit funding becomes impossible. *See* 52 U.S.C. § 30118-22; *Buckley*, 424 U.S. at 67-68.

### B.    Dark Money Is Undermining Disclosure and Harming Voters

"Dark money"—election spending by groups that do not publicly disclose their donors—directly harms voters. In the last 15 years, 501(c)(4) organizations have played the leading role in dark money spending, exploiting judicial decisions and regulatory failures that created multiple pathways for anonymous election spending.

The modern dark-money system emerged after the Supreme Court, in *Citizens United v. FEC*, swept aside longstanding restrictions on corporate independent spending, permitting incorporated 501(c)(4)s to spend unlimited sums directly from their treasuries. *See* 558 U.S. at 365-66. In its aftermath, *SpeechNow.org v. FEC* gave rise to "super PACs" capable of accepting unlimited contributions. 599 F.3d 686, 695-96 (D.C. Cir. 2010). Although super PACs must disclose their donors, 501(c)(4) organizations—which can contribute unlimited sums to super PACs—are not so required. *See* 26 U.S.C. § 6104(b). This structure allows the true sources of funds behind super PACs to remain hidden. *See* Anna Massoglia, *Dark Money Hit a Record High*

*of $1.9 Billion in 2024 Federal Races*, Brennan Ctr. for Just. (May 7, 2025) (hereinafter "Massoglia, *2024 Federal Races*"), https://perma.cc/49UE-VPAW (archived Jan. 29, 2026).

Since 2010, dark-money organizations—primarily 501(c)(4)s—have spent more than $4.3 billion in federal elections. *See id*. This case illustrates the problem. In early 2011, Plaintiff Freedom Path applied for 501(c)(4) status and told the IRS it would not spend any money to influence elections. *See* ECF No. 32-1 at 3 ("IRS MSJ Br."). Yet the administrative record shows that in 2012 Freedom Path devoted approximately 84% of its direct expenditures on ads and mailings—more than $782,000 out of roughly $930,000—to supporting Senator Orrin Hatch and opposing his challenger. *See id.* at 23-27, 29-30. Even under Freedom Path's own unduly narrow definition of political campaign intervention, it spent approximately $360,749, or 39% of its direct expenditures, expressly advocating for Hatch. *See id.* at 12-13.

More recently, nearly $2 billion in dark money was spent during the 2024 election cycle alone, the most in U.S. history, with more than $500 million coming from dark-money groups backing presidential candidates. *See supra* Massoglia, *2024 Federal Races*. Groups on both sides contributed: Future Forward USA Action, a 501(c)(4) supporting President Biden and Vice President Harris, provided more than $304 million, while dark-money groups supporting then-candidate Trump spent more than $100 million combined. *See id.*

### C.    The IRS Has Played a Key Role in the Rise of Dark Money

The IRS's flawed regulatory approach is a major reason why section 501(c)(4)s are the principal drivers of dark-money spending. Although Congress expressly limited 501(c)(4) status to "social welfare" organizations, IRS interpretations have enabled these entities to become the vehicle of choice for political operatives seeking secrecy.

Since 1913, Congress has provided a tax exemption for entities that are organized and operated "exclusively" for charitable or social welfare purposes. Revenue Act of 1913, ch. 16, sec. II(G)(a), 38 Stat. 114, 172 (1913). Today, section 501(c)(4) requires qualifying organizations to be operated "exclusively for the promotion of social welfare," 26 U.S.C. § 501(c)(4), and does not require such groups to publicly disclose their donors, *id.* § 6104(b). It is well established that "social welfare" does not include political campaign intervention. *See, e.g.*, Amicus Br. on Behalf of Tax Professor Donald B. Tobin at 12-16, ECF No. 56-1 ("Tobin Br.").

Despite the statutory command of "exclusively," the IRS has interpreted this requirement to permit (c)(4)s to engage in political activity so long as they are only "*primarily* engaged" in promoting social welfare. 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i) (emphasis added). As this Court has recognized, the IRS has offered inconsistent guidance on what "primarily" means: at times suggesting that political activity may constitute up to 49 percent of a 501(c)(4)'s expenditures; at other times implying that (c)(4)s may spend only an "insubstantial" amount on political activity. *See Freedom Path*, 805 F. Supp. 3d at 335-36, 359. After *Citizens United* and *SpeechNow* opened the door to widespread nonprofit election spending, the IRS initially attempted to define and police the boundary between "social welfare" and political activity, but political backlash in 2013, fueled by accusations of targeting conservatives, halted those efforts. *See* Maya Miller, *How the IRS Gave Up Fighting Political Dark Money Groups*, ProPublica (April 18, 2019), https://perma.cc/B6VK-PZS4 (archived Jan. 29, 2026). Since then, the IRS has not resumed enforcement, and congressional riders continue to block new donor-disclosure regulations. *See id.*; *see, e.g.*, Further Consolidated Appropriations Act, Pub. L. No. 118-47, § 633, 138 Stat. 460 (2024).

As a result, 501(c)(4)s now routinely serve as politically active entities while avoiding the donor-disclosure obligations applicable to section 527 organizations. *See* 26 U.S.C. § 527(j).

II.     **The Internal Revenue Code Unambiguously Prohibits 501(c)(4)s from Spending Any Amount on Political Campaign Intervention**

A.     **Under *Loper Bright*, the Standard for 501(c)(4) Political Campaign Intervention Must Be Rooted in the Statute**

In determining "how much [political campaign] intervention is too much," *Freedom Path*, 805 F. Supp. 3d at 364, the Court must begin with an *independent* interpretation of the governing statute. Section 501(c)(4) provides that an organization must be "operated exclusively" for the promotion of social welfare. 26 U.S.C. § 501(c)(4)(A). That statutory text, not an agency gloss, supplies the controlling standard.

In *Loper Bright*, the Supreme Court overruled "*Chevron* deference" and held that courts must interpret statutes *de novo*, giving agency views only whatever persuasive force their reasoning may warrant. 603 U.S. at 412. Applying *Loper Bright*, the Fifth Circuit recently rejected the IRS's claim that Treasury's (c)(4) regulation and its "primarily" standard supplies the "proper test" for 501(c)(4) status, holding instead that courts must apply the statute's text. *See Memorial Hermann Accountable Care Org. v. Comm'r of Internal Rev.*, 120 F.4th 215, 219-20 (5th Cir. 2024) ("[T]he IRS's embrace of a legal standard cannot supplant our independent interpretation of the statutory text.").

This Court should do the same. Framing the inquiry as a "Primary Activity" test, *see Freedom Path*, 805 F. Supp. 3d at 359—based on the regulation's "longstanding and consistent pedigree," *id.* at 364—effectively defers to the regulation and thus conflicts with *Loper Bright*. Moreover, because Treasury's (c)(4) regulation conflicts with the statute, the IRS's various interpretations of that invalid regulation carry no persuasive force. *But see id.* (suggesting deference under *Kisor v. Wilkie*, 588 U.S. 558 (2019) may be appropriate). Even before *Loper Bright*, courts refused to defer under *Kisor* (and its predecessors) to an agency's interpretation of

its own regulations that contradicts statutory text. *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012); *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981); *Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013). The Court's analysis must set aside all agency gloss and interpret section 501(c)(4)(A) according to its plain terms. *See Freedom Path*, 805 F. Supp. 3d at 368 (stating the correct standard must be "appropriately rooted in the statut[e]").

**B.    The Statute's Use of "Exclusively" Requires 501(c)(4)s to Operate *Solely* for the Promotion of Social Welfare**

Congress spoke with unmistakable clarity in 26 U.S.C. § 501(c)(4): civic leagues and similar organizations may qualify for tax-exempt status only if they are "operated exclusively for the promotion of social welfare." By its plain terms, the statute authorizes exemption only where an organization operates *solely*—and not merely "primarily" or "substantially"—to advance the "common good and general welfare of the people of the community." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i). The text, structure, history, and relevant interpretive canons all confirm that "exclusively" means what it says.

The Supreme Court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654 (2020). In 1913, when Congress enacted the language that would become section 501(c)(4), the ordinary public meaning of "exclusive" was "undivided" and "sole," and "exclusively" meant "[w]ith the exclusion of all others." *Exclusive* and *Exclusively*, The Century Dictionary: An Encyclopedic Lexicon of the English Language (William Dwight Whitney ed., 1911).  Today, "exclusively" is similarly defined to mean "in a way limited to a single person, group, category, method, etc." *Exclusively*, Merriam-Webster, https://perma.cc/MUP8-9LR9 (archived Mar. 4, 2026).

Reflecting the ordinary public meaning of "exclusively," this Court has already rightly observed that section 501(c)(4)'s language "suggest[s]" that "a (c)(4), like a (c)(3), may not engage in *any* political campaign activity." *Freedom Path*, 805 F. Supp. 3d at 334 (emphasis added); *see also id.* at 360 (observing that the regulatory language parroting the (c)(4) statute's use of "exclusively" is "read most naturally to prohibit (c)(4)s from engaging in *any* political campaign intervention at all"). The IRS too admits that "[o]n its face," section 501(c)(4)'s "exclusivity requirement might be read to disqualify an organization . . . that engages in *any* amount of activity that falls outside the tax-exempt purpose" given that "[d]efinitions of 'exclusively' include 'solely.'" ECF No. 55-1 at 22 ("IRS 2d MSJ Br.").

The IRC itself further confirms that "exclusively" in section 501(c)(4) means "solely." A separate paragraph of section 501 provides that certain cooperative hospital service organizations qualify as "organized and operated *exclusively* for charitable purposes" if they are "organized and operated *solely*" for specified functions. 26 U.S.C. § 501(e)(1)(A)-(B) (emphases added). Congress's own definition of "exclusively" to mean "solely" in the same statutory section removes any doubt. *See Advocate Christ Medical Center v. Becerra*, 80 F.4th 346, 352 (D.C. Cir. 2023) ("[I]dentical words used in different parts of the same act are intended to have the same meaning.").

Further reinforcing this reading is that section 501(c)(4) does not explicitly authorize (c)(4)s to intervene in political campaigns. Yet Congress knew how to grant such permission when it wanted to: in 1975, Congress added section 527 to the IRC, creating nonprofit "political organization[s]" that are "operated primarily" for the exempt function of influencing federal elections, 26 U.S.C. §§ 527(e)(1)-(2), and which must disclose their donors, *id.* § 527(j). In contrast, section 501(c)(4) lacks any authorization for political activity and, tellingly, does not require donor disclosure, *id.* § 6104(b). Interpreting section 501(c)(4) to permit campaign

intervention regardless would thus violate the canon that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004).[1]

### C.    Treasury's (c)(4) Regulation Is Not Rooted in the Statute

Because the ordinary public meaning of "exclusively" is "solely," this Court should reject the (c)(4) regulation's attempt to substitute "primarily" for "exclusively." *See* 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i). Congress itself distinguished these terms: section 527 requires exempt organizations only to be operated "primarily" for their exempt function, 26 U.S.C. § 527(e)(1), while section 501(c)(4) demands organizations operate "exclusively" for social welfare—and Congress's use of different words in related provisions must be given different meanings. *Sosa*, 542 U.S. at 711 n.9. Collapsing that distinction would render section 527 superfluous, because 501(c)(4) groups could engage in significant campaign intervention without triggering section 527's donor-disclosure requirements. *See* ECF No. 35 at 16 ("IRS Reply Br.") ("Congress would have had little need to enact § 527 . . . if the 'promotion of social welfare' under 501(c)(4) included political campaign intervention."); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (explaining that courts must avoid rendering statutory terms "superfluous, void, or insignificant").

Indeed, since the (c)(4) regulation's promulgation in 1959, the IRS itself has repeatedly admitted it conflicts with the statute. *See, e.g.*, General Counsel Memorandum ("GCM") 32394,

---

[1]    This conclusion is not undermined by the absence of an express prohibition on campaign intervention in section 501(c)(4) akin to that in section 501(c)(3). *Contra* ECF No. 54-1 at 16-18 ("FP 2d MSJ Br."). The negative inference that Freedom Path attempts to draw proves too much: if the absence of an express prohibition in 501(c)(4) meant an activity were permitted, *any* activity not expressly prohibited would be authorized regardless of whether it constitutes social welfare, rendering "exclusively" a nullity. Instead, it is section 527's express authorization of campaign intervention in 1975—not section 501(c)(3)'s express prohibition two decades earlier in 1954—that illuminates section 501(c)(4)'s meaning, because Congress would not have created an entire statutory category for activity already available to (c)(4)s under existing law.

1962 WL 14007, at *1-2 (Sep. 14, 1962) (relying on the regulation to reject the claim that "any amount" of campaign intervention precludes (c)(4) status, "notwithstanding the statutory language"); GCM 32395, 1962 WL 14008, at *2-3 (Sep. 14, 1962) (acknowledging the conflict between "exclusively" and "primarily" and urging "a policy decision as to whether the language of the statute or the regulations controls"); *see also* Laura Brown Chisolm, *Politics and Charity: A Proposal for Peaceful Coexistence*, 58 Geo. Wash. L. Rev. 308, 329 n.103 (Jan. 1990) (describing the IRS's "discomfort" in the 1960s with "the unduly broad interpretation of the [(c)(4)] statute" reflected in the "primary activities" regulation).

### D.    The Parties' Proposed Tests Are Not Rooted in the Statute

As this Court has observed, the IRS at different times has interpreted "primarily" in Treasury's (c)(4) regulation to mean that (c)(4)s may dedicate either as much as 49% or "insubstantial" amounts of their spending to campaign intervention. *See Freedom Path*, 805 F. Supp. 3d at 335-36, 359. To the extent that these tests are merely the IRS's interpretations of a regulation that itself is invalid, they must fail. *See, e.g.*, *Texas*, 726 F.3d at 195 (explaining that a regulation, "no matter how it is interpreted," cannot "override" statutory requirements). In any event, the parties' proposed tests also fail on their own terms to be rooted in the statute.

#### 1.    Plaintiff's 100% Test Is Not Rooted in the Statute

Freedom Path's principal statutory argument is that all "civic speech," including unlimited candidate express advocacy, constitutes "promotion of social welfare" under section 501(c)(4). ECF No. 54-1 at 14-21 ("FP 2d MSJ Br."). The upshot is breathtaking: under this view, a 501(c)(4) organization could dedicate *100%* of its activities to influencing elections without jeopardizing its tax-exempt status or disclosing its donors. Section 501(c)(4)s would become *de facto* section 527s while remaining exempt from donor disclosure.

Freedom Path concedes, as it must, that under *Loper Bright* this Court owes no deference to the Treasury regulation and must ground its analysis in the statutory text. FP 2d MSJ Br. at 19-20. But having invoked the primacy of statutory text, Freedom Path proceeds to ignore it. Freedom Path's view that political campaign intervention is social welfare would completely write 501(c)(4)'s use of "exclusively" and section 527 out of the IRC. "[E]xclusively" would impose no constraint on (c)(4) electoral spending at all. And section 527 would be rendered entirely superfluous. If candidate advocacy already qualified as "social welfare" under section 501(c)(4), any organization could conduct the same electoral activity as a 501(c)(4) while avoiding section 527's donor disclosure requirements—a result Congress plainly did not intend.

### 2. Plaintiff's "Not-More-Than-49%" Test Is Not Rooted in the Statute

Freedom Path's fallback position fares no better. Freedom Path claims that 501(c)(4)s should be permitted to devote up to 49% of their expenditures to political campaign intervention, relying on past IRS practice, statements by former IRS commissioners, and informal IRS publications. *See Freedom Path*, 805 F. Supp. 3d at 364-65; FP 2d MSJ Br. at 26-30. But such practices and statements are not binding and, in any event, "the IRS's embrace of a legal standard cannot supplant [a court's] independent interpretation of the statutory text." *Memorial Hermann*, 120 F.4th at 220 (citing *Loper Bright*, 144 S. Ct. at 2273). Like the (c)(4) regulation upon which it is based, the 49% rule is not a valid interpretation of "exclusively."

Nor is the 49% standard necessary to avoid the creation of an "unexplained gap" between section 501(c)(4) and section 527, as Freedom Path has claimed. *See Freedom Path*, 805 F. Supp. 3d at 365. As the IRS points out, "Congress chose 'exclusively' as the standard for § 501(c)(4)" and "chose 'primarily' as the standard for § 527." IRS 2d MSJ Br. at 26. There is thus no need or basis upon which to "correct" any perceived gap arising from those purposeful congressional

choices. In any event, there is no "gap": A 501(c)(4) that wishes to dedicate a substantial (but less than primary) share of its spending toward elections may—indeed, must—outsource that spending to a sister 527 organization that discloses donors and for which that spending would be the 527's "primary" activity. *See* Tobin Br. at 5 (citing S. Rep. No. 93-1357, at 30 (1974)). Advocacy groups commonly operate a (c)(3), (c)(4), and 527 simultaneously. Freedom Path's proposed 49% rule is "necessary" only for organizations that want to engage in large-scale political activity while evading donor disclosure. But nothing required Congress to accommodate that desire, which, as detailed above, is already harming the First Amendment interests of voters.

### 3.    The IRS's "No Substantial Part" Test Is Not Rooted in the Statute.

While rejecting Freedom Path's 49% standard, the IRS argues that (c)(4)s may spend on nonexempt activities (including elections) so long as that spending is "no substantial part" of its overall activities. *See Freedom Path*, 805 F. Supp. 3d at 336. To be sure, an approach that limits non-exempt activity to amounts that are *genuinely* insubstantial is far more protective of the important interests Congress sought to advance than Freedom Path's proposals. And ultimately, the Court need only reject Freedom Path's proposed standards to resolve this case, since Freedom Path reported spending a minimum of 39% of its direct expenditures in 2012 on express advocacy alone. *See* IRS MSJ Br. at 12-13.

But this Court has an obligation under *Loper Bright* to identify a standard appropriately rooted in the statute, and so it should go further and reject the IRS's "no substantial part" test since it too falls short. The IRS acknowledges that the plain meaning of "exclusively" includes "solely" and thus section 501(c)(4) "[o]n its face . . . might be read to disqualify an organization . . . that engages in *any* amount of activity that falls outside the tax-exempt purpose." IRS 2d MSJ Br. at 22. Yet the IRS's "no substantial part" test is founded not upon that statutory language but rather

13

on its interpretation of the term "'primarily' in the (c)(4) regulation." *See Freedom Path*, 805 F. Supp. 3d at 336. Making matters worse, the IRS admits its interpretation of the (c)(4) regulation is borrowed from a treasury regulation implementing a different statute—26 U.S.C. § 501(c)(3). *See id.* at 336, 365 (citing 26 C.F.R. § 1.501(c)(3)-1(c)(1)). That regulation defines "exclusively" in section 501(c)(3) to mean "primarily" and then "effectively defines 'primarily' to mean 'not insubstantial[ly].'" *Id.* at 365. This tortured regulatory gloss cannot survive *Loper Bright*.

A comparison of the texts of sections 501(c)(3) and (c)(4) further confirms that 501(c)(4)'s use of "exclusively" cannot be read to permit even insubstantial amounts of political campaign intervention. In section 501(c)(3), Congress expressly codified the "no substantial part" test to allow (c)(3)s to conduct insubstantial amounts of lobbying. In contrast, Congress did not include that language for any nonexempt activity in section 501(c)(4). Imputing this test into 501(c)(4) would impermissibly render the textual differences between the two provisions meaningless.

Despite conceding that "exclusively" means "solely," the IRS claims that Congress could not have intended that meaning to apply in section 501(c)(4) because the IRC also taxes nonprofits to the extent they engage in certain non-exempt activities, including campaign intervention. IRS 2d MSJ Br. at 22-24 (citing 26 U.S.C. §§ 511-12, 527(f)(1)). But this claim confuses *taxation* of nonexempt activity with *authorization* for nonexempt activity. The IRC routinely imposes taxes on conduct without thereby sanctioning it. *See, e.g.*, *James v. United States*, 366 U.S. 213, 219-20 (1961) (holding that embezzled funds are taxable under the IRC). If taxation implied authorization, then (c)(4)s would be free to devote 100% of their resources to political campaign intervention or unrelated business activities, because the provisions the IRS relies upon do not limit how much of that nonexempt activity may be taxed. The IRS has elsewhere acknowledged that section 527(f)'s taxation of a 501(c)(4)'s political expenditures does not prevent the IRS from revoking that (c)(4)'s

14

exemption for excessive non-exempt expenditures. *See* Rev. Rul. 2004-06, 2004-1 C.B. 328 (assuming that 501(c)s making taxable expenditures under section 527(f) "continue to be exempt" only "because the organization's primary activities" are not elections).

Section 527(f)(1) supports reading "exclusively" consistent with its plain meaning. By taxing a (c)(4)'s expenditures as though it were a 527, Congress signaled that to the extent a (c)(4) spends even one dollar on campaign intervention, it is functionally operating as a political organization. That treatment is entirely consistent with reading "exclusively" in section 501(c)(4) to require disqualification for any campaign intervention.

The IRS also wrongly claims that the "no substantial part" test is required by *Better Business Bureau of Washington, D.C., Inc. v. United States*, 326 U.S. 279 (1945). *See* IRS 2d MSJ Br. at 21-22, 24-25; *Freedom Path*, 805 F. Supp. 3d at 360. But that decision actually supports equating "exclusively" with "solely": the Court held that the Better Business Bureau ("BBB") was not exempt because it was not operated "exclusively" for educational purposes, concluding that "[a]ny claim that education is the *sole* aim of [BBB's] organization is . . . destroyed" by activities that were "largely" and "fundamentally" dedicated to non-educational purposes. *Better Business Bureau*, 326 U.S. at 326 U.S. at 284 (emphasis added).

The ruling is nevertheless often cited for the proposition that "the presence of a single non-educational purpose, *if substantial in nature*, will destroy the exemption." *Id.* at 283 (emphasis added). But this dictum cannot bear the weight the IRS and later cases have placed on it. The Court had no occasion to decide if the statute permits an insubstantial amount of nonexempt activity given its finding that BBB's activities were overwhelmingly non-educational. *See id.* at 284. And the clause offers no supporting analysis and thus is out-of-step with modern textualism. *See, e.g.*, *Loper Bright*, 603 U.S. at 408-09. While subsequent courts have applied the "no substantial part"

15

test, *see* IRS 2d MSJ Br. at 24-25, many of these pre-*Loper Bright* rulings rely on Treasury's (c)(3) regulation (which is no longer deserving of deference),[2] and candidly acknowledge that the "no substantial part" test departs from the plain meaning of "exclusively," *see, e.g.*, *New Dynamics Found. v. United States*, 70 Fed. Cl. 782, 799 (2006) ("'Exclusively' in this statutory context is a term of art and does not mean 'solely.'"); *Easter House v. United States*, 12 Cl. Ct. 476, 483 (1987) ("[I]n the context of [501(c)(3)], the word 'exclusively' is a term of art. 'Exclusively' does not mean 'solely.'"); *People's Educ. Camp Soc'y Inc. v. Comm'r*, 331 F.2d 923, 931 (2d Cir. 1964) ("[T]he word 'exclusively' as used in [501(c)(4)] has not been given a strict interpretation, . . . but rather has been interpreted to mean 'primarily.'").

The consequences of importing the "no substantial part" test into section 501(c)(4) are not merely semantic. Courts have held as much as five to ten percent of a group's spending to be "insubstantial." *See World Fam. Corp. v. Comm'r*, 81 T.C. 958, 967 (1983) (10%); *see also Seasongood v. Comm'r*, 227 F.2d 907, 912 (6th Cir. 1955) (5%); *see also* IRS Exempt Organizations Technical Guide, TG 3-1, at 25 (Feb. 1, 2024), https://perma.cc/YVS9-W5T7 (archived Jan. 28, 2026) ("Generally, less than five percent of activities and expenditures is considered insubstantial."). To our knowledge, the lowest spending percentage a court has ever held to be "substantial" is 20 percent. *Manning Ass'n v. Comm'r*, 93 T.C. 596, 610-11 (1989). For groups such as Future Forward USA Action, which reportedly spent more than $300 million in election-related advertising in the 2024 cycle, *see supra* at 5, an "insubstantial" allowance of anywhere from 5 to 19 percent would permit massive undisclosed political spending by just one

---

[2]       *See Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 407 (D.C. Cir. 2024) (relying on 26 C.F.R. § 1.501(c)(3)-1(c)(1)); *Family Tr. of Mass., Inc. v. United States*, 722 F.3d 355, 359 (D.C. Cir. 2013) (same); *Geisinger Health Plan v. Comm'r*, 985 F.2d 1210, 1215 (3d Cir. 1993) (same); *St. David's Health Care Sys. v. United States*, 349 F.3d 232, 237 (5th Cir. 2003) (same); *Living Faith, Inc. v. Comm'r*, 950 F.2d 365, 370 (7th Cir. 1991) (same).

of the thousands of politically active nonprofits. In contrast, reading "exclusively" to mean zero—both as a percentage and hard money cap on election spending, *cf.* Tobin Br. at 9-12—would set a non-vague standard rooted in the statute while halting millions in dark money spending.

## III. The IRS's Standard for Political Campaign Intervention, Properly Construed, Is Not Vague

Freedom Path also challenges the IRS's multi-factor "facts and circumstances" guidance that explains what types of political advocacy qualify as "participation or intervention in political campaigns," 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii), particularly as set forth in two revenue rulings, *see* Rev. Rul. 2004-06, 2004-1 C.B. 328 and Rev. Rul. 2007-41, 2007-1 C.B. 1421. *See* FP 2d MSJ Br. at 21-22.

But Freedom Path errs because it attempts to isolate the IRS's "facts and circumstances" guidance from the statute and regulation it interprets for the purpose of constitutional review. The relevant regulation itself describes political campaign intervention clearly and consistently with the statute: "The promotion of social welfare does not include direct or indirect participation or intervention in political campaigns *on behalf of or in opposition to any candidate for public office*." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii) (emphasis added).[3] As the IRS's brief explains, this language provides the operative "support-or-oppose" standard. *See* IRS 2d MSJ Br. at 11-12. Thus, although this Court expressed concerns about the open-ended nature and "prolixity" of the facts and circumstances guidance, 805 F. Supp. 3d at 362-63, the factors listed in Revenue Ruling 2004-06 are not meant to serve as a stand-alone test for political campaign intervention. They simply

---

[3]    This regulation tracks the statutory provision prohibiting Section 501(c)(3) organizations from "participat[ing] in, or interven[ing] in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." I.R.C. § 501(c)(3). For this reason, IRS guidance on what activities constitute "campaign intervention" is often relevant to both the activities of Section 501(c)(3) and 501(c)(4) organizations. *See* Rev. Rul. 81-95, 1981-1 C.B. 332.

provide guidance and examples to facilitate the application of the actual "on behalf of-or-in opposition to" standard.

In any event, to the extent this Court concludes that the existing regulation and guidance are vague, it should, at the very least, reject Freedom Path's request to use the inapposite and overly narrow "express advocacy" test that is derived from outdated campaign finance decisions that have been largely superseded. *See* FP 2d MSJ Br. at 22-24. More recent decisions, including from the Supreme Court, have rejected the express advocacy standard because it fails to meaningfully distinguish election advertising from issue advocacy. *McConnell*, 540 U.S. at 131-32. By contrast, the IRS's current standard for political campaign intervention appropriately covers a broad swath of spending that impacts electoral campaigns, expenditures about which voters have a well-recognized First Amendment interest in receiving information. *Citizens United*, 558 U.S. at 370-71; *Buckley*, 424 U.S. at 14-15. Even if this Court chooses to clarify the language of this guidance, it is crucial to maintain a definition of campaign intervention that prevents 501(c)(4) status from serving as a dark money vehicle to deprive voters of information about spending to influence their electoral decisions.

A.    **The Court Should Reject the Narrow Express Advocacy Test Proposed by Freedom Path**

Freedom Path urges the Court to replace the "facts and circumstances" guidance with an "express advocacy" test imported from campaign finance case law, but doing so would only exacerbate the dark money crisis. Insofar as the requirements for tax exempt status at issue here have any analogue in campaign finance law, they most closely resemble campaign reporting and donor disclosure requirements, as plaintiff concedes. 805 F. Supp. 3d at 354. But political disclosure laws, the Supreme Court has held, can extend beyond express advocacy and its

functional equivalent, *Citizens United*, 558 U.S. at 369, and indeed, are largely ineffective when confined to express advocacy as Freedom Path urges here, *McConnell*, 540 U.S. at 193.

As this Court has noted, 805 F. Supp. 3d at 364, "Freedom Path derives the [express advocacy standard] from the Supreme Court's decisions in *Buckley* and *WRTL*," but these precedents reviewed restrictions on campaign expenditures—a fundamentally different type of law from the tax exemptions at issue here. The analysis of whether a campaign finance expenditure ban sweeps too broadly under the First Amendment thus has little relevance to the review of the standards governing whether a group is entitled to a tax exemption under section 501(c)(4) or any other section of the federal tax code.

In *Buckley*, the Supreme Court created the express advocacy test to cure the potential vagueness and overbreadth of a federal law imposing a $1,000 limit on independent expenditures "relative to a clearly identified candidate." 424 U.S. at 41-43 (construing limit to apply only to communications that expressly advocate the election or defeat of a candidate). *Buckley* ultimately struck down this expenditure limit, even as narrowly construed, but the Court there also applied the "express advocacy" test to narrow FECA's disclosure requirements for independent expenditures by non-political committees made "for the purpose of . . . influencing" the nomination or election of candidates for federal office. *Id*. at 79-80. Going forward, the express advocacy test functioned to limit the scope of this particular disclosure requirement—and the existing federal ban on corporate and union campaign expenditures, *see* 2 U.S.C. § 441b (1982 ed.).

In the decades following *Buckley*, however, evidence mounted that "advertisers [could] easily evade the line" of express advocacy, and indeed, "would seldom choose to use such words even if permitted." *McConnell*, 540 U.S. at 193. In passing BCRA in 2002, Congress devised a new category of regulable ads, namely "electioneering communication[s]," "precisely because it

recognized that the express advocacy test was woefully inadequate at capturing communications designed to influence candidate elections." *Id*. at 217. Both the corporate and union expenditure ban and FECA's disclosure requirements were amended to cover this new category of communications in addition to express advocacy. *Id*. at 196 & n.81, 203-07.

But here, of course, the court is not reviewing a *ban* on campaign expenditures, but rather the requirements for tax-exemption under sections 501(c)(4) and 527. As the Supreme Court found in *Regan v. Tax'n with Representation of Wash*., 461 U.S. 540 (1983), tax exemption is akin to a government subsidy upon which Congress can permissibly set conditions, including limits on activities otherwise protected by the First Amendment. *Id*. at 546. The concurring opinion emphasized the importance of alternative exempt structures to the constitutional analysis, noting, for example, that any First Amendment implications of the limit on lobbying by 501(c)(3) groups were addressed by the availability of alternative organizational forms, such as section 501(c)(4), which allowed lobbying without limit. *Id*. at 552-53. Similarly, here, if Freedom Path wishes to engage in political campaign intervention, it can conduct such activity through the more transparent tax-exempt vehicle specifically designed for such activity, 26 U.S.C. § 527.

Freedom Path has no cognizable right—under the First Amendment or otherwise—to any particular form of tax treatment or exemption for *any* of its activities, let alone its electoral spending. Certainly, this putative "right" to a preferred form of tax exemption is not comparable to the expressive activities curtailed by the expenditure restriction invalidated by *Buckley*, and for which the decision devised the express advocacy test.

In any event, the Supreme Court ultimately recognized that the express advocacy standard is "functionally meaningless" for the purpose of distinguishing issue speech from electoral speech,

"in both the expenditure and the disclosure contexts." *McConnell*, 540 U.S. at 191-93.[4] Thus in pressing an express advocacy standard here, Freedom Path attempts to resurrect a standard the Supreme Court has questioned even with respect to a campaign expenditure restriction.

And, as plaintiff concedes, the key distinction between tax exemption under Section 501(c)(4) and Section 527 is the disclosure obligations that attend the latter status. With respect to campaign finance disclosure, however, the Supreme Court has not just questioned, but *explicitly rejected*, the "contention" that such "requirements must be limited to speech that is the functional equivalent of express advocacy." *Citizens United*, 558 U.S. at 369. *See also Indep. Inst. v. FEC*, 216 F. Supp. 3d 176, 189 (D.D.C. 2016) (three-judge court), *summ. aff'd*, 137 S. Ct. 1204 (2017) ("[T]he First Amendment is not so tight-fisted as to permit large-donor disclosure only when the speaker invokes magic words of explicit endorsement.").[5] To the contrary, "[r]equiring disclosure of information related to subtle and indirect communications likely to influence voters' votes is critical to the State's interest in promoting transparency." *Nat'l Ass'n for Gun Rts., Inc. v. Mangan*, 933 F.3d 1102, 1114 (9th Cir. 2019). The reporting requirements that are a condition of elective Section 527 status do not even rise to the level of the mandatory, broadly applicable disclosure and

---

[4]    In *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 449 (2007) (*WRTL II*), the Supreme Court narrowly construed the ban on corporate expenditures for "electioneering communications" to cover only those ads that were the "functional equivalent of express advocacy," but this test was short-lived. The Court subsequently abandoned this narrowing construction in *Citizens United*, 558 U.S. at 325, 329-30, ultimately holding that the federal corporate spending ban was not justified by a compelling governmental interest with respect to *any class* of campaign speech, including express advocacy. *See, e.g.*, *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 69 (1st Cir. 2011) (noting that "in striking down the federal electioneering expenditure statute, *Citizens United* eliminated the context in which [*WRTL II*'s] appeal-to-vote test has had any significance").

[5]    *McKee*, 649 F.3d at 54-55 ("[I]n light of *Citizens United*, [] the distinction between issue discussion and express advocacy has no place in First Amendment review of these sorts of disclosure-oriented laws."); *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir. 2010) ("Given the Court's analysis in *Citizens United*, . . . the position that disclosure requirements cannot constitutionally reach issue advocacy is unsupportable.").

disclaimer requirements considered in *Citizens United*. If an express advocacy standard has been repudiated with respect to the latter, it is all the more inappropriate here.

> **B.    Any Adjustments to the Political Campaign Intervention Standard Should Be Drawn from Political Disclosure Laws**

It is crucial to retain a standard for political campaign intervention that meaningfully delineates which communications constitute electioneering. An unduly narrow standard, like the express advocacy standard plaintiff proposes, would facilitate circumvention of the statutory command that 501(c)(4) organizations must operate "exclusively" for social welfare purposes and harm voters' First Amendment interest in being fully informed about electoral advocacy seeking to influence their votes.

Although campaign finance law is not a perfect analog to the IRC provisions at issue here, *see supra* at 20-22, campaign finance *disclosure* laws, rather than *expenditure bans*, are the more appropriate source for an alternative standard for defining political campaign intervention.

First, as discussed above, BCRA defined a new category of political ads—"electioneering communications"—to supplement and correct the deficiencies of the express advocacy test. An "electioneering communication" is a broadcast ad that "refers to a clearly identified candidate for Federal office," is distributed within 60 days of a general election or 30 days of a primary election, and is "targeted to the relevant electorate." 52 U.S.C. § 30104(f)(3). The Supreme Court approved this definition, noting that vagueness concerns were "simply inapposite" because the definition was "both easily understood and objectively determinable." *McConnell*, 540 U.S. at 194. *See also CREW v. FEC*, 209 F. Supp. 3d 77, 90 (D.D.C. 2016) (considering group's electioneering communications in determining whether it was a federal political committee because "WRTL II's constitutional division between express advocacy and issue speech is simply inapposite in the disclosure context").

Following *McConnell*, many states modeled their disclosure statutes on BCRA, often requiring reporting of both express advocacy and electioneering communications. *See Electioneering Communications Disclosure Requirements*, Nat'l Conf. of State Legislatures (July 22, 2022), https://www.ncsl.org/elections-and-campaigns/electioneering-communications-disclosure-requirements (outlining electioneering communications disclosure laws of over 25 states). But many jurisdictions also updated the federal definition of "electioneering communications" to include internet and electronic media or to expand the pre-election coverage window. Arizona, for instance, requires extensive disclosure in connection to "campaign media spending," including public communications in broadcast, internet, and print media that "refer[] to a clearly identified candidate within ninety days before a primary election until the time of the general election." A.R.S. § 16-971(2)(a)(iii). *See Ctr. for Ariz. Pol'y Inc. v. Arizona Sec'y of State*, 258 Ariz. 570 (Ariz. App. 2024) (review granted May 6, 2025) (rejecting overbreadth challenge to definition). *See also Gaspee Project v. Mederos*, 13 F.4th 79, 82 (1st Cir. 2021), *cert. denied*, 142 S. Ct. 2647 (2022) (upholding Rhode Island disclosure requirements for electioneering communications in print, broadcast, or electronic media); *See also Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 2376 (2016) (same).

Other federal and state laws use a "promote, attack, support, oppose" standard to define the universe of communications subject to campaign finance limits and reporting requirements. As the IRS explains, this is already the standard applied by courts in assessing whether 501(c)(3) and (c)(4) groups have engaged in political campaign intervention, *see* ECF No. 55-1 at 11-12, 14-15.

In *McConnell*, the Supreme Court rejected a vagueness challenge to a federal law requiring state parties to comply with federal contributions limits when funding an ad that "refers to a clearly identified candidate for Federal office . . . and that promotes or supports [or attacks or opposes] a

23

candidate for that office." 540 U.S. at 347 (reviewing 52 U.S.C. § 30101(20)(A)(iii)). The Court concluded that words like "'promote,' 'oppose,' 'attack,' and 'support' . . . 'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Id*. at 170 n.64 (citation omitted).

At least five Circuits have followed *McConnell* to approve various disclosure statutes that rely on a support-or-oppose standard. For instance, the Ninth Circuit upheld the constitutionality of a Hawaii state law that that required a disclaimer for those communications that "[a]dvocate[] or support[] the nomination, opposition, or election of the candidate, or advocate[] the passage or defeat of the issue or question on the ballot." *Yamada v. Snipes*, 786 F.3d 1182, 1192 (9th Cir. 2015) (citation modified). Similarly, the First Circuit rejected a vagueness challenge to multiple Maine campaign disclosure statutes that incorporated "promoting" and "defeating," as definitional terms, noting that "*McConnell* remains the leading authority relevant to interpretation of [those] terms." *McKee*, 649 F.3d at 62-64. *See also Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 128 (2d Cir. 2014); *Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 287 (4th Cir. 2013); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 486 (7th Cir. 2012).

Thus, if this Court has concerns with the current regulatory standard, *see* 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii), it should look to the widely-accepted definitions of campaign-related advocacy in political disclosure laws: for example, the "PASO" definition used in BCRA and state campaign finance statutes, and/or the definition of "electioneering communications" in federal or state law, or elements of these "electioneering communications" definitions. *See infra* n.8. All of these standards have been repeatedly affirmed as constitutional and not vague. Further, if the facts and circumstances guidance is still deemed overly flexible or open-ended, 805 F. Supp. 3d at 362-

63, this Court could emphasize that it serves merely as an interpretative aid for the regulatory definition of political campaign intervention, not a stand-alone test. *See supra* at 18-19.[6]

Ultimately, in determining the proper definition of political campaign intervention, it is critical that the Court ensures that the definition is not unduly or unnecessarily narrow such that it allows 501(c)(4)s to continue to be used as a vehicle for pouring massive amounts of dark money into federal elections. Campaign finance precedents have upheld multiple standards for political disclosure that are both broad enough to be effective and sufficiently clear to provide "a person of ordinary intelligence" "fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008).

## CONCLUSION

For these reasons, this Court should adopt an interpretation of 26 U.S.C. § 501(c)(4) that permits no amount of non-exempt political campaign intervention, and a definition of campaign intervention that ensures that all election-related spending is disclosed to the public.

---

[6]    Alternatively, the Court could clarify that certain factors are mandatory; in particular, the first three listed factors of Revenue Ruling 2004-1 are highly relevant and closely resemble the criteria underlying the definition of electioneering communications as well. *See* Rev. Rul. 2004-06, 2004-1 C.B. 328 (listing factors (1) "identifies a candidate for public office," (b) "coincides with an electoral campaign," and (c) "targets voters in a particular election").

Dated: March 9, 2026

Respectfully submitted,

/s/ Kevin P. Hancock

| | |
|---|---|
| Stuart McPhail | Erin Chlopak (DC Bar No. 496370) |
| CITIZENS FOR RESPONSIBILITY AND | Tara Malloy (DC Bar No. 988280) |
| ETHICS IN WASHINGTON | Kevin P. Hancock (DC Bar No. 90000011) |
| P.O. Box 14596 | CAMPAIGN LEGAL CENTER |
| Washington, D.C. 20044 | 1101 14th Street NW, Ste. 400 |
| (202) 408-5565 | Washington, DC 20005 |
| smcphail@citizensforethics.org | (202) 736-2200 |
| | echlopak@campaignlegalcenter.org |
| | tmalloy@campaignlegalcenter.org |
| | khancock@campaignlegalcenter.org |

*Counsel for Amici Curiae*