**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FREEDOM PATH, INC.,

*Plaintiff*,

v.                                                      Civil Action No.: 1:20-cv-01349-JMC

INTERNAL REVENUE SERVICE, *et al.*

*Defendants*.

**FREEDOM PATH'S OPPOSITION TO
DEFENDANTS' RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

Table of Authorities ............................................................................................................ ii

Introduction ........................................................................................................................... 1

Argument ................................................................................................................................ 3

I.   Freedom Path qualifies as a Section 501(c)(4) social-welfare organization, because its exclusive engagement in civic speech "promotes" "social welfare" under the plain meaning of the statute. .......................................................... 3

    A.   Defendants' interpretation of "the promotion of social welfare" to exclude "political campaign intervention" would atextually exclude broad swaths of civic speech and contravene decades of Supreme Court precedent, the plain statutory text, and common sense. ................................................ 4

    B.   Freedom Path's interpretation of Section 501(c)(4) does not render Section 527's "political organization" definition superfluous. ............................ 10

    C.   Under the correct interpretation of the statutory phrase "promotion of social welfare," all of Freedom Path's speech at issue here promoted social welfare, so Freedom Path is entitled to Section 501(c)(4) status ............... 12

II.  Under the IRS's regulation interpreting 26 U.S.C. § 501(c)(4), Freedom Path qualifies as a social-welfare organization under objective and workable definitions of 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i). ......................................... 13

    A.   *Political activity inquiry*: Defendants' interpretation of "political campaign intervention" as including "indirect" support or opposition to candidates does not cure the vagueness this Court already found, which is why "political campaign intervention" should be defined as express advocacy or its functional equivalent. ................................................. 14

    B.   *Primary activity inquiry*: Defendants' definition of "primary activity" likewise fails to provide sufficient notice, which is why the regulation should be interpreted to establish a clear 50% numerical threshold. ................... 18

    C.   Under a constitutionally permissible interpretation of the IRS regulation at issue, Freedom Path qualifies for Section 501(c)(4) status. ............................ 24

Conclusion ........................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airlie Found. v. IRS,*
    283 F. Supp. 2d 58 (D.D.C. 2003) ...................................................................................28, 29

*Am. Campaign Acad. v. Comm'r,*
    92 T.C. 1053 (1989) ..............................................................................................................7

*Better Business Bureau v. United States,*
    326 U.S. 279 (1945) .................................................................................................22, 23, 24

*Big Mama Rag, Inc. v. United States,*
    631 F.2d 1030 (D.C. Cir. 1980) ....................................................................................17, 20

*Branch Ministries v. Rossotti,*
    211 F.3d 137 (D.C. Cir. 2000) ...........................................................................................18

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ......................................................................................................9, 17, 25

*Christian Echoes Nat'l Ministry, Inc. v. United States,*
    470 F.2d 849 (10th Cir. 1972) ...........................................................................................18

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) ...........................................................................................................22

*Church in Bos. v. Comm'r,*
    71 T.C. 102 (1978) .............................................................................................................21

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of the Treasury,*
    21 F. Supp. 3d 25 (D.D.C. 2014) ..................................................................................20, 23

*Citizens United v. FEC,*
    558 U.S. 310 (2010) .............................................................................................................4

*Comm'r v. Lake Forest, Inc.,*
    305 F.2d 814 (4th Cir. 1962) ...............................................................................................4

*Democratic Leadership Council, Inc. v. United States,*
    542 F. Supp. 2d 63 (D.D.C. 2008) ..................................................................................4, 22

*Eu v. S.F. Cnty Democratic Cent. Comm.,*
    489 U.S. 214 (1989) ...........................................................................................................15

*FDIC v. Phila. Gear Corp.*,
    476 U.S. 426 (1986)..................................................................................................22

*FEC v. Beaumont*,
    539 U.S. 146 (2003)..................................................................................................22

*FEC v. Massachusetts Citizens for Life*,
    479 U.S. 238 (1986)..................................................................................................26

*Federal Election Com'n v. Wis. Right To Life, Inc.*,
    551 U.S. 449 (2007)........................................................................................15, 17, 25

*First Nat'l Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978)....................................................................................................5

*Fund for the Study of Econ. Growth & Tax Reform v. IRS*,
    997 F. Supp. 15 (D.D.C. 1998)..................................................................................27

*Haswell v. U.S.*,
    500 F.2d 1133 (Ct. Cl. 1974)......................................................................................7

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)....................................................................................................4

*Lorillard v. Pons*,
    434 U.S. 575 (1978)..................................................................................................22

*Malat v. Riddell*,
    383 U.S. 569 (1966)..................................................................................................19

*McConnell v. FEC*,
    540 U.S. 93 (2003)....................................................................................................25

*McCutcheon v. FEC*,
    572 U.S. 185 (2014)..................................................................................................10

*Mills v. Alabama*,
    384 U.S. 214 (1966)....................................................................................................5

*Monterey Pub. Parking Corp. v. United States*,
    481 F.2d 175 (9th Cir. 1973) ....................................................................................22

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)....................................................................................................5

*NLRB v. Bell Aerospace Co.*,
    416 U.S. 267 (1974)..................................................................................................22

*People's Educ. Camp Soc'y, Inc. v. Comm'r*,
    39 T.C. 756 (1963)..................................................................................................22

*Polselli v. IRS*,
    598 U.S. 432 (2023)................................................................................................7

*Rawat v. Comm'r*,
    108 F.4th 891 (D.C. Cir. 2024)..............................................................................7

*Regan v. Taxation With Representation of Wash.*,
    461 U.S. 540 (1983)................................................................................................7

*Slee v. Comm'r*,
    42 F.2d 184 (2d Cir. 1930)......................................................................................7

*World Family Corp. v. Comm'r*,
    81 T.C. 958 (1983)................................................................................................21

**Statutes**

26 U.S.C. § 170......................................................................................................8, 10

26 U.S.C. § 501............................................................................................. *passim*

26 U.S.C. § 527............................................................................................. *passim*

26 U.S.C. § 6104.......................................................................................................10

52 U.S.C. § 30104................................................................................................16, 17

Pub. L. No. 104-168, 110 Stat. 1478 (July 30, 1996)..............................................23

**Other Authorities**

26 C.F.R. § 1.501(c)(4)-1..................................................................................2, 13, 18

85 Fed. Reg. 31959 (May 28, 2020)........................................................................10

Acting Commissioner Werfel, *Charting a Path Forward at the IRS* (June 24,
    2013), https://perma.cc/5PAH-PLBM ...................................................................19

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
    Texts* (2012)............................................................................................................22

IRS, *Exempt Organizations Determinations Unit 2* (Rev. Sept. 2009),
    https://perma.cc/Y26H-J4L2...................................................................................19

Paul C. Barton, *Koskinen's Comments on Political Spending of Nonprofits
    Disputed*, Tax Notes and Tax Analysis (Mar. 31, 2015).......................................19

Rev. Rul. 68-656 ............................................................................................................6, 13, 27

Roger Colinvaux, *Political Activity Limits and Tax Exemption: A Gordian's Knot*,
    34 Va. Tax Rev. 1 (2014)......................................................................................................12

S. Rep. No. 93-1357 (1974) ......................................................................................5, 6, 23

Treasury Inspector General for Tax Administration, Inappropriate Criteria Were
    Used to Identify Tax-Exempt Applications for Review (May 14, 2013),
    https://perma.cc/HZL6-3U6X ............................................................................................17

**INTRODUCTION**

The government has failed to provide this Court with constitutionally permissible interpretations of 26 U.S.C. § 501(c)(4) or the IRS regulation interpreting this statute. This Court previously held that the IRS' 11-factor, facts-and-circumstances test for evaluating political speech is unconstitutionally vague. ECF 48 at 50. This Court therefore asked the parties to provide permissible tests for the "Primary Activity inquiry and Political Activity inquiry that are (a) not unconstitutionally vague and (b) appropriately rooted in the statutory and regulatory scheme, and constitutional principles, that govern this tax exemption in light of the Court's findings in this opinion." ECF 48 at 60. Instead, Defendants offer amorphous standards unmoored from statutory text. And these recreate the same unconstitutional vagueness problems that this Court already found.

Worse yet, Defendants' new, post hoc litigation position is *even more antagonistic* to political and civic speech than the IRS' unconstitutional 11-part, facts-and-circumstances test. Civic speech promotes "social welfare," under Section 501(c)(4), and the IRS has no statutory basis to reach any other result. This Court should therefore reject DOJ's belated attempt to give the IRS even more discretion to punish political speech. The Court should reject Defendants' interpretations in favor of Freedom Path's—which provide the objective and workable standards that the First Amendment and due process require.

At the outset, Freedom Path should prevail under Section 501(c)(4)'s plain statutory text. Supreme Court precedent going back more than half a century recognizes that *all civic speech*—including both issue advocacy and express advocacy supporting candidates—promotes social welfare. There is no basis to depart from this accepted, commonsense understanding of this key statutory term. So an organization that exclusively engages in this civic speech is, by statutory defini-

tion, "operated exclusively for the promotion of social welfare." 26 U.S.C. § 501(c)(4). Yet Defendants now ask this Court to make Section 501(c)(4) even more hostile to civic speech than the IRS's unconstitutional 11-part facts-and-circumstances test. That argument is refuted by both binding precedent and common sense. This case can therefore be resolved by adopting Freedom Path's straightforward interpretation of the statutory text in Section 501(c)(4), as Freedom Path has engaged exclusively in civic speech in the form of both issue and express advocacy.

Regardless, even if this Court were to reach the IRS regulation interpreting this statute, 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i), Freedom Path still qualifies for Section 501(c)(4) status. Defendants have appeared to retreat from the IRS's regulation, at least as it has been understood for decades. There are massive fair notice problems with Defendants' new approach. More fundamentally, Defendants' newfound tests for Section 501(c)(4) status do not satisfy the criteria set by this Court to cure the IRS' unconstitutionally vague regime. Defendants' proposed test for the "political activity inquiry" reproduces the same unconstitutional vagueness that this Court rejected because it covers any communication that even "*indirectly* []supports or opposes" a candidate. ECF 55-1 at 11 (emphasis added).[1] Instead, the "political activity inquiry" should cover only express advocacy or its functional equivalent. This clear line will avoid the constitutional vagueness problems the Supreme Court has recognized in amorphous standards for evaluating political speech. Likewise, Defendants again refuse to commit to any threshold for the "primary activity inquiry," which unconstitutionally would preserve maximum IRS discretion while imposing maximum uncertainty for regulated entities. That is why the primary activity inquiry should turn on a

---

[1] All pin cites in docket citations are to internal document pagination, not ECF pagination.

clear 50% numerical threshold. The plain meaning of "primarily," the IRS's own training materials, and the IRS Commissioner's public statements all confirm that an organization spending less than half its resources on political activity has not made that activity its primary one.

Applying these correct regulatory standards to this record, the result under the IRS regulation is straightforward. Freedom Path's express advocacy supporting candidates is at most approximately 39% of total expenditures (well below 50% in any calculation), after properly identifying which of Freedom Path's advertisements count as express advocacy or its functional equivalent versus those that do not. Defendants' contrary figure of 78% misclassifies two *issue*-advocacy advertisements ("Three Men" and "Repeal It") under a similar methodology this Court already repudiated. Both advertisements focus on discrete legislative issues, urge viewers to contact their elected officials, and contain none of the hallmarks of express advocacy. Correcting that misclassification, and accounting for Freedom Path's substantial 2011 issue-advocacy expenditures that the IRS ignored entirely, the record points in one direction: "political campaign intervention" was never Freedom Path's "primary" activity.

Freedom Path dedicated itself to civic speech about healthcare policy, fiscal reform, and government accountability. That speech promotes the social welfare. Freedom Path is entitled to 501(c)(4) status. This Court therefore should deny Defendants' motion and grant Freedom Path's cross-motion.

## ARGUMENT

I.   **Freedom Path qualifies as a Section 501(c)(4) social-welfare organization, because its exclusive engagement in civic speech "promotes" "social welfare" under the plain meaning of the statute.**

Freedom Path exclusively engaged in civic speech, so it is a "civic league[]" that is "operated exclusively for the promotion of social welfare." 26 U.S.C. § 501(c)(4)(A). Defendant erroneously asserts that civic speech educating voters and encouraging civic engagement—including

3

independent expenditures that expressly advocate for the election or defeat of particular candidates—does not serve the social-welfare function. That argument is not entitled to any deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent judgment"). And it is contrary to binding precedent, plain text, and common sense. It is undisputed that Freedom Path "exclusively" engaged in civic speech. So if this Court rejects Defendants' interpretation of the statutory term "social welfare," it should grant Freedom Path summary judgment.

   **A.    Defendants' interpretation of "the promotion of social welfare" to exclude "political campaign intervention" would atextually exclude broad swaths of civic speech and contravene decades of Supreme Court precedent, the plain statutory text, and common sense.**

   **1.** Section 501(c)(4) applies to organizations that operate "exclusively for the promotion of social welfare." Congress did not define "social welfare," but it did not write on a blank slate either. "Social welfare" carries an ordinary meaning that courts have applied without difficulty: "the well-being of persons as a community," encompassing purposes for the "betterment or improvement of the community as a whole." *Comm'r v. Lake Forest, Inc.*, 305 F.2d 814, 818 (4th Cir. 1962); *see Democratic Leadership Council, Inc. v. United States*, 542 F. Supp. 2d 63, 69 (D.D.C. 2008) (collecting cases).

   Congress's use of "social welfare" is therefore intentionally capacious. Civic speech promotes the social welfare because it is the "essential mechanism" through which citizens hold their government accountable, whether it takes the form of issue advocacy or candidate express advocacy. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). Nothing in the phrase "social welfare" excludes civic speech about candidates, elections, or the officials who make law. To the contrary, that is exactly the speech that the Constitution most jealously protects, because it is "a necessary means to protect" "enlightened self-government." *Id.*; *see* ECF 54-1 at 14-16 (collecting

authorities). The Supreme Court has articulated this bedrock principle in case after case going back over half a century, for example:

- "This Court has recognized that expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (internal quotation marks and citation omitted);

- Speech about governmental affairs is at "the heart of the First Amendment's protection." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978).

- "[A] major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).

26 U.S.C. § 527 provides contextual statutory support for the proposition that express candidate advocacy promotes social welfare. In particular, Section 527(f)(1) provides that "an organization described in section 501(c)"—including Section 501(c)(4) organizations—"shall be subject to tax" based on any "expen[se]" for "influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office or office in a political organization, or the election of Presidential or Vice-Presidential electors." In other words, Congress anticipated that 501(c)(4) organizations may engage in express candidate advocacy and decided those organizations should be taxed on those activities—*not* denied Section 501(c)(4) status entirely. The Senate Report accompanying the creation of Section 527 explained that "[u]nder present law, . . . 501(c)(4) organizations . . . *may engage* in *political campaign activities*." S. Rep. No. 93-1357, at 7505 (1974), reprinted in 1974 U.S.C.C.A.N. 7478, 7505 (emphasis added). This, of course, contravenes Defendants' current position. The entire purpose of 26 U.S.C.

5

§ 527(f)(1) was to tax the portion of a Section 501(c)(4)'s expenditures influencing elections the same as a Section 527 political organization:

> Under present law, certain tax-exempt organizations (such as sec. 501(c)(4) organizations) may engage in political campaign activities. The bill generally treats these organizations on an equal basis for tax purposes with political organizations. Under the bill, organizations which are exempt under section 501(a) and are described in section 501(c), that engage in political activity, are to be taxed on their net investment income in part as if they were political organizations. Thus, an exempt organization is to be subject to this tax if it spends any amount on the nomination, election, etc., of a candidate for public office, etc. However, these organizations are to be taxed only to the extent they actually operate as political organizations (that is, to the extent of their political expenditures).

S. Rep. No. 93-1357, at 7505.

Accordingly, an organization that exclusively engages in civic speech necessarily operates "for the promotion of social welfare" within the meaning of 26 U.S.C. § 501(c)(4). The undisputed facts show Freedom Path does exactly that. *See* ECF 54-1 at 21.

**2.** Yet Defendants claim that (amorphously defined) "[p]olitical campaign intervention does not promote social welfare." ECF 55-1 at 8. Tellingly, Defendant does not disclaim the IRS's longstanding position that "social welfare" *does* include speech "seeking [ ] legislation germane to the organization's programs"—*e.g.*, issue advocacy. Rev. Rul. 68-656, 1968 WL 15166, at *1. That is undoubtedly correct, as one of the many ways that people seek social betterment is through advocating for policies they believe will improve society. As addressed below at pp.14-17, Defendants fail to provide a clear definition of "political campaign intervention," under the IRS regulation interpreting this statute. So they cannot support the broad declaration that "political campaign intervention" speech categorically cannot "benefit the community as a whole." ECF 55-1 at 8.

Regardless, Defendants offer scant support for the proposition that the "social welfare" simultaneously *includes* issue advocacy *yet excludes* other civic speech touching on candidates for

6

public office. There is no principled basis for that distinction. Fundamentally, issue advocacy and express advocacy supporting candidates—who in turn legislate and execute public policy—are not materially different for determining whether speech promotes the "social welfare."

To be sure, issue versus express advocacy are distinct concepts for purposes of determining whether an entity has participated in a "political campaign"—but that phrase is the statutory text Congress chose to use and prohibit in the neighboring Section 501(c)(3). *See* ECF 54-1 at 16-18. This statutory phrase appears nowhere in Section 501(c)(4). Section 501(c)(4) instead uses a broader phrase: activities for "the promotion of social welfare." This textual distinction is crucial. What Congress expressly prohibits in one subsection, but omits from an adjacent one, is presumptively permitted in that adjacent subsection. *See Polselli v. IRS*, 598 U.S. 432, 439 (2023); *Rawat v. Comm'r*, 108 F.4th 891, 898 (D.C. Cir. 2024). Congress knew how to draft Section 501(c)(4) to turn on involvement in a "political campaign," yet it deliberately did not prohibit this for 501(c)(4) status.

Defendants' cited authority thus has little force, because these cases all address applications for Section 501(c)(3) status, which is distinct from the Section 501(c)(4) status at issue in this case. *See, e.g.*, *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550 (1983); *Am. Campaign Acad. v. Comm'r*, 92 T.C. 1053, 1054 (1989); *Haswell v. U.S.*, 500 F.2d 1133, 1139 (Ct. Cl. 1974); *Slee v. Comm'r*, 42 F.2d 184 (2d Cir. 1930) (addressing precursor to Section 501(c)(3)); *see* ECF 55-1 at 8. As Freedom Path has explained, Section 501(c)(3)—unlike (c)(4)—expressly provides that "no substantial part of" a Section 501(c)(3)'s purpose may be "to influence legislation" or "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3); *see* ECF 54-1 at 16-19. This "political campaign" language is nowhere to be found in

7

Section 501(c)(4), which instead asks whether activities promote "social welfare." Civic speech, including political speech, does just that.[2]

Defendants try to evade this core feature of civic speech, asserting that "political campaign intervention does not benefit the community as a whole" because "supporting or opposing only select candidates or one political party provides a substantial private benefit to such candidates or party." ECF 55-1 at 8. But the Supreme Court has made clear that more political speech benefits society by providing more perspectives and voices, which allow citizens to make informed decisions while participating in our democracy. ECF 54-1 at 14-16; *supra* pp.4-6. Even if someone disagrees with certain political speech, that does not mean it lacks a social-welfare purpose. And this certainly does not mean *government* gets to decide which particular political speech does or does not promote social welfare. All civic speech, including political speech, promotes the social welfare in our Nation with strong First Amendment free-speech protections.

Besides, the question is not whether a Section 501(c)(4) organization's speech may benefit others. The entire point of civic speech is the "promotion of social welfare"—that is, the betterment of society as a whole. 26 U.S.C. § 501(c)(4). Whenever society benefits, certain private parties will often benefit alongside it. The same logic applies to civic speech that advocates for particular political candidates, who are key actors in shaping public policy and thus advancing the public good. Consider a more mundane example: playground equipment manufacturers may benefit from civic speech calling for more public parks—yet no one would suggest that such speech fails to promote social welfare.

---

[2] Section 501(c)(3) organizations differ from Section 501(c)(4) organizations in another important way: contributions to Section 501(c)(3) entities can be *tax-deductible* for donors, while that is not true for Section 501(c)(4) organizations. *See* 26 U.S.C. § 170(c); ECF 54-1 at 26.

If anything, Defendants' reasoning proves too much. Taken to its logical conclusion, it would allow the IRS to recast broad swaths of even pure issue advocacy as "political campaign intervention" whenever the agency determines that the speech would benefit one political party or candidate versus another. In this very case, Freedom Path engaged in speech criticizing the Affordable Care Act—an issue position generally supported by Republican Party candidates and opposed by Democratic Party candidates. Under Defendants' approach, the IRS could now deem even pure issue advocacy about major legislation as providing a substantial benefit to just one political party—rendering it "political campaign intervention" disallowed by Section 501(c)(4). That absurd result refutes Defendants' latest amorphous test for evaluating civic speech.

As the Supreme Court has recognized, "candidates, especially incumbents, are intimately tied to public issues." *Buckley v. Valeo*, 424 U.S. 1, 42 (1976) (per curiam). However, this does not mean that "[f]unds spent to propagate one's views on issues without expressly calling for a candidate's election or defeat" can be regulated as campaign expenditures. *Id.* at 44 (quotation marks omitted).

And even if a Section 501(c)(4) organization urges a Senator's reelection because of his vote on ACA repeal, or his sponsorship of a balanced budget amendment, it is not abandoning its focus on issue advocacy or acting contrary to the social welfare. The candidate and the cause are inseparable for purposes of asking whether this speech promotes social welfare. Advocacy that helps citizens connect a legislator's record to a legislative outcome promotes informed democratic participation. It holds officials accountable. It enables constituents to advocate for the kind of society they wish to inhabit. That is social welfare activity.

9

**B.**  **Freedom Path's interpretation of Section 501(c)(4) does not render Section 527's "political organization" definition superfluous.**

Defendants incorrectly assert that Freedom Path's interpretation of Section 501(c)(4), recognizing all civic speech as promoting "social welfare," renders Section 527's classification of "political organizations" superfluous. ECF 55-1 at 8-9, 23-24. To the contrary, Section 527 confirms that Section 501(c)(4) organizations may engage in all manner of civic speech. *See* ECF 54-1 at 18-19; *supra* pp.5-6. And Defendants' interpretation of Sections 501(c)(4) and 527 would create an unconstitutionally irrational gap in the Internal Revenue Code.

Sections 501(c)(4) and 527 serve complementary roles that inform each other's boundaries (although contributions to both Section 501(c)(4) and 527 organizations are *not* tax deductible, *see* 26 U.S.C. § 170(c)). Section 527 covers a "political organization," which "primarily" operates to influence the selection or election of candidates. *See* 26 U.S.C. § 527(a) (covering a "political organization"); *id.* § 527(e)(1) (using "primarily" in defining "political organization"). So Section 527 covers a group that primarily tries to elect candidates. Section 527 organizations are treated as "an organization exempt from income taxes," *id.* § 527(a), but their income derived beyond contributions, dues, and fundraisers is taxed, *id.* § 527(b)-(d), and they must disclose their donors, *id.* § 527(j)(3)(A)-(B).

Section 501(c)(4), by contrast, covers organizations whose exclusive purpose is promoting "social welfare." 26 U.S.C. § 501(c)(4). Section 501(c)(4) organizations are also "exempt from taxation," *id.* § 501(a), but they do not have to disclose their donors. *See McCutcheon v. FEC*, 572 U.S. 185, 224 (2014) (citing 26 U.S.C. § 6104(d)(3)); Guidance Under Section 6033 Regarding the Reporting Requirements of Exempt Organizations, 85 Fed. Reg. 31959, 31968 (May 28, 2020) (amending 26 C.F.R. § 1.6033-2(g)). Section 501(c)(4) covers (but Section 527 does not cover) a

10

group that primarily tries to advance a policy agenda, educate the public, or promote civic participation—even if it occasionally speaks about the candidates who will decide on the issues it cares about. All this speech furthers "social welfare" under Section 501(c)(4), while only the latter speech would try to influence candidate elections under Section 527. (As explained above at pp.5-6, when Section 501(c)(4) organizations engage in activities to influence elections, those activities are subject to unique tax considerations. 26 U.S.C. § 527(f)(1).) This potential for speech to count as both furthering "social welfare" and also influencing candidate elections does not create statutory superfluity. The two concepts are not mutually exclusive, and Congress deliberately used the broader statutory phrase "social welfare" in Section 501(c)(4) in this distinct section of the Internal Revenue Code.

Importantly, Defendants' interpretation of the relationship between Sections 501(c)(4) and 527 would create a substantial, irrational gap in the Internal Revenue Code that Congress plainly never intended. ECF 54-1 at 18-19. Under Defendants' interpretation, an organization would lose its tax-exempt status *in its entirety*, because it would be neither a tax-exempt Section 501(c)(4) organization nor a tax-exempt Section 527 organization, if it engages in less than 50% but more than 10% (or perhaps 21%) of "political campaign intervention." That is because under Defendants' test, an organization loses Section 501(c)(4) status once it engages in "substantial" "political campaign intervention." ECF 55-1 at 19-20. Defendants say "substantial" maybe means perhaps more than "10%," but certainly "21%" or more. ECF 55-1 at 27 (citations omitted). (Defendants still refuse to provide a clear threshold, and Freedom Path below at pp.20-22 explains how this is unconstitutionally vague.) But if that same organization engages in less than 50% of political campaign intervention, then it also does not qualify as a Section 527 organization—since it would not be "primarily" engaging in this activity (as required for a Section 527 organization under 26

11

U.S.C. § 527(a) and the corresponding definition of "political organization" at 26 U.S.C. § 527(e)(1)).

The result would be an arbitrary no-man's-land where organizations that engage "substantially," but not "primarily," in political campaign intervention could lose *all tax-exempt status* under both Sections 501(c)(4) and 527. It makes no sense that Congress would grant more favorable tax status to organizations that spend more than 50% of their resources on political campaign intervention than to organizations that spend 10-50% of their resources on such activity. *See* Roger Colinvaux, *Political Activity Limits and Tax Exemption: A Gordian's Knot*, 34 Va. Tax Rev. 1, 32 (2014). There is not even a hypothetical rational basis for such a distinction. Regardless, Congress does not create regulatory voids by accident. And it did not create one here. This reveals that Defendants' standard fits neither the statute Congress wrote nor the tax structure Congress built.

That is precisely why this Court must interpret the statutory phrase "social welfare" to cover all civic speech if it is going to reinterpret how Section 501(c)(4) uses the phrase "exclusively." Defendants want to cherry pick "exclusively" from the statute to reinterpret it in a way diverging from decades of IRS practice, yet they want to lock in the IRS' atextual limitation of "social welfare" to just issue advocacy and not other civic speech like express advocacy of candidates. The government cannot have it both ways, and "social welfare" must be given its natural meaning covering all civic speech.

**C.**      **Under the correct interpretation of the statutory phrase "promotion of social welfare," all of Freedom Path's speech at issue here promoted social welfare, so Freedom Path is entitled to Section 501(c)(4) status.**

If this Court agrees with Freedom Path's interpretation of Section 501(c)(4) to encompass all civic speech, all of Freedom Path's speech "promot[es] the social welfare," and thus is Freedom Path's "exclusive[]" purpose. 26 U.S.C. § 501(c)(4); *see* ECF 54-1 at 21. Freedom Path's expenditures on "advertisements, mailers, and other expressive activity regarding government spending,

12

fiscal issues, and federal health-care policies," ECF 48 at 23, undisputedly qualify as speech promoting social welfare under the correct interpretation of Section 501(c)(4)'s statutory text posited by Freedom Path.

## II. Under the IRS's regulation interpreting 26 U.S.C. § 501(c)(4), Freedom Path qualifies as a social-welfare organization under objective and workable definitions of 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i).

As explained above, this Court need not reach the IRS regulation to hold that Freedom Path is entitled to Section 501(c)(4) status under this statute's plain text. Regardless, Freedom Path is also entitled to Section 501(c)(4) status under a constitutionally permissible reading of the IRS's regulation interpreting 26 U.S.C. § 501(c)(4). When permissible standards are applied under the IRS' regulation, the uncontested facts demonstrate that Freedom Path is "primarily engaged in promoting in some way the common good and general welfare of the people of the community." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i). With the "political activity" and "primary activity" standards properly construed, Freedom Path's speech "seeking [] legislation," Rev. Rul. 68-656, 1968 WL 15166, at *1, constitutes more than 60% of Freedom Path's 2012 expenditures. That far clears the 50% threshold that the IRS regulation's "primarily" standard requires.

Defendants' arguments fail to provide the objective and workable standards that this Court already held are required under the IRS regulation's "Political Activity inquiry" and "Primary Activity inquiry." ECF 48 at 60. Defendants' latest proposed tests are still "unconstitutionally vague" and are not "appropriately rooted in the statutory and regulatory scheme, and constitutional principles." ECF 48 at 60. This Court thus should adopt the objective tests that Freedom Path has offered instead.

13

A.    *Political activity inquiry*: **Defendants' interpretation of "political campaign intervention" as including "indirect" support or opposition to candidates does not cure the vagueness this Court already found, which is why "political campaign intervention" should be defined as express advocacy or its functional equivalent.**

**1.** After this Court declared the IRS's previous "political campaign intervention" standard unconstitutionally vague, Defendants have failed to replace that standard with a constitutionally compliant one. ECF 48 at 50 ("[T]he [IRS] test in question certainly raises vagueness concerns that this Court cannot ignore."). In fact, Defendants' proposed inquiry into whether speech "indirectly []supports or opposes" a candidate, ECF 55-1 at 11, simply recreates the prior facts-and-circumstances test's constitutional failings. Defendants' proposed political activity inquiry still fails to provide a standard that is "not unconstitutionally vague" and "appropriately rooted in . . . constitutional principles," as requested by this Court. ECF 48 at 60.

Like the vague facts-and-circumstances test, Defendants' new five-element test contains a mix of purportedly objective and subjective elements: "a communication is political campaign intervention (and thus does not promote social welfare within the meaning of § 501(c)(4)) if it is [1] a communication [2] by an organization [3] during an election campaign [4] that supports or opposes [5] a candidate for public office." ECF 55-1 at 10.

To begin, the seemingly objective elements do not cure any problems with the facts-and-circumstances test because those elements were largely not in dispute. For instance, the parties never disputed (and this Court never questioned) that the IRS's regulations require a "communication" by an "organization." ECF 55-1 at 10-11. In addition, the mere fact that such speech must be "[d]uring an election campaign" and apply to a "candidate for public office" does not cure the vagueness problems. ECF 55-1 at 11-12. If anything, these putatively objective factors ensure that the IRS will be applying its otherwise-vague standard to "speech uttered during a campaign for political office"—where the "the First Amendment has its fullest and most urgent application."

14

*Eu v. S.F. Cnty Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (citation modified); *cf. Federal Election Com'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 474 (2007) ("*WRTL*") ("Discussion of issues cannot be suppressed simply because the issues may also be pertinent in an election.").

That leaves the crux of the IRS's new test: an open-ended and subjective evaluation of whether speech "*indirectly* []supports or opposes" a candidate. ECF 55-1 at 11 (emphasis added).[3] This consideration just reraises the problems with the subjective 11-factor facts-and-circumstances test this Court already held unconstitutionally vague. As used by the IRS, "indirect" has no statutory definition, no regulatory definition or gloss, and no limiting principle. Any issue advertisement *merely mentioning* a sitting officeholder who also happens to be a candidate could—according to the IRS—provide "indirect" support or opposition.

So under Defendants' test, virtually any significant issue-advocacy organization in the country operates under a permanent cloud of potential disqualification from 501(c)(4) status. ECF 55-1 at 11. An organization that runs advertisements on healthcare, taxation, immigration, or any other contested policy issue that mentions a candidate would face exposure under this framework. *Id.* at 10-11 (defining "political campaign intervention" as including communications that "support[] or oppose[] the positions or actions of [a] candidate"). Accordingly, Defendants' "indirect support" standard carries the same risk of arbitrary and viewpoint-discriminatory enforcement as the IRS's facts-and-circumstances test. ECF 48 at 47-48.

In addition to constitutional concerns, Defendants' framework could also transgress an explicit statutory boundary set by Congress. Defendants' proposed definition of "political campaign

---

[3] The first half of Defendants' test for supporting a candidate would apply to speech that "directly (e.g., vote for, vote against)" "supports or opposes the election of a particular candidate." ECF 55-1 at 11. This part of the IRS's proposed test is materially similar to the express-advocacy test that Freedom Path has advocated for. ECF 54-1 at 22-26. So Freedom Path does not contend that portion of Defendants' test is unconstitutionally vague.

15

intervention" seems to borrow from the federal campaign finance statute FECA's "electioneering communications" definition:

- **Electioneering communication:** "any broadcast, cable, or satellite communication which—(I) *refers to a clearly identified candidate* for Federal office; (II) is *made within*—(aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or (bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and (III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate." 52 U.S.C. § 30104(f)(3) (emphases added).

- **Political campaign intervention:** "a communication is political campaign intervention (and thus does not promote social welfare within the meaning of §501(c)(4)) if it is a communication by an organization *during an election campaign* that *supports or opposes a candidate* for public office." ECF 55-1 at 10 (emphases added).

As the emphasized language confirms, both the FECA electioneering-communications and the Defendants' new test both ask whether (1) the communication is during an election campaign and (2) mentions a candidate.[4] But Congress expressly said FECA's electioneering-communication definition *cannot* be used to interpret the Internal Revenue Code. As Congress dictated, nothing in that subsection containing FECA's definition of electioneering communications "may be construed to establish, modify, or otherwise affect the definition of political activities or electioneering

---

[4] In notable contrast to FECA's "electioneering communications" definition, however, defendants' proposed definition of "political campaign intervention" has *no* bright-line time windows or electoral targeting element.

activities . . . for purposes of Title 26 [the Internal Revenue Code]." 52 U.S.C. § 30104(f)(7). Yet Defendants seemingly would have this Court import FECA's criteria in determining what counts as "political campaign intervention" under the Internal Revenue Code. ECF 55-1 at 10-13. Congress foreclosed the IRS from doing this.

**2.** That is why Freedom Path has proposed "the objective and clear 'express advocacy' test from *Buckley v. Valeo* and its progeny." ECF 54-1 at 22 (citation omitted). Under these tests, courts would engage in two objective inquiries: (1) whether the communication "expressly advocate[s] the election or defeat of a clearly identified candidate," 424 U.S. at 80; or (2) whether the communication is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate," *i.e.*, the "functional equivalent" of express advocacy test. *WRTL*, 551 U.S. at 470.

These formulations provide objective, viewpoint-neutral, and administrable tests. They are therefore the kinds of "explicit guidelines" necessary to "avoid arbitrary and discriminatory enforcement." *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1035 (D.C. Cir. 1980). They foreclose the kind of open-ended, impressionistic enforcement that due process forbids. ECF 48 at 36; *Big Mama Rag*, 631 F.2d at 1034 ("regulations authorizing tax exemptions may not be so unclear as to afford latitude for subjective application by IRS officials"); *see* Treasury Inspector General for Tax Administration, Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review 47-48 (May 14, 2013), https://perma.cc/HZL6-3U6X ("TIGTA Report") (finding that lack of definitional clarity created "confusion" among IRS reviewers and contributed to targeting abuses).

Defendants' *own authority* supports Freedom Path's approach, as multiple cases concern express advocacy. *Branch Ministries v. Rossotti* featured full-page newspaper advertisements urging Christians not to vote for a named presidential candidate days before the election. 211 F.3d 137, 140 (D.C. Cir. 2000). *Christian Echoes Nat'l Ministry, Inc. v. United States* involved broadcasts explicitly attacking and endorsing candidates by name, with the organization's annual convention formally endorsing one. 470 F.2d 849, 856 (10th Cir. 1972). In all events, Defendants' authority concerned organizations seeking Section 501(c)(3) status, which involved Congress setting intentionally different statutory text by design—as explained above and in previous briefs. *See* ECF 54-1 at 16-18.

**B.**      ***Primary activity inquiry*: Defendants' definition of "primary activity" likewise fails to provide sufficient notice, which is why the regulation should be interpreted to establish a clear 50% numerical threshold.**

Defendants have also failed to provide anything close to a workable definition for evaluating an organization's "primary" activity when determining whether it is "*primarily* engaged in promoting in some way the common good and general welfare of the people of the community" (emphasis added). 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i). Rather, they have just repeated the same "substantial non-social-welfare-purpose" standard that this Court already rejected as unconstitutionally vague. ECF 48 at 47-48. Defendants' new arbitrary 10%—or maybe 21%— thresholds do not provide any reason for the Court to revisit its previous conclusions. If anything, they confirm that the IRS would apply ad hoc standards to determine an organization's primary purpose. Freedom Path, by contrast, has provided an objective measure grounded in the plain text of the word "primarily": Evaluating whether promoting the social welfare is more than 50% of an organization's activities.

**1.** Freedom Path is the only party to offer an objective and workable definition of the "primary activity" analysis: An organization's "primary activity" must be "50% of the organization's expenditures." ECF 54-1 at 27.

The Supreme Court has explained that "primarily" means "of first importance" or "principally." *Malat v. Riddell*, 383 U.S. 569, 572 (1966) (quotation marks omitted). Here, an organization that devotes less than half of its resources to promoting social welfare has not made promoting social welfare its primary activity. By definition, something else commands greater priority. A 50% threshold is, therefore, the natural and unavoidable meaning of the word "primarily" that the IRS used in its regulation. Any standard that would disqualify an organization spending less than 50% on what the IRS considers political activity cannot be squared with that plain meaning.

The IRS's own historical understanding of its regulations' "primarily" test confirms it should require a 50% threshold. Commissioner Koskinen publicly stated that an organization spending less than 49% of its resources on politics qualifies for Section 501(c)(4) status. ECF 54-1 at 28-29 (citing Paul C. Barton, *Koskinen's Comments on Political Spending of Nonprofits Disputed*, Tax Notes and Tax Analysis (Mar. 31, 2015)). Internal IRS training materials used at the time of the Freedom Path's application defined "primary activity" as constituting 51% or more of an organization's total activities. ECF 54-1 at 29 (citing IRS, Exempt Organizations Determinations Unit 2 at 7-19 (Rev. Sept. 2009), https://perma.cc/Y26H-J4L2). The IRS's own expedited review process employed a 40% threshold as a safe harbor. ECF 54-1 at 30 (citing Acting Commissioner Werfel, Charting a Path Forward at the IRS at 25 (June 24, 2013), https://perma.cc/5PAH-PLBM). A 40% safe harbor confirms that the actual disqualification line

19

sits at or near 50%. When the IRS trains its own personnel using a 51% definition and its Commissioner announces a 49% ceiling in public remarks, the agency has told us what "primarily" means. The Court should hold it to that answer.

A 50% threshold also serves an important structural function. Section 501(c)(4) and Section 527 are complementary provisions. As explained above at pp.11-12, there should not be an irrational gap in the two statutes' coverage for tax-exempt status. And Congress used "primarily" in Section 527 to define that statute's coverage. *See* 26 U.S.C. § 527(a); *id.* § 527(e)(1). So as Freedom Path's alternative argument asserts, a clear numerical line at 50% creates a coherent test. Organizations can plan their activities, allocate their resources, and structure their operations with confidence that good-faith issue advocacy will not inadvertently forfeit their tax status. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of the Treasury*, 21 F. Supp. 3d 25, 33 (D.D.C. 2014). That clarity is a constitutional prerequisite for any regulatory regime that burdens expressive association.

Plus, a bright-line 50% rule satisfies every criterion this Court has identified as constitutionally mandatory. *See* ECF 48 at 50-52. It prevents arbitrary and selective enforcement by removing the IRS examiner's discretion to draw the line wherever the agency finds it convenient. *Big Mama Rag*, 631 F.2d at 1035. And it is objective, viewpoint-neutral, and immune to the kind of after-the-fact rationalization that vague standards invite. *Id.* at 1038; *see also* ECF 48 at 40-41.

**2.** In contrast, Defendants have repeated their unsuccessful argument that any "substantial" non-exempt activity disqualifies an organization from Section 501(c)(4) status. ECF 55-1 at 21-25. This newfound—and vague—interpretation of the IRS's regulatory standard lacks foundation in the *regulatory* text. And its supposed basis in the *statutory* text would require this Court to reinterpret *part* of the governing statutory and regulatory scheme ("exclusively" versus "primarily"),

instead of taking into account the rest of the statutory scheme (including what constitutes "social welfare").

The Court has already decided that Defendants' "more than insubstantial" test for an organization's primary activity is unconstitutionally vague as applied to First Amendment-protected political speech. ECF 48 at 47-48. That holding was not tentative. It was a reasoned constitutional judgment grounded in decades of First Amendment doctrine. Defendants' renewed motion does not grapple with this Court's holding or offer a meaningfully different standard.

Defendants' own brief supplies a vivid illustration of the inherent vagueness in their proffered standard. Specifically, Defendants acknowledge that non-exempt activity comprising roughly 10% of an organization's total expenditures is insubstantial and therefore permissible. ECF 55 at 27. Defendants then contends that 21% is too much. *Id.* There are multiple problems with this approach. First, where exactly is the line? Parties have no way to tell. Second, neither figure (10% nor 21%) is based on statutory or regulatory text. Instead, they are numbers plucked from caselaw. *See* ECF 55-1 at 27 (citing *World Family Corp. v. Comm'r*, 81 T.C. 958, 967 n.10 (1983), and *Church in Bos. v. Comm'r*, 71 T.C. 102, 108 (1978)). Third, Defendants offer no principle, formula, or guideline for the territory in whatever gray area the IRS believes exists between 10% and 21%. An organization reading that brief cannot determine whether 11% would trigger revocation, or 15%, or 18%. So organizations would not be able to structure their activities to stay on the safe side of a line that Defendants decline to draw. ECF 48 at 20-21.

Compounding the fair notice problems, Defendants' newfound interpretation is also inconsistent with the IRS's own revenue rulings and regulatory practice spanning more than sixty years. *See* ECF 54-1 at 26-30. That is why "[f]ederal courts have long interpreted the [Section 501(c)(4)] statute consistently with the regulations: a § 501(c)(4) organization must primarily operate to bring

21

about social improvements." *Democratic Leadership Council*, 542 F. Supp. 2d at 69 (citing *FEC v. Beaumont*, 539 U.S. 146, 150 n.1 (2003); *Monterey Pub. Parking Corp. v. United States*, 481 F.2d 175, 176 (9th Cir. 1973); *People's Educ. Camp Soc'y, Inc. v. Comm'r*, 39 T.C. 756, 768 (1963)).[5]

Defendants ask this Court to ignore that regulatory practice and instead import definitions from the Supreme Court's decision in *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945). Yet reinterpreting the IRS's regulations—and their statutory foundations—requires a holistic analysis that Defendants ignore. This holistic analysis provides yet another alternative basis to reject Defendants' interpretation.

Specifically, Congress has long been "aware of" the IRS's "administrative . . . interpretation of" Section 501(c)(4) and has never once sought to amend and clarify Section 501(c)(4). *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) (collecting authorities). "If a word or phrase . . . has been given a uniform interpretation by . . . the responsible agency, a later version of that act perpetuating the wording is presumed to carry forward that interpretation." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012). This canon applies "to well-established agency interpretations." *Id.* at 324 (citing *FDIC v. Phila. Gear Corp.*, 476 U.S. 426, 437 (1986); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275 (1974)).

---

[5] Due process demands that parties receive fair notice of the standard governing their conduct before they engage in it, not a revised standard conjured by government attorneys over a decade after the fact. The Supreme Court addressed precisely this dynamic in *Christopher v. SmithKline Beecham Corp.*, holding that an agency's "convenient litigating position," or "post hoc rationalization," that contradicts its longstanding practice warrants no deference and raises serious fair notice concerns. 567 U.S. 142, 155-56 (2012) (citation modified).

As explained above at pp.5-6, Congress passed 26 U.S.C. § 527 on the understanding that Section 501(c)(4) organizations "*may engage* in political campaign activities" and retain their Section 501(c)(4) status. S. Rep. No. 93-1357 at 7505 (emphasis added); *see* 26 U.S.C. § 527(f)(1). That was also the IRS's position then (as reflected in its regulation), and for decades later until this lawsuit, as long as the organization did not "primarily" engage in political campaign activities. 26 U.S.C. § 527. Congress enacted the Section 527 statutory framework in 1975, using the same "primarily" language from the IRS regulation on Section 501(c)(4) status, to use the same test distinguishing between the two. *See* 26 U.S.C. § 527(a) (covering a "political organization"); *id.* § 527(e)(1) (using "primarily" in defining "political organization"); *Citizens for Responsibility & Ethics in Wash.*, 21 F. Supp. 3d at 33 ("an organization that qualifies for a tax exemption under section 501(c)(4) should not qualify for a tax exemption under section 527, because it cannot be both 'primarily engage[d]' and 'primarily operated' in two mutually exclusive initiatives" (alteration in original)).

Since then, Congress has amended Section 501 over 40 times—without altering the Section 501(c)(4) statutory language that was definitively interpreted by the IRS's longstanding primary-activity test initially created in 1959. *See, e.g.*, Pub. L. No. 104-168, 110 Stat. 1478 (July 30, 1996) (substantively amending other parts of 26 U.S.C. § 501(c)(4)). Similarly, the standard from *Better Business Bureau* has never been applied by the IRS as the governing standard for Section 501(c)(4)'s "primary activity" inquiry. That case was decided years before the IRS adopted

23

the Section 501(c)(4) primary-activity test in 1959 and many years before Congress enacted Section 527 in 1975.[6] So it could not have been ratified by, or acquiesced to, by Congress.

Freedom Path maintains the plain text of "social welfare" includes all civic speech, including both issue advocacy and express advocacy of candidates. *See supra* pp.4-6. But if this Court rejects that contention, then it should alternatively hold that Congress acquiesced in the IRS regulation's "primary" purpose test for Section 501(c)(4) status. This would also avoid the constitutional problems of the irrational gap in the Internal Revenue Code created by Defendants' newfound interpretation, as explained above at pp.11-12.

In any event, Defendants' reliance on *Better Business Bureau* fails on the merits. That case did not interpret 26 U.S.C. § 501. And it also involved a "Treasury regulation" that included a "primarily" test, "and petitioner admittedly d[id] not meet its terms." *Better Bus. Bureau*, 326 U.S. at 286. The organization seeking exempt status was engaged in commercial, non-exempt activity with no First Amendment free-speech dimension whatsoever. *See id.* at 283-84.

**C.    Under a constitutionally permissible interpretation of the IRS regulation at issue, Freedom Path qualifies for Section 501(c)(4) status.**

**1.    Freedom Path's "Three Men" and "Repeal It" advertisements are issue advocacy, not express advocacy or its functional equivalent.**

Freedom Path's two primary disputed television advertisements are textbook issue advocacy, and thus not "political activity" under the IRS regulation. Neither "Three Men" nor "Repeal It" comes close to the constitutional threshold for express advocacy. Under *McConnell v. FEC*, express advocacy requires the so-called "'magic words'"—phrases like "'vote against,'"

---

[6] Similarly, DOJ erroneously relies on various circuit cases citing *Better Business Bureau*. Each of these cases either (a) were decided before the IRS promulgated the "primary" activity test for 501(c)(4) status in 1959; (b) were decided before Congress enacted Section 527 in 1975 with its "primarily" test; or (c) dealt with 26 U.S.C. § 501(c)(3) status, which entails a different statutory test as explained above at pp.7-8.

24

"'elect,'" or "'defeat.'" 540 U.S. 93, 126 (2003) (quoting *Buckley*, 424 U.S., at 44, n.52). Neither advertisement contains any such language. Neither ad mentions an election, a campaign, or a ballot. That alone is dispositive under the express advocacy standard.

The functional equivalent test fares no better for Defendants. Under *WRTL*, a communication is the functional equivalent of express advocacy only if it is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 551 U.S. at 470. Both advertisements easily survive this inquiry. Each one focuses on a discrete legislative issue, stakes out a position on that issue, urges the public to embrace that position, and directs viewers to contact their elected officials. *See* ECF 54-1 at 32-34. That is the *WRTL* Supreme Court's own definition of a genuine issue advertisement. 551 U.S. at 470 ("[genuine issue] ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter"). The natural reading of each advertisement is a call for legislative action, not a call to the ballot box.

"Repeal It" exemplifies this point. The advertisement criticized the Affordable Care Act's costs, highlighted Senator Hatch's role in sponsoring repeal legislation and signing a legal brief challenging the law, and urged viewers to "Tell Senator Hatch: Keep leading the fight!" AR.884; *see also* ECF 54-1 at 9. Senator Hatch appears in the ad not as a candidate soliciting votes but as a legislator with direct institutional authority over the ACA. He was the ranking member of the Senate Finance Committee, which oversees the IRS and its implementation of the Act. *See* ECF 54-1 at 33-34. He also sat on the Senate Health, Education, Labor and Pensions Committee, which oversees the Department of Health and Human Services. *Id.*; *see* AR.296. The advertisement's call to action was to pressure a sitting lawmaker to pursue repeal. That is legislative advocacy, not express advocacy.

"Three Men" is equally straightforward. The advertisement highlighted the national debt, identified Senators Hatch and Lee as co-authors of the Balanced Budget Amendment, described the amendment as a conservative fiscal solution, and urged viewers to contact both Senators in support. *See* ECF 54-1 at 33; AR.885. Critically, Senator Lee was not a candidate at the time. *Id.* Both legislators received equal attention as co-authors of the same bill. No election was referenced. The advertisement's singular focus was legislative: pass the Balanced Budget Amendment. *See id.* at 9-10. When a non-candidate co-author shares the screen throughout an entire ad, the notion that the communication is really about electing someone strains credulity.

These examples highlight what the Supreme Court has long recognized—that certain policy debates are inseparable from the legislators who champion or oppose them. In *FEC v. Massachusetts Citizens for Life*, the Court acknowledged that certain "public issues . . . by their nature raise the names of certain politicians," but that does not transform speech into express advocacy. 479 U.S. 238, 249 (1986). ACA repeal and the Balanced Budget Amendment are paradigm examples of this phenomenon. These were among the most prominent legislative controversies of the era. Any honest advocacy about either issue would necessarily involve the names of the legislators driving or blocking the debate. Penalizing Freedom Path for that unavoidable reality would chill precisely the civic speech that Section 501(c)(4) exists to protect.

### 2. The undisputed expenditure data shows Freedom Path's "political campaign intervention," as permissibly understood under this IRS regulation, is well below 50%.

The numbers in this case are not close. Both Freedom Path and the IRS, applying their own methodology, calculate Freedom Path's candidate express advocacy at $360,748.91. AR.889-921; *see* ECF 54-1 at 11. That figure is undisputed. Then, under even the most Government-favorable total expenditure calculation—the IRS's own $917,435 figure—express advocacy accounts for approximately 39% of Freedom Path's total spending. That is well below the 50% threshold that

the plain meaning of "primarily," IRS officials, and internal IRS training materials all confirm is the operative line. *Supra* p.19-20. No arithmetic manipulation changes that result.

The picture sharpens further once "Three Men" and "Repeal It" receive their correct classification as issue advocacy. Together, those two advertisements account for approximately $319,400 in expenditures. ECF 54-1 at 9. When those dollars are properly moved from the political campaign intervention column to the issue advocacy column, Freedom Path's intervention figure drops well below 40% of total expenditures under any calculation. The inverse is equally important: at least 60% of Freedom Path's activities constitute the kind of legislative issue advocacy that the IRS has expressly recognized as a permissible social welfare purpose. Rev. Rul. 68-656, 1968 WL 15166, at *1 ("[S]eeking [] legislation germane to the organization's programs is recognized . . . a permissible means of attaining social welfare purposes."). This is not a marginal case.

Incorporating Freedom Path's 2011 expenditures into the analysis only reinforces what the 2012 data already shows: political campaign intervention was never Freedom Path's primary activity. *See Fund for the Study of Econ. Growth & Tax Reform v. IRS*, 997 F. Supp. 15, 18 (D.D.C. 1998) (review included the "overall picture presented by the administrative record"). Freedom Path spent hundreds of thousands of dollars on pure issue advocacy in 2011, before it made a single express advocacy expenditure. AR.48-49. No FEC-reportable disbursements appear in that period.

The IRS ignored 2011 entirely when it evaluated Freedom Path's application. AR.235. That omission was not incidental. An organization that spent its earliest resources on issue advocacy, watched the IRS stall its application for years, and then curtailed all activity rather than fundraise without a determination, AR.287, is not an organization "organized and operated primarily" to influence elections.

The record, taken whole, points in one direction. Freedom Path's primary activity was, and always was, the promotion of social welfare through civic speech.

### 3. Defendants' assertion that Freedom Path made 78% of its 2012 expenditures on political campaign intervention is methodologically unsound and should not be considered.

Defendants now argue that 78% of Freedom Path's 2012 expenditures "do not promote social welfare within the meaning of § 501(c)(4)." ECF 55-1 at 20. This figure is an artifact of flawed methodology, not a faithful accounting of Freedom Path's activities. The attached chart summarizes Freedom Path's advertisements, their descriptions, and the parties' conflicting categorizations of each. *See* Ex. 1.

Defendants' numbers are the direct product of classifying Freedom Path's "Three Men" and "Repeal It" ads as political campaign intervention, under nearly the same vague facts-and-circumstances test this Court already struck down as unconstitutionally vague. ECF 48 at 49. Once those two advertisements receive their correct classification as issue advocacy, the figure collapses. The corrected political intervention total drops well below 50% under every available calculation. Defendants' headline number is only as strong as the methodology behind it, and that methodology has already been repudiated by this Court.

The denominator is equally problematic. Defendants build their percentage on program service expenses of $1,040,362—a figure that excludes substantial portions of Freedom Path's actual spending. Freedom Path's own accounting reflects total expenditures of $1,178,927. AR.860. The IRS Appeals Officer calculated $1,068,966.70. AR.846. Either figure is larger than Defendants' chosen denominator. A smaller denominator inflates the resulting percentage. Defendants' selection of the most favorable possible base is not neutral accounting. And the agency's determination can be supported only by the administrative record—not post hoc litigation positions. *Airlie Found. v. IRS*, 283 F. Supp. 2d 58, 62 (D.D.C. 2003).

28

Defendants compound this problem by drawing adverse inferences from gaps in the mailing cost data. ECF 55-1 at 18-19. But context matters. Freedom Path withheld certain specific cost information because the IRS had already unlawfully disclosed confidential contents of its application. *See* ECF 30-1 at 11. An organization that curtails its disclosures in response to demonstrated government misconduct should not then bear the evidentiary burden of that restraint. This Court reviews the record de novo and is not obligated to adopt Defendants' preferred inferences, particularly where those inferences flow from circumstances Defendants themselves helped create. *See Airlie Found.*, 283 F. Supp. 2d at 62 ("Courts reviewing a final determination of tax exempt status by the IRS must consider the overall picture presented by the administrative record." (internal quotation marks and citation omitted)).

After accepting Defendants' own expenditure figures without adjustment, correcting the classification of either contested advertisement pushes Freedom Path's political intervention percentage below 50%. Correct both, and the result is not marginal. Freedom Path's candidate express advocacy, undisputed at $360,748.91, represents at most 39% of total expenditures under the Defendants' least favorable denominator. That figure stands alone as the proper measure of political campaign intervention under the constitutional standard this Court should adopt. Every other dollar Freedom Path spent went toward issue advocacy that the IRS has long recognized as a legitimate social welfare purpose.

## CONCLUSION

For these reasons, the Court should grant Freedom Path's Renewed Motion for Summary Judgment, deny Defendants' Renewed Cross-Motion for Summary Judgment, and declare that Freedom Path is entitled to 26 U.S.C. § 501(c)(4) tax-exempt status.

29

Dated: March 27, 2026                          Respectfully submitted,

                                               */s/ Scott A. Keller*

Chris K. Gober                                 Scott A. Keller (D.C. Bar # 1632053)
D.C. Bar No. 975981                            Jeremy Evan Maltz (D.C. Bar # 155451)
Lex Politica PLLC                              LEHOTSKY KELLER COHN LLP
611 Pennsylvania Ave SE #353                   200 Massachusetts Ave. NW
Washington, DC 20003                           Washington, DC 20001
(512) 354-1783                                 (512) 693-8350
cgober@lexpolitica.com                         scott@lkcfirm.com


                    *Counsel for Plaintiff Freedom Path, Inc.*