**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FREEDOM PATH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-01349 (KBJ) |
| | ) | |
| INTERNAL REVENUE SERVICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**REPLY IN SUPPORT OF DEFENDANTS'
RENEWED MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………………...1

ARGUMENT………………………………………………………………………………..2

    I.   The United States' proposed elements better capture Congress's intent not to subsidize political campaign intervention, and Freedom Path's arguments do not change that conclusion…………………………………………………………………………2

        The statutory scheme shows that Congress did not intend the promotion of social welfare to encompass political campaign intervention……………………………………….3

        Freedom Path misunderstands the difference in statutory language between § 501(c)(3) and § 501(c)(4)……………………………………………………………………….5

        Freedom Path's position equating political campaign intervention with the promotion of social welfare would lead to an absurd result in the application of § 501(c)(4) and § 527…………………………………………………………………………..….7

        Freedom Path's "civic speech" argument is not supported………………………….8

        Freedom Path's lone criticism of the United States' elements is unfounded…………...11

II.    By any metric, Freedom Path engages in too much political campaign intervention to qualify for tax-exempt status under § 501(c)(4)……………………...…………….14

        Freedom Path's "Primary Activity Test" ignores well-established principles…………..15

        Freedom Path's argument incorrectly assumes that any organization that chooses to engage in political campaign intervention should be entitled to tax-exempt status under one statute or another……………………………………………………………17

        Freedom Path engages in too much political campaign intervention under either metric……………………………………………………………………………19

III.   When viewed as a whole, Freedom Path clearly was created to re-elect Orrin Hatch…..19

CONCLUSION………………………………………………………………………...21

i

# TABLE OF AUTHORITIES

**Cases**

*Allgemeiner Arbeiter Verein v. Comm'r*,
25 T.C. 371 (1955), *aff'd*, 237 F.2d 604 (3d Cir. 1956) .......................................................17, 18

*American Campaign Academy v. Comm'r*,
92 T.C. 1053 (1989).............................................................................................................9

*Ass'n of the Bar of City of New York v. Comm'r*,
858 F.2d 876 (2d Cir. 1988)...................................................................................5, 9, 11, 12

*Better Business Bureau v. United States*,
326 U.S. 279 (1945)......................................................................................................2, 15, 16

*Branch Ministries, Inc. v. Rossotti*,
40 F. Supp. 2d 15 (D.D.C. 1999) ........................................................................................12

*Chattanooga Auto. Club v. Comm'r*,
182 F.2d 551 (6th Cir. 1950) ...............................................................................................18

*Christian Echoes National Ministry, Inc. v. United States*,
470 F.2d 849 (10th Cir. 1972) ....................................................................................12, 20, 21

*Comm'r v. Lake Forest, Inc.*,
305 F.2d 814 (4th Cir. 1962) ................................................................................................9, 15

*Contracting Plumbers Co-op. Restoration Corp. v. United States*,
488 F.2d 684 (2d Cir. 1973)..................................................................................................20

*Haswell v. United States*,
500 F.2d 1133 (Ct. Cl. 1974) ..............................................................................................20, 21

*Memorial Hermann Accountable Care Org. v. Comm'r*,
120 F.4th 215 (5th Cir 2024) ...............................................................................................15, 16

*Orange Cnty. Agr. Soc., Inc. v. Comm'r*,
893 F.2d 529 (2d Cir. 1990)..................................................................................................4

*Senior Citizens Stores, Inc. v. United States*,
602 F.2d 711 (5th Cir. 1979) ...............................................................................................21

*Stevens Bros. Found. v. Comm'r*,
324 F.2d 633 (8th Cir. 1963) ...............................................................................................15

**Statutes**

26 U.S.C. § 501(c)(3)................................................................................................ *passim*

26 U.S.C. § 501(c)(4)................................................................................................ *passim*

26 U.S.C. § 501(c)(7)................................................................................................7,18,19

26 U.S.C. § 511................................................................................................................4

26 U.S.C. § 512................................................................................................................4

26 U.S.C. § 527................................................................................................................ *passim*

26 U.S.C. § 527(e)(2).......................................................................................................4

26 U.S.C. § 527(f).......................................................................................................4, 5, 7

**Regulations**

Treas. Reg. § 501(c)(3)-1(c)(3)(iii)..............................................................................11

Treas. Reg. § 1.501(c)(4)-1(a)(2)(ii).........................................................................11, 18

Treas. Reg. § 1.527-6(g) .................................................................................................5

**Other Authorities**

Rev. Rul. 68-656, 1968-2 C.B. 216 (1968).................................................................10

S. Rep. No. 93-1357, 1974 U.S.C.C.A.N. 7478 (1974)...............................................3, 8

**INTRODUCTION**

The administrative record shows that Freedom Path dedicated approximately 78% – and perhaps more – of its overall expenditures to supporting Senator Orrin Hatch's 2012 primary campaign against former Utah State Senator Dan Liljenquist. Given the breadth of its political campaign intervention (under what the Court captioned the "Political Activity inquiry"), Freedom Path cannot meet its burden to show that it was operated exclusively to promote social welfare. Indeed, there is virtually no evidence in the record to establish that Freedom Path promotes social welfare as § 501(c)(4) requires. On the contrary, Freedom Path's activities consist almost entirely of print, internet, and television advertising that advocate for and against candidates seeking elective public office. Under what this Court characterized as the "Primary Activity inquiry," no factual basis exists to conclude that Freedom Path's political advocacy to influence the outcome of an election is insubstantial. Freedom Path instead attempts to change the long-standing playing field by redefining what it means to promote social welfare within the meaning of § 501(c)(4). But trying to redefine the promotion of social welfare to include political campaign intervention flies in the face of the plain meaning of the statutes involved and is in no sense "appropriately rooted in the statutory and regulatory scheme." Doc. 48 at 60. Consequently, Freedom Path cannot establish that it is "operated exclusively" to promote social welfare, and its request to be recognized as a § 501(c)(4) organization should be denied.

The Court does not have to accept the United States' math to reach that conclusion. Freedom Path's characterization and resulting admission that it devoted 31% of its total expenditures on political campaign intervention exceeds the limits of any acceptable level of political campaign intervention. Organizations like Freedom Path that are so substantially engaged in activities for non-exempt purposes do not "operate exclusively to promote social welfare" under any reasonable construction of those words—particularly under the Supreme

1

Court's reasoning in *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945) (holding that a single substantial non-exempt purpose will destroy exemption regardless of the number or importance of exempt purposes).

## ARGUMENT

I.     **The United States' proposed elements better capture Congress's intent not to subsidize political campaign intervention, and Freedom Path's arguments do not change that conclusion.**

The language of § 501(c)(4), court cases interpreting the term "social welfare" as used in that statute, and the plain meaning of "political campaign intervention" and court cases interpreting that concept, taken together, provide a guide to evaluate whether Freedom Path's communications constitute political campaign intervention. As described in its renewed motion for summary judgment, the United States has distilled five core elements from those authorities that inform this Court's analysis of whether Freedom Path engages in political campaign intervention on behalf or (or in opposition to) a particular candidate that contravenes the text of § 501(c)(4). Those elements are:

1.     **Communication -** A statement, broadcast, publication, distribution, or any other form of circulation of a communication.

2.     **By an organization -** The organization itself makes the communication.

3.     **During an election campaign -** The communication is made after the candidate has announced or registered his/her candidacy for the particular office and continuing through the time of the election.

4.     **That supports or opposes** - The communication supports or opposes the election of a particular candidate directly (e.g., vote for, vote against) or indirectly (supports or opposes the positions or actions of the candidate).

5.     **A candidate for public office** - The person supported or opposed must be a candidate for a public office.

2

Those elements are in keeping with the plain language of the statutes involved and have been identified in other court decisions that have determined an organization's communications constitute political campaign intervention.[1] Those elements give discrete, clear guidance about what communications constitute political campaign intervention and thus do not promote social welfare within the meaning of § 501(c)(4). Freedom Path's contrary arguments are unpersuasive.

> The statutory scheme shows that Congress did not intend the promotion of social welfare to encompass political campaign intervention.

Congress never authorized § 501(c)(4) tax-exempt organizations to be substantially engaged in anything other than promoting social welfare. No statute, regulation or court decision equates "promoting social welfare" with promoting a candidate for elected office.

Even though § 501(c)(4) does not expressly mention intervening in political campaigns, the overall statutory context shows that Congress did not consider the promotion of social welfare to encompass political campaign intervention. If political campaign intervention furthered social welfare, then Congress would not have created an entirely separate category of exemption under § 527 for organizations that primarily engage in candidate advocacy. Indeed, the legislative history demonstrates that Congress, in enacting § 527, was specifically concerned that these political organizations lacked a provision exempting them from income tax, even though § 501(c)(4) had by then existed for many decades. *See* S. Rep. No. 93-1357, 1974 U.S.C.C.A.N. 7478, 7502-03 (1974). And Congress would not have *subjected § 501(c)(4)*

---

[1] Freedom Path incorrectly characterizes the government as setting out a "new five-element test." The government is not looking to use this litigation to advance a new, all-encompassing test. Moreover, the government has not attempted to set out an exhaustive list of the ways in which an organization may intervene in a campaign but rather sought to demonstrate that Freedom Path's activities contain the elements common in cases identifying political campaign intervention in the tax-exemption context.

*organizations to taxation* for "influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State or local public office," *see* 26 U.S.C. § 527(e)(2), (f)(1), if Congress believed that same activity should render the organization *tax exempt*.

Freedom Path is wrong when it invokes § 527(f) and the 1974 Senate Report on § 527 as evidence that Congress intended the promotion of social welfare to include political campaign intervention. *See* Doc. 62 at 5-6. The fact that the Senate Report acknowledges that tax-exempt organizations, such as § 501(c)(4) organizations, may engage in political campaign activities is hardly surprising; it merely reflects the reality that Congress understood those organizations could engage in *some* amount of political campaign intervention, as otherwise there would have been no point in subjecting those organizations to tax for that very activity. But neither § 527 nor its Senate Report says a § 501(c)(4) organization may engage in those activities to a substantial degree that would be inconsistent with its tax-exempt purpose.

Indeed, § 527(f) is analogous to the taxation of unrelated business income for tax-exempt organizations. Section 501(c) organizations are taxed on their income from unrelated trades or businesses. §§ 511, 512. If taxing the activities of an exempt organization shows that Congress believed the taxed activity furthered an exempt purpose, then the existence of the unrelated business income tax would transform any and all business activity into, for example, charitable activity under § 501(c)(3). This would be an absurd result. The enactment of the unrelated business income tax in 1950 has not changed the requirement that a § 501(c)(3) or (4) organization cannot have a substantial non-exempt purpose, including a purpose of carrying on a substantial unrelated trade or business. *See Orange Cnty. Agr. Soc., Inc. v. Comm'r*, 893 F.2d 529, 534 (2d Cir. 1990) ("a taxpayer with substantial non-exempt activities cannot avoid the

4

revocation of its tax-exempt status simply by paying the unrelated business income tax"). Similarly, the enactment of § 527(f) did not change the requirement that substantial political-campaign-intervention activities would preclude § 501(c)(4) exemption. The fact that § 527(f) taxes exempt-function expenditures and permits organizations to set up separate segregated funds does not mean an organization can engage in political campaign intervention when it would be inconsistent with its exempt status. Treas. Reg. § 1.527-6(g). The best way to understand both taxes is that Congress has identified types of activity as *incongruous* with the § 501(c) organization's exempt purpose and subjected those activities to the appropriate tax regime. And § 527(f) applies to any § 501(c) organization, not only § 501(c)(4) organizations. In enacting § 527, Congress did not change the fundamental qualifications for tax exemption that it created for each organization described in § 501(c).

<u>Freedom Path misunderstands the difference in statutory language between § 501(c)(3) and § 501(c)(4).</u>

Freedom Path incorrectly argues that, because political campaign intervention is expressly prohibited in § 501(c)(3), but not in § 501(c)(4), Congress intended to permit political campaign intervention as an activity that promotes social welfare under § 501(c)(4). This misunderstands the nature of the Johnson Amendment. The Johnson Amendment, which amended § 501(c)(3) to prohibit all § 501(c)(3) non-profit organizations from engaging in *any* political campaign intervention, did not change the nature of political campaign activity in § 501(c)(3) from exempt to non-exempt. Instead, it provided an exception to the general rule (applicable to both § 501(c)(3) and (c)(4)) that an organization can be "operated exclusively" for an exempt purpose while having insubstantial nonexempt activity. Even before the Johnson Amendment was added to § 501(c)(3) in 1954, political campaign intervention was not considered an exempt purpose under § 501(c)(3). *See Ass'n of the Bar of City of New York v.*

*Comm'r*, 858 F.2d 876, 879 (2d Cir. 1988) ("This provision merely expressly stated what had always been understood to be the law. Political campaigns did not fit within any of the specified purposes listed in the section.") (citations omitted). Section 501(c)(3) organizations must be operated exclusively for a charitable purpose, which generally allows for insubstantial non-charitable activity. The Johnson Amendment, added in 1954, barred political campaign intervention from a (c)(3)'s activity. 26 U.S.C. § 501(c)(3) (adding to the definition of a § 501(c)(3) organization that it "does not participate in, or intervene in . . . any political campaign"). This meant even insubstantial political campaign intervention was inconsistent with § 501(c)(3) exemption. This history shows that the Johnson Amendment did not recategorize political campaign intervention from an exempt purpose to a non-exempt purpose; it merely provided a special rule about the *quantum* of non-exempt activity permissible for a (c)(3). When that non-exempt activity is not political campaign intervention, it can be insubstantial. But as a result of the Johnson amendment, political campaign intervention, singled out from other non-exempt activities, cannot even be insubstantial for a (c)(3).

The United States' interpretation of § 501(c)(4) respects this difference in statutory language. While the Johnson Amendment lowered the permissible quantum of political campaign intervention in § 501(c)(3), it did not do so for § 501(c)(4). Accordingly, the statute permits less political campaign intervention under § 501(c)(3) than § 501(c)(4). Thus, it was unnecessary for Congress to add a specific clause to § 501(c)(4) with respect to political campaign intervention, because political campaign intervention is treated like any other non-social welfare purpose (i.e., such purposes must be less than substantial).

6

<u>Freedom Path's position equating political campaign intervention with the promotion of social welfare would lead to an absurd result in the application of § 501(c)(4) and § 527.</u>

Freedom Path takes the position that, when political campaign intervention becomes an organization's "primary" activity, the organization loses § 501(c)(4) status because it then qualifies under § 527. *See* Doc. 62 at 17, 26. This means that even under Freedom Path's framework, where political campaign intervention is a § 501(c)(4) social welfare purpose, a court or the IRS would still need to distinguish political campaign intervention from other § 501(c)(4) activity and determine whether political campaign intervention was the organization's primary activity. If an organization engaged "primarily" in political campaign activities could have simultaneous qualification under § 527 and § 501(c)(4), the statutory scheme would achieve absurd results. For example, § 527(f) would tax the organization's exempt function expenditures, despite this organization also being described in § 527. The statutes are clearly written to be mutually exclusive.

In trying to avoid that absurdity, Freedom Path's interpretation of the two statutes leads to another bizarre result: that an organization could engage in too much promotion of social welfare to be described in § 501(c)(4). There is no comparable treatment of exempt purposes in the tax code. An organization cannot do too much of any charitable or educational activity to be described in § 501(c)(3), or too much of any exempt recreational activity to qualify under § 501(c)(7). But Freedom Path posits that Congress created a unique rule for campaign activity, where such functions would be exempt under § 501(c)(4) but only until they became the organization's "primary" purpose, at which point the organization was no longer eligible because then it would qualify for tax-exempt status as a § 527 political organization. Freedom Path believes Congress expected political campaign intervention to receive this unique treatment without citing anything in the code that permits an organization to transform from one type of

7

tax-exempt organization to another. Section 501(c)(4) by its terms describes organizations "operated exclusively for the promotion of social welfare." Under Freedom Path's interpretation in which political campaign intervention would promote social welfare, an organization operated exclusively for political campaign intervention would not qualify under § 501(c)(4).

Regardless, the legislative history shows that prior to § 527, political organizations were taxable organizations.[2] *See* S. Rep. No. 93-1357, 1974 U.S.C.C.A.N. 7478, 7502, 7508-09 (1974). Freedom Path's theory would hold that exclusively political organizations were entitled to § 501(c)(4) status until the enactment of § 527. But Freedom Path cites no authority for its proposition, nor is the government aware of any.

Freedom Path's "civic speech" argument is not supported.

As discussed above, the statutory scheme does not support Freedom Path's argument that political campaign intervention is a form of "civic speech" that must necessarily promote social welfare. But even if that were not the case, Freedom Path still fails to advance its argument.

Freedom Path has yet to define what "civic speech" is, cites no authority defining the term, provides no objective criteria for evaluating what it does and does not encompass, and does not explain how its specific communications fit within that purported term. Freedom Path can point to no § 501(c)(4) authorities even hinting at the notion that participation in a political campaign furthers an exempt purpose. The excerpts from case law that Freedom Path cites as evidence of the social value of civic speech are cases about the importance of the First Amendment's free speech protections generally. Freedom Path's asserted implication is that all

---

[2] Note that an organization being "taxable" means that it is not exempt from income tax, not necessarily that the organization actually paid income tax. Income from contributions, because they generally are unconditional gifts, ordinarily would not be taxed.

speech protected by the First Amendment is an activity conducted for the promotion of social welfare, which is an extraordinarily broad definition. No § 501(c)(4) authority supports such an expansive reading of the statute.

While Freedom Path claims that Supreme Court precedent recognizes that all "civic speech" promotes social welfare, no Supreme Court case holds that any speech of a political nature promotes "social welfare" within the meaning of § 501(c)(4). To date, there are no Supreme Court cases that even consider the meaning of "social welfare" under § 501(c)(4), let alone Supreme Court cases finding that political campaign speech falls within that term.

Freedom Path's position amounts to a statement that, because partisan political campaigns are a part of the democratic process, any and all election-related speech promotes social welfare. Doc. 62 at 8. But whether communication in part may serve a public interest is not the test for federal tax exemption. *See, e.g., Association of the Bar of City of New*, 858 F.2d at 878 ("The issue . . . is not whether Bar Associations serve the public by rating candidates and publicizing their rating. It is whether they may do so and still claim tax exemptions . . . ."); *Comm'r v. Lake Forest, Inc.*, 305 F.2d 814, 818 (4th Cir. 1962) ("Its work in part incidentally redounds to society but this is not the 'social welfare' of the tax statute," and other social welfare features "do not overbalance the private nature of the project."). And whether a communication that urges the election or defeat of a particular candidate serves society at large most likely would be a topic of heated debate. What is not up for debate is that such a communication necessarily promotes the private interest of the candidate or party involved. *See, e.g., American Campaign Academy v. Comm'r,* 92 T.C. 1053, 1078 (1989) (while training political campaign workers "may incidentally benefit the public," the organization "confers substantial private benefits on Republican entities and candidates."). Political campaign intervention has an inherent

9

connection to private interests. It necessarily provides substantial private benefit to the candidate who is endorsed or whose opponent is disparaged. This is not merely incidental to activities that otherwise and unequivocally promote the good of society at large. Promoting social welfare, including through promoting civic engagement and education, does not require partisan candidate endorsements, which is precisely the activity that sinks Freedom Path's application here. Likewise, organizations can seek the adoption of legislation through means that do not provide a disproportionate substantial benefit to an individual candidate or specific political party.

Intervention for or against a candidate necessarily goes beyond educating the public on issues or "seeking legislation germane to the organization's programs." Rev. Rul. 68-656, 1968-2 C.B. 216 (1968). Candidate endorsements, even based on that candidate's position on an issue relevant to the (c)(4)'s social welfare purpose, communicate to the public that a candidate's positions on a given issue should outweigh any other considerations about the candidate, including those not germane to the (c)(4)'s purpose. The same can be said for opposition to candidates. And while legislative advocacy related to an organization's social welfare purpose may incidentally benefit private interests, the benefit to those interests is more attenuated than the benefit to a candidate that results from political campaign intervention. To take Freedom Path's example, the benefit to any particular playground equipment manufacturer when an unrelated organization advocates for more public parks is significantly more speculative and remote than the benefit to Orrin Hatch when Freedom Path tells voters to vote for Orrin Hatch.

Resolving Freedom Path's exemption does not require further addressing their speculative hypotheticals here. As discussed in the United States' renewed motion for summary judgment, the bulk of Freedom Path's activities neatly fit the elements courts have most easily

associated with political campaign intervention because they are (1) communications (2) by Freedom Path (3) during an election campaign that unambiguously (4) support or oppose (5) a candidate for public office.

Freedom Path's lone criticism of the United States' elements is unfounded.

The United States' elements correctly acknowledge that political campaign intervention may be either direct (e.g., vote for, vote against) or indirect (supports or opposes the positions or actions of a candidate without a direct appeal to vote). Freedom Path characterizes the concept of "indirect" political campaign intervention as lacking definition or limiting principle, allowing the IRS to characterize pure issue advocacy that "merely mention[s] a sitting officeholder who also happens to be a candidate" as political campaign intervention. Doc. 62 at 15. This mischaracterizes the government's analysis.

Political campaign intervention can be "indirect" in that it does not expressly tell its audience to vote for (or against) a candidate. That is not the same as saying that any activity with a conjectural benefit to a candidate could constitute "indirect" political campaign intervention. "Merely mentioning" a candidate is not enough to constitute political campaign intervention, and the United States does not claim as much. The "limiting principle" here is that the communication must support or oppose a candidate for public office. That standard is consistent with the regulatory scheme, which describes intervention "on behalf of or in opposition to" a candidate. Treas. Reg. § 501(c)(4)-1(a)(2)(ii); *see also* § 501(c)(3); Treas. Reg. § 501(c)(3)-1(c)(3)(iii). The cases cited by the United States show examples of how this concept has been applied, without mention of any vagueness. Those cases involved unambiguous support or opposition for the candidates during an election campaign, as does Freedom Path's case. For example, in *Ass'n of the Bar of the City of New York*, the Second Circuit considered an

11

association's ratings of judicial candidates during an election campaign when it upheld the IRS's determination that the association was not exempt under § 501(c)(3). The court rejected the association's assertion that its "rating activity involves merely the collection and limited dissemination of objective data," and credited the Tax Court's finding that it is "obvious that the ratings are published with the hope that they will have an impact on the voter." *Ass'n of the Bar of the City of New York*, 858 F.2d at 879, 880. That case is an example of indirect support or opposition. In that case, the communications involved rating candidates as qualified or unqualified, rather than invocations to vote for or against the candidate. *Id.* Freedom Path incorrectly argues that the United States' authority supports the notion that political campaign intervention is limited to express advocacy on the grounds that *Branch Ministries* and *Christian Echoes* involved express candidate attacks. In reality, the two cases involved both direct campaign intervention (such as an endorsement) and indirect campaign intervention (such as a criticism of a candidate's position), never distinguishing between those two kinds of campaign advocacy.[3] In neither of those cases did the courts suggest that political campaign intervention was limited to communications using the words "vote for" or "vote against." To the contrary, *Ass'n of the Bar of the City of New York*, discussed above, involved what would be considered indirect political campaign intervention, and the court had no trouble identifying the organization's communications as political campaign intervention.

---

[3] *See Branch Ministries, Inc. v. Rossotti*, 40 F. Supp. 2d 15, 17 (D.D.C. 1999) (ads in part stated the candidate's positions were "in rebellion to God's laws," and asked: "How then can we vote for Bill Clinton?", but did not expressly state to vote for or against the candidate); *Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d 849, 856 (10th Cir. 1972) (organization that generally "did not formally endorse specific candidates for office" nonetheless engaged in "attempts to elect or defeat certain political leaders").

12

Nor is there any difficulty identifying Freedom Path's indirect exhortations as campaign advocacy supporting Orrin Hatch in his 2012 primary bid. For example, there are three direct mailings that mention Dan Liljenquist that Freedom Path reported to the Federal Election Commission as "independent expenditures" totaling $99,369. Doc. 55-2 ¶¶ 63, 67; ADMIN-000120-21, 187-88, 189-90. If you compare those to the two other mailings that focused on Liljenquist's ownership of a firm that outsourced jobs and his earlier vote on access to Utah state documents, ADMIN-000129-30, 135-36, it is clear that all five of those mailings contained negative comments about Liljenquist. The only difference between the three that were reported as independent expenditures to the FEC and the other two is that the three independent expenditures contain an explicit message to vote "no."

Freedom Path's disputed television and web advertisements also show unequivocal support for Orrin Hatch as a candidate. He is not merely "mentioned" in these ads; he is supported in the course of his re-election campaign. These ads do more for Orrin Hatch than merely list him as a relevant point of contact for his constituents to express their support or displeasure with pieces of legislation. Rather, the promotion of any underlying legislation or policy issue is incidental to the promotion of Orrin Hatch as a political figure. Orrin Hatch's connection to the legislation is framed as reflecting well on Orrin Hatch himself:

- In "Repeal it," Orrin Hatch appears with music. His conservatism and shared values with the audience are emphasized. The ad mentions Orrin Hatch filed a brief to have the Affordable Care Act declared unconstitutional. These facts indicate unambiguous support for Orrin Hatch personally rather than informing the public about the substance of the bill. Doc. 55-2 ¶¶ 13, 70, ADMIN-000884.

13

- "Three Men Again" similarly refers to Hatch's conservatism when it states that "conservative Utah senators Orrin Hatch and Mike Lee have authored the balanced budget amendment," which it calls "the bold conservative plan supported by Mitt Romney." Framing Orrin Hatch as a bold conservative leader promotes him rather than the legislation. Doc. 55-2 ¶¶ 13, 70, ADMIN-000885.

- "Leaders" foregrounds Orrin Hatch among other conservatives. It states that Hatch and Lee are "Utah conservatives leading the fight to stop runaway spending." The advertisement unambiguously supports both senators, particularly the candidate Hatch, emphasizing their conservatism and leadership. Orrin Hatch's personal conservatism and leadership abilities are relevant to his suitability for office, but not to the merits of the legislative proposals. Doc. 55-2 ¶¶ 13, 70, ADMIN-000883.

Freedom Path says that certain public issues by their nature raise the names of certain politicians. Doc. 62-1 at 26. But in these ads, Orrin Hatch's name was not merely "raised." The ads emphasize things like his conservatism and his leadership, which are unrelated to the merits or substance of the bill. Viewed objectively, the ads are candidate-focused and support Orrin Hatch's re-election bid.

II.     **By any metric, Freedom Path engages in too much political campaign intervention to qualify for tax-exempt status under § 501(c)(4).**

Freedom Path does not qualify for exemption under § 501(c)(4) under the "Primary Activity inquiry" because it operated for a substantial non-social-welfare purpose. As the Supreme Court held what "exclusively" means in the federal tax-exemption context more than 80 years ago, and as every circuit court to rule on § 501(c)(4) exemption has followed for more than 60 years, the "the presence of a single non-[exempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] purposes."

14

*Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945). *See, e.g., Lake Forest*, 305 F.2d at 820; *Memorial Hermann Accountable Care Org. v. Comm'r*, 120 F.4th 215, 219-20 (5th Cir 2024). Courts have struck the appropriate balance by consistently finding that more than an insubstantial amount of non-exempt activity will disqualify an organization from tax-exempt status. As described in the United States' prior briefs, that is the standard courts have applied in interpreting Congress's use of "exclusively" in both § 501(c)(3) and § 501(c)(4).

*Better Business Bureau* provides the proper metric here, and Freedom Path's arguments do not change that conclusion. In any event, the record shows that, by its own metrics, Freedom Path engages in more political campaign intervention than § 501(c)(4) conceivably allows.

<u>Freedom Path's "Primary Activity Test" ignores well-established principles.</u>

Freedom Path is wrong when it claims *Better Business Bureau* does not apply here. While the case did not directly interpret § 501, courts have universally applied it as the definitive case on the meaning of "exclusively" in § 501(c). *See Stevens Bros. Found. v. Comm'r,* 324 F.2d 633, 638 (8th Cir. 1963) ("The meaning of the term 'exclusively' as used in the statutes is no longer open to debate."). It has been uniformly applied to § 501 not solely on the persuasiveness of the reasoning, but because the exemption from social security tax at issue in that case "was drawn almost verbatim from Section 101(6) [the predecessor to § 501(c)(3)] of the Internal Revenue Code dealing with exemptions from income taxation." *Better Business Bureau*, 326 U.S. at 284 (internal citation omitted). The notion that the Supreme Court's substantial non-exempt purpose test could be discarded as dicta flies in the face of the eight decades of case law that continued to rely on *Better Business Bureau* to apply a "substantial non-exempt purpose" standard in § 501(c)(3) and (c)(4) cases.

Freedom Path further claims the cases cited by the United States that used *Better Business Bureau*'s substantial non-exempt purpose standard are inapplicable because they were decided before the 1959 regulation, were decided before the enactment of § 527 in 1975, or involved § 501(c)(3). The cases preceding the enactment of the regulations are still relevant in determining the meaning of the statutory text. That text precedes the regulation by decades, and the regulation may not exceed the statute's limits. And the cases applied *Better Business Bureau* before and after the enactment of the regulations, and in both the § 501(c)(3) and (c)(4) contexts – in fact, as recently as 2024, *see Memorial Hermann*, 120 F.4th at 219-20 (applying *Better Business Bureau* in the § 501(c)(4) context). Furthermore, the legislative history of § 527 offers no basis for the claim that Congress believed § 501(c)(4) organizations could engage in substantial campaign activities (as discussed above), nor did the regulation or IRS rulings before 1975 interpret the regulatory term "primarily" in terms of a 50% threshold. As such, there is no reason to believe that Congress's enactment of § 527 constituted acquiescence to a 50% threshold, and no evidence for the idea that § 501(c)(4) cases predating § 527 were made obsolete by its enactment.

The standard for "too much" political campaign intervention under § 501(c)(4) is the same as any other non-exempt activity and should not be analyzed under a unique standard. For example, organizations that are tax-exempt for promoting social welfare should not have substantial commercial activity. If Freedom Path's interpretation of "primarily" prevails, it would entitle organizations whose commercial activities nearly equal their other so-called social welfare efforts to claim they are operated exclusively for that latter purpose. This is plainly inconsistent with operation "exclusively" to promote social welfare.

16

<u>Freedom Path's argument incorrectly assumes that any organization that chooses to engage in political campaign intervention should be entitled to tax-exempt status under one statute or another.</u>

Freedom Path argues that the government's "substantial non-exempt purpose" test would create an irrational "gap" for organizations that engage in social welfare activity and political campaign intervention. In short, because an organization with insubstantial political campaign intervention is eligible for tax exemption under § 501(c)(4) and an organization primarily engaging in political campaign intervention is eligible for tax exemption under § 527, an organization with substantial—but not primary—political campaign intervention would not be entitled to an exemption. Freedom Path incorrectly presumes that an entity that engages in political campaign intervention must qualify for tax-exempt status and that it is only a matter of classifying which section gives it the exemption.[4] For-profit corporations can and do engage in political advocacy. Doing so does not entitle these corporations to tax exemption because Congress has not written the tax code that way. Freedom Path incorrectly presumes that the two statutes are "two sides of the same coin." This is not the case. They were enacted at different times for different purposes. Section 501(c)(4) exists to subsidize organizations operated "exclusively" for the promotion of social welfare. Section 527 was intended to clarify the treatment of "political organizations." Each treats the activity of the other as non-exempt activity because it is unrelated to the purpose of that provision. *Allgemeiner Arbeiter Verein v. Comm'r*, 25 T.C. 371 (1955), *aff'd*, 237 F.2d 604 (3d Cir. 1956), involved a taxpayer similarly arguing

---

[4] In fact, if Plaintiff's alternative argument that political campaign intervention promotes social welfare is accepted, then there would be significant overlap between an entity exempt under § 501(c)(4) and § 527 as both could engage in 100% political campaign intervention.

17

that because it engaged in two kinds of exempt activity, it should be entitled to exemption under

one provision or the other. But the court strongly rejected that argument:

> It is contended instead that, since of its two functions either alone would qualify an organization for exemption . . . petitioner should therefore be held to be a tax-exempt entity. Tempting as it is to accept this argument we cannot do so because the result would do violence to the statute. The remedy, if any, must lie with Congress, and not in a tortured judicial application of the statute . . . . The statute plainly sets forth various separate grounds for exemption. Petitioner must qualify under one of the paragraphs of section 101 in order to prevail . . . . It either falls within one of the exemption paragraphs or it does not . . . . Perhaps Congress had its own reasons for demanding compliance in full with the requirements of one of the paragraphs. In any event, that is the way the statute is written, and if a different result is to be reached the statute should be amended.

*Allgemeiner Arbeiter Verein v. Comm'r*, 25 T.C. 371, 375-76 (1955), *aff'd*, 237 F.2d 604 (3d Cir.

1956).

Putting aside the cause of the perceived gap, Freedom Path's 50% solution would not

"fix" the supposed problem. Interpreting the regulatory term "primarily" to permit up to 50%

non-exempt activity would not eliminate similar gaps in other definitions. For example, consider

an organization that engages only in (c)(4) promotion of social welfare *and* (c)(7) social activity.

Section (c)(7) requires that "substantially all" of the organization's activity be devoted to

"pleasure, recreational, and other nonprofitable purposes."[5] Operating a social club does not

promote social welfare within the meaning of § 501(c)(4). Treas. Reg. § 1.501(c)(4)-1(a)(2)(ii).

Under Freedom Path's interpretation of "primarily," an organization cannot engage in more than

50% non-exempt activity. Thus, if an organization engages in 30% social activity and 70% social

welfare activity, it would be a (c)(4) under Freedom Path's interpretation. If "substantially all" of

---

[5] Here, "other nonprofitable purposes" means other purposes of the same character as pleasure and recreation. *Chattanooga Auto. Club v. Comm'r*, 182 F.2d 551, 554-55 (6th Cir. 1950) (discussing the predecessor to § 501(c)(7)).

an organization's activity is that of a social club, with de minimis (c)(4) activity, it could qualify as a (c)(7) organization. However, if an organization engages in 51% social club activities, it would qualify for neither provision. That amount of social activity is too much for (c)(4) but is far from "substantially all" and so fails to qualify under (c)(7).

The existence of this "gap" between exempt categories is a natural feature of the statutory structure, not something unique to the context of political activity. Here, the "gap" is created by Congress's choice of different terms to define the required levels of exempt activities for § 501(c)(4) social welfare organizations ("exclusively") and § 527 political organizations ("primarily") to qualify for tax-exempt status.

Freedom Path engages in too much political campaign intervention under either metric.

As explained in the United States' renewed motion for summary judgment, Freedom Path has dedicated approximately 78% of its total program expenses to activities that do not promote social welfare activities within the meaning of § 501(c)(4). *See* Doc. 55-1 at 19-20. That is far more than an insubstantial amount. Freedom Path also fails to qualify for tax-exempt status even under its own, too-permissive metric that would allow an organization that engages in up to 50% of non-exempt activities to qualify as an organization that "exclusively" promotes social welfare.

## III.    When viewed as a whole, Freedom Path clearly was created to re-elect Orrin Hatch.

Freedom Path has the burden to show that it exclusively promotes social welfare if it wants tax-exempt status under § 501(c)(4). As the current briefing has become focused on specific standards and percentages of non-exempt activity, it is important not to lose sight that this is the ultimate issue in this case. Looking at the bigger picture, even if the Court adopts a test whereby some of the communications at issue are not characterized as political campaign intervention, that does not automatically mean that Freedom Path promotes social welfare. When

19

considering Freedom Path's activities as a whole, their purpose becomes apparent and the fact that some of the communications do not mention candidates does not detract from the fact that it could only have been about one of two candidates.

The history of an organization's founding and the centrality of a purpose or activity to the organization's program is relevant in considering whether the organization had a substantial non-exempt purpose. *Contracting Plumbers Co-op. Restoration Corp. v. United States*, 488 F.2d 684, 686 (2d Cir. 1973) (considering the "formative history of the organization" in evaluating whether § 501(c)(4) organization had a substantial non-exempt purpose); *Haswell v. United States*, 500 F.2d 1133, 1136, 1147 (Ct. Cl. 1974) (finding that arrangements predating an organization's formation indicated legislative advocacy was a substantial component of its program); *Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d 849, 855 (10th Cir. 1972) (finding that influencing legislation was "[a]n essential part of the [organization's] program"). Freedom Path was founded the same month that Hatch's opponent launched his primary bid. Doc. 55-2 ¶¶ 1, 34. Freedom Path's June 2012 letter to the IRS contains a table of its third-party vendor expenses. ADMIN-00048. Those figures differ little from its total reported expenditures on its 2012 tax return, indicating that Freedom Path spent very little after June 2012. This table provides the best approximation in the record of how Freedom Path spent its money in 2011 and the first six months of 2012. To compare the two periods: Freedom Path's YTD 2012 spending was 180% of total 2011 spending, and spending on vendors for public communications for YTD 2012 was 668% of its total 2011 counterpart, going from 30% of Freedom Path's expenses to 81%. The 2012 Utah Republican convention was held April 21, 2012, and the primary was held June 26, 2012.

These figures show Freedom Path significantly increased its spending on public communications in the months leading up to the primary, with research, fundraising, and polling dropping as a portion of its expenditures. This suggests that the timing and audience of the Utah Republican convention and Utah Republican primary formed an important part of the timing and context for Freedom Path's advertising campaign. Also, Freedom Path's "Our Team" fundraising brochure, the only fundraising material Freedom Path produced in the record, advertises the experience of its officers and contracted groups in working on elections and campaigns, particularly regarding Republican candidates. *See* Doc. 55-2 ¶ 16. One of its vendors noted that "[a]dvocacy programs are an effective way to convert undecided or infrequent voters to your side." Doc. 55-2 ¶ 16. The facts of this case thus indicate that political campaign intervention was unmistakably a substantial factor in Freedom Path's activity, "an end in itself rather than merely a means" of promoting social welfare. *See Senior Citizens Stores, Inc. v. United States*, 602 F.2d 711, 714 (5th Cir. 1979). Evaluating Freedom Path's purpose solely on a communication-by-communication basis risks missing the forest for the trees. Unmistakably, political campaign intervention was an "essential part of the program" for Freedom Path, "not incidental, but [was] substantial and continuous." *See Christian Echoes*, 470 F.2d at 855-56. Orrin Hatch's campaign was "not secondary or incidental," but of fundamental "importance . . . in [Freedom Path's] program as a whole." *See Haswell*, 500 F.2d at 1147.

## CONCLUSION

Freedom Path has failed to show, by any measure, that it qualifies for tax-exempt status as an organization that exclusively promotes social welfare under § 501(c)(4). The Court should deny Freedom Path's motion for summary judgment and grant Defendants' cross-motion.

DATED: April 24, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch


*/s/ Laura M. Conner*
LAURA M. CONNER (VA Bar No. 40388)
Assistant Director
JOSEPH A. SERGI (DC Bar No. 480837)
Senior Litigation Counsel
Tax Litigation Branch
Civil Division, U.S. Department of Justice
Post Office Box 227
Washington, DC 20044
Tel: (202) 514-2986
Fax: (202) 514-6866
laura.m.conner@usdoj.gov
joseph.a.sergi@usdoj.gov

Counsel for Defendants

22